1          UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3    _____

4    UNITED STATES OF AMERICA,

5                     Plaintiff,
                                  DOCKET NO. 1:20-mj-416
6    vs.

7
     ADAM FOX, TY GARBIN,
8    KALEB FRANKS, DANIEL HARRIS,
     BRANDON CASERTA,
9
                     Defendants.
10   _____/

11

12      TRANSCRIPT OF VOLUME II OF PRELIMINARY HEARING

13    BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

14              GRAND RAPIDS, MICHIGAN

15               October 16, 2020

16

17   Court Reporter:        Glenda Trexler
                            Official Court Reporter
18                          United States District Court
                            685 Federal Building
19                          110 Michigan Street, N.W.
                            Grand Rapids, Michigan 49503
20

21   Proceedings reported by audio recording, transcript produced by

22   computer-aided transcription.

23

24

25

```
 1     A P P E A R A N C E S:

 2     FOR THE GOVERNMENT:

 3          MR. NILS R. KESSLER
            UNITED STATES ATTORNEY'S OFFICE
 4          330 Ionia Avenue, N.W.
            P.O. Box 208
 5          Grand Rapids, Michigan 49501-0208
            Phone:  (616) 456-2404
 6          Email:  Nils.Kessler@usdoj.gov

 7          MR. AUSTIN JACOB HAKES
            UNITED STATES ATTORNEY'S OFFICE
 8          330 Ionia Avenue, N.W.
            P.O. Box 208
 9          Grand Rapids, Michigan 49501-0208
            Phone:  (616) 456-2404
10          Email:  austin.hakes@usdoj.gov

11     FOR THE DEFENDANT ADAM FOX:

12          MS. HELEN C. NIEUWENHUIS
            FEDERAL PUBLIC DEFENDERS OFFICE
13          50 Louis Street, N.W., Suite 300
            Grand Rapids, Michigan 49503-2633
14          Phone:  (616) 742-7420
            Email:  Helen_nieuwenhuis@fd.org
15
       FOR THE DEFENDANT CASERTA:
16
            MR. MICHAEL DARRAGH HILLS
17          HILLS AT LAW, PC
            425 South Westnedge Avenue
18          Kalamazoo, Michigan 49007
            Phone:  (269) 373-5430
19          Email:  mhills@hillslawoffice.com

20     FOR THE DEFENDANT GARBIN:

21          MR. GARY K. SPRINGSTEAD
            SPRINGSTEAD, BARTISH, BORGULA & LYNCH
22          28A West Main Street
            Fremont, Michigan 49412
23          Phone:  (231) 924-8700
            Email: gary@springsteadbartish.com

24

25
```

```
 1    FOR THE DEFENDANT HARRIS:

 2         MR. THOMAS WILLIAM PARKER DOUGLAS
           DOUGLAS LAW, PLLC
 3         106 East 8th Street
           Holland, Michigan 49423
 4         Phone:  (801) 699-7746
           Email:  parkerdouglas66@gmail.com
 5
      FOR THE DEFENDANT FRANKS:
 6
           MR. SCOTT GRAHAM
 7         SCOTT GRAHAM, PLLC
           1911 West Centre Avenue, Suite C
 8         Portage, Michigan 49024
           Phone:  (269) 327-0585
 9         Email:  sgraham@scottgrahampllc.com

10                          *   *   *   *   *

11                                    Grand Rapids, Michigan

12                                    October 16, 2020

13                                    10:06 a.m.

14                     P R O C E E D I N G S

15         THE COURT:  Good morning.  We are back on the record

16    for a preliminary examination in this case.  Or the

17    continuation of one.

18              Let's start with appearance of counsel.

19         MR. KESSLER:  Good morning, Your Honor, Nils Kessler

20    for the United States.

21         THE COURT:  Good morning.

22         MS. NIEUWENHUIS:  And Helen Nieuwenhuis on behalf of

23    Mr. Fox, Your Honor.  And seated at our table is also

24    Celia Sang who is an investigator with our office.

25         THE COURT:  Good morning to both of you.
```

1          *MS. NIEUWENHUIS:*  Good morning.

2          *MR. HILLS:*  Michael Hills on behalf of Mr. Caserta

3    seated to my right.

4          *MR. SPRINGSTEAD:*  Good morning, Your Honor,

5    Gary Springstead on behalf of Ty Garbin.  Seated to my left is

6    Attorney Kathy Springstead from the same firm.  And then seated

7    next to her is my cocounsel Mark Satawa who is seated next to

8    our client.

9          *THE COURT:*  Good morning to all of you.

10          *MR. DOUGLAS:*  Parker Douglas, Your Honor, here on

11    behalf of Daniel Harris who is seated to my right.

12          *THE COURT:*  Good morning.

13          *MR. GRAHAM:*  Good morning, Your Honor, Scott Graham

14    on behalf of Kaleb Franks seated next to me.

15          *THE COURT:*  Good morning.  As I said, this is the

16    continuation of the preliminary examination that we began on

17    Tuesday of this case.  On Tuesday Defendants Fox and Garbin

18    asked for additional time both to prepare for the preliminary

19    examination and their bond hearings and I granted that request.

20    I think, unless there's something else we need to take up, we

21    are at the point where Ms. Nieuwenhuis is invited to begin

22    cross-examination.

23          Is there anything from counsel that we need to take

24    up first?

25          *MR. KESSLER:*  Nothing additional from the government,

1   Your Honor.

2         THE COURT:  All right.  Then, Agent Trask, if you

3   want to come forward, we'll swear you in again.

4                       RICHARD J. TRASK

5                  (The oath was administered)

6         THE WITNESS:  I do.

7         THE CLERK:  Please take the stand and state and spell

8   your name for the record.

9         THE WITNESS:  My name is Special Agent Richard J.

10  Trask.  Last name is T-R-A-S-K.

11        MS. NIEUWENHUIS:  Your Honor, at this time I would

12  also make the 26.2 motion.  I believe it's already been

13  complied with, but I did want to put that on the record.

14        THE COURT:  Thank you.  It's granted.

15                      CROSS-EXAMINATION

16  BY MS. NIEUWENHUIS:

17  Q.   Agent Trask, could you tell us a little bit about what you

18  knew in regard to Mr. Fox and his affiliations with any militia

19  groups?

20  A.   As I understand it, Adam Fox used to be part of the

21  Michigan Home Guard and then had since left that group or was

22  removed from that group.  And then upon meeting the

23  Wolverine Watchmen, I don't know that he was ever a member of

24  the group officially.

25  Q.   Okay.  And do you know the circumstances surrounding why

1   he was no longer with the Home Guard Group?

2   A.   I'm not aware of that at this time.

3   Q.   Okay.  And you said that you have not come to a conclusion

4   about whether or not he was actually a member of the Wolverine

5   group?

6   A.   That is correct.  At this time I'm not sure if he was

7   actually formally accepted into the group.

8   Q.   Okay.  And do you have any knowledge from this case

9   whether or not he was ever in the group referred to as

10  Boogaloo?

11  A.   I don't have any knowledge of that.

12  Q.   Okay.  And what about the group known as the Michigan

13  Patriot Three Percenters?

14  A.   I know he was associated with that group and according to

15  the Facebook page was listed as the leader or the president of

16  that group.

17  Q.   Okay.  And I don't want to go over all of the same issues

18  or things that were already discussed and testified to on

19  Monday, but I would like to talk a little bit about the

20  confidential source number 2.

21       Do you know, did you have conversations with that

22  confidential source?

23  A.   I have not had personal conversations with that source.

24  Q.   Okay.  And so everything that you testified to is coming

25  basically secondhand to you from what he said?

CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS

1    A.    Through either audio or from the handling agents, yes.

2    Q.    Okay.  And in looking through the paperwork, this

3    confidential source number 2 was paid approximately how much

4    money, do you recall?

5    A.    I don't recall at this time.

6    Q.    Okay.  And if I refreshed your memory a little bit from

7    your Complaint, does $14,800 sound maybe in the ballpark?

8    A.    That sounds correct.

9    Q.    Okay.  And do you know how that was divided up?

10   A.    I'm not aware of the specific numbers.  I know that

11   at least a bulk, if not more, was for expenses that came out of

12   their pocket.

13   Q.    Okay.  And was it also for reporting purposes?

14   A.    I'm not aware of that.

15   Q.    Okay.  And do you recall whether or not in your Complaint

16   it's talked about that that might have been the division which

17   was between expenses and reporting?

18   A.    Pardon?  I'm not understanding your question.

19   Q.    I said in your Complaint that was filed, I said do you

20   recall whether or not in your Complaint it made a -- it talks

21   about this $14,800 and that it was for expenses and for

22   reporting?

23   A.    I recall that.  I don't think it lists a division between

24   the amounts.

25   Q.    Okay.  So it could be that he was paid more for reporting

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS*

1    even maybe than expenses?

2    A.   It's possible, but I don't know at this time.

3    Q.   Okay.  Can you say from your investigation up to this

4    point that CHS Number 2 really spent the majority of his time

5    with Mr. Fox as opposed to any of the other individuals that

6    have been charged in this conspiracy?

7    A.   I would have to go back through the record to determine

8    the amount of time.  I know CHS-2 spent a lot of time with all

9    the group members based on their position within the

10   organization or the group.

11   Q.   Okay.  But early on was Mr. Fox somebody that was actually

12   targeted and the source was, you know, basically told to hang

13   out and become friends with Mr. Fox?

14   A.   I would not say targeted.  CHS -- Mr. Fox was brought to

15   the attention, and that was somebody that CHS reported and

16   provided information on.

17   Q.   Okay.  And as soon as his name came through, it wasn't too

18   long after that that CHS Number 2 starts hanging around with

19   Mr. Fox.  Is that a fair statement?

20   A.   Once they became introduced, yes.

21   Q.   Okay.  And are you able -- do you recall who CHS-2's

22   direct supervisor is?

23   A.   Um, CHS-2, we don't -- he has a handling agent, yes.

24   Q.   Okay.  And do you recall who that is?

25   A.   Yes.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS*

1    *Q.*    And who is that?

2    *A.*    That would be Jason Chambers.

3    *Q.*    Okay.  And when CHS-2 would do something, make a

4    phone call, have contact with Mr. Fox, see something on one of

5    these chat sites, how is that actually documented?

6    *A.*    It would be documented in a report to the case file.

7    *Q.*    Okay.  But if I were CHS Number 2 and say, you know, I get

8    up this morning and I'm like "Okay, I'm going to contact

9    Mr. Fox," is every single thing I do being documented by the

10   FBI if I'm working with the FBI?

11   *A.*    I can't speak to that at this point.  Different situations

12   have different circumstances.

13   *Q.*    Okay.  And you cannot speak to exactly how each

14   interaction with any of the group here in regard to this

15   conspiracy was actually documented then?

16   *A.*    Based on -- I can only speak to the reports that I have

17   seen or that are in the case file.

18   *Q.*    Okay.  Do you have any idea about how many hours that

19   agent spent with Mr. Fox?

20   *A.*    With Mr. Fox?

21   *Q.*    Yes.

22   *A.*    Um, are you talking about when -- after he was arrested or

23   when are you referring to?

24   *Q.*    I'm actually speaking about during the time once Mr. Fox

25   becomes a person of interest we'll call him to the FBI and the

CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS

1   agent CHS Number 2 is introduced to Mr. Fox, how many hours do

2   you think that agent actually -- or the source actually spent

3   with Mr. Fox?

4            THE COURT:  I'm sorry, Ms. Nieuwenhuis, can you just

5   clarify that?  Are you talking about the CHS or the handling

6   agent?

7            MS. NIEUWENHUIS:  I'm sorry, the CHS.

8            THE COURT:  All right.

9            THE WITNESS:  I couldn't speculate, but I know it was

10  hundreds of hours probably.

11  Q.   (BY MS. NIEUWENHUIS)  Okay.  Hundreds of hours.  Okay.

12       Now, during the time that you are doing this

13  investigation, and if he's spending hundreds of hours with

14  Mr. Fox, do you learn some personal things about Mr. Fox?

15  A.   As part of the investigation, yes.

16  Q.   Okay.  And part of that would have been that he stayed or

17  lived in that vac shop?

18  A.   That's correct.

19  Q.   Okay.  And were you aware that he was living in the

20  basement with his two dogs?

21  A.   That's correct.

22  Q.   Okay.  And so you knew that much about him at least --

23  A.   Yes.

24  Q.   -- correct?

25       Okay.  And were you aware that Mr. Fox had some emotional

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS*

1    issues?

2    A.   I was not aware of any emotional issues.

3    Q.   Okay.  Were you aware that he had any anxiety issues?

4    A.   I was not aware of that.

5    Q.   Or that he ever had any mental health treatment or issues?

6    A.   I cannot speak to that at this time.

7    Q.   Okay.  Do you know whether or not he had an emotional

8    support dog?

9    A.   I am not aware of that.

10   Q.   Do you know or was it reported to you that he heavily

11   smoked marijuana every day?

12   A.   Not every day, but we knew that he did smoke marijuana,

13   yes.

14   Q.   I'm assuming that you've listened to many, many hours of

15   these recordings to date, correct?

16   A.   That's correct.

17   Q.   Okay.  And would you agree with me, not necessarily if

18   we're talking about the content, but that Mr. Fox is very

19   verbal?  Is that a fair statement?

20   A.   That would be a fair assessment.

21   Q.   Okay.  And that he kind of has a big mouth?

22   A.   I would say he does enjoy talking quite a bit.

23   Q.   Okay.  And that he talks a lot about his theories or

24   beliefs?

25   A.   That's correct.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS*

1   Q.   Okay.  And some of them are antigovernment?

2   A.   Correct.

3   Q.   Okay.  And in your recordings that you've listened to --

4   and if you can't, you can't -- but I think your testimony on

5   Monday was that you did not feel the agent was pushing any sort

6   of an agenda or anything.  Or at least that's not the vibe that

7   you got.  Is that correct?

8   A.   That is correct.

9   Q.   And so you did not see things where the agent is

10  suggesting or encouraging or supporting something further than

11  just talk?

12  A.   I can't recall anything at this time.

13  Q.   Do you know whether or not the CHS-2 encouraged the group

14  to go to an encrypted website?

15  A.   I am not aware of that.

16  Q.   Do you know whose suggestion it was?

17  A.   I don't know the first -- the first encrypted website,

18  whose suggestion that was.

19  Q.   Okay.  And that would have been Wire; am I correct?

20  A.   Yes, that's correct.

21  Q.   Okay.  And you're unaware of who it was that encouraged

22  that?

23  A.   I'm not aware.

24  Q.   And I'm pretty certain that over your investigation you

25  certainly look into whether or not somebody has a criminal

1    history, correct?

2    A.   That's correct.

3    Q.   Okay.  And Mr. Fox, for all intents and purposes, did not

4    have a prior criminal history, correct?

5    A.   Not that I can recall offhand.

6    Q.   Okay.  And the items that we saw when you testified on

7    Monday in conjunction with Mr. Fox, those were all legal items

8    as far as you know?

