UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                               No. 1:20-cr-183

ADAM DEAN FOX,               HON. ROBERT J. JONKER
BARRY GORDON CROFT, JR.,     Chief United States District Judge
KALEB JAMES FRANKS,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

        Defendants.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS TO COMPEL

The United States respectfully submits this response in opposition to Defendants Kaleb James Franks and Brandon Michael-Ray Caserta's motions to compel the production of certain items related to FBI confidential human sources and two Special Agents interacting with those informants, among other information. The other pending co-defendants have all joined one or both motions. This dispute arises out of the fact that the vast majority of the information sought is not discoverable—much of the information is not relevant to the case, and therefore the requests are overbroad—and some information that is relevant is protected from disclosure by the informant privilege.

The government will follow the ordinary rules for discovery in criminal cases, both with respect to the information to be produced and the timing of production. Some of the items are discoverable only in connection with trial and are dependent upon the witnesses called by the government, and therefore are subject to disclosure only at a later date. The government is currently undertaking a review of the items for any information subject to disclosure under *Brady*

and will produce that information as it is identified, unless it is Jencks material subject to
production at a later time as discussed below.  The motions should be denied.

## I.      BACKGROUND

### A.  Procedural history

Movants Franks and Caserta, and co-defendants Adam Fox, Barry Croft Jr., and Daniel
Harris are charged with, among other things, conspiring to kidnap the Governor of Michigan, in
violation of 18 U.S.C. § 1201(c). (R. 172: Superseding Indictment.) On July 12, 2021, Franks
and Caserta filed the pending motions.  (PageID.1238–60, 1351–70.)  Fox, Croft, and Harris
joined in one or both motions.  (PageID.1372–1374, 1378.)

The government began providing informant-related discovery to the defendants even
before their indictment.  For example, the government's very first, pre-indictment production
included more than 800 audio and video recordings that captured interactions with and among
the defendants, confidential human sources, and undercover agents.  The government also
produced hundreds of electronic communications involving the same parties, including messages
exchanged via Facebook Messenger, Threema, and Wire.  Beyond this, the government has
given the defendants the opportunity to review the tools that the defendants used to communicate
with each other and with confidential sources.  Since February of this year, the government has
been producing extractions of the defendants' own cell phones and computers in discovery.

### B.  Franks and Caserta, and the other defendants, were predisposed to commit the offense.

When a defendant alleges entrapment and seeks informant-related discovery, he must
show the discovery is essential to a fair trial and outweighs the public's interest in nondisclosure.
This analysis often turns on the evidence of entrapment marshalled by the defendant, which is in
turn contingent on the defendant's predisposition to commit the offense.  "Entrapment has two

2

related elements. One is that the defendant was not already willing to commit the crime. The other is that the government, or someone acting for the government, induced or persuaded the defendant to commit it." Sixth Circuit Pattern Jury Instruction § 6.03 (2019); *see United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990) (citing *Mathews v. United States*, 485 U.S. 58 (1988)). The first element is referred to as predisposition, which is guided by

> five separate factors: (1) the character or reputation of the defendant; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense but was overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government.

*Nelson*, 922 F.2d at 317 (citing *United States v. Lazcano*, 881 F.2d 402, 406 (7th Cir. 1989)).

Thus, it is helpful to understand, at the outset, that the defendants were predisposed to join the kidnapping and explosives conspiracies, and therefore will not be able to prove entrapment.

For example, on June 6, 2020, Fox and Croft attended a meeting with "militia" activists from multiple states, where they proposed attacking the governors of Michigan, Ohio, and Virginia. Croft brought and displayed to the group an improvised explosive device he had constructed for the purpose. Croft referred to himself as a "terrorist" who was going to "burn motherfucking houses down, blow shit up."

On July 3, 2020, Fox met for the first time with an undercover agent who had been introduced to the group, and advised *him* of the group's plans:

> FOX: We're, we're movin' forward man, we're actively planning some missions right now.
>
> UCE: Okay.
>
> FOX: Um. The consensus is as of right now is takin' the fuckin' capitol. By force. Like, with extreme heavy fuckin' prejudice toward our fuckin' governing

3

officials.  I mean obviously we're not just talkin' about goin' to murder a bunch of cops and shit, but they got a choice to make.

