UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
KALEB JAMES FRANKS,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

        Defendants.
_____/

No. 1:20-CR-183

Hon. Robert J. Jonker
Chief United States District Judge

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS FOR SPECIAL JURY INSTRUCTIONS

The defendants suggest that because they spoke words to each other while plotting, their conspiracy to kidnap the Governor is protected by the First Amendment. They ask the Court to: (1) instruct the jury their crimes had to be imminent every time they talked about them; and (2) add additional elements to the long-established crime of conspiracy.

Because the defendants are not charged with speech crimes, their attempt to apply *Brandenburg* free speech protections to this case are misplaced. Their statements were not public advocacy; they were secret, internal discussions of why and how they planned to commit felonies. They are entitled to no special First Amendment consideration.

### FACTS

Defendants Fox, Croft, Harris, Franks, and Caserta are charged with conspiracy to kidnap the Governor of Michigan, in violation of 18 U.S.C. § 1201(c); Fox, Croft and Harris are also charged with conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a.

(R.172: S. Ind., PageID.961.) In addition to physical action (training with firearms, making bombs, conducting reconnaissance, etc.) the defendants spoke to each other in furtherance of the conspiracy, including discussion of their motives, intent, planning, and preparation. They took precautions to ensure their communications remained secret, and could be disavowed if discovered. For example:

On June 6, 2020, Fox and Croft met with other anti-government extremists in Dublin, Ohio. (*Id.*, PageID.963) The meeting participants discussed their opposition to public health measures intended to curb the spread of COVID, discussed kidnapping state governors, and agreed to recruit like-minded individuals in their home states. (*Id.*) One attendee cautioned, "We have to behave in this room as though we have either police here in flesh, or by other means. Do not be foolish at any time. Always, always, always OPSEC,[1] you know. So, everything we discuss is in the realm of 'if' and hypothetical."

On June 25, 2020, Fox explained his motives for kidnapping the Governor in an encrypted chat with a Wolverine Watchmen informant in Michigan: "She's refusing to allow gyms to open now. She's manipulating the Justice system. Just few days ago courts ruled gyms could open now she kicks it up to another court to get that overturned. What good is a justice system if they can always just get their way by moving it to another court? I dunno bro, I'm fed up with this Tyrant Bitch." Fox added, "My minds been racing with ideas lol. Can't wait to speak to y'all in private."

At a group training on July 11-12, 2020, Croft and Harris constructed and attempted to detonate two improvised explosive devices containing shrapnel. (*Id.*, PageID.968.) Croft told an

---

[1] OPSEC (Operations Security) is defined by the National Institute of Standards and Technology as a "process by which potential adversaries can be denied information about capabilities and intentions." NIST SP 800-53 Rev. 5.

informant that they could use bombs to destroy police cars and take down communications towers, then use snipers to kill Governor Whitmer's protective detail and abduct her.

On July 27, 2020, Fox told an informant they needed to find a realtor in the Traverse City area to obtain information on the Governor's home, and a "mole" to give them inside information about her travel routes, schedule, and security. Fox said he would share the plan with the others at a Wolverine Watchmen training on August 9, 2020, so they could begin planning and practical training. Upon hearing Fox's ideas, Franks wrote, "OK sounds good I'm in for anything as long as it's well planned."

At a meeting on June 28, 2020, Wolverine Watchmen member Pete Musico told attendees including Fox, Harris, Caserta and Garbin that they were planning "real shit" action that required dedication to the cause. He advised anyone who was just there to train and improve his personal tactical skills to leave immediately, if they did not want to be a part of what was coming. The defendants all remained at the meeting, and discussed the idea of coordinated kidnapping of politicians.

On August 10, 2020, Caserta posted his motives in the conspirators' group chat: "I think some medical fascists are going to need a vibe check real fucking soon. How about we find out who is shipping the vaccines and then accost them and destroy the shipment. Doctors who advocate mandated vaccines? Bullet to the face right in their own home. Buildings manufacturing vaccines? Blow them up. I'm not kidding about any of this." He added, "[T]hey are going to do it through employment. So, once they mandate that, we need to have a plan in place to take them out. Once they realize people are getting picked off for passing this shit they'll ride it back real fucking quick."

Harris suggested just simply shooting the Governor, although it would mean getting caught or killed: "Either way if yall wanna go after her, just do it that way. Pass your shit off and just take a pistol and like, 3 rounds." "Well who's got a suicide mission??" replied Fox, "I wanna live in the restored Constitutional Republic. She's one of many domestic enemies atm [at the moment]." Franks wrote, "No if were spear heading all these ops we ainyt coming back bois.[2] Tie up your loose ends."