9    A.   The -- are you referring to the weapons?

10   Q.   Yes.

11   A.   That is correct.

12   Q.   Okay.  Do you recall in these recordings, particularly

13   Mr. Fox with his concern about the unrest, the civil unrest

14   that might happen around election time -- do you recall that?

15   A.   I do recall him making statements regarding that.

16   Q.   Okay.  And that he had made some statements in regard to

17   what he might do in response to that?

18   A.   I don't recall specific statements he made in response to

19   that civil unrest.

20   Q.   Okay.  Do you recall him saying anything about, you know,

21   gonna pack up his stuff and be ready to go and all of these

22   things in conjunction with that statement?

23   A.   I recall him making statements, but I don't recall them

24   being in connection with the upcoming civil unrest.

25   Q.   Okay.  Now, I would like to talk about one particular

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MS. NIEUWENHUIS*

1    incident which was August 23 of 2020.  And this is the

2    incident, it's number 24 in your Complaint, but it talks about

3    a meeting that had taken place up by Lake Orion, Michigan?

4    *A.*    Yes, ma'am.

5    *Q.*    Do you recall that?

6    *A.*    Yes.

7    *Q.*    Okay.  And do you recall that in fact Mr. Fox was not

8    present during that meeting?  Is that correct?

9    *A.*    That's correct.

10   *Q.*    Okay.  And from looking at the Complaint it talks about

11   some things that CHS-2 is referring to allegedly what --

12   Mr. Fox's beliefs or what he was saying.  Do you recall that?

13   *A.*    I don't recall that right offhand.

14   *Q.*    Okay.  And excuse my language, Your Honor, but it says

15   "CHS-2," referring to Fox, "stated 'He is all about fuckin'

16   killing her.'"  Do you recall that?

17   *A.*    I do recall that.

18   *Q.*    Okay.  And then later on it's talked about and it says

19   "CHS-2 explained that was why Fox wanted to do recon for the

20   plan."  Right?

21   *A.*    Correct.

22   *Q.*    Okay.  And that's not Mr. Fox saying that, that is

23   actually CHS-2, correct?

24   *A.*    I believe that was CHS-2's recollection of the events,

25   yes.

1    *Q.*    Okay.  And that's maybe his recollection, but that's what

2    he's claiming at this meeting that that's what Mr. Fox is

3    saying, correct?

4    *A.*    I would have to look back at my notes or the transcript

5    from that.

6    *Q.*    Okay.  Just so we're all clear, Mr. Fox is not present

7    during the time that these statements are made and being

8    attributed to Mr. Fox?

9    *A.*    I can't recall if it was that date that there was the

10   phone call afterwards and there was a conversation.

11   *Q.*    Okay.  There might have been a phone call afterwards, but

12   my question is is at that meeting -- was Mr. Fox at that

13   meeting saying these things?

14   *A.*    Mr. Fox was not at the meeting.

15          *MS. NIEUWENHUIS:*  Okay.  Then I don't have any

16   further questions.  Thank you.

17          *THE COURT:*  Mr. Springstead.

18          *MS. NIEUWENHUIS:*  Oh, Your Honor, could I ask one

19   more?  I'm sorry.  I did mean to ask that.

20          *THE COURT:*  Of course.

21   *Q.*    *(BY MS. NIEUWENHUIS)*  And what is your interpretation of

22   that word "recon" that you have in quotations in the Complaint?

23   *A.*    A reconnaissance with military or law enforcement

24   background would be to conduct some sort of surveillance

25   planning for a mission that is upcoming.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

 1   *Q.*   Okay.  Like a surveillance maybe to the governor's house

 2   or . . .

 3   *A.*   That would be correct, yes.

 4          *MS. NIEUWENHUIS:*  Okay.  I have nothing further,

 5   Your Honor.  Thank you.

 6          *THE COURT:*  Thank you.

 7                          CROSS-EXAMINATION

 8   *BY MR. SPRINGSTEAD:*

 9   *Q.*   Good morning, Agent Trask.  My name is Gary Springstead.

10   I represent Ty Garbin.

11          And I want to start by clarifying some of the testimony

12   that we heard earlier in the week on Tuesday, if I could.

13   *A.*   Okay.

14   *Q.*   So during your direct testimony Mr. Kessler was asking you

15   when the FBI became involved in investigating this, right?

16   *A.*   Correct.

17   *Q.*   And you told him in response that the FBI had been

18   investigating this prior to being tipped off to it by CHS-2,

19   right?

20   *A.*   That -- we became aware of a plot, not specifically this

21   portion of it, but yes.

22   *Q.*   And how did you become aware of that plot without the

23   informant?

24   *A.*   It was -- my understanding is it was through another

25   division.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   Q.   Okay.  So do you know how they became aware of it?

2   A.   I'm not aware.

3   Q.   Do you know if it was through human sources?  Again,

4   informants that are in these groups that notified them?

5   A.   I'm not aware of the specific details on how they became

6   aware of it at that time.

7   Q.   At some point there was some mention of the FBI monitoring

8   these groups on their social media and online.  Did that occur

9   in this case?

10  A.   As part of the investigation, yes.

11  Q.   Did it occur prior to that?

12  A.   I cannot speak to that, but I'm not aware of that.

13  Q.   Okay.  So you, at least your division and what you were

14  doing, you weren't monitoring these groups online?

15  A.   Only as part of the investigation.  I can only speak to

16  that.

17  Q.   Okay.  So when we talk about Mr. Garbin specifically, you

18  said that he was part of the leadership of the

19  Wolverine Watchmen; is that right?

20  A.   He was, from my understanding, placed into a leadership

21  role within the group, yes.

22  Q.   And the Wolverine -- to be clear, the Wolverine Watchmen

23  was just a Facebook group, right?

24  A.   They were designated militia based on their Facebook group

25  and -- so yes.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  Q.   So the government designated them militia.  They didn't

2  designate themselves militia, right?

3  A.   I did not designate them militia, so . . .

4  Q.   Well, I didn't say you did, but did the government?  Is

5  that why you're saying that?

6  A.   I am not aware of that.

7  Q.   Well, did they call themselves militia?

8  A.   I would have to review their Facebook page and the

9  information that they had out there.

10 Q.   Okay.  And in fact the Wolverine Watchmen existed prior to

11 Mr. Garbin's joining that Facebook group, right?

12 A.   I don't know the exact timeline of his joining that group.

13 Q.   Okay.  That would be something that you would want to know

14 in terms of determining whether he's part of the leadership or

15 actively involved in it, right?

16 A.   As far as when he joined?

17 Q.   Correct.

18 A.   Yes, it would be.

19 Q.   And as -- was it -- did you -- during your investigation

20 did you learn that he had been named an admin on the Facebook

21 group?

22 A.   I'm not aware of that.

23 Q.   Okay.  Do you know if that's why he was deemed to be,

24 quote, leadership?

25 A.   I am not aware of that.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    Q.   If it was that fact, would you agree that simply being an

2    admin or somebody that monitors the group doesn't necessarily

3    mean that you're a leader?

4    A.   Again, I can't speculate on his position based on what

5    you're stating at this point.

6    Q.   Okay.  Let's -- we talked a lot about the sources.  You

7    had two citizen sort of informants, right?  CHS-1 and 2?

8    A.   That's correct.

9    Q.   And then through CHS-2 you introduced two undercover FBI

10   agents, right?

11   A.   I believe one was introduced through CHS-2.

12   Q.   Okay.  How was -- and that would have been Red, right?

13   A.   That's correct.

14   Q.   And how was Mike [sic] introduced to this group?

15   A.   I am not aware of the exact details on how that UC was

16   introduced.

17   Q.   Okay.  Did it predate -- did his involvement with the

18   group predate your investigation into this alleged plot?

19   A.   I came onto the investigation shortly before Mark was

20   introduced.

21   Q.   Okay.  So -- and was he based in Ohio as opposed to

22   Michigan?

23   A.   No.

24   Q.   He was a Michigan agent that was undercover in the

25   Michigan group?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  A.    Mark was the -- his backstory was he was based in

2  Michigan.

3  Q.    Okay.  So with respect to these CHS-1 and 2, every time

4  that they went to the group, after they had become cooperating

5  witnesses for the government, did they record their

6  conversations?  Did they always -- were they always equipped

7  with a wire or a recording device when they went to these

8  meetings?

9  A.    I cannot speak to -- excuse me.  I cannot speak to every

10  meeting on whether that occurred.

11  Q.    Okay.  Well, you must know as the alleged plot developed

12  or as you guys started to follow it a lot more closely, at that

13  point did they start always having a recording device on them?

14  A.    I cannot speak to the term "always."  The intent or the

15  plan was to always have that, however, there are circumstances

16  that may dictate otherwise.

17  Q.    I understand that.  There's practical realities of it.

18  But let's say, for instance, on September 12th and 13th when

19  the group was in Luther at Mr. Garbin's property, would CHS-2

20  have had a recording device on him at that point?

21  A.    Yes.

22  Q.    And how long would that recording device work?  Did it

23  have a time limit on it or anything?

24  A.    I'm not familiar with those details.

25  Q.    Do you know whether it was only activated by voice so that

1    it could work at a longer -- over a longer period of time?

2    A.   I have not seen the recording devices, so I'm not aware of

3    the details of that.

4    Q.   Do you know if the recording also included video or did it

5    simply record audio?

6    A.   I'm not aware of that.

7    Q.   That would be something pretty important to know, wouldn't

8    it?

9    A.   Again, I know that I've listened to some of the audio from

10   that.  I know that it was recorded.  I cannot speak to if there

11   was video also recorded on those same devices.

12   Q.   Okay.  We know that CHS-2 at times recorded with video,

13   right?

14   A.   That's correct.

15   Q.   But you're just saying you don't know whether he was able

16   to record video all the time or whether he was equipped with

17   video recording all the time?

18   A.   I don't know if the device he had that weekend would have

19   had video on it.  I'm not aware of that.

20   Q.   Okay.  So if you had video -- if he did record video, then

21   if somebody said -- you know, if Mr. Fox or somebody else said,

22   you know, "Are you -- everybody is in?  Are we all down with

23   this plot to kidnap the governor?" and somebody shook their

24   head no, that would be captured on video, right?

25   A.   Potentially if the camera was pointing at that individual.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   Q.   Right.  And it may not be reflected on an audio recording,

2   right?

3   A.   Speculating, yes, that would be correct.

4   Q.   And do you know whether the undercover agents were

5   recording with audio or video or both when they were there that

6   weekend?

7   A.   I know of at least audio.  I'm not aware of the video.

8   Q.   Okay.  And were the sources and the undercovers equipped

9   with a transmitter as well to transmit the conversations off to

10  other agents or surveillance groups that were listening nearby?

11  A.   I was not in attendance up in that area at that time, so I

12  can't speak to if that was the case.

13  Q.   Well, do you know whether that -- you just don't know

14  whether they had transmitters on them as well?

15  A.   I do not know that.

16  Q.   Okay.  If they did have transmitters, would that have been

17  also recorded at a separate location as kind of Bureau

18  practice?

19  A.   It's recorded on the device, and when we have used

20  transmitters, it's not, that I'm aware of, recorded at a

21  separate location as well.

22  Q.   Okay.  Now, when this -- since you had undercover agents

23  involved in this case, I assume that there's additional steps

24  that are taken at the FBI to approve an undercover operation,

25  right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    A.    That's correct.

2    Q.    It's not as if you can just declare that you're conducting

3    an undercover operation on your own.  You need supervisor

4    approval at least, right?

5    A.    Correct.

6    Q.    And then it probably even goes to a headquarters level,

7    right?

8    A.    That's correct.

9    Q.    And FBI headquarters would then meet with the Department

10   of Justice and review the plan and the objectives, right?

11   A.    That would be correct, yes.

12   Q.    Do you know when that occurred?

13   A.    I don't.  I was not part of that procedure.

14   Q.    Okay.  And do you know if that -- during that procedure

15   when this undercover plan was presented how many plots it

16   included?

17   A.    I am not aware of that.

18   Q.    Because there were a number of plots that were bandied

19   about, right?

20   A.    In regard to -- are you referencing earlier conversations

21   or . . .

22   Q.    Yes.

23   A.    Okay.  Yes, there were.

24   Q.    Okay.  So -- and to name a few, there was a plot to

25   firebomb police vehicles, right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  A.   That's correct.

2  Q.   And that never came to fruition, right?

3  A.   That was part of the plot.  It was not a separate plot.

4  It was part of this plot.

5  Q.   Okay.  Does that -- is that the same thing as the MSP

6  attacks that they were talking about, or was that related to

7  the Capitol?

8  A.   I don't recall offhand.

9  Q.   Okay.  You testified on Tuesday that there was a plot to

10  remove the governor of Virginia, right?

11  A.   That was brought up as a possible scenario, yes.

12  Q.   Okay.  And the idea there, what you specifically said, was

13  that they would kidnap them and remove him from his seat,

14  right?

15  A.   Specifically they mentioned those two governors, yes.

16  Q.   Okay.  And that didn't happen?

17  A.   That's correct.

18  Q.   There was also talk among the various people that are

19  charged here -- not my client -- about just opening the door

20  and shooting the governor, right?

21  A.   That's correct.

22  Q.   That didn't happen?

23  A.   That's correct.

24  Q.   And there was talk of maybe putting on a disguise as a

25  pizza man and going to the door and then presumably shooting

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1    the person, like the federal judge, right?

2    A.   That's correct.

3    Q.   And that didn't happen?

4    A.   Correct.

5    Q.   And there was a plot where they discussed just shooting

6    the governor's house, right?

7    A.   Correct.

8    Q.   Were you aware of the conversation where they talked about

9    going to Home Depot and recruiting people there looking for

10   work just to go vandalize the governor's house?

11   A.   I'm not familiar with that conversation.

12   Q.   Okay.  And then when we even get -- so there's a variety

13   of ideas that are being thrown out there, from storming the

14   Capitol, right?

15   A.   Correct.

16   Q.   To shooting the governor, kidnapping the governor of

17   Virginia, right?

18   A.   Correct.

19   Q.   Vandalizing the house, right?

20   A.   Correct.

21   Q.   And then there's a number of different ideas that are

22   being thrown out as to what to do if they were to kidnap the

23   governor of Michigan, right?

24   A.   That's correct.

25   Q.   They talked about one person, I think it was Mr. Fox I

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  think you testified to, said that they were going to take the

2  governor and put her in a boat in Lake Michigan, right?

3  A.   That's correct.

4  Q.   That -- did you have any evidence that that plot was ever

5  acted upon?

6  A.   It was not.

7  Q.   And they also talked about maybe taking Governor Whitmer

8  to another state, right?

9  A.   That's correct.

10  Q.   Several states in fact.

11  A.   That is correct.

12  Q.   One in Wisconsin where they might try her for treason,

13  right?

14  A.   Correct.

15  Q.   And then talk of taking her to other states where they

16  presumably -- do you know what they would do in those other

17  states?

18  A.   I do not know.

19  Q.   So when we're talking about these various ideas that are

20  being bandied about, what evidence do you have that Mr. Garbin

21  actually agreed to participate in this plot to kidnap the

22  governor and then what were they going to do with her?