UCE:  Yeah.

FOX:  They swore an oath just like we all did when we joined the, the militias, you know.

UCE:  Right, well that's to the Constitution, not to the fuckin' legislature.

FOX:  We swore an oath to the constitution. So, if they're going to sit here and stand between us and a fuckin' oppressor, a tyrant.

Harris expressed similar sentiments before he even met Fox, and offered his explosives expertise to the Wolverine Watchmen as early as May 1, 2020:

> **Daniel Harris**
> I can make things go boom if you give me what I need. I think I have the algorithm for timing det cord somewhere in my office
>
> Stick up for your rights dude
>
> **grandpa**
> Dude keep it going and tell him this is a constitutional repulic
>
> **Daniel Harris**
> We started out that way, pretty sure if the founding fathers saw how shit was being run they'd be looking at us like "wtf, kill them"

At "field training exercises" in Cambria, Wisconsin, on July 11, 2020, and Luther, Michigan, on September 13, 2020, Harris assisted Croft in constructing and testing improvised explosive devices for the kidnapping plot.  After their return from training, defendants Fox ("AlphaFuckYou"), Caserta ("DebasedTyrant"), Harris ("Beaker"), Garbin ("Gunny") and Franks ("redhot") internally discussed practicing the "extraction" of the Governor:



The defendants all agreed that it was important to keep a low profile until they could

carry out their planned operation:



**C. The discovery requested is voluminous.**

The discovery sought by Franks and Caserta is voluminous. Franks asserts the government has used at least 12 informants in this investigation. (PageID.1352.) Franks and Caserta collectively seek (1) all of the information stored on each informant's cell phone, (2) each informant's file maintained by the FBI,[1] (3) each informant's "data records" to the extent they fall outside of Category 1, (4) all of the information stored on two FBI agents' cell phones, (5) communications between agents and informants to the extent they fall outside of Categories 1 and 4, including communications through various methods (text, social media, etc.) (6) agents' notes related to each informant, (7) agents' surveillance logs related to each informant, (8) agents' reports related to each informant, and (9) records or information documenting unsuccessful investigative efforts.[2] Caserta's request is limited to Category 1 with respect to CHS-2 and Category 4.[3]

## II. LEGAL STANDARD

**A. The identity of confidential human sources is protected by the informant privilege.**

The government holds a privilege to restrict disclosure of the identity of a confidential informant and information related to the informant. *See Roviaro v. United States*, 353 U.S. 53

---

[1] For simplicity, this brief includes in this category information sought by Franks that could be contained in an informant's file, irrespective of whether it is, as the analysis of all of this information is the same in the discussion below. Thus, this category for purposes of this brief includes instructions, admonitions, and agreements; payments; polygraphs and polygraph requests; breaches of the agreements; criminal history; cooperation history; and mental health records.

[2] This brief refers to information in each category by the number referenced in this paragraph.

[3] The government does not address Caserta's request for his own cell phone in light of the parties' agreement it will be produced, as acknowledged by Caserta. (PageID.1238 n.1.)

(1957). That privilege permits the government to restrict disclosure even where partial disclosure is necessary to litigate a particular case. *United States v. Sierra-Villegas*, 774 F.3d 1093 (6th Cir. 2014). In *Sierra-Villegas*, a case arising out of this district, the "Government sought to block the public disclosure of the CI's identity that could arise through the admission of evidence and the CI's appearance to testify." *Id.* at 1098. Recognizing the informant privilege provided by *Roviaro*, the Sixth Circuit observed that the "government does not necessarily waive the informant privilege whenever the identity of the informant is known by the defendant . . . . Such situations are best understood as partial disclosure, and some of the government's interest in protecting an informant's identity may remain." *Id.* Even though "the Government ha[d] pointed to no specific threat to the CI, it [was] clear that the CI could potentially be harmed by disclosure." *Id.* at 1099. Accordingly, the "district court properly rejected [the defendant's] motion to compel." *Id.*; *see United States v. Wilson*, 653 F. App'x 433, 444–45 (6th Cir. 2016) (affirming order denying production of the informant where the defendant knew the informant's identity because the defendant failed to meet his burden that examination of the informant was "essential to a fair trial" (internal quotation marks omitted)). "The interests protected by the privilege . . . often extend beyond identification of the informer[,]" including the "informer's location" and "the precise relationship between the government and an individual." *United States v. Sharp*, 778 F.2d 1182, 1186 (6th Cir. 1985).