On August 23, 2020, Caserta reiterated his motives, and intent to act, in a recorded conversation with the group:

| | |
|---|---|
| Caserta: | Where is your line at? Do you have lines drawn in the sand? When are you actually willing to use deadly force? When are you willing to use physical force in retaliation? |
| Other: | Let's get a circle around. |
| Caserta: | I'll go first. Mine … I have a couple lines. The, the main thing that's concerning me right now, is uh, that's negatively affecting me, and, and kind of making me angry and affecting my positivity in my life, is the mask thing. The mask thing and the compliance with the mask thing. And businesses, my uh, company, and then all other companies being coerced by the government to do this nonsensical thing. And then, those businesses coercing the individual against his will, to essentially discriminate against him (cross talk). |
| | The main line I have myself, where, with or without you guys, I'm willing to (unintelligible) is mandated vaccines. I know what's going on with the vaccine, I know what the fuck they're putting in it, I know their plan. I know what Abboject[3] is all about and if, I will, I will lose my job. I will be willing to lose my job. I will lose my apartment. I will totally disassociate myself from society, and be willing to physically act, to do something about it, to keep myself from being injected against my will. |

---

[2] Short for "Boogaloo Bois," adherents of the extremist Boogaloo movement.

[3] The Abboject syringe, developed by Pfizer pharmaceuticals, is a ready-to-use, prefilled emergency syringe commonly used to deliver COVID vaccines.

Later the same day, the defendants and other Wolverine Watchmen discussed the importance of keeping their plans to themselves:

| | |
|---|---|
| Other: | I know this goes probably without saying, but I just have to say it for my sanity. Um, nobody talks, everybody walks. I think, obviously, most of us aren't gonna talk in any regard anyway. But even if you're getting some dude out there with a clipboard – got nothing to say. The less you talk to any, anyone. They'll use every word back on you. (Crosstalk) |
| Caserta: | Whatever we do in the future, this is my personal choice to be involved in here. So, I voluntarily consent and I, uh, accept responsibility for anything that happens to me. So, you know, my word is, is solidified as far as what's going on. I'm not – If I ever get hemmed up, I ain't sayin' shit. I'll do my time." |

Harris affirmed that day that he also intended to act, writing in the group chat, "I'm just a trigger now." Caserta asked, "What you mean Beaker? You saying you're a trigger just waiting to be pulled? You see what's coming so just waiting for that moment to act?" Harris replied, "Pretty much man, I'd love for it not to happen but I'm pretty sure the days coming so now I'm just getting ready and waiting. Said it before and I'll say it again, I don't plan on living past 30."

To be sure their discussions of motive and intent would be concealed from law enforcement, Harris set up a new encrypted chat application for the group that evening:



On August 29, 2020, Fox conducted a daytime reconnaissance of the Governor's home in preparation for the kidnapping. He drove to within yards of her home, took pictures and videos, drew a map of the location, and noted distances to local police responders:

5



In an encrypted chat five days later (September 4, 2020), Fox ("AlphaFuckYou") and Caserta ("DebasedTyrant") discussed their intent to "disappear" Governor Whitmer:



The same day, another member of the conspirators' group chat wrote, "They're officially picking bois up. We are all just larpers[4] right?" Garbin responded, "This is why we preach low profile and proper communication." Fox posted legal citations and wrote, "Felonies against Whitmer … gives us not only the moral high ground, but technically justifies us in ending her tyrannical reign." Garbin replied, "let's see where it goes," to which Fox responded, "Well we can but doesn't prevent us from moving forward."

Over the weekend of September 12-13, 2020, the conspirators conducted a nighttime reconnaissance of the Governor's home, practiced an armed assault on a plywood model building, and tested an improvised explosive device. (R.172: S. Ind., PageID.964-65.) On the way to the home, Fox and Croft stopped to inspect the underside of a highway bridge for a place to mount an explosive charge, to foil any police response. (*Id*., at PageID.968.) Fox later posted a photo of the location to the group's encrypted chat:



Four days later, Fox ("AlphaFuckYou"), Harris ("Beaker"), Caserta ("DebasedTyrant"), Franks ("redhot") and Garbin ("Gunny") discussed why they should *not* participate in First Amendment protests at the state capitol:

---

[4] "LARPing" is shorthand for "live action role playing," a type of interactive role-playing game in which the participants portray characters through physical action, often in costume and with props.





LAW AND ARGUMENT

1. Motion for *Brandenburg* jury instruction (R. 219)

The defendants propose a jury instruction to the effect that their words cannot be the basis for a guilty verdict unless they were likely to produce an imminent kidnapping or bombing. (R. 220-3: Proposed *Brandenburg* Instruction, PageID.1217.)

The First Amendment does not permit the State to "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). But "the First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech." *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005). "Words that are the very vehicle of a crime are not protected merely because, in part, the crimes may have involved the use of language." *United States v. Stewart*, 590 F.3d 93, 115 (2d Cir. 2009), quoting *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990).