23  A.   I can only speak to what I filed in my Complaint and the

24  knowledge that I have of this messaging.

25  Q.   Well, in your Complaint you accused him of conspiring with

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    the other defendants that are here and Mr. Croft of trying to

2    kidnap the governor.  Of conspiring to do that.  Right?

3    A.    That's correct.

4    Q.    And so I'm asking you, what evidence did you base that

5    decision on that Mr. Garbin had actually agreed with these

6    other people to do that?

7    A.    Again, I can only speak to what's in my Complaint, and

8    I've laid that out in there.

9    Q.    Okay.  And I'm asking you to testify to that right now,

10   what it was specifically.

11   A.    And that information has already been placed on the

12   record.  I've already spoken about that.  That Complaint.

13   Q.    Okay.  And what was that specifically that Mr. Garbin in

14   his role --

15          MR. KESSLER:  Your Honor, it seems like the same

16   question over and over.  He's asking him to recite from memory

17   everything that's in the Complaint.  I'm not sure that's

18   reasonable.

19          THE COURT:  Do you want him to read the Complaint?  I

20   mean, he can go through each day and --

21          MR. SPRINGSTEAD:  No, I would like him to actually

22   answer the question instead of referring me to the Complaint.

23   It's a fair question.  Because assuming he answers the

24   question, then I have follow-up questions for him about that.

25          THE COURT:  All right.  But he's already testified to

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1   the facts that he believes supports the probable cause, so if

2   you have specific questions about those facts, I think you can

3   ask those.

4            MR. SPRINGSTEAD:  Okay.  I'll get into the specifics

5   of it.

6   Q.   (BY MR. SPRINGSTEAD)  So one thing that was alleged in the

7   Complaint was that surveillance was conducted of the governor's

8   vacation property, right?

9   A.   That is correct.

10  Q.   Now, there was a first surveillance that was conducted,

11  right?

12  A.   Correct.

13  Q.   And that was not conducted by Mr. Garbin?

14  A.   Correct.

15  Q.   And in fact CHS-2 invited Mr. Garbin, called him and said,

16  "Hey, we're gonna go do that recon.  Do you want to go?  I'm in

17  the area."  And Mr. Garbin said no, right?

18  A.   I don't recall the specific conversation.

19  Q.   It would be a pretty important conversation to keep track

20  of, wouldn't it?

21  A.   There are a number of conversations, and it's a lot to

22  review, but yes.

23  Q.   I agree.  A lot of information for you to review, but also

24  an important detail in an investigation if in fact Mr. Garbin

25  was asked, invited, and declined, right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  A.   I can't speculate without seeing that conversation.

2  Q.   Okay.  But what we do know is that he didn't go?

3  A.   That is correct.

4  Q.   And then we also know that Mr. Garbin was recorded with a

5  group of people talking about the kidnapping, and he said,

6  "We're not kidnapping anybody," or something to that effect,

7  right?

8  A.   That was the first part of the conversation, yes.

9  Q.   And then he also indicated that he was not interested at

10 all in storming the Capitol.

11 A.   Correct.

12 Q.   And the second time that there was a surveillance that was

13 conducted of the governor's lake house, Mr. Garbin was present

14 for that, right?

15 A.   That's correct.

16 Q.   But do you know whether Mr. Fox ever told him what he was

17 going to be doing prior to leaving?

18 A.   I don't know the specific conversation prior.

19 Q.   Okay.  Do you know that Mr. Fox left Mr. Garbin's

20 property, said that he was going to go do something, and then

21 left the property in Luther with another person?

22 A.   I am not aware of that situation.

23 Q.   Okay.  Were you aware that Mr. Harris then asked

24 Mr. Garbin "Do you want to go for a ride and get something to

25 eat?"

1   A.   I'm not aware of that conversation.

2   Q.   Did you know that they then went to Big Rapids and ate

3   dinner at the Holiday Inn?

4   A.   I'm not aware of that conversation.

5   Q.   Are you aware that that's where they went?

6   A.   I'm not aware of that.

7   Q.   The undercover agents never told you that?

8   A.   Again, there's a lot of information to review, and I'm not

9   aware of that situation.

10  Q.   Okay.  So I believe you testified that you were aware of

11  who was in what car when they traveled up to Governor Whitmer's

12  lake house, right?

13  A.   That's correct.

14  Q.   And Mr. Garbin wasn't driving his own car, right?

15  A.   Correct.

16  Q.   In fact, it was another unidentified individual from

17  Wisconsin?

18  A.   Correct.

19  Q.   And the CHS-2 told you -- or at least told the FBI, I

20  don't know if he told you specifically -- that everybody was

21  armed when they went up there?

22  A.   That is the information we received, yes.

23  Q.   And do you know -- were you ever able to corroborate that?

24  A.   I was not specifically, no.

25  Q.   You don't know whether that's true or not, do you?

1    A.    I do not.

2    Q.    In fact, Mr. Fox told -- when he was interviewed --

3    indicated that he wasn't armed during that surveillance, right?

4    A.    That's correct.

5    Q.    And you just don't know whether anybody else was actually

6    armed; is that right?

7    A.    I have no way to confirm that.

8    Q.    And that's even though you had an undercover human source

9    in the car along with an undercover, right?  Undercover agent?

10   A.    I cannot speak to what they saw at that time.  I'm not

11   aware of that information, so . . .

12   Q.    Okay.  Now, do you know that Mr. Fox had to provide

13   Mr. Garbin with the address to the governor's house?

14   A.    I'm aware they had conversations of the address, yes.

15   Q.    And that would seem to indicate that Mr. Garbin didn't

16   have it before he left his residence, right?  Or his property

17   in Luther.

18   A.    I can't speculate to what Mr. Garbin had prior to that.

19   Q.    Well, there would be no need to give it to him later if he

20   already had it, right?

21   A.    If I forget an address and have to ask somebody for an

22   address, that does not insinuate that I do not have that

23   address.  It's only that I do not have it at that time.  So I

24   cannot speak to that.

25   Q.    Okay.  What we do know is that Mr. Fox later when they all

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    sort of met up in a Wal-Mart parking lot provided Mr. Garbin

2    with the address, right?

3    A.   That is incorrect.

4    Q.   That's incorrect?  Who actually provided the address?

5    A.   I know at one point on the video Mr. Fox provides the

6    address to Mr. Garbin over the phone.

7    Q.   Okay.  Okay.  Yeah.  Sorry.  Maybe not at the parking lot,

8    right?

9    A.   That's correct.

10   Q.   Okay.  And we also know that they never found the address

11   that night, right?

12   A.   That's incorrect.

13   Q.   They -- I thought you said that they were in the vicinity

14   of it but not that they actually located the residence.

15   A.   I did not say that.

16   Q.   Okay.  Do you know that -- are you saying that's not true?

17   A.   That is not true.  They did locate the residence.

18   Q.   Okay.  And did you ever download Mr. Garbin's phone to

19   find out whether he actually put in a GPS direction for the

20   correct address?

21   A.   We do not have a review of Mr. Garbin's phone at this

22   time.

23   Q.   Okay.  So you don't know whether he actually drove up to

24   it or whether he simply had to go by a map?

25   A.   The vehicle that he was in had a recording device which

1    had the GPS address on it and it places him right at the end of

2    the drive.   In addition to audio recording or the video of

3    stating they located it.

4    Q.   Okay.  And you've reviewed that video and audio?

5    A.   I have.

6    Q.   Okay.  And where is that?

7    A.   Pardon?

8    Q.   Is that in ELSUR in Detroit?

9    A.   I believe so.

10   Q.   Okay.  Now, going back to -- do you know who -- the person

11   that drove Mr. Garbin and Kaleb Franks to the property that

12   night?

13   A.   Yes, I do.

14   Q.   I'm not asking you necessarily to tell us who it is at

15   this point, but is it -- they all returned back to Mr. Garbin's

16   property that night, right?

17   A.   That's my understanding, yes.

18   Q.   And spent the night?

19   A.   That's correct.

20   Q.   And I think you testified at the beginning of this

21   Mr. Kessler sort of walked you through the security measures

22   that they were allegedly taking, right?  By changing chat

23   groups?  Right?

24   A.   That's correct.

25   Q.   And that they were supposedly going to limit themselves to

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  just that group, just the group that was allegedly going to

2  kidnap somebody.  The governor, I guess.  Right?

3  A.   They agreed to limit it to a small core group, that's

4  correct.

5  Q.   Okay.  Now, do you have any idea how many people were at

6  Mr. Garbin's that night?

7  A.   I don't know that number.

8  Q.   It was more than just a small group, wasn't it?

9  A.   That's correct.

10  Q.   And in fact rather than keep tight controls over it,

11  Mr. Garbin didn't even do the inviting, did he?

12  A.   I'm not sure who did the inviting to that.

13  Q.   Would it surprise you to find out that CHS-2 was the one

14  that did the inviting?

15  A.   It would not surprise me to find out that multiple

16  individuals invited others.

17  Q.   And it wouldn't surprise you because CHS-2 is the one that

18  invited the undercover agents, or at least one agent, to come

19  up that night, right?

20  A.   Are you asking me if that surprises me?

21  Q.   No.  I'm just saying that's a fact, right, that CHS-2

22  introduced the -- Red that night?

23  A.   I believe that is the case, yes.

24  Q.   And that would seem to indicate that he at least was doing

25  the inviting?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    A.    He at least invited Red, that is correct.

2    Q.    Okay.  And rather than being limited to the small group

3    that you mentioned earlier, it's actually quite a big group

4    that's at this property, right?

5    A.    The small group you are referring to is in the chat

6    groups.  You're referring now to an FTX which is a completely

7    separate situation.

8    Q.    Okay.  But there is no effort to limit this plot to this

9    small group, right?  It's being discussed at Mr. Garbin's

10   property the next morning.

11   A.    Again, I think that's speculation at this point, because,

12   again, the core group was a small chat group.  You're alluding

13   to a larger group that was at an FTX.  I can't speak to if

14   there were smaller groups or how that played out at that point.

15   Q.    Well, didn't -- wasn't there somebody that next morning

16   after the second surveillance who said, "Okay," something to

17   the effect of, you know, "are we all in on -- to do this

18   kidnapping or what?"  Didn't somebody say that?

19   A.    And as you explained earlier, without video I cannot

20   speculate who was all in that area at the time.

21   Q.    That's not my question.  My question is did somebody say

22   something to that effect the next morning?

23   A.    That's correct.

24   Q.    They did, right?

25   A.    That is correct.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1    Q.    Do you know who said that?

2    A.    I don't recall offhand.

3    Q.    Okay.  It wasn't my client, right?  Mr. Garbin?

4    A.    I don't believe so.

5    Q.    And at that point the unidentified person from Wisconsin

6    said, "I'm not okay with that.  I'm out."  Right?

7    A.    That's -- there were two individuals from Wisconsin, and

8    the one you're referring to did not say that that morning.

9    Q.    Okay.  But somebody from Wisconsin said that, right?

10   A.    That is correct.

11   Q.    And then the gentleman from Wisconsin that drove with them

12   on that surveillance, drove his truck there, he eventually said

13   "I'm out"?

14   A.    That was after returning to Wisconsin.

15   Q.    Right.  He said, "I'm out," and he was out?

16   A.    That is the way the events played out, yes.

17   Q.    And that's presumably why you didn't charge him in your

18   Complaint, right?

19   A.    Correct.

20   Q.    So at least up until that point somebody was able to

21   withdraw from this alleged conspiracy and not be charged in

22   your Complaint?

23   A.    That's correct.

24   Q.    And Mr. Garbin could do the same thing at that point,

25   right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  A.   Speculating, yes.

2  Q.   Do you know whether you have a recording of him telling

3  CHS-2 that he needed to stop Mr. Fox because this was crazy and

4  stupid?

5  A.   I spoke with the handling agents last night and they are

6  not aware of any recording that has that statement on it.

7  Q.   Okay.  Do you know if they pulled the recording to listen

8  to it?

9  A.   I know over the course of this investigation that they

10  have listened to at least a majority of the audio and they are

11  not aware of that.

12  Q.   Okay.  My question is did they -- after you advised them

13  of that, did they go and listen to it again, do you know?

14  A.   I do not know that.

15  Q.   Do you know if they went and asked CHS-2 if that was the

16  case?

17  A.   I do not know that.

18  Q.   How many of these posts, inflammatory posts in these chat

19  rooms went unresponded to?

20  A.   I cannot even wager a guess.

21  Q.   I mean, it's pretty common for somebody to come in there,

22  spout off, maybe some antigovernment rhetoric, and then just

23  have people -- it's crickets, right?  People are ignoring him?

24  A.   Again, I can't even speculate on that.

25  Q.   Do you know that that occurred?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   A.   Yes, it has.

2   Q.   Okay.  And just because somebody doesn't say anything in

3   that respect in response doesn't necessarily mean they agree

4   with the original poster, right?

5   A.   I -- I can't speculate whether they agree with something

6   just because they don't respond.

7   Q.   Right.  They could, they could agree, they might not

8   agree, or they might be somewhere in between, right?

9   A.   It's possible, yes.

10  Q.   And by the same token when the alleged conspirators, not

11  my client, say something like, "Okay, well" -- like Musico, for

12  instance, says, "Well, you know, you have to be in or otherwise

13  leave."  That doesn't necessarily mean that the people that

14  stayed are in, right?

15  A.   It does mean that they are at least aware of it and that

16  they are staying to hear what is going on, that's correct.

17  Q.   Right.  But your job as an FBI agent in this circumstance

18  is to try and determine each person's state of mind in a

19  general sense, right?

20  A.   It's to determine their intentions, yes.

21  Q.   Yeah.  And so it's not an easy job to do.  You have these

22  people that are in militia-type groups who want to play with

23  guns and run around in the woods and do stuff and all of that

24  might be perfectly legal, right?

25  A.   Correct.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1  Q.   And on the other hand, there may be people who actually

2  are going to take action and harm somebody.

3  A.   Correct.

4  Q.   And it's sort of the FBI's job and your job to try and

5  sort those people out, right?

6  A.   That's correct.

7  Q.   And one of the ways of doing that is trying to determine

8  whether they actually agree to go forward with that action, if

9  somebody proposes the action, right?

10  A.   Yes, to determine their intent in following through, yes.

11  Q.   Okay.  So what evidence do you have that Mr. Garbin

12  actually intended to go through with this and didn't just think

13  "This is dumb, stupid, and it's never going to come to fruition

14  whether I do anything or not"?

15  A.   Again, you're asking me the same question you asked

16  earlier regarding me explaining what is in my Complaint.

17  Q.   So you don't have any other evidence outside of what's in

18  your Complaint to suggest that?