A defendant can obtain access to an informant's identity and communications after showing that the disclosure "is relevant and helpful to the defense" or "essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60–61. The Court must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. "The presumption is strongly in favor of nondisclosure . . . ." *United States*

7

*v. Rodgers*, Nos. 92-5648 & 92-5769, 991 F2d 797, at 799 (6th Cir. 1993) (per curiam)

("*Roviaro* did not give the defense access on demand, however."); *accord United States v.

Skeens*, 449 F.2d 1066, 1070 (D.C. Cir. 1971) (describing the required showing as a "heavy

burden" on the defendant).

"[W]here the defendant implicates the informant in asserting an entrapment defense, [the

Sixth Circuit] require[s] evidence of entrapment beyond 'mere conjecture or supposition about

the possible relevancy of the informant's testimony.'" *Rodgers*, 1993 WL 94051, at *3 (quoting

*Sharp*, 778 F.2d at 1187). When informant-related evidence is not *Brady* material, the defendant

who advances the entrapment defense "must adduce some evidence of entrapment before the

government is called upon to disclose to the defendant [the] identity of an informant or to

disclose whether a potential witness may have given information to the government." *Sharp*,

778 F.2d at 1187 (citing *United States v. Paoli*, 603 F.2d 1029, 1037 (2d Cir. 1979)). "'Mere

conjecture or supposition about the possible relevancy of the informant's testimony is

insufficient to warrant disclosure.'" *Id.* (quoting *United States v. Gozales*, 606 F.2d 70, 75 (5th

Cir. 1979)). A defense assertion that an informant participated in the alleged crime, and thereby

entrapped the defendant, alone is insufficient to outweigh the public interest in protecting the

informant's identity. *United States v. Ashrafkhan*, No. 11-20551, 2015 WL 1757325, at *2 (E.D.

Mich. Apr. 17, 2015).

Defense requests for informant information based on alleged entrapment therefore fail

where the defendants do not "present[] . . . hard evidence" and defense counsel can "ably cross-

examine[]" the government's witnesses even without the information. *Rodgers*, 1993 WL

94051, at *3. It is often difficult for defendants to meet their heavy burden that production of an

informant or related information is essential to the defense and outweighs the public's interest

because the defendants already have access to the informant-related information that is probative

of their entrapment defense. For example, in *United States v. Bost*, 536 F. App'x 626 (6th Cir.

2013), the defendant alleged entrapment, and testified in his own defense that he was entrapped.

*Id.* at 633. The defendant knew the identity of the informant, and argued the district court had to

at least conduct an *in camera* examination of the informant on the basis of the defendant's

testimony. *Id.* at 633–34. In affirming the denial of the sought evidence, the Sixth Circuit

reasoned the defendant "did not establish how the informant testifying to the same facts [as the

defendant did] would have assisted him in establishing an entrapment defense." *Id.* at 633.

"While there may have been some evidence of entrapment based on Bost's testimony, such

evidence was not enough to require that the district court hold an *in camera* hearing regarding

the informant's disclosure." *Id.* at 634. The district court had previously reviewed a recorded

interaction between the informant and the defendant, and "found that nothing in it indicated that

'Bost's will had to be overborn' by the informant before Bost agreed to take part in the offense."