"The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993), citing *Haupt v. United States*, 330 U.S. 631 (1947) (statements of sympathy with Germany and Hitler properly admitted to show motive and intent in treason case.)

Freedom of speech does not "extend so far as to bar the prosecution of one who uses a public speech … to commit crimes." *United States v. Rahman*, 189 F.3d 88, 116-117 (2d Cir. 1999). The defendant in *Rahman* was charged with conspiring to wage war on the United States. He argued statements urging co-conspirators to kill U.S. Army personnel in the name of religion

were protected by the First Amendment. *Id.* The Court disagreed, holding "Words of this nature–ones that instruct, solicit, or persuade others to commit crimes of violence–violate the law and may be properly prosecuted regardless whether they are uttered in private, or in a public speech." *Id.* at 117.

Speech that would otherwise be protected by the First Amendment is simply evidence when it is part of a substantive crime:

> Rahman also protests the Government's use in evidence of his speeches, writings, and preachings that did not themselves constitute the crimes of solicitation or conspiracy. He is correct that the Government placed in evidence many instances of Rahman's writings and speeches in which Rahman expressed his opinions within the protection of the First Amendment. However, while the First Amendment protects Rahman's right to express hostility against the United States, and he may not be prosecuted for so speaking, it does not prevent the use of such speeches or writings in evidence when relevant to prove a pertinent fact in a criminal prosecution. The Government was free to demonstrate Rahman's resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal acts against the United States and President Mubarak of Egypt.

*Rahman*, 189 F.3d at 117-18.

Where speech is "inextricably intertwined with actions that facilitate" the crime, a First Amendment instruction is not appropriate. *United States v. Aguilar*, 883 F.2d 662, 685 (9th Cir. 1989) (defendants who conspired with illegal aliens about how and where to cross the border not entitled to a *Brandenburg* instruction). For example, in *Rice v. Paladin Enters.*, 128 F.3d 233 (4th Cir. 1997), the defendant claimed his dissemination of step-by-step instructions for murder was protected by the First Amendment and the *Brandenburg* rule. "Were the First Amendment to offer protection even in these circumstances, one could publish, by traditional means or even on the internet, the necessary plans and instructions for assassinating the President, for poisoning a city's water supply, for blowing up a skyscraper or public building, or for similar acts of terror

and mass destruction, with the specific, indeed even the admitted, purpose of assisting such crimes—all with impunity." *Id.* at 248.

These principles were specifically applied to kidnapping conspiracy in *United States v. Van Hise*, 2013 U.S. Dist. LEXIS 181894 (S.D.N.Y. 2013), quoting *Giboney Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech … extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.") In *Van Hise*, the court noted the defendant's "conduct went beyond speech. He allegedly met with [his co-conspirator] — not in an Internet chat room — but in 'real life' to discuss the kidnapping, rape and murder of women and children. Under these circumstances, it is a jury question whether the communications between Van Hise and his alleged co-conspirators rose to the level of a conspiratorial agreement." *Van Hise*, at *10-13.

As the defendants admit, another district court in this circuit rejected a *Brandenburg* instruction under similar circumstances. *United States v. Stone*, 2011 U.S. Dist. LEXIS 20136 (E.D. Mich. 2011) (citing cases). The court noted:

> Numerous crimes under the federal criminal code are, or can be, committed by speech alone. . . . Various [statutes] criminalize conspiracies of specified objectives. . . . All of these offenses are characteristically committed through speech. Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching. Of course, courts must be vigilant to insure that prosecutions are not improperly based on the mere expression of unpopular ideas. But if the evidence shows that the speeches crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible.

*United States v. Stone*, No. 2:10-CR-20123, 2011 U.S. Dist. LEXIS 20136, at *25-26 (E.D. Mich. Jan. 12, 2011) citing *Rahman*, 189 F.3d at 117 (conspiracy to kidnap is an offense "characteristically committed through speech"). The appropriate way to protect the defendant

11

against improper use of such evidence is through a standard limiting instruction. *Rahman*, 189 F.3d at 118 (limiting use of material received to the issue of motive).

If the defendants were charged with a pure speech crime (e.g., communicating a threat, 18 U.S.C. § 875; or promoting a riot, 18 U.S.C. § 2101) a *Brandenburg* instruction might be appropriate. But a simple analogy demonstrates the defendants' reliance on *Brandenburg* in this case is misplaced: One may advocate stealing from the rich to give to the to the poor, so long as the speech isn't intended or likely to result in imminent lawless action. But in a bank robbery conspiracy, the same speech is just evidence of motive. To paraphrase *Rice*, one could otherwise promulgate the "necessary plans and instructions for [kidnapping the Governor] … for blowing up a public [bridge], or for similar acts of terror and mass destruction, with the specific, indeed even the admitted, purpose of assisting such crimes – all with impunity." *Rice v. Paladin Enters.*, 128 F.3d at 248.