19  A.   I did not say that.

20  Q.   Okay.  Do you have any other evidence outside of the

21  Complaint?

22  A.   I can't speak to that at this time.

23  Q.   You don't know of any?

24  A.   There is a lot of information to review.  I have not

25  personally reviewed all that information.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1   Q.   Mr. Musico openly talked about "Everybody has got to be in
2   for this plot or leave," right?
3   A.   Yes, during that conversation, correct.
4   Q.   But he wasn't charged in your federal Complaint with being
5   a part of this plot to kidnap, was he?
6   A.   No, he was not.
7   Q.   And so simply being there and even talking about it is not
8   enough.  Do we agree?
9   A.   I would leave that up to the attorneys to make that
10  decision.
11  Q.   Okay.  Now, there's a lot of things that -- what the
12  Wolverine Watchmen or somebody like Mr. Garbin who is
13  interested in training in firearms can do that is perfectly
14  legal, right?  The other attorney sort of touched on this, but
15  it's not illegal to go and train with firearms, right?
16  A.   That's correct.
17  Q.   And it's not illegal to learn how to do combat shooting?
18  A.   Correct.
19  Q.   And it's not illegal to learn how to take care of wounds
20  or do field medicine or anything like that?
21  A.   That's correct.
22  Q.   And there's nothing wrong or illegal with having a go bag,
23  right?
24  A.   That's correct.
25  Q.   And you testified previously that there wouldn't be any

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    reason for sport for somebody to learn how to clear a house and

2    do a tactical entry, right?

3    *A.*    I believe my testimony was that would not be a common

4    occurrence.

5    *Q.*    Okay.  Have you heard of the sport of paintball?

6    *A.*    I have.

7    *Q.*    And you would want to learn how to do those types of

8    things in paintball, right?

9    *A.*    Comparing paintball and firearms training is -- are two

10   completely separate situations.

11   *Q.*    But the same tactics would apply, wouldn't they?

12   *A.*    I could shoot you with a paintball, but I could not shoot

13   you with a live round.  So the tactics could apply, however,

14   they are two completely separate situations.

15   *Q.*    Okay.  Well, I went to the FBI academy a long time ago,

16   20 years ago, at Quantico, Virginia.  Did you -- did you go

17   through the academy as well?

18   *A.*    Yes, I did.

19   *Q.*    And at the academy they had this thing called

20   Hogan's Alley.  Did you have that?

21   *A.*    That's correct.

22   *Q.*    And did you learn how to clear rooms and make breach

23   entries using paint guns?

24   *A.*    Yes, but they are different than the paintball guns that

25   you are speaking of.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    Q.   But you were taught the same tactics and principles using

2    a paint gun?

3    A.   That's correct.

4    Q.   Excuse me.  So, again, when we're talking about simply

5    being a part of this group, not everybody even in the

6    Wolverine Watchmen was charged, right?

7    A.   Correct.

8    Q.   And so that in and of itself is not a crime.  It's free

9    speech, right?

10   A.   Being part of the Wolverine Watchmen?

11   Q.   Yeah.  And being part of these groups and talking about

12   whatever you want to say about the government.

13   A.   That's correct.

14   Q.   Okay.  Let's move on to -- you discussed a little bit

15   about these improvised explosive devices or IEDs you called

16   them, right?

17   A.   Correct.

18   Q.   And was it Barry Croft, was he the only one or the one

19   that initiated this discussion of filling up the balloons?

20   A.   I don't know who initiated the discussion.

21   Q.   Okay.  Because it seems to me there was two separate

22   instances that we're talking about.  One was at an FTX earlier

23   on where there was two attempts and they were both duds.

24   A.   That's correct.

25   Q.   Do you remember that?  And then there was also one that

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   occurred at or near Mr. Garbin's property, right?

2   A.   That's correct.

3   Q.   And that was done by Mr. Croft, right?

4   A.   Yes.

5   Q.   And did you become aware at any time that Mr. Garbin told

6   Mr. Croft under no circumstances would he be allowed to explode

7   anything at his property?

8   A.   I'm not aware of that conversation.

9   Q.   Did the FBI then go and execute a search warrant at

10   Mr. Garbin's property in Luther?

11   A.   That's correct.

12   Q.   And did you find the site where those -- where whatever he

13   made was exploded?

14   A.   That is what I'm told, yes.

15   Q.   And was that explosion, did that actually take place on

16   state land, not Mr. Garbin's property?

17   A.   I'm not aware of anybody measuring that or doing an

18   assessment on that property at this time.

19   Q.   Okay.  So that's still a possibility then, right?

20   A.   I can't speculate.

21   Q.   It's still possible?

22   A.   Again, it's possible, but I'm not aware of it.

23   Q.   Okay.  Did the FBI search that shed at Mr. Garbin's

24   property in Luther?

25   A.   I believe so.  I was not at that property.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1   Q.   Okay.  Do you know if they recovered the fireworks that

2   Mr. Croft used?

3   A.   I'm -- I have not seen the list of items recovered at this

4   time.

5   Q.   Okay.  At any point did you -- or did you learn through

6   your investigation that Mr. Garbin locked up Mr. Croft's

7   chemistry set or his fireworks in his shed?

8   A.   I'm not aware of that at this time.

9   Q.   Okay.  When the FBI arrived at his property, were the

10  silhouettes that were allegedly damaged through the shrapnel,

11  were those still in place on the trees?

12  A.   I'm being told that there were some still there.

13  Q.   Okay.  And some were taken down?

14  A.   I'm not aware if any were taken down.

15  Q.   Okay.  And I believe -- correct me if I'm wrong -- but I

16  believe on the morning after the second surveillance at

17  Mr. Garbin's property that there was a discussion with Red or

18  with the group, among the group, about whether they could

19  afford to buy some explosives, right?

20  A.   The discussion was on the cost of the explosives.

21  Q.   Okay.

22  A.   On how much it would cost.

23  Q.   And at some point did the group discuss or were people,

24  members that were present there, were they asked to chip in for

25  the cost of the explosives?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  *A.*   I don't recall the exact conversation, but they were not

2  asked to provide money at that specific time.

3  *Q.*   Right.  But they were asked whether they were willing to,

4  right?

5  *A.*   I don't recall the exact conversation.

6  *Q.*   Okay.  If you listened to the recording, was the

7  human -- well, if you know, was the human source 2, was he

8  there at that point?

9  *A.*   I would have to look back through the details, but I

10  believe so.

11  *Q.*   And was Red there?

12  *A.*   I believe so, because they were having the discussion with

13  the costs.

14  *Q.*   Okay.  So between those two government agents, so to

15  speak, one of them would have recorded that conversation

16  presumably, right?

17  *A.*   I can't speak to what -- that's a hypothetical question.

18  I assume it would happen, but I can't speak to confirm that.

19  *Q.*   Okay.  I mean, it's certainly something that you would

20  want to record, right?

21  *A.*   Agreed, yes.

22  *Q.*   I mean, you've got an undercover agent there who is

23  introduced to sell explosives, you would want to know who is

24  okay with that, who agrees with that part of the plot, right?

25  *A.*   Agreed.  But again, as we discussed earlier, I can't speak

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1    to a hundred percent of the time.

2    Q.   Okay.  Did you ever bother to check and see whether

3    Mr. Garbin specifically said, "I'm not going to contribute

4    anything toward that because I'm broke"?

5    A.   I have not heard that conversation.

6    Q.   Okay.  And then I assume that -- do you know his finances,

7    whether he actually was broke at that point?

8    A.   I'm not aware of Mr. Garbin's finances.

9    Q.   He had a -- do you know that he had a full-time job?

10   A.   Again, I'm not aware of that at this time.

11   Q.   You don't know anything about his employment?

12   A.   Mr. Garbin was not my case to handle.

13   Q.   Okay.  There was some discussion, I'm guessing by Mr. Fox,

14   about a need to do this by the election; is that right?

15   A.   There were multiple references to the election, yes.

16   Q.   And why would there be a need to kidnap Governor Whitmer

17   at the election?  She's not even running at that point.

18           MR. KESSLER:  Calls for speculation, Your Honor.

19           THE COURT:  Sustained.

20           MR. SPRINGSTEAD:  I'm asking him if he knows.

21           THE COURT:  If you know.

22           THE WITNESS:  I can't speculate on that.

23   Q.   (BY MR. SPRINGSTEAD)  Do you know whether -- I guess we

24   can just take judicial notice of the fact that she's not up for

25   re-election, right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   A.   Pardon?

2   Q.   She's not up for re-election on the 3rd, right?

3   A.   Not that I'm aware of.

4   Q.   Okay.  So that deadline that was being talked about on

5   multiple occasions, that could have related to some other plot,

6   right?

7   A.   They reference the election.  I'm not aware of specific to

8   who they were speaking of at that time.

9   Q.   Could it have related to the governor in Virginia?

10  A.   It could have related to the president.

11  Q.   Okay.  And were they -- do you know whether the defendants

12  in this case, the accused in this case, were they supportive of

13  the president's comments about this?  About liberate Michigan?

14  Did that ever come up in your investigation?

15  A.   Throughout the investigation I'm not aware of comments one

16  way or another.

17  Q.   You never heard that President Trump tweeted "Liberate

18  Michigan," "Liberate Virginia"?

19  A.   I have heard that of the president, but as far as what

20  you're asking, I cannot speculate on their thoughts on those

21  comments.

22  Q.   Okay.  So you didn't have any indication that that was

23  what prompted them to act in this case?

24  A.   I believe this discussion of this occurred before those

25  comments.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1   Q.   Okay.  I'm just trying to figure out why you referenced

2   the election of the president.  The presidential election on

3   the 3rd.

4   A.   Because that is the election date of the president on

5   November 3rd.

6   Q.   Okay.

7   A.   And as you said yourself, Governor Whitmer is not up for

8   election.

9   Q.   So the inference being that maybe it had something to do

10  with the presidential election as opposed to Governor Whitmer's

11  election?

12  A.   Again, speculating at this point.

13  Q.   Okay.  You testified -- and I'm not trying to put words in

14  your mouth -- but Mr. Kessler showed you a picture of a -- what

15  you described as a short-barreled rifle with a silencer on it

16  that allegedly belonged to Mr. Garbin, right?

17  A.   Correct.

18  Q.   And subsequent search of his house found that firearm that

19  was shown in that -- depicted in that picture, right?

20  A.   I have not seen the list of items seized at the house.

21  Q.   Okay.  But you testified -- well, let me just ask you

22  directly:  Did you ever run the serial number associated with

23  that firearm to see what in fact it was?

24  A.   I have not specifically run that.

25  Q.   Would it surprise you to learn that it's a pistol and not

1   a sawed-off rifle?

2   A.   Again, I'm not -- I'm only basing it off of the picture

3   that I saw.

4   Q.   Okay.  So is it fair to say that you don't know whether

5   it's actually a sawed-off rifle?

6   A.   I have not seen the weapon specifically in person to

7   inspect it at this time.

8   Q.   Okay.  So did you get out ahead of yourself a little bit

9   by saying that it was an illegal rifle then?

10  A.   I believe the question was whether that would have been a

11  legal rifle if it was in fact a short barrel, and if that is

12  the case, yes, it would be an illegal.  Since it was

13  registered.

14  Q.   So then if it's a pistol, then it wouldn't be necessarily

15  illegal, right?

16  A.   I cannot speak to the ATF rules on that, but my

17  understanding is that would be correct.

18  Q.   Okay.  And did you ever -- we discussed the silencer that

19  was on it along with another silencer that Mr. Garbin had in

20  his possession.  Did you ever check to see whether he had

21  actually applied to the ATF to get the appropriate paperwork to

22  lawfully possess that?

23  A.   I have not.  I believe that has been done, though.

24  Q.   You believe it has been submitted?

25  A.   I believe a check was done with ATF, but I'm not -- I

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   cannot speak to it.

2   *Q.*   Okay.  You don't know?

3   *A.*   I have not seen it.

4   *Q.*   And did you check to see whether that weapon was actually

5   registered with the local police department and the

6   State Police or whatever he's required to do under state law?

7   *A.*   I believe that would have been done by the case agent

8   handling Ty Garbin's case, but I have not done that.

9   *Q.*   Okay.  And the -- I think you testified that maybe there

10   were three silencers that were found at Mr. Garbin's house?

11   *A.*   I believe that was the information that was provided to me

12   from another agent, but I cannot confirm that.

13   *Q.*   Okay.  Do you know whether or not one of those three

14   belonged to Kaleb?

15   *A.*   I'm not aware of that information.

16   *Q.*   You didn't check?

17   *A.*   Again, I have not run those checks.  I'm not the case

18   agent on Ty Garbin's case, so I'm not aware.  And I have not

19   seen the evidence list of items that were taken from

20   Ty Garbin's property.

21   *Q.*   Okay.  Let me ask you a slightly different question.  Did

22   you -- is there any problem with Mr. Garbin securing Kaleb's

23   firearm for him in his gun safe?

24   *A.*   I would have to review ATF rules on that to see if that is

25   an issue.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1           *MR. KESSLER:*  Your Honor, I'm just going to object on

2     relevance.  We've been going for a long time about guns and

3     silencers and nobody is charged with any firearms offenses at

4     this point.

5           *THE COURT:*  Mr. Springstead.

6           *MR. SPRINGSTEAD:*  Well, you know, the government

7     brought it up and suggested that he was in possession of an

8     illegal weapon, so I think it's fair for me to try and --

9           *THE COURT:*  But we're on the prelim right now which

10    is the question of kidnapping or the conspiracy to commit

11    kidnapping, so let's try and steer it back towards relevancy.

12          *MR. SPRINGSTEAD:*  Okay.  Fair enough.  I'm just going

13    to check and see if I have . . .

14    *Q.*  *(BY MR. SPRINGSTEAD)*  On August 9th Mr. Fox is --

15    allegedly said that that was when the kidnapping plot came up.

16    Do you recall that?

17    *A.*   I would have to look back through the notes or the

18    Complaint to recall that date or what that conversation was.

19    *Q.*   Okay.  And on that date there was no affirmative statement

20    by Mr. Garbin that he was in support and that he was in on that

21    plot?

22    *A.*   Again, I would have to look back through the notes and the

23    Complaint on that information.

24    *Q.*   Okay.  And just touching a little bit on the use of the

25    encrypted chats, there's nothing illegal about that, right?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    A.    That's correct.

2    Q.    And you said that -- I think that one of the defendants

3    said that one of the benefits of that, of using one of these

4    services, might be that law enforcement wouldn't be able to

5    find it.  They could delete it and be gone, right?

6    A.    That was actually a direct statement from one of the chats

7    from one of the defendants.

8    Q.    Okay.  And you've served a lot of subpoenas on different

9    Telecom providers like phones, phone companies, Verizon,

10   AT & T, Facebook, things like that, right?

11   A.    Historically, yes.

12   Q.    And are you aware that they are legally required to store

13   data for a certain period of time, either six months, for just

14   that reason, so that federal law enforcement can actually

15   access that type of thing?

16   A.    The telephone subscribers are not able to store

17   information on encrypted chats.

18   Q.    But they are required to back up their servers and

19   databases so that if they are asked by the FBI, they can

20   provide whatever requested information that they have access

21   to, right?

22   A.    You're talking about two different things.  They are

23   required to do that for text messages and stuff that are on

24   their service, however, that is an application that is

25   downloaded and it's encrypted.  They do not have access to

1   that.