*Id.* (quoting the record). Thus, it is difficult for defendants to meet their burden to defeat the

informant privilege, even where entrapment is alleged, because the defendants already have

access to the informant-related and other evidence that is probative of the elements of

entrapment: the defendant's interactions with the informant, and the defendant's own

predisposition to commit the crime. The informant's other communications, including with

agents, often do not bear on those elements in a significant way. *See Morris v. United States*,

No. 1:13-CR-00039, 2017 WL 9538520, at *3 (W.D. Ky. June 5, 2017) (report and

recommendation) ("[E]ven if the Court accepts Morris' account of the interactions with the CI as

true, there is still no circumstance in which Morris could have satisfied the predisposition prong

of an entrapment defense, meaning that the evidence would have no bearing on his guilt or

innocence."); s*ee also Zeune v. Warden*, No. 2:14-cv-1459, 2016 WL 2757508, at *8 (S.D. Ohio May 12, 2016)  ("[T]he evidence adduced at trial indicates that the withheld audio recordings, even assuming they could be considered exculpatory, were immaterial because appellant's predisposition to commit the drug offense negated any potential entrapment defense.").

### B.  Rule 16 requires the production of, among other things, documents material to the preparation of defense.

Rule 16 "is intended to prescribe the minimum amount of discovery" to which the defense is entitled.  *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011) (internal quotation marks omitted).  Pertinent here, Rule 16(a)(1)(B)(i) requires production of the defendant's relevant written and recorded statements in the government's possession that the prosecutor knows, or could know through diligence, exists.  Rule 16(a)(1)(E) provides three types of documents and objects that must be made available for inspection and copying if in the possession of the government: items material to preparing the defense, items that will be used in the government's case-in-chief, and items obtained from the defendant.[4]

To be material, "'there must be an indication that . . . disclosure . . . [will] enable[] the defendant to alter the quantum of proof in his favor.'"  *United States v. Dobbins*, 482 F. App'x 35, 41 (6th Cir. 2012) (quoting *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (per curiam)) (internal quotation marks omitted).  In *Dobbins*, the court held that inculpatory information that directly involved the defendant did not need to be disclosed to the defense. *Dobbins*, 482 F. App'x at 42.  This was because the document in question, a detective's rough notes, "tended to support the government's case."  *Id*.  Documents that do not alter the quantum of proof in the defendant's favor are not "material" in the meaning of Rule 16.

---

[4] The items in dispute here were not obtained from the defendants, with the exception of Caserta's phone, which Caserta acknowledges the government has agreed to produce.

In determining Rule 16 materiality, the burden is on the defense to "make a *prima facie* showing of materiality in order to obtain disclosure of a document." *Dobbins*, 482 F. App'x at 41. *See also United States v. Gibbs*, 646 F. App'x 403, 413 (6th Cir. 2016) ("We conclude that Gibbs has failed to carry *his burden* of establishing that the discovery sought was material to the case." (emphasis added)); *United States v. Clingman*, 521 F. App'x 386, 392 (6th Cir. 2013). "[I]nformation . . . is not material merely because the government may be able to use it to rebut a defense position." *Dobbins*, 482 F. App'x at 42 (second alteration in original) (quoting *Lykins*, 428 F. App'x at 624) (internal quotation marks omitted).

> Rule 16 also expressly exempts certain documents from disclosure.
>
> Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in [the Jencks Act].

Fed. R. Crim. P. 16(a)(2). "Reports, memoranda, and other internal government documents made by government agents in connection with the investigation or prosecution of the case are exempt from discovery." *Id*. advisory committee's notes (1966 amend.). An exception to this limitation exists, of course, for *Brady* material. *Id.* (1974 amend.).

### C. *Brady* requires the disclosure of materially exculpatory information, and *Giglio* requires the disclosure of material impeachment information.

The government is required to produce "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). The government here has endeavored,

and will continue to endeavor, to produce any information that is arguably *Brady* material reasonably promptly after discovery, but the constitutional standard is satisfied so long as disclosure is made in time for the defendant to use it at trial. *E.g.*, *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (citing *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988)); *see United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) ("Delay violates *Brady* only where the delay causes prejudice.").

A "defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). Thus, it is the government's responsibility to "decide[] which information must be disclosed," and "[u]nless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Id.* (footnote omitted).