The conspirators' statements demonstrate their diverse motives for kidnapping the governor and using bombs. They also show they actually intended to commit the crimes, rather than just make "big talk." As in *Van Hise*, the defendants did more than speak: They met in real life to discuss the kidnapping, and conducted actual training and reconnaissance. They used encrypted communications applications, vetted their group for "moles," used coded language, and spoke in terms of "hypotheticals," because they knew their speech proved criminal intent. They discussed "tying up loose ends" because they meant to follow through with their plans. They purposely *declined* to participate in First Amendment protected protest activities, so they could maintain a "low profile," and increase their chances of success. Their speech – to each other – in this context falls entirely outside the zone of public advocacy protected by *Brandenburg.*

The defendants' *Brandenburg* argument has superficial appeal only because their target is a political figure, and their motives echo some current political debates. The bank robbery hypothetical (which removes politics from the equation) demonstrates its misapplication in this case. Imagine the conspirators met dozens of times over a year to plan the heist, case the bank, practice with explosives, and rehearse the takeover. Should the court instruct the jury to acquit, unless the bank robbery was imminent every time the robbers talked to each other about it? The instruction proposed by the defendants is both inappropriate and unworkable.

2. <u>Motion for *strictissimi juris* instruction (R. 221)</u>

The defendants cite several inapposite cases for the notion that the First Amendment requires a higher standard of proof, because they talked politics while planning the kidnapping. (R.222: Def's Br., PageID.1225.)

In *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), the defendants were charged with inciting a riot (18 U.S.C. § 231) on the basis of their public speeches criticizing the Vietnam War.[5] No *strictissimi juris* instruction was given at that trial, and the court of appeals did not suggest one should have been given. It applied the concept in reviewing the sufficiency of the evidence, to avoid "an unfair imputation of the intent or acts" of some participants in a political or social movement to all the others. *Id.* at 392.

In *United States v. Spock*, 416 F.2d 165 (1st Cir. 1969), pediatrician and social activist Benjamin Spock was charged with conspiracy to violate the Military Selective Service Act of 1967 (50 U.S.C. § 462) after he co-authored a petition against the draft.[6] The court of appeals found the principle of *strictissimi juris* required his acquittal, because while "his views might

---

[5] The defendants included anti-war social activists Abbie Hoffman and Bobby Seale.

[6] Dr. Spock wrote, in pertinent part, "We believe…that every free man has a legal right and a moral duty to exert every effort to end this war, to avoid collusion with it, and to encourage others to do the same," *Id*, at 174.

13

give young men courage to take active steps in draft resistance," he never actually counseled anyone to break the law. *Id.* at 179.

In *United States v. McKee*, 506 F.3d 225 (3d Cir. 2007), the defendants were members of a fringe religious sect that opposed the payment of taxes. The court of appeals affirmed their convictions under the *strictissimi juris* standard because they committed overt acts of tax evasion in addition to teaching non-payment. *Id.* at 238-39. The appellate court did not suggest that a *strictissimi juris* instruction should have been given by the trial court.

Finally, *United States v. Stone*, 848 F. Supp. 2d 719 (E.D. Mich. 2012) involved a charge of seditious conspiracy (18 U.S.C. § 2384). The district court denied a request for a *Brandenburg* instruction, noting, "The Sixth Circuit does not appear to have addressed application of *strictissimi juris*. But, because the Court believes that Defendants' rights will be adequately protected under the normal standards for sufficiency of the evidence, the Court need not address further the contours of the doctrine as applied." *Id.* at 724-25.

This case is nothing like *Dellinger* or *Spock*. There is no danger that the acts of others might be unfairly imputed to the defendants because they were not involved in public advocacy at all. They maintained strict operations security and purposely *avoided* public advocacy, to make sure no one outside their circle would ever hear their speech or writings.

*McKee* is also off point. The court applied the *strictissimi juris* standard on appellate review, and did not suggest it should be used at the trial court. As the Eastern District of Michigan observed in *Stone*, the Sixth Circuit has never suggested that. That the district court entered a directed verdict in that case in no way undermines its conclusion that "defendants' rights [are] adequately protected under the normal standards for sufficiency of the evidence."

14

The defendants have proffered no example of a *strictissimi juris* instruction being given to a jury, let alone any binding authority requiring it.

WHEREFORE, the court should deny the defendants' motions to deviate from the standard jury instructions.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated: August 26, 2021          /s/ Nils R. Kessler
                                NILS R. KESSLER
                                AUSTIN J. HAKES
                                Assistant United States Attorneys
                                P.O. Box 208
                                Grand Rapids, MI 49501-0208
                                (616) 456-2404
                                nils.kessler@usdoj.gov