2   Q.   Okay.  Did you ever seize any of the defendant's phones?

3   A.   Subsequent to arrest, yes.

4   Q.   Okay.  And I assume that you guys -- that the FBI did some

5   sort of forensic analysis on those phones or at least is

6   beginning to?

7   A.   Um, I don't know if it's been started at this time, but it

8   is in the works.

9   Q.   And it's pretty difficult to actually destroy any

10  electronic evidence on devices, isn't it?

11  A.   It depends on what you're speaking to.

12  Q.   Well, for chat messages, texts, Facebook posts, pictures,

13  videos, things like that, it's not easy to get rid of those, is

14  it?

15  A.   So if you're speaking to wire-encrypted communications,

16  that is stored on their server, it's not stored on the phone

17  itself, so being able to destroy that where the server is

18  housed in an overseas location, we don't have access to that.

19  It is easy to not allow us access to that information.

20  Q.   Okay.  That wasn't my question.  I didn't say anything

21  about encrypted communications.  I said it's not easy to

22  destroy a lot of that other information, right?

23  A.   The basic information on the phone, that's correct.

24  Q.   And in fact you guys were being provided with relatively

25  realtime information from insiders, right?

1  A.    That's correct.

2  Q.    And do you know whether any steps were taken in these chat

3  rooms for people to distance themselves from certain defendants

4  or other people in those groups?

5  A.    I would have to look back through all the chats.

6  Q.    Okay.  Now, I'm just about out of questions, I think.

7        Another plot that was discussed that you testified about

8  was just sending a bomb, right?

9  A.    That was one idea that was brought up, yes.

10  Q.    And not -- that's not something that my client brought up,

11  right?

12  A.    No, I believe that was a different individual.

13  Q.    And, you know, somebody also discussed sending out

14  multiple cupcakes or something like that.  Some multiple --

15  mail out a bunch of different bombs to disrupt society, I

16  guess, right?

17  A.    Yes.

18  Q.    Again, nothing that Mr. Garbin did or agreed to do or

19  expressed any interest in, right?

20  A.    I can say he did not state that, that's correct.

21  Q.    And when Mr. Garbin was arrested, did CHS-2 tell them --

22  was he the one that kind of set that up, to meet at that

23  location?

24  A.    I don't know the series of events that preempted a meeting

25  at that location.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  Q.   But they were told -- kind of lured to that location

2  because Red was going to be passing by, right?

3  A.   That's correct.

4  Q.   And Red would have some free gear that had been left

5  behind at firing ranges, right?

6  A.   That was one of the portions of it, yes.

7  Q.   Okay.  And so we don't know whether Mr. Garbin went for

8  that free gear or whether he went to hopefully put a

9  down payment on those explosives with Red, right?

10 A.   I would have to go back through the messages leading up to

11 that.

12 Q.   But there was at least two different reasons why somebody

13 might go to that?

14 A.   The main reason being the explosives situation, but yes,

15 there was also talk of receiving gear.

16 Q.   Well, I understand why the FBI and why you would regard

17 that as the main reason, but you don't know what Mr. Garbin was

18 thinking, do you?

19 A.   Again, I would have to go back through the messages to see

20 what Mr. Garbin said.

21 Q.   Well, we know, don't we, that he didn't actually

22 contribute any money toward an explosive device?

23 A.    I'm not aware of what Mr. Garbin had on him when he was

24 arrested.

25 Q.   Okay.  Did you know that he was smoking?

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1    *A.*    I'm not aware of the details regarding Mr. Garbin when he

2    was arrested.

3    *Q.*    Okay.  Why -- what was the significance of that day?  Why

4    were they arrested on that day as opposed to letting it unfold

5    and go further?

6    *A.*    A potential compromise to the CHS at that time.

7    *Q.*    To -- I'm sorry?

8    *A.*    To the CHS at that time.

9    *Q.*    Okay.  So he had sort of run his course and was beginning

10   to get like he might be identified or outed, is that it?

11   *A.*    There was a potential compromise.

12   *Q.*    Okay.  Now, just to kind of put all this in perspective,

13   these -- and I'm going to speak generally -- people that are

14   interested in militia or involved in militia-type activities,

15   they can have a wide range of ideological viewpoints, right?

16   *A.*    That's correct.

17   *Q.*    So you could have Libertarian type of viewpoints that you

18   just want the government to leave you alone so you can do your

19   own thing, play guns in the woods, right?

20   *A.*    There could be a variety of viewpoints, that's correct.

21   *Q.*    And is it fair to say that there was a variety of

22   viewpoints among the defendants about their ideology?

23   *A.*    From the information I've seen, there was a variety, yes.

24   *Q.*    Okay.  And do you know whether Mr. Garbin's was sort of a

25   laisse fair Libertarianism, in other words, "I don't have to do

1  a lot because I think the government is going to collapse of

2  its own weight"?  Did you ever come across that statement?

3  A.  I have not.  I don't recall that -- those statements.

4  Q.  Did he say that in the context of why he didn't need to

5  storm the Capitol?

6  A.  I don't recall that specific statement.

7  Q.  Okay.  But that would be one possibility, is that somebody

8  might feel like they don't have to do anything because the

9  government is ineffective and it's going to collapse on its own

10  without doing anything, right?

11       MR. KESSLER:  Objection, Your Honor.  He's asking him

12  to speculate as to what's in the defendant's mind and why.

13       THE COURT:  Mr. Springstead.

14       MR. SPRINGSTEAD:  I'll just move on.  I'll withdraw

15  the question.

16       THE COURT:  All right.

17  Q.  (BY MR. SPRINGSTEAD)  And just to make sure that I mention

18  this, Mr. Garbin actually had at least one legal stamp that you

19  know of for the silencer that was found at his house, right?

20  A.  I believe that's correct.

21  Q.  And he doesn't have any felonies or any other convictions

22  that would prohibit him from possessing any of those firearms,

23  right?

24  A.  I have not seen his report recently, so I'm not aware of

25  anything.

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1   Q.   Now, the -- you testified that the informants said that

2   they wanted to be very careful not to spread their identities

3   outside the group.  Is that CHS-2 that said that?

4   A.   I specifically think that was in the chat message you're

5   referring to where they said no public contact, no putting our

6   identities out there.

7   Q.   Okay.  But they did go to -- some of them went to a

8   Capitol rally, right?

9   A.   That was prior to those statements.

10  Q.   And then they went to Wisconsin for an FTX up there?

11  A.   Prior to those statements.

12  Q.   And they went to Ohio for an FTX?

13  A.   It was prior to those statements.

14  Q.   Okay.  And we know that on the 12th and 13th more than

15  just the people that are here in this courtroom and charged in

16  this case were present at his property, right?

17  A.   That's correct.

18  Q.   Okay.  And so it's not as if they were hiding out.  They

19  were out in public with other people and they weren't being

20  that careful about their identities, were they?

21  A.   So you're discussing a statement by them that was what

22  they stated in the chat messages, and then, yes, they did have

23  other individuals at that, but it was not a public environment

24  because the public was not invited to attend that FTX as would

25  have been the Lansing rally.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1   Q.   And you talked about some other aspects of operational

2   security, about that I think Mr. Fox made them put their phones

3   upstairs when they went down in the basement; is that right?

4   A.   That's correct.

5   Q.   Do you know whether they actually verified that people did

6   that?

7   A.   I believe visually they all put a phone down, however, I

8   know at least the CHS had a second device on him.

9   Q.   And would it surprise you that Mr. Garbin didn't do that

10  and nobody cared?

11  A.   I can't speculate that it would surprise me or . . .

12  Q.   Okay.  Now, you also introduced or testified about

13  Mr. Garbin's response to some emojis.  Do you remember that?  A

14  wave and a police officer or something like that?

15  A.   That was Mr. Garbin's statements.  That was not his

16  response.

17  Q.   Okay.  So we're talking about the same text message,

18  right, where they are talking about the bridge and the source

19  texted them a picture or those emojis, right, to Mr. Garbin and

20  the group?

21          THE COURT:  Mr. Springstead, which exhibit are you

22  referring to?

23          MR. KESSLER:  Exhibit 16, Your Honor.

24          MR. SPRINGSTEAD:  Thanks, Nils.

25          THE COURT:  Thank you.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1    Q.    (BY MR. SPRINGSTEAD)  Do you recall that exhibit, 16?

2    A.    I recall the message, but I would have to see it to

3    understand what you're asking.

4            MR. GRAHAM:  Your Honor, I have one question

5    triggered by the further cross-examination.

6            THE COURT:  All right.

7                        RECROSS-EXAMINATION

8    BY MR. GRAHAM:

9    Q.    Agent, when the arrests of four of the defendants occurred

10   when they were going to meet with Red, I want to call your

11   attention to that, how much money was seized from them total?

12   A.    I don't have the total number at this time.

13   Q.    Okay.  Do you have the number for any individual

14   defendant?

15   A.    The only one I can speak to it is Adam Fox because I

16   conducted that interview.

17   Q.    How much did he have?

18   A.    $275.

19   Q.    Thank you.

20                   CROSS-EXAMINATION CONTINUED

21   BY MR. SPRINGSTEAD:

22   Q.    Okay.  Does this -- can you see that up there, or does

23   that refresh your recollection about the emojis that we're

24   talking about?

25   A.    Yes, I'm familiar with that.

CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD

1    Q.   Okay.  And did you review the text messages above that?

2    A.   I have not.

3    Q.   So you don't know whether somebody else, namely, CHS-2,

4    texted the Borat video and he shared it and agreed with it?

5    A.   I would assume based on this.  You can see that CHS-2 is

6    on the right there texting the messages.

7    Q.   That he's writing and texting?

8    A.   Yeah, I would assume that.

9    Q.   Okay.  And so when Mr. Garbin responds to the CHS, it's

10   actually CHS-2 that sends the emojis and he responds to it,

11   right?

12   A.   You're speaking about two different emoji conversations.

13   The emojis that you're referring to were -- I'm not sure where

14   in this conversation were.

15   Q.   Okay.  And so these aren't -- are these part of the

16   same -- these two exhibits, are they part of the same

17   conversation?

18   A.   Yes, I believe so.

19   Q.   Okay.  And the exhibits where he says X the water, that

20   would block the water, right?  Or the wave?

21   A.   The insinuation would be stop the wave.

22   Q.   Yeah.  And so -- or it also could mean, couldn't it, that

23   if the bridge goes down, then there will be water there?

24   A.   I guess you could say that.

25   Q.   And do you know whether CHS-2 was the one that sent those

*CROSS-EXAMINATION OF RICHARD J. TRASK BY MR. SPRINGSTEAD*

1  emojis first?

2  A.   I would have to see the entire text string, but based on

3  the timestamps, it would appear that CHS-2 made the first

4  comment, that's correct.

5  Q.   Okay.  Okay.  And going back to Mr. Garbin's role, alleged

6  role as leadership in the militia group, you can't say what

7  qualified him as, quote, leadership in the government's eyes?

8  A.   I don't say that we designated him as a leader, and I

9  don't think I've said that.

10  Q.   So that's not your position or the FBI's position?

11  A.   I cannot speak to the FBI.  I'm saying based on the facts,

12  I do not believe we placed him in that position.  I believe

13  that was his own organization placed him in a leadership role

14  within that.

15  Q.   Okay.  And going back to the date of arrest, I think you

16  said -- you testified that you don't know whether Mr. Garbin

17  had any money in his possession at that time?

18  A.   I'm not aware of what he had in his possession.

19  Q.   It would be a pretty important thing to know, right?  If

20  they were going to go put a down payment on explosives,

21  wouldn't you want to know whether somebody actually had money

22  to put down on it?

23  A.   Again, that day there were a lot of evidence items that

24  were collected.  I'm not aware of all the evidence, and

25  specifically I don't know specifically what he had on his

*REDIRECT EXAMINATION OF RICHARD J. TRASK BY MR. KESSLER*

1    person at that time.

2    Q.   Okay.

3              MR. SPRINGSTEAD:  That's all I have, Your Honor.

4              THE COURT:  Thank you.

5              Mr. Kessler, how long do you have for redirect?

6              MR. KESSLER:  Five minutes.

7              THE COURT:  Okay.  Let's go forward with that.

8                         REDIRECT EXAMINATION

9    BY MR. KESSLER:

10   Q.   Agent Trask, I'll just start with one question that

11   Ms. Nieuwenhuis asked you about, about whether CHS was pushing

12   the defendants here or any -- Mr. Fox in particular towards

13   this scheme.

14        Let me take you back to June 6th, the meeting in Dublin,

15   Ohio.  Isn't it true that Mr. Croft and Mr. Fox were talking

16   about kidnapping the governor there before they ever met CHS-2?

17   A.   That's correct.

18   Q.   So it was through somebody else that you learned about

19   that, right?

20   A.   That's correct.

21   Q.   Okay.  And let me address some of Mr. Springstead's

22   questions.  He mentioned the Hogan's Alley training center that

23   both you and he apparently attended at Quantico.  When you in

24   law enforcement and the FBI are trained to shoot at

25   Hogan's Alley, that's to do your job as law enforcement,

REDIRECT EXAMINATION OF RICHARD J. TRASK BY MR. KESSLER

1   correct?

2   A.   That is correct.

3   Q.   You might actually have to shoot human beings in the

4   course of your work, right?

5   A.   That's correct.

6   Q.   Something you take seriously?

7   A.   Absolutely.

8   Q.   If these people breached a house and started shooting

9   people or blew them up with an improvised explosive device,

10  that wouldn't be their job, would it?

11  A.   That's correct, it would not.

12  Q.   It wouldn't be a sport either, like paintball I think was

13  referred to a lot of times.

14  A.   That's correct.

15  Q.   Okay.  We talked about the surveillance the night of

16  September 12th and 13th.  Three cars went up there, correct?

17  A.   Correct.

18  Q.   Car number 2 had Mr. Garbin, Mr. Franks, and a person

19  we've been talking to up until now as an individual from

20  Wisconsin?

21  A.   That's correct.

22  Q.   That's a person by the name of Brian Higgins, correct?

23  A.   Correct.

24  Q.   And you know that because he was arrested yesterday,

25  right?

*REDIRECT EXAMINATION OF RICHARD J. TRASK BY MR. KESSLER*

1   A.   Yes.

2   Q.   Well, actually you knew his name before, but it's out in

3   the open now.  He was arrested and charged by the state

4   yesterday, correct?

5   A.   That's correct.

6   Q.   You referred to a recording that showed that they were

7   actually there?

8   A.   Yes.

9   Q.   That was not an FBI recording inside.  There was no FBI

10  informant in that car, right?

11  A.   No, there was not.

12  Q.   The recording came from a dash camera, didn't it?

13  A.   That's correct.

14  Q.   And who put that there?

15  A.   That would be Brian Higgins' personal dash cam.

16  Q.   So it was his car and his dash cam, right?

17  A.   That's correct.

18  Q.   And the reason you know about that -- tell the Court how

19  you know about what's on that dash cam video.