The *Giglio* Court followed the *Brady* standard for exculpatory evidence, holding that impeachment evidence also requires "[a] finding of materiality." *Giglio v. United States*, 405 U.S. 150, 154 (1972). The defense must be able to show that specific impeachment evidence is material. *E.g.*, *United States v. Watson*, 778 F. App'x 340, 353 (6th Cir. 2019) (observing that *Giglio* requires a showing of materiality). *Giglio* information is only discoverable with respect to a testifying witness who could be impeached, and so *Giglio* disclosures cannot be made before the government has identified which witnesses it will call at trial. Like *Brady* material, then, the constitutional requirement is satisfied so long as the disclosure is made in time for the defendant to use the information at trial. *See, e.g.*, *United States v. Blake-Saldivar*, 505 F. App'x 400, 410 (6th Cir. 2012) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)); *Crayton*, 357 F.3d at 569.

### D.  Rule 26.2 requires disclosure of certain statements of witnesses.

Jencks material is required to be disclosed by Rule 26.2.  Rule 26.2(a) requires the

production of "any statement of the witness that is in [the party's] possession . . . that relates to

the subject matter of the witness's testimony."  Although the government frequently makes

earlier disclosures voluntarily, the rule requires production only after the witness testifies.  *See*

Fed. R. Crim. P. 26.2(a); *Presser*, 844 F.2d at 1283 ("[T]he government may not be compelled to

disclose Jencks Act material before trial.").  This timing rule is based on concerns for witnesses'

safety, which the government is best positioned to evaluate.  *See Presser*, 844 F.2d at 1285

(observing that "an important function of the Jencks Act" is "the protection of potential

government witnesses from threats of harm or other intimidation before the witnesses testify at

trial").  The government here has good-faith, bona fide concerns about the informants' safety in

the context of this domestic terrorism investigation, where the defendants allegedly plotted to

kidnap the Governor as part of a militant, extremist group that regularly engaged in tactical and

weaponry training.  These timing requirements trump the otherwise applicable requirements.

*E.g.*, *Davis*, 306 F.3d at 421 ("When *Brady* material sought by a defendant is covered by the

Jencks Act . . . the terms of that Act govern the timing of the government's disclosure."

(alteration in original) (internal quotation marks omitted)); *Presser*, 844 F.2d at 1283 ("If

impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the

Jencks Act control discovery of that kind of evidence.").

### III.   ARGUMENT

There is no obligation under Rule 16, *Brady*, or *Giglio* to produce immaterial

information, and the Court should not order the disclosure of the entirety of the items in dispute

considering both the overbreadth of the requests and the informant privilege.  The government is

currently undertaking a review of the items in dispute for any information subject to disclosure

under *Brady*, and will produce that material as it is identified, unless it is subject to later disclosure as Jencks material.  Information solely discoverable in connection with trial testimony, under *Giglio* and Jencks, will be produced at or before the time required by law.  To the extent the Court disagrees with the government's approach to discovery regarding these items, it must conduct an *in camera* inspection rather than order immediate disclosure.

### A.    The informant privilege bars much of the sought disclosure, and *in camera* review is required before any ordered disclosure.

As an initial matter, the Court can deny the motions outright on the basis of the informant privilege.  Eight of the nine categories of information sought, and summarized above, relate to the government's use of informants, and the defendants seek information about the identities, communications, and actions of those informants.  The defendants bear the heavy burden of piercing the privilege.  They have not met that burden.

As noted in the cases cited above, representations of counsel alone are insufficient to overcome the privilege.  In some cases, like *Bost*, even testimony of the defendant was insufficient to overcome the privilege.  This is because information related to informants, unconnected from the informants' interactions with the defendants, is rarely probative of the elements of entrapment, and the public has a significant interest in protecting informants' identities.  For example, the defendants seek the communications between informants and FBI agents, purportedly to demonstrate that the government overcame their lack of predisposition to join the conspiracy.  But this argument misses that the communications between the informants and FBI agents are not directly probative of the issue; the communications between the informants and the defendants are.  The defendants already have those recorded interactions.