20  A.   After the surveillance Brian Higgins provided a copy to

21  CHS-2, told CHS-2 that he was providing it for their use.  He

22  was destroying his copy.  And then that was the end of the

23  conversation.

24  Q.   Okay.  So you have a copy of that, and it shows that they

25  actually went to the governor's house, right?

*REDIRECT EXAMINATION OF RICHARD J. TRASK BY MR. KESSLER*

1    A.    That's correct.

2    Q.    And you can actually see inside the car as well, right?

3    A.    That's correct.

4    Q.    So we know that Mr. Garbin and Mr. Franks were in the car

5    with Mr. Higgins?

6    A.    That is correct.

7    Q.    And after Mr. Higgins was arrested yesterday he was

8    interviewed by the FBI, correct?

9    A.    Correct.

10   Q.    And he made a point of saying he had destroyed that video,

11   right?

12   A.    Yes, he did.

13   Q.    Did he also do anything else to indicate that he was

14   worried about law enforcement finding that video?

15   A.    Yes, he indicated that he wanted to get the video back

16   from the CHS.

17   Q.    In Michigan?

18   A.    Yes.

19   Q.    Okay.  Mr. Springstead also asked you about the meeting

20   where Mr. Musico told everyone "If you're not down for

21   kidnapping, you should leave," right?

22   A.    Yes.

23   Q.    Okay.  And these gentlemen did not leave, right?

24   Including his client, Mr. Garbin.  He stayed?

25   A.    That's correct.

*REDIRECT EXAMINATION OF RICHARD J. TRASK BY MR. KESSLER*

1   Q.   Okay.  And I believe you were asked if -- why Mr. Musico

2   wasn't charged.  Mr. Musico didn't show up on September 12th or

3   13th for this whole nighttime surveillance, did he?

4   A.   That's correct.

5   Q.   He hasn't been involved in this particular plot, has he?

6   A.   That's correct.

7   Q.   And he was not the only one not involved.  You were asked

8   about whether Mr. Garbin actually said he was out.  You do know

9   about somebody who did say he was out, right, Mr. Higgins?

10  A.   That's correct.

11  Q.   He said he wanted nothing to do with this?

12  A.   Yes.

13  Q.   And another individual who was charged by the state, so we

14  now know his identity, is a person by the name Daniel Molitor,

15  right?

16  A.   That's correct.

17  Q.   And Daniel Molitor was in one of these cars doing the

18  surveillance, right?

19  A.   Yes, on the first surveillance.

20  Q.   And he also withdrew, didn't he?

21  A.   That's correct.

22  Q.   Which is why he's not in the Complaint.

23  A.   Correct.

24  Q.   And when he talked to some of these gentlemen on the

25  encrypted chat messages, what did he say he didn't want?

*RECROSS-EXAMINATION OF RICHARD J. TRASK BY MR. GRAHAM*

1   A.   I would have to recall that conversation.

2   Q.   Did he say something about going to jail?

3   A.   That's correct.

4   Q.   So he said he didn't want to go to jail, right?

5   A.   Correct.

6   Q.   Mr. Garbin didn't say that.  He kept meeting with

7   everyone, didn't he?

8   A.   Not that I'm aware of.

9   Q.   What -- not that you're aware of.  You're not aware of him

10   saying he wanted out?

11   A.   I have nothing to say that he stated he wanted out.

12            MR. KESSLER:  I have nothing further, Your Honor.

13            THE COURT:  All right.  We will do a brief recross

14   but only as relates to what Mr. Kessler just put on the record.

15            MR. GRAHAM:  Absolutely.

16                        RECROSS-EXAMINATION

17   BY MR. GRAHAM:

18   Q.   I have a question that relates to a specific point that

19   Mr. Kessler just asked you about, which is when Musico made the

20   statement about if you're not -- essentially if you're not up

21   for kidnapping, leave.  That happened at Munith, right?

22   A.   I would have to look back through the dates, but I believe

23   that's correct.

24   Q.   Okay.  And in fact Mr. Franks did leave, didn't he?

25   A.   Again, I would have to look back through the notes, but I

1    know at one point Mr. Franks did leave.  I would have to look

2    back through the series of events.

3    Q.   If it happened, if the statement was made by Musico at

4    this first Munith gathering, you're aware then Mr. Franks left?

5    A.   At that time Mr. Franks did.

6    Q.   Thank you.

7            THE COURT:  Mr. Douglas, do you have anything else?

8    Again, narrowly related to --

9            MR. DOUGLAS:  Yes.

10                          RECROSS-EXAMINATION

11   BY MR. DOUGLAS:

12   Q.   And Mr. Harris was not at Munith; isn't that correct?

13   A.   I would have to look through the notes to recall if he was

14   there or not.

15   Q.   But you don't recall that right now?

16   A.   There were a number of meetings.  I don't recall that

17   specific who was there.

18   Q.   Okay.

19            THE COURT:  And over here, Mr. Hills?

20            MR. HILLS:  I don't have anything, Your Honor.  Thank

21   you.

22            THE COURT:  Mr. Springstead.

23            MR. SPRINGSTEAD:  Nothing further, Your Honor.

24            THE COURT:  And Ms. Nieuwenhuis.

25            MS. NIEUWENHUIS:  No, thank you, Your Honor.

1          *THE COURT:*  All right.  In that case we will take

2     about a 10-minute break, and then we'll come back and I'll hear

3     argument on probable cause.

4          *THE CLERK:*  All rise, please.  Court is in recess.

5     *(Recess taken at 11:41 a.m.)*

6     *(Back on the record at 11:59 a.m.)*

7          *THE COURT:*  All right.  We're back on the record to

8     hear argument as to the preliminary hearing.

9          Mr. Kessler, you have the burden, so you can go

10    first.

11         *MR. KESSLER:*  Thank you, Your Honor.

12         Your Honor, I would submit that there is probable

13    cause to bind these gentlemen all over for trial.  What we have

14    here -- although there's been a lot of digressions and

15    discussion about firearms and about other things -- what we

16    have here is a conspiracy to commit kidnapping which consists

17    of an agreement they have to have joined voluntarily and

18    at least one person in that agreement has to have committed one

19    overt act.  I submit we have a lot more than that, but that's

20    all we need to establish to have probable cause here.

21         So taking the agreement first, we've heard some

22    discussion about that there were other things that they might

23    have talked about doing like storming the Capitol or like

24    sending out bombs or whatever.  Those are ideas that they might

25    have discussed, but those were not the plot.

1          The idea that they have talked about, and we've heard

2     plenty of evidence about it, is they have talked about

3     kidnapping the governor here.  Now, we also have to take a look

4     at what overt acts they have committed or that somebody in this

5     conspiracy has committed towards accomplishing that.  They

6     don't have to have gotten all the way to where they were almost

7     there to do it.  That would be an attempted kidnapping.  But

8     they do have to have done something, as people have -- as we

9     all agree here -- to indicate that they had the intent to

10    follow through.  No one of those things all by itself

11    establishes it.

12         And I believe we've heard a lot of argument here

13    saying this or that or the other thing is not by itself enough.

14    For example, it is legal to own assault weapons and shoot them.

15    Sure it is.  But when we take all these things together in the

16    totality of the circumstances, it paints a very different

17    picture.

18         So we have a number of individuals here.  All of them

19    here were training for combat.  It can be portrayed as a sport,

20    but I think portraying it as something as innocent as paintball

21    is just completely at odds with the facts that we have here.

22         And we heard the testimony of Agent Trask that while

23    some of these self-designated militia groups do things like

24    this, they train with firearms and they train for combat-type

25    scenarios, this was out of the ordinary.  This is something

1   nonstandard even within his experience.  Where they are

2   training for things like breaching a house, they are using

3   improvised explosive devices, they are doing assaulting cars

4   and ex-filtration from cars and whatever you want to call it.

5   This is a lot of nonstandard stuff that raised some flags.

6           I think another thing that we have to look at as far

7   their overt acts that's very indicative of their intent is all

8   of what they are calling op sec or operational security.  I

9   would focus your attention in particular on Exhibit 10 which is

10  a long text message encrypted chat that they all participated

11  in.  The one where they were calling themselves the Bonfire

12  Group.  And they were freaking out because somebody in the

13  group had left something behind when they moved that made law

14  enforcement wonder what they were up to.  They started

15  wondering if they had been infiltrated by the feds.  Did they

16  think they had a mole in their organization.  And they were all

17  talking about how they needed to tighten up their operational

18  security, only meet in person from then on.  And they actually

19  got together at one of the defendants' houses to meet in person

20  and bring three forms of ID, including things like

21  Social Security, other kinds of documents you would use to get

22  a passport almost to prove that they were really who they said

23  they were and they weren't feds.

24          And then we had them change at the insistence of one

25  of the members of the group.  Everyone did it.  They changed

1    over to another encrypted application so they could try and
2    drop any federal mole that they might have within their group.
3    And they actually specifically said, "The good thing about this
4    particular application is that if the feds get in here, you can
5    delete it right away so you can't see what we've been talking
6    about."
7              And I submit to the Court that if they were just
8    playing paintball in the woods and having fun and weren't up to
9    anything wrong, they wouldn't need to take all those steps for
10   operational security.
11             Now, when we get to the overt acts beyond that, it
12   starts getting more serious.  When we go back to August 29th,
13   Mr. Fox and another individual who we have now named,
14   Mr. Molitor, and the confidential informant all went to do a
15   surveillance of the governor's house.  They were the only ones
16   who participated the first time, but we saw the pictures.  They
17   drove right up to the house, looked at it from the other side
18   of the lake, and tried to figure out whether it would be a
19   feasible target.  And again, they had other ideas like storming
20   the Capitol, but the fact that those things didn't happen
21   doesn't mean that none of this was ever going to happen.  Those
22   were ideas they threw around, and some of them were discarded
23   as not feasible.  And as common sense would tell you, storming
24   the Capitol with this small handful of people is not feasible.
25   There's police everywhere and you would never get away with it.

1    So as we saw in the text messages, they focused specifically on

2    something that was feasible, trying to attack the governor's

3    house in a remote part of Northern Michigan where as they said

4    the nearest police department was minutes away on the other

5    side of a bridge.  And besides that it would be 20 minutes

6    at least to anything else like a Michigan State Police post.

7    So they focused on what was feasible, and that's what they

8    continued forward with.

9            Right after that surveillance Mr. Fox sent out

10   pictures, which we saw in evidence yesterday -- or we saw in

11   evidence back on Tuesday of his surveillance of the house.  And

12   then they had a discussion about the bridge.  And we saw that

13   text message just a couple of minutes ago during -- during

14   Mr. Springstead's examination of the agent.  And we saw that

15   Mr. Garbin himself said, "If you take that" -- he may have had

16   the idea suggested, but he said -- and nobody made him do it --

17   he said, "If you take that bridge down, it will stop the wave".

18           You can try and construe that as meaning something

19   else, but obviously these people all knew what that meant

20   because when they next went up there to surveil the governor's

21   vacation home, Adam Fox went under that bridge.  And we saw the

22   pictures of him going under there to look for a place where he

23   could put the explosives.  So they were definitely taking it

24   seriously.

25           And then they started taking it more seriously the

1    next time they went around.  So they didn't just surveil once

2    but twice, and the next time a whole lot more of them were

3    involved.  So now we're up to September 12th and 13th when they

4    did a nighttime surveillance of the governor's house.

5         And again back to this theme that maybe they were

6    having fun shooting guns in the woods, playing paintball,

7    you're crossing a pretty serious line when you go in the middle

8    of the night in multiple cars and stage up at a gas station and

9    decide who is going to have what part of the mission and you go

10   to the house of the sitting governor of the state to go surveil

11   her house at night.

12        And they knew they were doing something wrong because

13   one of the cars was video recording it for their own use.  And

14   the most important thing on the mind of Mr. Higgins, who was

15   just arrested yesterday apparently, was destroying that

16   evidence.  If they were just playing games and they were just

17   having fun and doing nothing wrong, you wouldn't want to be

18   destroying the evidence that you were ever there at the

19   governor's house.  So they knew it was a sinister thing and how

20   it was going to look.

21        All of them wanted to keep a low profile.  And I

22   think that was important when we see what their intention was.

23   That brings us to the message they had about being invited by

24   Mr. Musico.  And I think some attention was drawn to the fact

25   that Mr. Musico wasn't charged.  Mr. Musico obviously was

trying to make a big statement by being out in front of the

Capitol, and we saw that text message string on the encrypted

chat where he, who they referred to as Grandpa, said, "Let's

have an armed demonstration in front of the Capitol" like they

had been doing before.  And these individuals said, "No way."

Adam Fox posed it to all of the rest of them and said, "Who is

up for doing this?"  And they all said, "No way.  We have to

keep a low profile."  And I believe the exact words were

something along the lines of -- for Mr. Garbin where "We have

to have zero and I mean zero public interaction with him if we

want to follow through with our plans."  Why would you say zero

public interaction if the reason why you were doing this was

not just fun but it was political and you wanted to make a

statement?  Why would you say "We want to have zero interaction

with the people who are being noticed by the media, who are

going to see our faces, and we are going to be seen involved

with this."  They wanted to keep a low profile.  And they say

"If we want to follow through with our plans."  So obviously

they had some plans not just to get back together again and

have a potluck like somebody was saying and shoot at targets in

the woods.

          Finally, they were arrested all coming to buy -- to

give money for more gear.  I think the totality of the

circumstances here is what tells us what was going on.  I

understand that defense counsel want to try and pick it apart

1    and say that this was fine, that was fine.  And it's right,

2    there's nothing wrong with training for medical situations or

3    how to shoot guns.  There's nothing wrong with talking over

4    encrypted applications.  People do that for all kinds of

5    reasons, I suppose.  There's nothing wrong with being upset

6    with your government or your governor.  There are people who

7    protest with signs out in front of the Capitol.  That's okay.

8    There's nothing wrong with driving around at night.  There's

9    nothing wrong with having night-vision goggles, I suppose, or

10   silencers if they are legal and you've paid the tax stamps.

11   But when you put all those things together, you have a

12   different picture.

13        And I was trying to bring it up yesterday during

14   questioning, but I think it's more appropriate to make the

15   analogy here in argument, you can analogize this to something

16   like a bank robbery or a burglary.  If you're planning to

17   burgle somebody's house, you can say there's nothing wrong with

18   having ski masks.  It's perfectly legal.  Lots of people have

19   them.  And there's nothing wrong with driving around on a

20   public street.  But if you say that you are interested in

21   burglarizing somebody's house and you get ski masks and you

22   drive by their house in the middle of the night casing it out

23   once, maybe twice, then it starts to paint a picture that you

24   may really intend to burglarize that house, which is I think

25   what we have here.

1          If they weren't serious about doing this, they

2    wouldn't have freaked out about having feds in their presence.

3    They wouldn't have been saying, like Mr. Garbin did, "We should

4    have zero and I mean zero public interaction with the public

5    where they are going to see what we're up to."  And you

6    wouldn't, I think most importantly, have a couple of other

7    people who actually did withdraw.  We heard a lot of discussion

8    about, "Well, you don't know that my client didn't withdraw,"

9    but you know what, we know that at least two people said they

10   wanted nothing to do with this.  And I think if all they were

11   doing was something recreational in the forest, you wouldn't

12   have people saying "I don't want to go to jail over that."