Franks and Caserta have not explained why they need this information, or otherwise met their burden.  Caserta offers only an exchange between an informant and an agent (which the

government disclosed) averring that he "believe[s] this was an accidental disclosure."
(PageID.1241–43.)  Franks offers only testimony from a state preliminary hearing that (1) an
informant received financial compensation (PageID.1357), (2) agents take notes and write
reports (PageID.1358), (3) informants receive admonishments and instructions (PageID.1359),
(4) informants build relationships with targets and may not know the identities of other
informants (PageID.1359), (5) informants often talk with agents (PageID.1360), (6) agents direct
informants (PageID.1362), (7) some people had "a negative reaction" the first time Fox proposed
kidnapping (PageID.1364), and (8) some people involved in the plot sometimes followed the law
(PageID.1365).  Franks, in short, argues that some of the information he wants exists.

But these broad assertions, applicable to almost any case in which informants are used,
are not enough to overcome the privilege.  First, the defendants offer no hard evidence that
would overcome the strong presumption against disclosure.  *Rodgers*, 1993 WL 94051, at *3.
They offer no affidavits of their clients, or testimony of participants in the conspiracy, that would
tend to establish either element of entrapment.  They do not say why the evidence they already
have (e.g. their own recorded interactions with the informants) are insufficient to evaluate an
entrapment defense.  They do not explain how interactions between the informants and their
handling agents would be more probative.  The evidence Franks and Caserta proffer shows only
that the government used informants (as it does in many terrorism and organized crime cases),
and agents worked with those informants.  This is not the kind of specific, particularized
showing envisioned by *Roviaro* and its progeny.  In short, examining every (or any) informant's
entire cell phone and file, and two agents' phones to review all of their communications with
every informant, is not "essential to a fair trial."  *United States v. Beals*, 698 F.3d 248, 269 (6th

15

Cir. 2012) (quoting *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992)) (internal

quotation marks omitted).

In the event the Court disagrees, it must hold an *in camera* review of informant-related

disputed evidence before ordering broad disclosure. *Sharp*, 778 F.2d at 1187 (holding the

district court abused its discretion by "ordering disclosure based solely on defense counsel's

representations, without conducting an *in camera* interview of the informant, and without first

requiring that the defendant adduce some evidence of entrapment").

    **B.**    **The defendants are entitled to *Brady* and Rule 16 information now, and Jencks and *Giglio* information later.**

The government has already produced its initial Rule 16 discovery and continues to

produce any additional Rule 16 material as it becomes available.[5] Fed. R. Crim. P. 16(c). The

records and information already produced include each defendant's recorded statements. Fed. R.

Crim. P. 16(a)(1)(B). Therefore, to the extent the defendants seek the items under Rule 16, their

arguments concern only discovery available under Rule 16(a)(1)(E) and not otherwise prohibited

from disclosure by the privilege and Rule 16(a)(2). These issues are addressed below.

The government has also acknowledged above that it is currently undertaking a process

to identify arguable *Brady* information on agents' and informants' electronic devices. Thus, the

government respectfully disagrees with Caserta's suggestion that the government is not

undertaking this process. (PageID.1250.)

With trial more than two months away, any Jencks or *Giglio* production is premature.

These discovery rights attach to the testimony of specific witnesses, and the government has not

yet finalized its witness list. As noted above, Jencks material need not be produced until trial

---

[5] The government is continuing to process evidence, and has been producing, and will continue to produce, information as it becomes available in accordance with Rule 16.

itself (though the government intends an earlier production here), and *Giglio* material need only

be produced in time for the defense to make use of it at trial.  The government intends a Jencks

and *Giglio* production no later than two weeks before trial, to permit for the efficient progress of

trial, though the government may opt to withhold some information until a later time with respect

to one or two witnesses.

### C.    Most of the information in dispute is not subject to production.

Even to the extent the information sought is discoverable, the requests are overbroad.