13          *THE COURT:*  Ms. Nieuwenhuis.

14          *MS. NIEUWENHUIS:*  Your Honor, we are objecting

15   without argument at this time.

16          *THE COURT:*  All right.  Thank you.

17          You're next, Mr. Springstead.

18          *MR. SPRINGSTEAD:*  Mr. Satawa is going to handle the

19   arguments.

20          *THE COURT:*  All right.

21          *MR. SATAWA:*  Good afternoon, Your Honor.  And

22   congratulations.

23          *THE COURT:*  Good afternoon.

24          *MR. SATAWA:*  Your Honor -- Your Honor, if it pleases

25   this Honorable Court, I note that the government made its

1      bond-over argument and stated that, you know, "We presented a

2      bunch of evidence about firearms and other things, but the

3      charge is kidnapping."  It is interesting and question --

4      raises an interesting question as to if the charge is

5      kidnapping, why was so much, in fact a significant part of the

6      government's case, focused on whether or not somebody had a

7      firearm or a silencer, whether a rifle was too short or whether

8      it was a pistol, pictures of individuals playing army in the

9      woods?

10             Your Honor, I think that the probable-cause standard

11     at this point -- the government chose the charges, the

12     government chose to charge conspiracy to commit kidnapping.

13     That is the government's prerogative.  And it's interesting

14     that when -- when the charges are chosen, we are, as defense

15     lawyers and on behalf of Mr. Garbin, our task is to answer

16     those charges.

17             The government could have charged weapons violations

18     or seditious conspiracy or other offenses.  But now that we're

19     talking about bindover the only offense that's in front of the

20     Court is conspiracy to commit kidnapping.

21             So the first question that responds to the government

22     talking about the elements involved is when did this conspiracy

23     begin?  And do we have evidence as to when a formal conspiracy

24     began on behalf of Mr. Garbin?  After that conspiracy began

25     when did Mr. Garbin join that conspiracy?  And in fact if he

1    ever did join it -- and I would submit that he did not -- did

2    Mr. Garbin abandon that conspiracy?

3            I will remind the Court in response to

4    Mr. Springstead's questioning of the agent, it is now

5    unrebutted that Mr. -- that Mr. Garbin stated "We're not

6    kidnapping anyone" I believe at the September 13th meeting.

7            If in fact a conspiracy was reached -- and I'm not

8    sure there was -- and if in fact Mr. Garbin joined that

9    conspiracy, did in fact that statement not only just express a

10   criticism or a lack of criminal intent to be a member or to

11   join that conspiracy but did it also possibly suggest that he

12   was not -- that he was abandoning it if in fact he was ever in

13   it to begin with?

14           Your Honor, I think that when we talk about the

15   charges here today it's important to remember that, as I was

16   saying earlier, in charging conspiracy to commit kidnapping and

17   yet bringing all this other information into the fold, the

18   government is bringing a case that does involve the

19   First Amendment freedom of speech and of association and of

20   assembly.  The government is bringing a case that is talking

21   about the Second Amendment right to possess firearms.

22           When there is black-letter law, black-letter

23   conspiracy law that when conspiracies touch on those things,

24   the government -- that this Court's function and inquiry is

25   raised to a higher level.  In order to sustain a conviction for

1    conspiracy, the government must prove each defendant agreed to

2    violate the law, possessed the knowledge and intent to join the

3    conspiracy and participated in that conspiracy.  That's

4    United States v. Silvo [sic], S-I-L-V-O, 620 F.3d. 630 (2010).

5

6         Your Honor, Pinkerton, of course, of which this Court

7    is well familiar, went on to state that -- hold criminal

8    conspiracy requires an object to be accomplished, a plan or

9    scheme embodying a means to accomplish that object, the

10   agreement by two or more defendants to accomplish that object,

11   and an overt act when applicable.

12        One of the requisite elements the government must

13   show in a conspiracy case is that the alleged conspirators

14   shared a unity of purpose.  The intent to achieve a common goal

15   and an agreement to work together towards that goal in absence

16   of evidence of these essential factors, a conspiracy charge

17   cannot be sustained.  That's United States v. Lee, a

18   Sixth Circuit case from 1993.  991 F.2d. 343.

19        Most importantly in this case is that when a

20   conspiracy implements -- implicates -- I apologize,

21   Your Honor -- when a conspiracy implicates First Amendment

22   protections such as freedom of association and freedom of

23   speech, the court must make specially meticulous inquiry into

24   the government's evidence so that there is not an unfair

25   imputation of the intent or acts of some participants to all

others.  United States v. Dellinger, 472 F.2d. 340,

Seventh Circuit (1972).  "A defendant cannot be convicted of a

conspiracy merely on the grounds of guilt by association and

mere association with the members of the conspiracy without the

intention and agreement to accomplish an illegal objective is

not sufficient to make an individual a conspirator."  Lee at

348.  "Mere presence at a scene does not establish

participation in a conspiracy."  United States v. Paige,

470 F.3d. 603, Sixth Circuit (2006).

Your Honor, I would submit as it relates to

Mr. Garbin that that is all the government has done there,

which is to show that he was a participant.  The government has

made a bindover argument stating that they took steps towards

actually kidnapping the governor.  And he talked about the

steps that he alleged the conspirators in the conspiracy in

this case made.  There has been no evidence submitted in this

record that Mr. Garbin did those things, that he embraced the

goals of the conspiracy, that he agreed to the goals of that

conspiracy, and that he went on to support the goals of that

conspiracy in so doing.

Your Honor, I think it's important for things like

the chats that the government makes such a big deal about that

Mr. -- in response to Mr. Springstead's questioning the chat

attributed to Mr. Garbin was in response -- it was in response

to the confidential informant basically saying the same thing

1    and Mr. Garbin parroting it back.

2              The government makes an argument that at the 9-12

3    into 9-13 nighttime surveillance the conspirators had to decide

4    who was going to do what and who was going to do what part of

5    the mission.  Your Honor, that's evidence that simply doesn't

6    exist, at least -- and again we understand that it's a

7    preliminary examination, and we understand that hearsay upon

8    hearsay is allowed, and that the case agent -- it's not humanly

9    possible for him to have reviewed the hundreds if not thousands

10   of hours of tapes that exist in this case, but just because

11   three different cars went somewhere, and the case agent is not

12   familiar as to what Mr. Garbin's car did before then, whether

13   or not it went to dinner in Big Rapids, whether or not they ate

14   at the Holiday Inn, what exactly was told to Mr. Garbin before

15   he went on this drive, whether or not Mr. Garbin was told what

16   was going to be happening.  According to the case agent the car

17   that Mr. Garbin is in's task was to flash headlights.  Again,

18   Your Honor, without more -- and we understand that the burden

19   is relatively low at this point -- but without more does the

20   testimony provided by the case agent and the argument provided

21   by the government overcome the specially meticulous inquiry

22   that the -- that Dellinger requires in a case that does

23   implicate the First Amendment -- the First Amendment

24   association, assembly, and free speech rights.

25             Your Honor, Mr. Garbin showing up, participating, is

1    not by itself, without more, evidence that he agreed, that he

2    agreed to the conspiracy, if we even have enough evidence that

3    one was formed, and if we have one, even if it was formed, that

4    Mr. Garbin knowingly and voluntarily entered into.  We would

5    ask the Court to not bind over as to Mr. Garbin.  Thank you.

6              *THE COURT:*  Thank you, Mr. Satawa.

7              Mr. Graham.

8              *MR. GRAHAM:*  Your Honor, a few simple points.  I know

9    the Court is well aware of the standard, we all are, to be

10   applied here.  It does remain the government's burden no matter

11   what.

12             We don't think that a conspiracy has been established

13   by any standard of proof.  If there was actually a conspiracy

14   as opposed to some loose talk, then what really was the

15   conspiracy?  Was it a conspiracy to take the governor and set

16   her adrift in the middle of the lake?  Was it a conspiracy to

17   take her and then -- again, the government urges us to apply

18   common sense and I agree with that.  Common sense looks at this

19   "A kidnapping of the governor?"  And then people apparently --

20   well, we didn't hear anything about a real plan that would

21   cause someone to do something in the face of what

22   undoubtedly -- again common sense -- be the largest manhunt in

23   the history of the state.  What was going to happen?  It's

24   loose talk.

25             And again, the point is:  What has been done to show

1    you that there was an actual, actual agreement?  And I would go

2    back to a fact, to an actual fact as opposed to speculation

3    that all of the attorneys are prone to make.

4            In the transcript of proceedings from Tuesday at

5    page 62, line 13, there is a statement that when Mr. Fox was

6    arrested he made a statement and he talked about his plan.

7    That's a quote.  Well, that doesn't show that Mr. Fox is guilty

8    of a conspiracy.  And it certainly doesn't show that anyone

9    else is.  If Mr. Fox -- if he said that -- and again, who

10   knows -- and I'm not -- I am not impugning the agent in terms

11   of saying he was told that, it's not that at all -- but we get

12   into questions of reliability when we're dealing with fifthhand

13   hearsay.  But his plan, his plan would not be a conspiracy.  He

14   would not be guilty of conspiracy and most certainly no one

15   else would.

16           So in some ways -- I understand the seriousness of

17   this charge.  It is incredibly serious.  I understand that.

18   But they still have to produce some evidence that causes you

19   when you evaluate and all of us when we apply common sense to

20   think "Really?  Was there really an agreement here?  Or is it

21   just loose talk?"

22           It could be loose talk, it could be dangerous talk,

23   but was there really an agreement?  And if so, what exactly was

24   the agreement?  Because I have no idea right now.

25           Now, the government says that, you know, in the

1    course of these proceedings that we've digressed a bit.  Well,

2    the reason we've digressed from the question of kidnapping is

3    because the government says there are certain things that show

4    that there was going to be a kidnapping and that has to do with

5    training, weapons, explosives.  You know, the whole point about

6    explosives -- and at various times the government said this is

7    not a case about explosives -- well, it is, because that was a

8    key component to their alleged, I guess, what the government

9    believes is the conspiracy here.

10            And what we do know about the allegation of

11   explosives is we've got nothing that goes beyond some enhanced

12   firecrackers.  We've got talk about $4,000 for explosives that

13   would be used on the bridge, but what's the evidence before you

14   about what happened to follow up?  When in fact the arrests

15   were made at this meeting where there's apparently -- I don't

16   know if it's going to be a purchase or the $4,000 will be

17   delivered -- what is the evidence before you about how much

18   money was there?  The evidence is $275.

19            So every -- the reason we've tried to pick this apart

20   is because this overriding, I think -- this overriding

21   allegation of a conspiracy has got -- is so outlandish, it's

22   got to be made up of actual facts.  And when you look at those

23   facts, they don't make sense.  They don't make sense under any

24   standard of proof.

25            We certainly know that in regard to Mr. Franks

1    that -- we certainly know that -- and it's undisputed -- that

2    at some point early on he says he is opposed to a forced

3    kidnapping or to the concept of forced kidnapping.  The

4    government argues that he -- I think would argue that he goes

5    beyond that by his actions after.

6         Well, where -- where do those actions actually --

7    whatever you find that those things are, those actions are, how

8    do they -- how do they actually tie in with an agreement?  How

9    do they tie in with an agreement?  And again, if there was an

10   agreement, what exactly was that agreement?  Was the agreement

11   to cast her adrift in the lake?  Was the agreement to take her

12   and move her to another location?  Or is the government's

13   position that there simply was an agreement "I guess we're

14   going to kidnap her and leave her in the car somewhere."  I

15   don't know.  I just have no idea.  That's how absurd the whole

16   thing is.

17        So from our perspective we believe that the evidence

18   has not established by any standard of proof that there was a

19   conspiracy here, and certainly -- and certainly don't believe

20   that Mr. Franks is tied to any conspiracy, and so we'd ask you

21   to reject the government's motion for a bindover.  Thank you.

22        *THE COURT:*  Thank you.

23        Mr. Douglas.

24        *MR. DOUGLAS:*  Your Honor, we'll continue to object

25   but not argue.  I think the issues are before you.

1          *THE COURT:*  Thank you, Mr. Douglas.

2          Mr. Hills.

3          *MR. HILLS:*  Thank you, Your Honor.  As this Court

4     knows, this Court has to make an individualized assessment, and

5     it becomes a difficult job in my estimation when you've got

6     several defendants and throughout the course of the testimony

7     it's they did this and they did that.  But "they" weren't

8     always there.  They weren't always present as a group in a

9     whole.

10          And I'll give you an example.  Mr. Kessler indicated

11    on October 7th they were all there and they were all going to

12    contribute money for these explosives.  Well, Mr. Caserta was

13    not there.  He was at work.  So that's just one example.

14          And when I go back and look for my client with what

15    he participated in, he started June 28th in Munith, and I think

16    that's when that video was there, so he was not doing anything

17    illegal.  He was participating in a group.  And I think that

18    throughout all of them I think the agent testified that there

19    were multiple people there, anywhere from 30 to 50 or so, and

20    doing legal things, training in different areas.  So that's

21    what my client was doing at that location.  And because

22    somebody says "Okay, we're going to have this agreement, and if

23    you don't agree with it, you have to leave," well, people came

24    there to do a certain thing, to train, and they are training,

25    as my client was.

1                The same thing with Wisconsin.  On June I think it

2      was -- July 10th through 12th, at that location, again multiple

3      people there, my client is training, no allegation that my

4      client did anything there.  There was, I think, an attempted

5      explosion there.  I think that was the BB thing.  My client had

6      nothing to do with that.  There's no evidence of anything

7      there.

8                There was a meeting at Lake Orion.  There was nothing

9      there.  My client made a few statements, but these are general

10     statements, not anything specific.  And I'll get back to that

11     regarding the First Amendment and freedom of speech and

12     assembly.

13               But moving forward to Luther in September, again, my

14     client is there.  There are multiple people there.  I'll just

15     go with 30 to 50 people.  But it's an FTX training exercise

16     event.  And that's what my client was doing there.  There were

17     these two surveillance operations apparently that were

18     testified to, and again they didn't do it.  My client didn't do

19     it.  My client wasn't a part of the first surveillance.  My

20     client wasn't a part of the second surveillance.  And

21     apparently there's jobs that are being done as a part of this

22     mission.  You can't tell me here right now what my client's

23     alleged job was for this alleged conspiracy.  Was he a driver?

24     A shooter?  A grabber?  A lookout?  You don't know.  You don't

25     have that information because he wasn't involved in it.  That

1    information wasn't provided because it doesn't exist.

2         When you go through, my client wasn't a part of any

3    militia.  He wasn't a part of the surveillance.  He was not

4    part of the explosions.  He was not part of the IEDs.  He was

5    not part of any cupcake or baker or cake talk.  He wasn't part

6    of drawing a map or detail.  I already discussed that he wasn't

7    involved in any sort of plan.  He didn't go to any rally.  He

8    didn't contribute any money.  No dues to anything.  And I

9    would -- all we have -- and the Court didn't like my client's

10   statement yesterday.  I might not have liked it either.  On

11   Wednesday.  All right?  But it doesn't have anything to do with

12   kidnapping the governor of the State of Michigan.