The government is not required to produce the entirety of the items sought, first because

significant of amounts of those documents are immaterial to the case.  Agents' cell phones

contain broad amounts of information about other investigations, internal government

administration, and perhaps even de minimis personal correspondence and data, among other

kinds of information.  The disclosure of an agent's entire phone for freewheeling exploration

would be unprecedented—the defendants cite no precedent permitting it.  *See United States v.*

*Flynn*, 411 F. Supp. 3d 15, 30–34 (D.D.C. 2019) (denying request for internal government text

messages, "information concerning those text messages," cell phone data, and an agent's

"unredacted electronic communications with various individuals and government employees

regarding" the defendant, in part because the defendant had not shown materiality); *United States*

*v. Halgat*, No. 2:13-CR-00241, 2016 WL 4528961, at *2–3 (D. Nev. Aug. 30, 2016) (reversing

report and recommendation that had ordered disclosure of agents' and an informant's phones*, in*

part because the agents did not communicate directly with the defendant and the informant's

phone was not used to record the defendant, but ordering the government to review the agents'

phones for discoverable material).  It is left to the government to review the phones and produce

any discoverable information pursuant to Rule 16 or *Brady*.  *See* Fed. R. Crim. P. 16(a)(2);

*Ritchie*, 480 U.S. at 59–60.  Likewise, informants' devices, including their "data records" such as "google searches" and "phone searches" and "social media," (PageID.1366), almost certainly contain information completely unrelated to this investigation.  Overbroad disclosure of cell phone information can violate privacy interests, including those of uninvolved parties.  *See Williams v. United States*, 331 F.R.D. 1, 4–5 (D.D.C. 2019).  Other aspects of the requests suffer from overbreadth, too.  For example, the file of an informant who the government will not call as a witness has no probative value whatsoever.

Under *Dobbins*, information is not material just because it involves an informant, or a particular defendant: the documents must alter the quantum of proof in the defendant's favor to be obtained under Rule 16.  Information not involving an agent's or informant's work in this particular investigation is almost certainly immaterial to the preparation of the defense.

The same analysis follows under Rule 16(a)(1)(E)(ii).  The government has not yet finalized its exhibits for trial, but they will certainly comprise a small fraction of the sum of information sought here.  Rule 16 does not compel production of immaterial information that the government does not intend to use as evidence.  *Clingman*, 521 F. App'x at 391–92.

For similar reasons to the discussion of Rule 16, the defense cannot compel the production of the entirety of the items sought through *Giglio*.  The *Giglio* production is contingent on the government's witnesses, and has a materiality requirement.  Most of the information sought could not be used to impeach a witness, and the government will, at the appropriate time, produce information discoverable under *Giglio*.

### D.    The government has complied, and will continue to comply, with its discovery obligations.

For the sake of completeness, the government will address each category of information sought by the defendants.[6]  Categories 1, 3, 4, 5, 6, 7, and 8 are being reviewed for arguable *Brady* material.  Category 2 material could only conceivably be *Giglio* or Jencks material, and therefore will be produced only if a witness testifies requiring production.  Categories 1, 3, 4, 5, 7, and 8 could also contain *Giglio* or Jencks material, and therefore the government will follow like procedures and timing of disclosure for subsets of those categories that must be produced.

Category 6 information—rough notes—will not be produced as a matter of course. Unless rough notes are discoverable as *Brady*, *Giglio*, or Jencks material, they are not discoverable.  Rule 16(a)(2) expressly bars such discovery.  Therefore, their discoverability turns on the content of the notes.  *See, e.g.*, *United States v. Jones*, 347 F. App'x 129, 137 (5th Cir. 2009) (per curiam) (finding no *Brady* violation where there was no conflict between the notes and the final report); *United States v. Walker*, 272 F.3d 407, 417 (7th Cir. 2001) (affirming denial of notes after comparison with reports); *United States v. Adams*, No. 13-20874, 2014 WL 1509288, at *2 (E.D. Mich. Apr. 16, 2014) (observing that rough notes are not discoverable per

---

[6] The categories summarized above are:

(1) all of the information stored on each informant's cell phone,
(2) each informant's file maintained by the FBI,
(3) each informant's "data records" to the extent they fall outside of Category 1,
(4) all of the information stored on two FBI agents' cell phones,
(5) communications between agents and informants to the extent they fall outside of Categories 1 and 4, including communications through various methods (text, social media, etc.)
(6) agents' notes related to each informant,
(7) agents' surveillance logs related to each informant,
(8) agents' reports related to each informant, and
(9) records or information documenting unsuccessful investigative efforts.