13        I would reiterate Mr. Satawa's recitation of

14   Dellinger, Paige, and I believe Lee regarding where these

15   statements run head-long into the First Amendment, freedom of

16   speech and freedom of assembly.  So that's what you have with

17   my client.  You have him assembling and doing these things that

18   are perfectly legal, and you've got some other statements that

19   maybe it's inflammatory rhetoric, I'll give you that, but it's

20   perfectly legal.  We might not like it.  The Court might use it

21   to detain my client.  But it doesn't have anything to do with

22   kidnapping the governor or a conspiracy to kidnap the governor.

23        And Exhibit 10, I don't think my client was even

24   alleged to have been a part of that text string that the

25   government talked about.  So I would ask the Court to deny

 1    bindover.   Thank you.

 2          *THE COURT:*  Thank you, Mr. Hills.

 3          Mr. Kessler, I'll give you the last word.  I do have

 4    one question for you.

 5          *MR. KESSLER:*  Yes, Your Honor.

 6          *THE COURT:*  In connection with the conspiracy charge,

 7    because it requires -- what the statute says is "If two or more

 8    persons conspire to violate this section and then one or more

 9    persons do an overt act to effect the object of the conspiracy,

10    each will be punished by imprisonment," yadda, yadda.

11          In violating this section, which of the provisions

12    above are you relying on?  (a)(1)?  1201(a)(1)?

13          *MR. KESSLER:*  I'll have to pull it out.

14          *THE COURT:*  I guess my question, without reference to

15    the statute, is do you need to show probable cause that the

16    object of the conspiracy was to take her across state lines in

17    order to support the conspiracy charge in this case?

18          *MR. KESSLER:*  We do not, Your Honor.  It's sufficient

19    that they used a means or instrumentality of interstate

20    commerce.  And they used the internet, cell phones, and various

21    things like that to further the purpose.

22          *THE COURT:*  All right.  Thank you.

23          Did you wish to argue further in rebuttal?

24          *MR. KESSLER:*  Yes, Your Honor.  I just want to

25    address a couple of things that counsel said.

1              We did have two statements, one from Mr. Garbin and

2      one from Mr. Franks, that all alone and taken out of context

3      might imply that they weren't interested in it.  For example, I

4      think they highlighted on behalf of Mr. Garbin saying "We're

5      not here to kidnap anybody."  But as the Court will recall,

6      that was in the context of a conversation when they had just

7      gotten back from casing her house and they were all laughing

8      and the responses were "No, no children, we're adult napping."

9              So, if anything, it just shows their callousness

10     towards the seriousness of the whole thing.  Mr. Franks may

11     have said he was opposed to kidnapping at some point long

12     before that, but then unlike Mr. Higgins and Mr. Molitor who

13     said, "I don't want to go to jail" or "I want no part of that,"

14     they stuck around and they continued doing things in

15     furtherance of this purpose.

16             I do want to address, since two counsel had brought

17     it up, the notion that this case involves the First or

18     Second Amendment rights at all.  And I think that's a complete

19     red herring that this Court should disregard.

20             The idea that this implicates freedom of speech is,

21     frankly, absurd in this case when you have all their

22     communications going on on encrypted chats that no one else can

23     see.  So the idea that that's somehow protected speech, it

24     doesn't make a whole lot of sense.  Their whole purpose was to

25     keep anyone from hearing what they were saying.  And they are

1   not being charged with saying anything that's against the law.

2           The idea that freedom of assembly should protect them

3   is also kind of silly.  If all they were doing was assembling

4   to have FTXs with no ulterior motive, maybe that would be an

5   issue.  But that's not what we have here.  And you certainly

6   can't claim when you all get together to rob a bank or commit

7   some other crime that somehow that implicates your

8   First Amendment to assemble freely.

9           The same thing goes for the Second Amendment.  They

10  are not being charged with firearms offenses, so the fact that

11  they had firearms as tools of the crime that they were

12  intending to commit does not implicate the Second Amendment,

13  any more than it does when somebody brings a gun to a

14  conspiracy to rob a bank.  That's not

15  Second Amendment-protected and it doesn't require any

16  heightened scrutiny by the Court.

17          The idea that these folks didn't embrace the

18  conspiracy, I think, you know, you could point to a number of

19  things, but the one that obviously jumps out is if you are not

20  onboard with this plan, you don't case the governor's house at

21  night.  There's just no innocent explanation for why you do

22  that.

23          Now, Mr. Graham made a point that, as to his client,

24  he's not involved because Mr. Fox had said at one point that it

25  was his plan.  Every plan starts with somebody, and I don't

1   dispute that the evidence seems to suggest that the plan

2   originated with Mr. Fox.  But just because Mr. Fox came up with

3   the plan doesn't mean the other people aren't -- are absolved

4   of guilt if they follow his plan.

5          As to Mr. Caserta, Mr. Hills is not incorrect that

6   his client appears to be less involved than some of the other

7   defendants, but less involved is not the same thing as not

8   involved.  Unlike some of the other people we've heard about,

9   he was there for conversations where they talked about

10  kidnapping and he stuck around and continued with the plot.

11         And I understand -- Mr. Hills was saying "What was

12  his job?  Was he a grabber?  Was he a looker?"  Well, yeah, in

13  Exhibit 20 they discussed training for asset extraction, which

14  can really only in common sense be read one way.  They had been

15  talking about taking the governor out of her house, and he was

16  enthusiastic about the idea of training for asset extraction.

17  That would make him a grabber in the terms we just heard.

18         It was asked was he a looker.  In Exhibit 29, among

19  all the inflammatory language, I think one word jumps out.  He

20  didn't just say "We should kill cops wherever we find them."

21  He said, "We should kill cops if we run into them on a recon."

22  As the agent testified, that means a reconnaissance or planning

23  for a mission.  If he's not doing a recon, then what is he

24  talking about at this point?

25         So just to sum up, I think we heard what is a

1    reasonable question from a lot of these people.  Was it a good

2    plan?  Had they thought it through?  As Mr. Graham was saying,

3    did they think through what they would do after they took the

4    governor?  No, it doesn't look like they did.  It looks like

5    they might have disagreed or not discussed it much.  One person

6    saying leave her out on a boat in the middle of the lake, other

7    people not really talking about what to do at all.  It doesn't

8    have to be a good plan to be dangerous.  These people got

9    caught because they are amateurs and they hadn't thought things

10   through.  That doesn't mean it wasn't dangerous, Your Honor.

11           *THE COURT:*  Thank you, Mr. Kessler.

12           All right.  The question before me in a preliminary

13   hearing is whether there's probable cause, not proof beyond a

14   reasonable doubt, to support the charge.  Nonetheless, it's the

15   government's burden to provide that evidence.

16           Under 18 U.S.C. 1201(c) the government must prove

17   that two or more persons conspired or agreed to commit

18   kidnapping as defined in 18 U.S.C. 1201.  And that one or more

19   of such persons did any overt act to effect the object of the

20   conspiracy.

21           The evidence that has been presented in this case

22   shows a series of events as laid out in the Complaint, which

23   was incorporated into Special Agent Trask's testimony, during

24   which the defendants trained and planned for an operation in

25   which they intended to kidnap Governor Gretchen Whitmer.  They

1    had discussions by electronic messaging and voice-to-voice and

2    in person about how to accomplish their plans.  And there's

3    also evidence that members of the conspiracy undertook overt

4    acts toward accomplishing that plan.

5              Various counsel take issue with each of the events

6    that took place and what those show, but on a probable-cause

7    standard, as I'll explain, there is sufficient evidence to

8    support the charge.

9              With regard to Mr. Fox, the evidence set out in the

10   Complaint and in Special Agent Trask's testimony is that he

11   coordinated and planned the kidnapping and agreed with his

12   codefendants to kidnap the governor.  As much as the AUSA

13   summarized in his argument.  There is certainly sufficient

14   evidence of probable cause to support the charge against

15   Mr. Fox.

16             Likewise, with Mr. Garbin there is ample evidence

17   that he intended to join the conspiracy to kidnap

18   Governor Whitmer.  And just to recap a small portion of that

19   testimony from the later stages of planning, you have the

20   September 12 and 13 FTX at Garbin's property in Luther which

21   Mr. Fox, Mr. Croft, Mr. Garbin, Mr. Franks, and Mr. Caserta all

22   attend.  That's the event at which Mr. Croft constructs an IED

23   and detonates it.  At that exercise Mr. Fox takes Mr. Croft,

24   Garbin, Franks, and Caserta and others aside to brief them on

25   the plot.  And he selects Croft, Garbin, and Franks to conduct

1    a nighttime surveillance.  As we know, Harris and Caserta

2    remained at the camp.

3         The evidence regarding that surveillance demonstrates

4    that the group was focused on Governor Whitmer and her

5    property.  That they filmed it.  That at least one person who

6    was involved in that surveillance was very concerned about the

7    destruction of that video.

8         On September 13 the group again meets and confirms

9    that this is the group that's going to kidnap Governor Whitmer.

10   And they agreed to conduct a final training exercise in

11   late-October setting up a timeline for this event.

12        On September 14 in an encrypted chat Mr. Fox states

13   that he doesn't want that exercise to be the last week of

14   October because it's not enough time before the national

15   election.  And the group discusses using the time to raise

16   money for explosives and other supplies.

17        On September 17 in an encrypted group chat Fox,

18   Garbin, Franks, Harris, Caserta, and others are involved and

19   there's discussion of the invitation to participate in an armed

20   protest at the Capitol.  And specifically Mr. Garbin is against

21   public exposure, as they all are.  And he references the

22   ability to continue with their plans and that avoiding public

23   exposure is important to continuing with their plans.

24        On October 7 Mr. Fox, Mr. Garbin, Mr. Harris, and

25   Mr. Franks plan to meet with the UCE to make a payment on

1    explosives and tactical gear.  Again, there are questions about

2    exactly how that plays out and exactly what they were buying,

3    but it is the series of events and continuing building toward a

4    plan that is important here.

5           And I do intend this to be individualized.  I'm

6    focused just now on Mr. Garbin.  And as I said, counsel takes

7    issue with what each of these events show, but again on

8    probable cause there is sufficient evidence to support the

9    charge because of the repetition of the group's activities and

10   the building of the preparation toward the goal.

11          It appears from the government's evidence that the

12   group had coalesced around a plan to kidnap Governor Whitmer

13   and was preparing for that event.  In other words, there's

14   probable cause that the conspirators, as Mr. Satawa points out,

15   shared a unity of purpose, at least in that regard.  And

16   there's more than mere presence and association in evidence

17   here.

18          Counsel argues -- counsel argue that there was no

19   evidence of the specific agreement here or that this was just

20   loose talk.  The government isn't required to show that the

21   conspirators signed on a dotted line and had a multipage

22   five-step plan for exactly how it was going to go.  Instead

23   they are required to show a unity of purpose.  And again the

24   steady work towards this plan to kidnap the governor is ample

25   evidence of the probable cause to commit kidnapping.

1          Counsel isn't wrong that there is a lot of discussion

2     about various scenarios, but again, the plan seems to be

3     building through -- that is being built through these overt

4     acts seems to be, at its face, the plan to kidnap the governor

5     from her home in Northern Michigan and to take her elsewhere.

6     The fact that that was likely to be unsuccessful or difficult

7     to accomplish is not particularly relevant as to whether or not

8     the group intended to make that plan.

9          So that's a short recitation of some of the facts

10    that support probable cause.  Sufficient facts to support

11    probable cause.  And those same facts support a finding of

12    probable cause as to Kaleb Franks, Daniel Harris, and

13    Brandon Caserta.  I laid out the evidence supporting probable

14    cause in more detail during their bond hearings, and I

15    incorporate into my ruling here that reference.

16         Of those three Mr. Hills makes a good argument that

17    only Mr. Caserta was not involved either in the surveillance of

18    the governor's vacation home or with an attempt to purchase

19    explosives from what turned out to be an undercover agent.

20    Nonetheless, at least on a probable cause standard there is

21    sufficient evidence as to Mr. Caserta in that he was present

22    and involved in the planning discussions and appears to have

23    agreed on the objective of the group by continuing to be

24    involved in it.

25         But I don't rest on mere association.

1   Government Exhibit 19 demonstrates his involvement in strategy.

2   He didn't want to engage in protests where the engagement would

3   jeopardize the scheme.   In Government Exhibit 20 the group is

4   discussing the scheme and his participation references "When

5   the time comes."  So he appears to also be agreeing that this

6   plot should go forward.

7          He is also, as Mr. Kessler points out, enthusiastic

8   regarding training for acquiring an asset and detaining for

9   extraction.  In addition, the evidence in Exhibit 29 that he

10  believes the group has to be prepared to kill cops if we run

11  into them on a recon adds to the evidence that would support

12  at least probable cause that he committed the crime of

13  conspiracy to commit kidnapping.  So that is sufficient in

14  Mr. Caserta's case as well to demonstrate probable cause of his

15  intent in joining the conspiracy.

16         In summary, there is evidence sufficient to support

17  probable cause that the defendants charged agreed to kidnap

18  Governor Whitmer, and there is evidence that at least one

19  individual and in fact there's evidence that most of the

20  individuals in the group engaged in an overt act in furtherance

21  of that conspiracy.  At a minimum the surveillance of the

22  governor's house satisfies that requirement.

23         Therefore, I find that there is probable cause as to

24  each defendant to support the charge and will bind the

25  defendants over for proceedings before the grand jury.

1          That concludes the preliminary hearing, and we'll

2     adjourn at this point.  It's about 12:47.  Let's be back on the

3     record at 1:30 where we can conduct bond hearings.  Let's start

4     with Mr. Fox.

5          *THE CLERK:*  All rise, please.  Court is in recess.

6     *(Recess taken at 12:48 p.m.)*

7                         *   *   *   *   *

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10         I further certify that the transcript fees and format

11    comply with those prescribed by the court and the Judicial

12    Conference of the United States.

13

14    Date:  October 21, 2020

15

16                         **/s/ Glenda Trexler**
                           _____
17                         Glenda Trexler, CSR-1436, RPR, CRR

18

19

20

21

22

23

24

25

1          *EXAMINATION INDEX*

2                                                    *PAGE*

3     *RICHARD J. TRASK*

4          *CROSS-EXAMINATION BY MS. NIEUWENHUIS:      167*

5          *CROSS-EXAMINATION BY MR. SPRINGSTEAD:      178*

6          *RECROSS-EXAMINATION BY MR. GRAHAM:         222*

7          *CROSS-EXAMINATION BY MR. SPRINGSTEAD:      222*

8          *REDIRECT EXAMINATION BY MR. KESSLER:       225*

9          *RECROSS-EXAMINATION BY MR. GRAHAM:         230*

10         *RECROSS-EXAMINATION BY MR. DOUGLAS:        231*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25