19

Rule 16(a)(2) unless they contain *Brady* material); *United States v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 1691745, at *1 n.1 (S.D.N.Y. Apr. 27, 2010) (noting Rule 16(a)(2) permits the government to refuse to produce notes, "subject to other disclosure obligations").  *Cf. United States v. Cessa*, 861 F.3d 121, 133 (5th Cir. 2017) ("Interview notes may be discoverable under *Brady* if they are inconsistent with the content of the corresponding 302s.").

Finally, Category 9 information will not be produced for vagueness reasons and because it is not materially exculpatory.  Here, Franks seeks the absence of evidence—investigative efforts that were made, but did not bear fruit.  Specifically, he seeks evidence of "the government's failure to find wrongdoing, all efforts to link Mr. Franks to any political or extremist groups, all government decisions not to follow up on leads or investigate further, and any past investigations of Mr. Franks."  (PageID.1367.)  The vagueness problem is evident: it is conceptually difficult to comprehensively identify and disclose such information.  What constitutes an investigative effort, or a "failure to find wrongdoing"?  The government cannot conceivably categorize every question asked by every agent.  And even if it could, how should an unsuccessful effort be defined?  By reference to the agent's expectation in asking the question?  The request for "government decisions not to follow up on leads" suffers from similar vagueness problems and also infringes on the deliberative process of the government.  *See, e.g.*, *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) ("The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency.").  These requests seek precisely the internal government memoranda expressly protected from disclosure by Rule 16(a)(2).

Moreover, the absence of evidence is not evidence of absence.  Thus, courts have rejected this kind of effort to classify the absence of evidence as "exculpatory."  *See, e.g.*, *Downs v. Hoyt*,

232 F.3d 1031, 1037 (9th Cir. 2000) ("*Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up."); *United States v. Brock*, No. 13-CR-6025CJS, 2015 WL 8732432, at *14 (W.D.N.Y. Dec. 11, 2015) (report and recommendation), *amended on other grounds*, 2016 WL 3743242 (W.D.N.Y. July 13, 2016) ("Brock's request for disclosure of reports reflecting any witness statements that do not mention or implicate Brock is, in the context of an indictment charging him with involvement in a multi-year conspiracy, overbroad and beyond the scope of required Brady disclosure."); *United States v. Sims*, 808 F. Supp. 607, 615 (N.D. Ill. 1992) (denying request for disclosure of witnesses who did not implicate the defendant as too general and overbroad); *United States v. Rovy*, No. 90 CR 0008, 1990 WL 51642, at *1 (N.D. Ill. Apr. 5, 1990) ("Defendants' Brady request is overly broad; they are not entitled to names, statements and documents relating to leads which went nowhere.").

## IV.    CONCLUSION

The motions should be denied.  The defendants will obtain the discovery to which they are entitled under the ordinary rules and procedures governing federal criminal cases.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated:  August 9, 2021

/s/ Nils R. Kessler
NILS R. KESSLER
AUSTIN J. HAKES
JUSTIN M. PRESANT, on brief
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, Michigan 49501
(616) 456-2404
nils.kessler@usdoj.gov

## CERTIFICATE IN ACCORDANCE WITH
## LOCAL CRIMINAL RULE 47.2(b)(ii) AND ADMIN. ORDER 18-RL-85

Under Local Criminal Rule 47.2(b)(ii) and Administrative Order No. 18-RL-85, a brief responding to a non-dispositive motion is required to contain no more than 4,300 words as provided by Rule 47.2(b)(i). The Court entered an order permitting the government to file an oversized brief. (PageID.1398.) A word count was made using Microsoft 365 and the brief contains 5,912 words.

ANDREW BYERLY BIRGE
United States Attorney

Dated: August 9, 2021      /s/ Nils R. Kessler
NILS R. KESSLER
AUSTIN J. HAKES
JUSTIN M. PRESANT, on brief
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, Michigan 49501
(616) 456-2404
nils.kessler@usdoj.gov