```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF MICHIGAN

 3                     SOUTHERN DIVISION

 4     UNITED STATES OF AMERICA,

 5              Plaintiff,          No: 1:20cr183-1/2/4/5/6

 6      vs.

 7     ADAM DEAN FOX,
       BARRY GORDON CROFT, JR.,
 8     KALEB JAMES FRANKS,
       DANIEL JOSEPH HARRIS and
 9     BRANDON MICHAEL-RAY CASERTA,

10              Defendants.

11

12     Before:

13                   THE HONORABLE SALLY J. BERENS
                       U.S. Magistrate Judge
14                      Grand Rapids, Michigan
                    Thursday, September 2, 2021
15                      Motion Proceedings

16     APPEARANCES:

17                   MR. ANDREW BIRGE, U.S. ATTORNEY
                     By:  MR. NILS R. KESSLER
18                   MR. AUSTIN HAKES
                     The Law Building
19                   333 Ionia Avenue, NW
                     Grand Rapids, MI 49501-0208
20                   (616) 456-2404

21                        On behalf of the Plaintiff;

22                   MR. CHRISTOPHER M. GIBBONS
                     MS. KAREN M. BOER
23                   Dunn Gibbons PLC
                     125 Ottawa Avenue, NW, Suite 230
24                   Grand Rapids, MI 49503-2865
                     (616) 336-0003
25
                          On behalf of the Defendant Fox.
```

```
 1                    JOSHUA ADAM BLANCHARD
                      Blanchard Law
 2                    309 South Lafayette Street, Suite 208
                      P.O. 938
 3                    Greenville, MI 48838-1991

 4                         On behalf of Defendant Croft, Jr.

 5                    SCOTT G. GRAHAM
                      Scott Graham PLLC
 6                    1911 West Centre Avenue, Suite C
                      Portage, MI 49024-5399
 7                    (269) 327-0585

 8                         On behalf of Defendant Franks.

 9                    JULIA ANNE KELLY
                      Willey & Chamberlain LLP
10                    300 Ottawa Avenue NW Suite 810
                      Grand Rapids, MI 49503-2314
11                    (616) 458-2212

12                         On behalf of Defendant Harris.

13                    MICHAEL DARRAGH HILLS
                      Hills at Law PC
14                    425 South Westnedge Avenue
                      Kalamazoo, MI 49007-5051
15                    (269) 373-5430

16                         On behalf of Defendant Caserta.

17                    Also Present:  Pam Vandermeer
                                     Bonnie Riley
18
          REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
19

20

21

22

23

24

25
```

1          09/02/2021

2          (Proceedings, 10:03 a.m.)

3          THE CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Sally Berens, Magistrate Judge, presiding.  Please be seated.

6          THE COURT:  Court calls case No. 20cr183, United

7    States versus Adam Dean Fox, Barry Gordon Croft, Jr., Kaleb

8    James Franks, Daniel Joseph Harris and Brandon Michael-Ray

9    Caserta.

10         All right.  Good morning everyone.  We are on the

11   record for two hearings today, ECF No. 225, Defendant Caserta's

12   motion to hold discovery, and ECF No. 258, Defendant Franks'

13   motion to disclose confidential human sources.  Let's start

14   with appearances and introductions.

15         MR. KESSLER:  Good morning, Your Honor.  Nils Kessler

16   and Austin Hakes for the Government.

17         MR. HILLS:  Michael Hills on behalf of Brandon

18   Caserta, who is appearing via video this morning.

19         THE COURT:  And Mr. Caserta, can you hear me okay?

20         DEFENDANT CASERTA:  Yeah.  I can hear you right now.

21   It's a little bit choppy and the visual is a little bit blurry,

22   but so far it's all right.

23         THE COURT:  You let us know if you have difficulty

24   hearing at some point.

25         DEFENDANT CASERTA:  Yeah.  No problem.

1      MR. GRAHAM:  Good morning, Your Honor.  Scott Graham

2  on behalf of Mr. Franks who is also present, and in addition

3  Pam Vandermeer is here with us to assist all of the Defendants.

4      THE COURT:  Thank you.

5      MR. GIBBONS:  Good morning, Your Honor.  Chris Gibbons

6  on behalf of Adam Fox.  I am at table with Karen Boer, my law

7  partner, and my client Adam Fox.

8      THE COURT:  Good morning.

9      MR. BLANCHARD:  Good morning, Your Honor.  Josh

10  Blanchard representing Barry Croft, who is present.

11      MS. KELLY:  Good morning, Your Honor.  Julia Kelly,

12  representing Daniel Harris, who is present.

13      MR. GRAHAM:  Bonnie Riley is also here to help all of

14  us.  I want to make sure she gets introduced.

15      THE COURT:  All right.  Thank you.

16      Mr. Hills, the initial motion at least is yours.  I'll

17  let you begin unless there is anything else we need to take up.

18  I would note that there was a subpoena that I granted a motion

19  for.  Based on my review of the materials in front of me I

20  don't believe that testimony will be necessary at this point

21  and I am not expecting to have that.  If something changes we

22  can discuss that.

23      And before I let you get started I should also just

24  make sure that I have everything because a lot was filed on

25  these two matters.  I have ECF No. 225, Mr. Caserta's motion to

1    compel discovery as I mentioned.  ECF No. 258 is Mr. Frank's

2    motion.  260 is the Government's response to those.  Then a

3    number of replies were allowed, 285 is Mr. Fox's reply.  286

4    was Mr. Frank's reply, 297 Mr. Caserta's reply.  Then at the

5    end of last week, ECF No. 315, a supplement, was filed as well

6    as 316, and then the Government's response to that, 319, and

7    there are a number of joinders which everyone has joined

8    everyone and everything else.  So I think that that is

9    everything that I have in front of me, but did anybody note

10   something that I did not mention that they filed?  All right.

11   With that, Mr. Hills.

12            MR. HILLS:  That's a lot.

13            THE COURT:  It is.

14            MR. HILLS:  A lot has been filed on this.  It seems

15   like a long time ago since July 12th when I first filed this

16   motion.

17            As I was deciding on what motions to file, it looked

18   to me like I was missing kind of the most obvious thing.  We'll

19   call him Dan on CHS-2, he's got a number as well, was the

20   center of activity in this case from the beginning from its

21   inception in March, I believe I want to say March 17th through

22   October 7th when the takedown occurred.  His handlers, Special

23   Agent Impola and Special Agent Chambers, were with him from the

24   very beginning.  We have collected the FD 1023 reports in a

25   binder that Mr. Gibbons has in front of him, and we have 1,454

1   pages I believe of very short brief reports, just I think most

2   of them authored by Special Agent Chambers regarding Dan.

3   These are just Dan reports.  And throughout this entire event,

4   seven months or so, the central feature that I can see, one of

5   the central features, I guess, that Dan was using, was his

6   phone.  He was communicating, it appears to me if not daily,

7   certainly weekly with people that are sitting at this table

8   here indicted on federal charges and charged in state court.

9   Every one of those Defendants.  I don't know how many CUEs,

10  confidential undercover employees, there were.  There were

11  several communicating with them.  There were other confidential

12  human sources.  He was communicating with them as well as

13  unindicted individuals that were on the periphery of these

14  things.

15      In my count, and we'll get into this a little bit

16  later, there were, I think, somewhere around 17 different

17  chats, encrypted chats, Facebook chats.  There was an encrypted

18  chat wire that they were on for a long period of time with

19  multiple chats on wire.  There was a Threema chat, which is

20  another encrypted wire.  Multiple chats on Threema.  So Dan was

21  communicating with everybody in this whole sphere throughout

22  this whole thing, including Agents Chambers and Impola.

23      Dan, as you know, was paid money.  He was paid money

24  for his phones.  It's in the pleadings.  I want to say $54,000,

25  including $6,000 for phones and other electronics.

1          So my obligation is to try and obtain something that I

2     don't have -- I know the Government says I do have some of it.

3     We do have some, but we definitely do not have the entire

4     catalog of his encrypted chats, conversations, text messages,

5     et cetera.  So it's my obligation to establish a plausible

6     showing that there's a claim that these undisclosed documents

7     contain material evidence for the Defense.

8          As the Court knows, the offense in this case has been

9     raised by several, if not all, Defendants as entrapment.  And

10    the Government in its response indicates multiple times that

11    the Defendants are predisposed.  They are predisposed.  They

12    are predisposed.  Okay.  Well, as the Court knows that it's the

13    Government's burden to prove beyond a reasonable doubt that the

14    Defendant was already willing to commit the crime of kidnapping

15    prior to first being approached.

16         The Sixth Circuit pattern instruction gives several

17    things for the jurors to consider.  Ask yourself if the idea

18    for committing the crime originated with or came from the

19    Government, among other things.  Ask yourself what kind of

20    persuasion and how much persuasion the Government used?  Okay.

21    So that's important for the jury to consider.

22         And I think it's also important, as we are going

23    through this, to sort out the backdrop.  As the Court -- there

24    has been a flurry of filings since I filed mine, and there are

25    basically the three main agents that I can see in this case are

1    Trask, Impola and Chambers.  Trask, as you know, signed off on

2    the complaint, testified at the preliminary examination in this

3    case.  He was on multiple affidavits for search warrants,

4    involved in interviews, and he, as this Court knows, about five

5    days after I filed this was charged in state court with assault

6    with intent to commit great bodily harm less than murder for

7    his attack on his wife.  And then this week I get an e-mail

8    from Mr. Nils -- or Mr. Kessler.  Sorry.

9            MR. KESSLER:  That's okay Mr. Mike.

10           MR. HILLS:  That's okay.  I'll take Mr. Mike.

11           From Mr. Kessler showing Special Agent Trask's

12   Facebook post, and he is -- I'll spare the quotes, but he is

13   using a lot of profanity and basically ranting.  All right.

14           Then we have Special Agent -- so Mr. Kessler says to

15   me earlier in this case after that came about, he is slicing

16   him out.  He is culling him from the heard.  He is not calling

17   him.

18           Special Agent Impola, as the Court knows, has been

19   accused of a couple of counts of perjury by one of the, as far

20   as I'm concerned, most respected attorneys before the bar in

21   this court, of doing that in front of a Federal Magistrate

22   Judge.  And it was just not a flippant, you know, accusation.

23   It was pages and pages and pages, chapter and verse of what had

24   happened.

25           And then we have Special Agent Chambers now, who as

I'll go through here in a few minutes, looks -- looks like --
yes.

THE COURT:  So let me focus you in on what I think is
actually the real issue here.  You have asked for, in your
motion, four things.  Let's make sure I have them all.  One was
Defendant's cell phone, which it sounds like the Government was
producing in any case, is that right?

MR. HILLS:  I got that, I believe, last week.

THE COURT:  Okay.  So that I don't have to deal with.
Second through four, 2, 3, 4, are -- No. 2 is the cell phone
used by CHS-2, which is Dan, is that right --

MR. HILLS:  Yes.

THE COURT:  -- in the investigation and any associated
electronics.  Three, the cell phone used by Special Agent
Impola.  And is it Impola?  Am I saying that right?  All right.
And then finally the cell phone used by Special Agent Chambers.
So what you are asking for, if I understand it correctly, is
those cell phones in their entirety without any sort of, you
know, review or redaction for information that's not relevant
to this case.  And I looked at all the cases that both you and
the other Defendants cited, and I can't find one where any
court has ever allowed that kind of production.  So that's my
biggest problem here.

MR. HILLS:  Well, I am not asking for that big of
production.  I think I indicated in my reply, or my response to

1    their reply, that what I'm looking for -- I am not looking for

2    personal pictures.  I am not looking for personal

3    correspondence.  I would agree that my first request was broad.

4    It was -- it was overly broad, but that's not what -- that's

5    not what the Defense is interested in here.  The Defense is

6    interested in all the communications involving this case,

7    involving this alleged conspiracy.  That is what we're

8    interested in here, and that's what we're after.  And I thought

9    that I clarified that.  Perhaps I didn't clarify it very well.

10                THE COURT:  There was a lot of briefing.

11                MR. HILLS:  Yeah.  There was a lot of briefing, but I

12   tried to make that clear.  We are not after anybody's personal

13   information.  We are not after anybody's personal pictures or

14   personal correspondence.  What we're after are the

15   communications between all the Defendants in this case, all the

16   state Defendants, all the people in the world of this

17   conspiracy, and the text messages between the agent and Dan.

18   That's -- that's what we're interested in, and that's what I

19   want.  And originally when I filed it, I -- mostly what I'm

20   after is Dan's phone and his communications involving this

21   case.

22                THE COURT:  Well, okay.  So same question then, Dan's

23   phone?

24                MR. HILLS:  Yes.

25                THE COURT:  I have not found a case, none has been

1    cited by any of the Defendants, in which an entire phone

2    belonging to an informant as opposed to a Defendant has been

3    produced.

4            MR. HILLS:  I haven't found it either.  Okay.  But the

5    question remains, right, are we entitled to it?  Have I offered

6    a significant or have I offered a plausible reason to get the

7    undiscovered or undisclosed information?

8            THE COURT:  Well, but again, what happens in criminal

9    discovery is the Government goes through it.  It produces all

10   of the categories or all of the evidence in that phone that

11   is -- it is obligated to produce under all of the various

12   categories, buckets of information that it's required to

13   produce, Brady, Jencks, Giglio, Rule 16, and then that's what's

14   provided to you.  And so I guess the question really what you

15   need to be getting to and what I need to figure out in terms of

16   if there is anything additional I need to order is if there are

17   categories of information where you two disagree that the

18   Defense is entitled to, right, and how do we characterize that

19   disagreement for the Court to make a ruling on?  Because I am

20   not going to change the normal process here where you concede

21   that there is information in those phones that you are not

22   entitled to.  I am not going to give the Defendants full access

23   to the phones just to inspect them where there is likely to be

24   personal information in the case of the agents' information

25   related to other cases.  So what is it you think that the

1   Government is not producing that they are required to produce?

2   And I recognize that you talked about this some in your

3   briefing, but I want to make sure that we are focused in on it

4   so that we can tease out any -- figure out whether or not the

5   Government is actually even disagreeing with you on those

6   points.

7           MR. HILLS:  Well, I think we are -- I think we are

8   entitled -- first of all, these chats that I'm talking about,

9   the encrypted chats, the text messages between the Defendants

10  obviously everybody has got their own statements on those and

11  we are entitled to those.  Now, the Government says that we

12  have some of those.  Maybe they are saying we have all of

13  those.  I would disagree with that.  I don't think that I have

14  all of the conversations that my client has had on encrypted

15  chat.  Plus, the chats that we have that have been discovered

16  to us, multiple of them, many of them frankly, look like they

17  were produced by agents that are on, like, a Word document and

18  then PDFd and here you go.  So that's a lot of what we have.

19  We don't have the actual encrypted chats, and so --

20          THE COURT:  Tell me a little bit more about what you

21  think is missing there.  You are saying you want screen shots

22  of the chats or you want a download of the chat as opposed to a

23  copying of the chat into a Word document or however else it was

24  preserved?

25          MR. HILLS:  Yeah.  I want -- I want the native file on

those chats from the phone, from Dan's phone.

MR. KESSLER:  Your Honor, maybe I can clarify something here that would help before we get too far down the road.

THE COURT:  It may be helpful to do these one by one.

MR. KESSLER:  They have all the chats between that where their clients were chatting, and they have all of the -- we've already produced for Dan and the agents basically today all the communications between them.  What he's talking about with the Word documents, a lot of the chats that they were doing with each other were on encrypted apps that would disappear as soon as you wrote it.  So what they were doing was typing it up while they were looking at it.  And to the extent we have screen shots -- they tried to screen shot a lot of stuff, and to the extent we have screen shots we have provided those.  There probably are some instances where somebody was looking at a disappearing message, typed it down, and that's the Word document.  Those were also produced so they could be searched by the way.  So they have in a lot of cases things that are screen shots and the Word document.  So we've given all of that to them.  It is possible that there are, you know, Word documents that are somebody's, you know, was simultaneously typing it down as they were reading it and then it disappeared.  There is no way -- that's why I wanted to get away from the idea that the Court should order us to produce

1    what doesn't exist.  If it's a disappearing app it's gone, and

2    Defendants would be free, of course, at court to make an

3    argument that -- you know, they could cross examine the agent

4    who typed that down and suggest that they didn't get it right

5    or that they are lying or whatever they want to do, but that

6    doesn't mean that any underlying thing exists.  There isn't

7    some universal stuff we can download and give to them that they

8    don't have already.

9        THE COURT:  So I take it the Government agrees that

10   the chats are discoverable?

11       MR. KESSLER:  Sure.  That's why -- and actually,

12   all -- the example that they attached to everything have our

13   Bates numbers on them because we have given it to them.  I

14   don't think we actually have an -- especially with Mr. Hills'

15   motion, I don't think we really have a disagreement other than

16   the idea that they get to rummage through the phones to look

17   for other stuff.  And I can wait until it's my turn if you

18   want, but I think they need to show some prima facie case that

19   there is something out there that we haven't turned over,

20   because there isn't.

21       THE COURT:  All right.

22       MR. HILLS:  Well, that's always the problem.  That's

23   the problem if we don't know what it is and we're trying to get

24   it.  That's the problem in all of these cases is how do you

25   establish that there is something there?  We have to establish

1    a prima facie case that there is something there.  The things

2    that I've cited in my -- in my brief, the screen shots are

3    screen shots of text messages between the agent and Dan

4    indicating -- and they are on the agent's phone, I believe, so

5    those are showing and establishing that there is an

6    orchestrated, a coordinated effort to create, to create the

7    conspiracy, to create the overt acts, the recon if you will.

8    And that's one of the ones that we have, and that's an example

9    that I have of the Government pushing this, and pulling it, and

10   orchestrating it, and making it happen.

11         Now, I don't know, maybe I do have all those screen

12   shots of the text messages.  Those aren't the disappearing --

13   those aren't of the disappearing kind unless they deleted them,

14   and there is an indication that they did delete some.

15         THE COURT:  Well, I just want to raise that.  The

16   indication that you have was that the informant was instructed

17   to delete information off of his phone.  Presumably that was so

18   he was not detected as an informant, correct?

19         MR. HILLS:  Right.  Yes.

20         MR. KESSLER:  And for what it's worth, those are not

21   truly deleted.  The informant was told to delete them off his

22   phone so he wouldn't be caught talking to FBI agents on the

23   phone, but they are two-part messages, right?  So the other

24   side of it is the agent has it.  The agent saved it, Bate

25   stamped it and gave it to the Defense.  So they weren't truly

1    deleted.

2              THE COURT:  I understand that.  I want to make sure

3    that you don't have any evidence that you submitted, that I saw

4    anyway, where the agents were deleting information off of their

5    own phones.  There was nothing in your briefs that suggest

6    that.

7              MR. HILLS:  No, no, no.  I am not suggesting that at

8    all.  What I'm suggesting is that they have this information,

9    and that's kind of why I wanted the agents' phones for these

10   text messages.  And yes, we do have some of those text messages

11   saved, and I am not sure that I have the entire gamut of that.

12   As a matter of fact, I am confident that I don't.  I take

13   Mr. Kessler's word, but we have screen shots.  What I would

14   like are the communications between Special Agent Impola and

15   Special Agent Chambers and Dan based on what I have shown the

16   Court, that they are orchestrating this, and we, I think, only

17   have a little picture of this.

18             THE COURT:  Well, I mean, I agree with you, and I

19   think Mr. Kessler does, too, that you are entitled to those

20   text messages or those messages back and forth.  Apparently,

21   the disconnect is whether you think you have all of it and

22   whether or not the Government has produced everything that it

23   indicates that they have.  And you know, that is how criminal

24   discovery works in that we rely on AUSAs to exercise their

25   ethical responsibilities to provide this information.  So I am

1   not exactly sure what else -- given that he is agreeing that he

2   will produce that information, I am not sure -- exactly sure

3   what else I should or you even want me to order here beyond a

4   separate review of the phone, which I -- obviously as we have

5   discovered there is no case law that suggests that I could give

6   you an FBI agent's phone to go through, and that seems like a

7   bad idea in any case.  So tell me what else you are asking for

8   that --

9        MR. HILLS:  Well, I started -- I am concerned about

10  who is reviewing the phones.  I mean, I started out by

11  indicating, you know, Trask, Chambers, Impola.  I don't have

12  faith in them to review that -- to review that information.  I

13  have no issue with the Government.  I have no issue with either

14  of them.  If they are reviewing it and they say there is

15  nothing else there, I take them at their word.  I am concerned

16  that agents are reviewing this stuff and saying, there is

17  nothing here.  There is nothing here to see.  There is no more.

18       THE COURT:  Well, certainly having raised it now, the

19  AUSAs in this case are on notice of what it is you are looking

20  for, and they are, I am sure, quite aware of their professional

21  responsibility, because at the end of the day their ethical

22  responsibility is to make sure that all of that information is

23  produced.  So beyond that, again, is there something else

24  beyond what we've talked about so far that you think I need to

25  order them to do?

1      MR. HILLS:  I do want Dan's phone.  I want Dan's phone

2  for all those communications, because they say we have them and

3  we have them in -- if we do, we have them in his phone, his

4  phone, his phone, his phone.  There is a central depository of

5  these chats, and it is on, I believe, would be on Dan's phone.

6  So in trying -- instead of trying to put this altogether

7  piecemeal, it would be on one phone.

8      THE COURT:  So --

9      MR. HILLS:  Instead of spending weeks and weeks and

10  weeks and trying to -- which we've already spent.  I mean, it

11  is a lot to go through.

12      THE COURT:  So the argument I think you are making

13  there is that you think it would be easier to review in its

14  native format as opposed to meeting on the phone than in

15  various printouts of various documents?

16      MR. HILLS:  Yes.

17      THE COURT:  All right.  Anything else besides Dan's

18  phone in its entirety that you want to raise right now?  Let me

19  let Mr. Kessler respond to that otherwise.

20      MR. HILLS:  Okay.

21      THE COURT:  But is there something else before?

22      MR. HILLS:  I don't think so right now.

23      THE COURT:  All right.  Since I've already let him

24  interrupt you a couple of times.

25      MR. HILLS:  That's all right.

1          THE COURT:  So what is the problem with the CHS-2 -- I

2     mean, Mr. Hills has a point, right?  It's a lot easier to

3     review this stuff if it's on the phone and you can go through

4     it and you can see it in context as opposed to having to review

5     printouts that you've reviewed that may or may not be in the

6     right order either chronologically or -- or in lots of cases

7     people let the other side review stuff in its native format.

8     What's the problem with that here?

9          MR. KESSLER:  I don't think what he's asking for

10    necessarily even exists.  It doesn't necessarily even exist

11    anymore, Your Honor.  I mean, he's been through more than one

12    phone.  These are old chats.  They were recorded at the time --

13    you know, they were two parts.  He is talking to the agents.

14    The agents have it from their end, and they were screen

15    shooting them and giving them to the Defense, and I am not sure

16    what would be better than that.  We are looking at what was

17    actually said.  The danger when you start asking agents or

18    anybody else -- actually, the CHS Dan is a private citizen, to

19    ask him to turn over his phone and rummage through it, as you

20    pointed out it, is really dangerous because it's got a lot of

21    other stuff on there.  And honestly, if they are not going to

22    be able to rummage through it willy-nilly on their own -- we

23    are already relying on us to go through this evidence and look

24    for anything that's Brady or Giglio and turn it over to them,

25    and we've already promised to do that, and I think with respect

to Dan they have everything already.  There are other witnesses
who, you know, for reasons the Court has ruled on in other
motions where we are waiting until closer for trial for their
safety, but they know about Dan already so they have all of
that.  I just don't think they have made a showing of
materiality.  I mean, they have thrown out -- basically you've
got this conclusory argument here that we don't trust these FBI
agents because of various, you know, supposed scandals, but
that's not a showing that there is anything out there that we
haven't given them.

THE COURT:  There is really, I think, a second
argument that Mr. Hills has made as part of his argument today,
which is that it's hard to process the information when it's
received out of context and in short screen shots as opposed to
being able to look at someone's long, long text via a message
strain and review that and understand that as it goes along,
which might be something that you could see more easily on a
phone than if it's produced in multiple pages.  So I think the
argument he is making now has less to do with making an
argument that he hasn't gotten something, although he says
that, too, that he hasn't gotten something that he thinks he is
entitled to, but more that looking at the phone in its native
format makes it easier to process the information and read it
and understand it in a way that is helpful to the Defense.

MR. KESSLER:  Well, first you have an -- I think there

1    is an assumption that that thing exists.  Like I said, he had a

2    phone that he used for a while that broke and then gave a

3    different phone.  I don't know what -- if what they are asking

4    for even exists.

5            THE COURT:  How did you preserve the phone as it went

6    along?

7            MR. KESSLER:  Nobody has ever turned over anybody's

8    whole phone, so we don't preserve a whole phone.  They are

9    preserving the communications.  That's what we are required to

10   give them.

11           THE COURT:  So you didn't image the phone before you

12   switched to a new phone?

13           MR. KESSLER:  Not that I am aware of.  It's a private

14   citizen's phone, and it's not a child porn case or something

15   where he is the Defendant.  We preserve all the communications

16   and we have turned those over.  And you know, I understand the

17   argument that there might be formats that are more convenient.

18   He is looking at them in the same format that we are, and I

19   don't know that -- I am not aware of any authority that says we

20   have to create the most convenient possible format.  We are

21   certainly not trying to make it harder.  He's got -- like I

22   stated, he's got them in the same format we do.  We don't have

23   some, like, more organized and nice and easy format that we've

24   scrambled for their use.  They have what we have and that's the

25   only obligation that I am aware of.

1        THE COURT:  Also fair to say that because you produced

2   the client's phone, any of those chats that still exist based

3   on his client's phone would also be already available?

4        MR. KESSLER:  Sure.  Absolutely.

5        THE COURT:  Anything else you wanted to say on this

6   topic?

7        MR. KESSLER:  No.  I mean, I have more to say in

8   general, but I think there are other people who want to have

9   their say and maybe you'll give me a chance to sum up at the

10  end.

11       THE COURT:  Mr. Hills, did you want to respond to

12  that?

13       MR. HILLS:  Well, I think that's one of the other

14  problems.  We don't know how many phones there were.  I mean,

15  it sounds like they didn't preserve them.  One broke.  Was he

16  given a phone by the FBI?  Was that preserved?  These are

17  questions that I don't know the answers to, and that's why I

18  wanted the testimony of Dan to find out what was going on with

19  all the phones, what happened to the phones, did they download

20  the phones?  You know, did he take them to the agents?  He met

21  with the agents I know quite often.  So those are issues that

22  we just don't -- we don't know.

23       THE COURT:  All right.  Well, I don't think that that

24  satisfies the Defendant's burden at least in this case on this

25  motion.  Let's then give Mr. Graham an opportunity to argue as

1     to --

2          MR. GIBBONS:  Your Honor, if I may, I did join the

3     motion.  I did file a reply.

4          THE COURT:  All right.  Why don't you come up to the

5     podium at least so it's a little bit easier for the court

6     reporter to hear you.

7          MR. GIBBONS:  Your Honor had asked for some authority

8     that says that we should get it, and I would like to first

9     state that I think that the request for the phone that was

10    originally stated in the motion is overly broad and I would

11    agree with the Court's concern there.  I think that that would

12    bring into purview things that are beyond the needs of the

13    Defense in any real way.

14          I think that the issue is squarely is the

15    communications that exists between the CHS and the handler, FBI

16    supervising agents who have daily contact with the CHS.  The

17    CHS and the agents work hand in hand.

18          THE COURT:  And you are talking now about multiple

19    CHSs.  We are not just focused on Dan anymore.  Your motion for

20    joinder specifically related, at least as I recall, to four

21    specific CHSs, is that correct?

22          MR. GIBBONS:  That's correct.  As the Court is aware,

23    the Government had a number of undercover agents actively

24    working in conjunction with their FBI handlers to perform

25    different roles in this case.  There were CHSs who were

1    associated with the alleged national militia, who invited the

2    Defendants to national militia meetings to conduct discussions

3    where -- and then things would be discussed and then later used

4    against our clients.  So I think that Dan is the most

5    significant, and if I may just -- if I can?

6                    THE COURT:  Of course.

7                    MR. GIBBONS:  This binder is comprised of

8    exclusively -- it was put together by my investigator.  This is

9    all of the 1023s that exist between -- and of Jayson Chambers

10   only.  And what these are is a collection of hundreds of

11   contacts.  So every time, as I understand it, Agent Chambers

12   would have contact with the CHS, he has to document that.  And

13   so these are one-page, some time two-page reports, and they are

14   very simple.  It'll just say, received some evidence.  Received

15   a phone call.  CHS reports contact.  I mean, there is just not

16   a lot in these about -- what they are good for is they kind of

17   show you how much contact is occurring between the special

18   agent and the CHS who is out in the field.  And this is all of

19   the reports that are accumulated in about five months of

20   activity.  It's huge.  And what we have is less than 300 screen

21   shots of text communication that exists between Dan and his

22   handler, Chambers, and his other handler who was apparently, I

23   think, a supervisor, Special Agent Impola.

24                    I can tell you from my review that the screen shots

25   that we have are somewhat ordered in time, and they fall all

around the 15th of September, which is the weekend when Dan set up an FTX for all of these Defendants and targets to attend, to train, and do a recon.  So we have about a week's worth of looking into that relationship, and the amount of information in support of an offense that has been gleaned from these limited screen shots to me is stunning.

As I was writing the brief and taking apart some of these screen shots it became apparent to me that Dan is vetting who is supposed to be invited to these events that the Government is sponsoring through its agents.  How many events do you want?  And you have to understand the event isn't just an event for the sake of an event, it's an event that is later going to be portrayed in a courtroom as an overt act.  These are significant developments.  And that's just on what we happen to get.  That's on the small fraction of the screen shots that we had, which also involved a target in Virginia who Dan was assigned to work on named Frank, a Vietnam era veteran and a career long civil servant in Virginia who served in the Navy.  We have those, and I have given those to the Court, inviting him or suggesting to him he create chemical bombs, encouraging him to do that.

We have given you other examples of this CHS that don't involve the screen -- the coms per se.  We did give the Court examples of verbal discussions that this particular CHS had, suggesting to Adam Fox and others that they fire rounds

1    into the Governor's home, giving them all kinds of criminal

2    ideas.  As Mr. Hills so eloquently stated, the jury instruction

3    goes right to the heart of those matters.  Again, I think it is

4    material.

5            THE COURT:  I am less concerned at this point about

6    whether or not there is going to be sufficient evidence at

7    trial for disposition.  That's not in front of me and I think

8    the Government has to proceed as if any exculpatory evidence

9    even remotely related to predisposition has to be disclosed.

10   So the question I want to bring you back to is what are you

11   asking me to order them to do that is in addition to the normal

12   process of criminal discovery where they review all of this

13   information and produce what is required by law to be produced?

14   Where is the disconnect between what you think you are entitled

15   to and have not received and that they have and what is -- is

16   there even any disagreement between what you are asking for and

17   what the Government thinks it is required to produce?

18           MR. GIBBONS:  As I understand the case law, in the

19   event that predisposition and criminal design, and we cited a

20   case in our reply, United States versus Eddings, the Government

21   is not in a position to object providing evidence of activities

22   of its representatives, and that's what we're asking for, and I

23   know that we don't have it.  So we are in a different position

24   here.

25           I mean, the reality is, and I think Your Honor is

1    correct, we move forward in good faith, right?  And if people

2    do what they are supposed to do, it's great.  We have a final

3    result that works.  But if -- if -- I think the Court is

4    presented with a situation where maybe, and I think we've given

5    a good maybe, there is material information that has not been

6    proffered that should, it's inviting error and we are all back

7    here after a trial on these Brady issues as a remedy, which

8    Brady has been designed more as a remedy then and affirmative

9    step, which I totally understand.

10          So we are here today to state that our client, Adam

11    Fox, he has a right to confront his accusers.  He has a right

12    to a fair trial.  I have a portion, a very small portion of

13    communications that the Government has given me relative to

14    that, and I know that they haven't given me nearly all, and I

15    just really want the communications -- so I am not asking to go

16    on a wild goose chase, and I am not asking to go on a fishing

17    expedition.  I just want the communications between the CHS,

18    who is having daily contact with my client and his handlers,

19    who are clearly directing the CHS to take affirmative steps to

20    have my client engage in certain activities.  And it seems to

21    me where entrapment is the issue at trial it is not unfair to

22    ask for that modicum of transparency, and that's what we're

23    seeking.  Nothing more.  Nothing less.

24          THE COURT:  Isn't that exactly what the Government

25    agrees to produce in its response?  And I am looking at ECF 260

starting at page 1445 through 1447.

MR. GIBBONS:  It does, but I think the disconnect, Your Honor, is I don't have it, and I know I don't have it, and I don't think there is a question that I do have it, because I have it for seven days worth of screen shots and I have none other.

THE COURT:  So it's --

MR. GIBBONS:  Where is it?

THE COURT:  I think you have to be more specific because I am not really sure what it is that you don't think you have right now.

MR. GIBBONS:  Okay.

THE COURT:  And once you tell me that, once you explain it to me, then I can ask the Government what they -- let me finish.  What they -- you know, their intention is with regard to that material.

MR. GIBBONS:  That's fine.  Just to make sure I'm clear, I am looking for the text communication between Dan and the other CHSs and their handlers such as Jayson Chambers or Henrik Impola as an example.  We have provided and have been provided a very limited amount of that communication.  It appears that it relates to about a week's period of time. We're asking that we be provided with all of that communication as a class, as a character.

THE COURT:  So -- maybe what you're asking, too, is

1    that you believe it should be produced at this stage as Brady

2    as opposed to a later stage because that's Jencks or Giglio, is

3    that fair to say?

4        MR. GIBBONS:  That is correct.

5        THE COURT:  Anything else beyond that that you want me

6    to inquire of the Government on?

7        MR. GIBBONS:  No, Your Honor.  I am satisfied.

8        THE COURT:  All right.  Thank you.

9        MR. GIBBONS:  Thank you.

10       THE COURT:  Mr. Kessler?

11       MR. KESSLER:  I'd like to point out a little problem

12   with the logic here.  I mean, nobody is saying that they can't

13   try to argue whatever defense they want to later, but this is a

14   discovery motion where they are trying to say that there is

15   stuff that hasn't been disclosed so they get to rummage for it,

16   and I don't think standing here and continuing to say that we

17   only have a fraction and there is more out there and I just

18   know it is evidence that such is the case.

19       THE COURT:  So let me actually get to what I think are

20   a couple of potentially disconnects between the way you are

21   looking at this and the way they are.  They are assuming, and I

22   take your point that it's an assumption to some degree, that

23   because there are these text messages for periods of time, and

24   they have a lot of those, the fact that they don't have those

25   same text messages for other periods of time is an indication

1    that those have not been produced.  And so the question in my

2    mind is, one, do those exist where they are preserved along the

3    way or were they not because they weren't important moments in

4    time or for whatever other reason, or two, do you not view them

5    if they did exist as being Brady information that should be

6    produced now as opposed to being Jencks or Giglio?  The danger,

7    of course, with Jencks and Giglio being depending only who

8    testifies it may or may not become relevant.

9         So to the extent that there are these communications

10   between the CHSs and the agents and/or the Defendants, do you

11   undertake -- what standard is the Government applying to

12   determine whether that is relevant as Brady information as

13   opposed to being only relevant as Giglio and Jencks?  And

14   that's, I think, the danger that might face the Government in

15   having to prepare or having to confront its discovery

16   obligations here if the Government doesn't sufficiently broadly

17   include information that might be related to an impeachment

18   defense as part of its undertaking to produce Brady

19   information.  Do you follow my question?

20        MR. KESSLER:  It's pretty long but I am going to try.

21   Stop me if I am not getting to what you are looking for, Your

22   Honor.

23        I have the same problem that the Court is having right

24   now, is I have no idea what he is talking about saying he

25   doesn't have.  As far as I am aware we have produced

1    everything.  There may be some things that were screen shotted

2    and others that weren't screen shotted, but I am not aware of

3    what it is that he thinks there is out there that we haven't

4    given him, so I don't think there is some universe of stuff

5    that we are sitting on and saying, well, we don't think this is

6    important so we are not giving it to him.  When it comes to

7    communications between Dan and his client we have given them.

8            There is some -- there is a logical problem with what

9    he's doing, too, and I don't want the Court to be confused by

10   it, where he holds up the large binder and says, look at all

11   these 1023s but there is only this many screen shots.  A 1023

12   is basically a report of any time something happens with an

13   informant.  So say the informant calls their handler and says,

14   hey, I just had lunch with so and so.  They are going to write

15   up a 1023.  It doesn't mean that there is a chat out there or a

16   screen shot or text of it, because people don't do everything

17   through text.  So you know, the fact that there are less text

18   messages than there are 1023s reporting that something happened

19   is meaningless.

20           THE COURT:  The reason I am pushing you a little bit

21   on where you draw the line between what might conceivably be

22   Brady as opposed to Jencks and Giglio or a Rule 16 is that a

23   lot of your initial response brief was directed at pointing out

24   that there is predisposition in this case and lots of evidence

25   of predisposition.  But given where we are in the proceedings,

1    I obviously can't make any sort of finding on that.  I have no

2    idea how that will play out at trial or what Judge Jonker or

3    the jury will say about it, and it left some question in my

4    mind as to whether or not the Government thought that it could

5    withhold communications that establish the manner in which the

6    CI or CHSs and the agents interact with one another because it

7    was in the Government's view didn't matter because there is

8    predisposition and therefore no entrapment.

9         MR. KESSLER:  We are not doing that.

10         THE COURT:  That's one of the major points I wanted to

11    make or at least understandings I wanted to have about how the

12    Government is proceeding here, because I think it would be

13    imperilous to proceed as in the manner in which the

14    communications that were occurring between agents and CHSs were

15    not -- did not rise to the level of Brady information.

16         MR. KESSLER:  I agree, and we are not doing that.

17         THE COURT:  All right.  That's helpful.  Thank you.

18         Anything else you wanted to say with regard to

19    Mr. Gibbons?

20         MR. KESSLER:  Yeah.  I think we need to get back to

21    the point of we are not litigating whether there was entrapment

22    here today.  I understand what their argument is as to why they

23    think such evidence would be relevant, and they have it.

24    That's why they have been able to cite it.  And I am just not

25    hearing anything suggesting, you know, of any kind of

1    suggestion that there is evidence out there that we are not

2    giving them.  You know, they are standing up here and saying,

3    look at the amount of evidence of entrapment there is.  That's

4    not evidence that there is stuff out there that we are not

5    giving them, you know.  And what they are asking for is, again,

6    to bring it back to what they are actually asking for is to

7    rummage around in people's phones to look for it.  They'd have

8    to make some prima facie showing that exists other than just

9    standing up here and getting excited.  That's not evidence that

10   something is out there.  And saying that I just know I don't

11   have everything also isn't evidence that you don't have

12   everything.

13            THE COURT:  All right.  Thank you.

14            Mr. Gibbons, anything else from you?

15            MR. GIBBONS:  No, thank you, Your Honor.  I am

16   satisfied.

17            THE COURT:  All right.  I think that brings us then to

18   Mr. Graham.

19            MR. GRAHAM:  Your Honor, before I begin, I've just got

20   to jump in real quick on that from my perception this is where

21   the disconnect may be.

22            First in regard to Dan.  It's my understanding that

23   one or more phones were provided to Dan by the Government for

24   the purpose of working on this case.  If that happens I think

25   he loses all protection that -- talking about his personal

1    information that's on the phone.  So any phone that might have

2    been given to him I think we are entitled to see in its

3    entirety.

4         THE COURT:  So that wasn't fleshed out in the briefing

5    but is an interesting argument.  Do you have any cases on it?

6         MR. GRAHAM:  No.  I don't have any cases but I guess

7    it's, I think, a relatively straightforward proposition that

8    if, in fact, the cases say you can't get an entire phone in

9    part because of personal information, the logical inference to

10   me is if you provide the phone for use on a case, you kind of

11   waive any claim that there is personal information.  It's not

12   his personal phone.  It's his -- it's his G phone, if you will

13   for lack of a better term.  That's what it is.  So if those

14   phones exist I think we are entitled, you know, to all of them.

15        To the extent that he has a phone that has personal

16   information, I am not sure why we couldn't at least investigate

17   the possibility of using a third party, kind of akin to a

18   special master.  I mean, our big concern here is --

19        THE COURT:  So let me just stop you with that, because

20   by making that argument you are essentially saying we don't

21   trust AUSA Kessler and AUSA Hakes to review the phone.

22        MR. GRAHAM:  And let me go back to the disconnect.

23   It's not a matter of trust.  It's a matter of interpretation of

24   the law.  The Government's papers disagrees with us very

25   clearly on the question of what agent communication or activity

1     is imputed to the Government.

2         THE COURT:  That I just probed a little bit, though,

3     and I think Mr. Kessler conceded, agreed that they are viewing

4     what is required to be produced as Brady information pretty

5     broadly and not cutting it off.  That was my concern, too, in

6     reading their response, was that they are narrowly defining

7     what they are required to produce as part of -- as being

8     relevant to this defense that they think is ridiculous but you

9     have an entitlement to proffer, but I think what Mr. Kessler

10    just conceded or agreed, committed to the Court, was that they

11    are not holding back discovery on that basis.  I think that he

12    was pretty clear about that.

13        MR. KESSLER:  And I want to just be clear that I was

14    not committing that we were going to give them everything

15    that's on the phone.  Otherwise, we would just give them the

16    phone.  It has to be related to the case and potentially

17    exculpatory.

18        THE COURT:  In this case the special master probably

19    would be me.  Maybe as part of this I order the Government, to

20    the extent that there is something that they view as being a

21    close call or potentially privileged, that that be something

22    that be reviewed by the Court.

23        MR. GRAHAM:  Sure.

24        THE COURT:  But I cut you off and then Mr. Kessler cut

25    you off, too, because I have been letting him, but it's helpful

1      to go back and forth during this process so we -- we can do it

2      bit by bit as opposed to forgetting something down the road.

3      So please continue.

4              MR. GRAHAM:  And again, it's hard for us.  We file

5      something.  The Government responds.  Clearly disagrees on

6      imputing certain information to the Government.  Now we get

7      here and apparently there is a change in position.  I just

8      would ask that any order perhaps address -- you know, address

9      what the difference is between the Government's position and

10     its papers and what its position is here today because I

11     don't -- I mean, we've got to pin this down somehow.

12             THE COURT:  So I don't know that it's really a

13     difference in the papers, and I can read the Government's

14     response again.  I took the first part of their brief which

15     talked about predisposition essentially the same way that I

16     took the first part of all of the Defendant's briefs, which was

17     that it was the initial discussion of how they viewed the case,

18     and most of which was not really all that helpful or important

19     to the Court in its decision of the case, and then starting as

20     I think I mentioned on later in the Government's brief --

21             MR. GRAHAM:  I'm sorry, Your Honor.  I was actually

22     talking about the briefing on the supplement and then the

23     Government's response to that.

24             THE COURT:  I don't think we've gotten to the

25     supplement yet.  I think we are still on the phones, but it

appears to me on page 19 of the Government's brief that it's
set out essentially exactly what its response is to the first
part.  We'll call it the.

Phones of the CIs' and CHSs' and agents' part, and the
only thing that is somewhat more contested, I think, is the
category, what it says as category two, which is each
informant's file is maintained by the FBI because that would be
Giglio or Jencks material, and so it would be produced only if
a witness testifies, then production were required.  But
otherwise, it appears to me that the Government is
appropriately setting out what it is required to produce for
each of those categories.  So that's why I'm trying to bring it
to specifics is to figure out exactly where there is some other
disconnect.

MR. GRAHAM:  The disconnect to me comes in -- again, I
am not talking about phones now, not getting to my phones.  In
regards to phones in the supplements that's where the
Government says to me it doesn't agree with us the standard of
imputing information to the Government, and doesn't agree with
us on financial motives being exculpatory.  So I think there is
the real disconnect between the Defendants and the Government
on those points.  You asked point-blank where is the
disconnect?  The disconnect is in the perception of the
obligation under the law to provide information.

THE COURT:  So let's again get to the supplements in a

1    minute so that we can keep it straight as to which items we are

2    talking about here.  As to Mr. Hills' motion, the phone

3    belonging to Dan and the phone or the phones belonging to Dan,

4    and then the phones belonging to the two agents, did you have

5    anything else that you think hasn't been adequately fleshed out

6    today as to those three?

7         MR. GRAHAM:  No, but I guess -- and again, I defer the

8    Court's -- the way the Court wants to handle it here, but I see

9    the supplements as directly relating to those points to the

10   phones, because what we are talking about here is a question

11   about in regard to Mr. Hills' motion, you know, ultimately a

12   question of, you know, okay, what information comes into the

13   Government, and are we rummaging around in phones?  So I've

14   made my point about if it's a G phone I don't think they have

15   any rights.  I guess that's my point there.  I made my point

16   about the possibility of whether it's the Court or someone else

17   acting as a special, you know, master to look at this, and it

18   all ties into the question of what kind of showing have we

19   made?  Well, the showing we've made is that some of these key

20   phones are coming in from people, and we've made a showing that

21   those people are not reliable.  We've made a showing to the

22   Court that Special Agent Impola has said he's going to make

23   discovery as difficult as possible.  We've made that showing.

24   He said that in interviewing another CHS.  We know that.  So

25   the source of the information coming in is from someone who

1    says, we are going to make this difficult. It's going to be

2    hard for them to figure out. The Defense attorneys are paid

3    liars. I mean, you know, so that's kind of our showing in

4    regard to that.

5         In regard to Chambers, we feel that we have made a

6    very clear showing that it's distinctly possible that he's got

7    a separate financial motive here. So the -- my point, Your

8    Honor, is I don't think that -- we don't trust what's coming to

9    the Government. We are not saying that --

10        THE COURT: Okay. How does appointing a special

11   master, having me review the phones, help you then? If you are

12   saying the problem is that the phones themselves have been

13   altered before they get to the Government or me, then --

14        MR. GRAHAM: Well, I don't know what has happened

15   because I don't know what those agents sent to the Government

16   in terms of did they -- did they pull things out and send it?

17   Did they send the entire phone? If they did pull things out

18   and they manipulated, then I don't think a special master

19   helps, however, unless that special master had tech capability

20   to look at the phone. But if -- but if they did turn over

21   more, well, then I think a special master, you know, might be

22   relevant. We just don't know.

23        THE COURT: Well, the problem is when you say we just

24   don't know, that essentially demonstrates that this is a

25   fishing expedition.

1          MR. GRAHAM:  No, Your Honor.  We've shown Your Honor

2     that the sources of the information have extreme bias, and

3     we've shown that there are real problems with them and --

4          THE COURT:  Just wait.

5          MR. GRAHAM:  And we've shown that they say we are

6     going to make discovery as difficult as possible.  We are going

7     to create chaos in the discovery process.  If someone makes the

8     statement that they are going -- their best chance to protect

9     an informant is to create utter chaos and confusion -- that's

10     what an FBI agent said.  That's in the transcript.  So are we

11     going to trust that person, and are we simply fishing when we

12     want to figure out if that person is telling the truth?  If the

13     same person says, I have done this many times before, we can

14     cloud the water and send everybody into disarray and chaos,

15     haven't they waived their right to say we are fishing when we

16     want to see into that person's phone?  That's our argument

17     whether, you know, whether the Court accepts it or not.

18          THE COURT:  All right.  Let's move onto your discovery

19     motion to the extent that it is broader than what Mr. Hills

20     asked for.

21          MR. GRAHAM:  Yes, Your Honor.  I mean -- and I think

22     recognizing the Court has looked at everything, this is my

23     position in regard to what I will call the CHS files.  We know

24     the files exist.  That's undisputed.  We know that there are

25     policies that exist for maintaining the content of those files.

1    And in regard to Mr. Franks, I do think -- very briefly on the

2    question of predisposition, whatever the arguments are that the

3    Government makes, et cetera, such as the argument here, they

4    are not entitled to anything we've asked for because of

5    predisposition.  What the Court knows --

6            THE COURT:  Again, I think he's -- that's not the

7    argument they are making so can we stick to what is actually

8    being litigated here, which is what is it in addition that you

9    are asking that the Government turn over that they haven't

10   already agreed to, again, in the pages of their briefs?  I feel

11   like a lot of briefing in this case has been aimed more at the

12   press than at me and I have to make specific decisions --

13           MR. GRAHAM:  Sure.

14           THE COURT:  -- about specific legal questions that

15   you've raised, and I'd like to focus on those as opposed to

16   both sides frankly mudslinging at each other.  So can we

17   focus --

18           MR. GRAHAM:  Sure.

19           THE COURT:  -- exactly on categories you would like

20   that you don't think that the Government has already agreed to

21   produce, with specific reference to their brief in which they

22   set that out?

23           MR. GRAHAM:  And let me begin by saying that my

24   understanding is that in terms of what they have agreed to

25   produce in response to my motion, my understanding is what they

1          have agreed to produce is nothing, zero.

2                    THE COURT:  But that does not read clearly in the

3          motion or the response to your motion in which they said all

4          the things that they do intend to produce.

5                    MR. GRAHAM:  Well, they intend to produce at some

6          point down the road certain things.

7                    THE COURT:  Right.  As is appropriate under the

8          criminal discovery rules.

9                    MR. GRAHAM:  And what I'm saying is we are entitled to

10         it now to prepare a defense -- to prepare a defense.  So

11         essentially what they are saying is if it's in the file and it

12         meets Rule 16, down the road we'll produce it, but that's not

13         my point in regard to what I think they are obligated to

14         produce now.

15                   THE COURT:  All right.  We are at such a level of

16         abstraction that I can't actually even begin to conceive of how

17         I would formulate an order even if I wanted to do that.  So can

18         we get to ultimately what you think that you want me to order

19         them to produce?

20                   MR. GRAHAM:  I want them to produce the entire CHS

21         file for at least four CHSs, and I'd like to have all of them,

22         but I am focusing on CHS-2 right now under a simple theory that

23         it's undisputed that on July 7, Kaleb Franks says, I am not

24         into kidnapping.  I am here for the training.  Let's assume the

25         Government is correct in its theory that in the next three

months by October 7th he has changed his mind and he is in.

Let's assume that they are correct.  That's their theory in the

indictment.  By October 7th he has conspired.  What happened in

those three months?  And then that doesn't matter so much as

except what's in the file that talks about what did the

Government tell that CHS to do, or these CHSs?

THE COURT:  Okay.  So the CHS file, as I understand

what the Government is suggesting, is what's in that is things

like their personal information, records related to that

person, how much they have been paid over time, that kind of

information, not the communications that occurred between the

CHS and your client.  You understand that that's probably not

in that file?

MR. GRAHAM:  I don't know.  I just know that the DOJ

and the Attorney General tells the FBI to put it in the file,

and so whatever the Government says I am going by what the DOJ

and the FBI says should be in the file.  And of course, as you

point out Your Honor, amounts paid certainly is key.  How did

they meet?  How did they verify and get the CHS going?  How

did -- what is -- what were the instructions given to the CHS?

What were the specific instructions given to the CHS regarding

permission to break the law, if any?  What admonishments were

given to the CHS for interaction with the Defendants?  Those

are things that at least the DOJ says are in the file.  And I

think we are entitled to see those before a simple -- before a

1    simple Jencks production.  I think those are a lot more,

2    because I do think those are absolutely Brady if there is

3    something there.

4         So I am asking for production of the entire file

5    because in the first place I can't conceive of any information

6    that we shouldn't have based on the -- I am going by the DOJ,

7    Your Honor.  I am going by the DOJ, not by what I'm told would

8    be in the file but by the DOJ requirements.  So we think that

9    there could be significant exculpatory evidence and in light of

10   the fact that something happens over time.  We've shown to the

11   Court that, you know, communications are going that try to push

12   various people into taking action.  Anyway, we think the entire

13   file should be produced because based on what the DOJ says

14   should be in there it's all -- it's all Brady.  So that's what

15   I'm asking for.

16        THE COURT:  All right.  Is there any other categories

17   that you think are in dispute at this time?

18        MR. GRAHAM:  No.  Again, I'm asking the entire file

19   for all of these people, but I think the Court could also peel

20   back and say, well, you know, if you were to ask me the

21   question what's the most important to me, obviously CHS-2, the

22   CHS out of Wisconsin, a CHS -- I don't want to use names, but a

23   woman out of Tennessee.  Those are the people who are really

24   important to me because they were actively involved on a

25   day-to-day basis with the group.

1          THE COURT:  All right.  And again, I want to make sure

2     we are talking about the same thing.  When you say CHS file,

3     are you talking about the file that the FBI keeps as sort of a

4     background file on that information?  Are you talking about all

5     the communications between the agent and the CHS?  Are you

6     talking -- what all do you believe is in that, because you just

7     said what the DOJ requires, but I don't have that regulation in

8     front of me to the extent that it exists, and so I need a

9     little bit of clarity on that.

10          MR. GRAHAM:  The DOJ says to the FBI for every CHS you

11    shall open a file and you shall keep various things, including

12    how to determine that the CHS qualifies, your payments to the

13    CHS, your admonishments to the CHS, your permission to act

14    illegally, your closing of the file.  So the DOJ tells the FBI

15    open a CHS file, and what I'm looking for is whatever that file

16    is that the FBI is told to open and maintain.

17          THE COURT:  All right.  Thank you.

18          MR. GRAHAM:  Thanks.

19          THE COURT:  Mr. Kessler?

20          MR. KESSLER:  Yes, Your Honor.  I don't think we have

21    that much of a disagreement other than that he wants things he

22    is not necessarily entitled to.  And this is very much like the

23    phone argument.

24          THE COURT:  That seems like a big disagreement, don't

25    you think?

1          MR. KESSLER:  Well, everything he actually just said

2     up here, right, things like payments, you know --

3          THE COURT:  Admonishments.

4          MR. KESSLER:  Admonishments.

5          THE COURT:  Permission to act legally, you would agree

6     that all of those are discoverable?

7          MR. KESSLER:  Right.  That's why I'm saying we don't

8     have a big disagreement.  Everything he actually listed is

9     stuff that we agree is Giglio as to any testifying witnesses.

10         THE COURT:  So here is the question, though.  What if

11    you don't have one of these CHSs testify and the Defense theory

12    is all of these folks who were sent out to go talk to our

13    clients, they all have these same instructions; would you agree

14    with me that that information then becomes Brady information

15    because of the Defense of entrapment that's been raised?

16         MR. KESSLER:  Yeah.  It depends what we're talking

17    about.  And there isn't --

18         THE COURT:  Specifically, you know, payments to CHS,

19    how much money the FBI spent on paying CHS, admonishments to

20    CHSs in general or specifically to individual ones even if they

21    don't testify at trial that they are to do certain things like,

22    you know, create FTXs, create surveillance missions, whatever,

23    or permission to act illegally.  Would you agree that because

24    of the Defendant's theory of the case, which is that we were

25    entrapped, that they are entitled to know what the FBI's plan

1       was in terms of attempting to sus out what was going on with

2       the group and direct the activities of the group going forward?

3               MR. KESSLER:  Yeah.  To the extent that there are

4       things like that that would bear on that we would turn that

5       over.  I mean, things like how much somebody was paid or

6       whether they have a drug problem or whatever that are part

7       of -- and there are a lot of things like that.

8               THE COURT:  Those two might have been different,

9       right?  How much they were paid is one thing that I think was

10      more likely to be potentially exculpatory even if that

11      individual is not called as a witness, right, based on the

12      number of CHSs that are being used and how much the FBI is

13      paying all of them together regardless of whether they testify?

14      Whether or not the individual person has a drug problem, that

15      would be less relevant.

16              MR. KESSLER:  Right.  I don't disagree with anything

17      the Court is saying.  To the extent there is anything in the

18      files of those CHSs that would be potentially exculpatory that

19      might tend to back up their -- you know, their theory of

20      entrapment, then that's stuff we would turn over and we are

21      going to comply with the Brady and Giglio obligations.  What

22      he's asking for is to look through the whole file, and where we

23      do disagree is that there is a lot of stuff in those kind of

24      files if it's not exculpatory because it doesn't bear on

25      entrapment, and if it's just for impeachment we don't have to

1    turn over stuff like that on witnesses who aren't testifying,

2    and there is other stuff that's just personal information about

3    people, how many children they have, where they live, what is

4    their social security number.  We are just not -- we are not

5    turning all that stuff over, and I don't think there is anybody

6    has been presented any authority for us to ever have to do

7    that.  I don't think that's ever been done.

8            THE COURT:  Did you want to respond, going back a page

9    or two in my notes here, to this question of if you buy a phone

10   for a CI, if it becomes a Government phone such as the

11   Government has an obligation to preserve it for the course of

12   criminal proceeding?

13           MR. KESSLER:  I totally disagree with that.  There is

14   no authority for that.  You know, Mr. Graham was just saying

15   basically if the Government pays for a phone for somebody it's

16   no longer a personal phone.  I think that's wrong.  It was his

17   personal phone.  You know, his phone broke so they had to give

18   him a new phone or he couldn't keep working, but that doesn't

19   mean it becomes a G phone as he said where he can no longer do

20   anything personal on the phone and it's not his.  So that's

21   wrong.  And then you take it to the next step he is basically

22   saying if it's a G phone then they get to root around it, but

23   we just settled that they don't get to look in the FBI agents'

24   phones, and those are G phones provided by the Government

25   specifically for doing your work and not personal stuff.  There

1    is just no authority for that.  What they are entitled to is

2    anything that's on that phone that's exculpatory that is Brady

3    or impeachment material for a testifying witness.  They are not

4    just entitled to the phone because the Government paid for it.

5         THE COURT:  Anything else on Mr. Graham's argument

6    that you wanted to respond to?

7         MR. KESSLER:  No, Your Honor.

8         THE COURT:  All right.  I think that brings us I think

9    to the supplements that were filed on Friday.  Is someone

10   prepared to argue on that issue?  It was actually Mr. Graham

11   that kind of rolled over from the initial -- despite my best

12   efforts rolled over from the initial motion to the supplement,

13   but I'll let you be heard on that if you want to be heard

14   further.

15        MR. HILLS:  I am not actually the author on the

16   supplements but I wanted to step back up anyway and put kind of

17   a point on what our -- what I'm hoping to get at some point

18   regarding these text messages between the CHS and the agents,

19   understanding now that some of those text messages may be gone

20   because Dan used multiple phones.  One of them broke or is gone

21   and he used a different phone.  But all of those text

22   messages -- and I don't, again, don't think we have them -- are

23   included on the agent's phone.  So I am -- I guess I am

24   wondering if the Government is saying that they are going to

25   scrub those text messages for our defense for information

1    regarding entrapment.

2           THE COURT:  I am not sure I understand the word scrub,

3    that context?

4           MR. HILLS:  I don't have a word.

5           THE COURT:  They are going to review.

6           MR. HILLS:  Review them.

7           THE COURT:  They are going to review that phone and

8    produce anything that is relevant, correct, Mr. Kessler?

9           MR. KESSLER:  To the extent a phone still exists that

10   can be actually searched we would turn over anything that is

11   Brady or impeachment material for a testifying witness.

12          THE COURT:  I think he is saying, though, to the

13   extent it's on the agent's phone you are also going to review

14   the agent's phone for that purpose.

15          MR. KESSLER:  Sure.

16          MR. HILLS:  Okay.

17          THE COURT:  Anything else?  All right.  So that then

18   brings us again to the issue raised in the supplement and

19   second joint supplement on the motion to compel, which

20   Mr. Gibbons, is that your handy work?

21          MR. GIBBONS:  I would defer to Mr. Graham.  He handled

22   that.

23          THE COURT:  All right.  Mr. Graham?

24          MR. GRAHAM:  I think I have told you everything that I

25   think about that and what the problems that it creates for us

1    in terms of credibility for agents and what we are looking for.

2    So at least from my perspective I have said everything to you

3    that I was going to say about those.  Be happy to answer any

4    questions.

5           THE COURT:  Well, I guess my concern is that there is

6    this BuzzFeed article and very little else, and I don't really

7    know what to do with that other than ask the Government to do

8    what it is required to do, which is to produce anything that is

9    required by the rules to your clients.  They are not required,

10    as you know, and you don't dispute this either I'm sure that

11    they are not required to go out and look for more discoverable

12    material, and essentially that's their response.  We'll produce

13    anything that is relevant to the case, and I think that they

14    understand that the -- well, maybe the issue here is the

15    question of financial incentive.  The suggestion I think in the

16    Government's response was, well, if he is not a witness at

17    trial, and he doesn't have an interest in the trial, then a

18    financial interest is irrelevant.  I don't know whether that's

19    true or not based on what has been produced so far whether

20    there is sufficient evidence here to suggest that he had a

21    financial interest in the investigation at all.  It's pretty

22    early days to make that kind of conclusion.  I suspect, though,

23    that if -- and we can ask Mr. Kessler, because at the end of

24    the day it doesn't really matter much what I suspect but that

25    if he were to discover that an agent had had a financial

1    interest in the investigation that he would view that as Brady

2    material.

3              So to start with, Mr. Graham, do you think I have

4    appropriately summed up what the question is here?

5              MR. GRAHAM:  The question of financial gain I

6    think -- I think you are spot on.  The question of if the Court

7    is under the impression that the only thing we have is a

8    BuzzFeed article, I would simply note for the Court that it is

9    undisputed that articles of organization were filed --

10             THE COURT:  I don't mean to leave that out.  I do

11   recall that.  I don't mean to leave that out.

12             MR. GRAHAM:  Articles of organization were filed in

13   Mexico for an entity identified as Exeintel, E-x-e-i-n-t-e-l,

14   LLC, and Jayson Chambers from Clarkston, Michigan, is the

15   person who is identified as the member, sole member.  And then

16   we have a connection between that entity and another entity

17   that is sending out tweets that say, you know, essentially I'll

18   characterize it, watch out in Michigan.  Watch out in Michigan.

19   At the same time, Jayson Chambers is one of the key agents in

20   working this file to communicate with Dan, giving him

21   instructions on what to do to talk with people involved.  So

22   our concern is if Jayson Chambers created an entity, then --

23   and you know, wants that entity to look like it is the Best

24   Fuel Security entity at the same time he is involved in the

25   investigation when there is a connection saying watch Michigan,

watch Michigan, and then he is connected with the
investigation.  That's our real concern that comes up, and I
think that's all supported.  And of course, then the -- and as
the Court is aware I think, the entity that was sending out the
tweets, within, I don't know, 24, 36 hours after we filed our
supplement somebody scrubbed the site.  Somebody scrubbed the
site.  I mean, from our perspective, Your Honor, you know, we
pointed out and then somebody goes in and scrubs it, and it
just doesn't make sense.  So we are very concerned about that.

Now, if you were to ask, well, what are we asking, you
know, you to do about that?  First, to the extent that there
might be subpoena requests for anyone involved with that
Exeintel, we think it's crucial that we, you know, be able to
issue a subpoena to them and just to try to get to the bottom
of this.  And my big concern was, I think, the Government's
response was kind of, you know, it's his business.  It's
Chambers' business.  If that's their response then we've got a
real disagreement.

THE COURT:  Well, I believe there was at least one
subpoena that was issued without the Government objecting to
it, you know.  I don't have anything else in front of me --

MR. GRAHAM:  Okay.

THE COURT:  -- on that front at this point.  So based
on what you have provided here, is there anything else you are
asking me to do today as part of the motions that have been

1    filed?  These were filed as supplements to the motion to

2    compel.  They are of a different character and nature.  I

3    considered just striking them all and making you file a

4    separate motion but why do more?

5              MR. GRAHAM:  I think you and I have a disagreement,

6    but I think they relate directly back to the --

7              THE COURT:  You have made that point, too.

8              MR. GRAHAM:  Anyway.  So I don't have anything to add

9    to that.

10              THE COURT:  Well, it doesn't relate to the same CHS

11   connection with the agents that seem to be the point of the

12   other motions.  At least that's -- I understand your argument.

13              MR. GRAHAM:  It is one of the same agents.

14              THE COURT:  All right.  Mr. Kessler?

15              MR. KESSLER:  Yeah.  I think all we've got here is

16   innuendo, Your Honor.  As you pointed out there is a BuzzFeed

17   article and there's just been no showing.  You can stand up and

18   say there is a financial interest, but there is no evidence

19   that there is a financial interest.  And we are aware of our

20   obligations.  If I were to find out that Jayson Chambers had a

21   financial interest in the outcome of the case, if that's Brady

22   we are going to tell them about it.

23              THE COURT:  When you say if that's Brady.  Would you

24   agree -- and I'm asking this because in the response you make a

25   distinction between a witness at trial having an interest in

1    the outcome of the trial and a financial -- I mean, a financial

2    interest in the outcome of the trial versus an agent having an

3    interest in how an investigation went along, and I think --

4        MR. KESSLER:  It would depend on what we learned, and

5    as far as I know from talking to Agent Chambers, you know,

6    there is no financial interest at all.  There is nothing.  So

7    you know, if we were to find out that there was some financial

8    interest that would make him want to go out and entrap people,

9    of course we would tell the Defense about that.

10       THE COURT:  All right.

11       MR. KESSLER:  That's all I can say.

12       THE COURT:  I want to go back to my notes just to make

13   sure I don't have any --

14       MR. KESSLER:  I do just want to be clear, because

15   there were some very heated things that were actually filed

16   over the weekend throwing sand and stuff like runaway train of

17   misconduct and sinister and blah, blah, blah.  We have never

18   had anything to do with this Twitter account.  I heard about it

19   from them.  So I don't know what they are talking about.  I

20   just want to be clear about that, that there is no Government

21   taking down Twitter sites.  That's why we have no objection to

22   them subpoenaing Twitter and finding out whatever they find

23   out, and we assume they'll share it with us under their

24   reciprocal discovery obligations.

25       THE COURT:  All right.  Thank you.  Hang on a second.

1    I want to make sure I've gone through my notes.  You talked at

2    one point in your brief, Mr. Kessler, about an investigative

3    privilege or informant privileges.  Is there anything that you

4    are currently holding back on the basis of an investigative or

5    other privilege that -- other than that -- other than the

6    privilege you believe would be discovery?

7         MR. KESSLER:  There is -- we have talked about the

8    distinction between CHS-2 and the other informants.  So there

9    are communications like the ones that we gave them for -- you

10   know, that were Agents Impola and Chambers talking to Dan.  We

11   have communications that we've already downloaded that were

12   between the agents handling those other CHSs and those CHSs and

13   those -- they may have guessed who some of them are.  You know,

14   I know they are starting to throw around possible identities,

15   but we are not -- we are going to wait until closer to trial,

16   as is our right to do, to turn that stuff over, but it's the

17   same sort of thing.

18        THE COURT:  All right.  But that's not information

19   that you are intending on withholding completely --

20        MR. KESSLER:  No.

21        THE COURT:  -- from trial?

22        MR. KESSLER:  No.

23        THE COURT:  That is information you intend to --

24        MR. KESSLER:  Correct.

25        THE COURT:  -- produce but at a later time due to the

1      security concerns --

2                  MR. KESSLER:  That's right, Your Honor.

3                  THE COURT:  -- in the case?

4            All right.  I'll say this as part of the order but it

5      just should -- I'll say it again, too, to the extent the

6      Government has a concern about where something falls on the

7      line, I'll invite the Government to submit that for in camera

8      review down the road if it thinks that would be helpful or to

9      the extent, frankly, that it comes close to the line of

10     wondering whether or not it should be produced now as opposed

11     to later.

12                 I think you have committed already to the fact that

13     you are, as I would expect, reviewing and producing any

14     relevant communications between any other FBI agents and other

15     CHSs, but that that simply may not happen sooner rather than

16     closer to trial, correct?

17                 MR. KESSLER:  Yes.

18                 THE COURT:  All right.  This isn't my trial, of

19     course, but I will remind you, although you know this already,

20     too, that the orderly progression of trial is very helpful, and

21     the Court does not enjoy having it delayed by delays that are

22     required by having to review and follow up on evidence, and

23     obviously, they shouldn't be prejudiced by any delay in

24     producing information.

25                 MR. KESSLER:  Right.  The big concern we have is just,

1    you know, once some of these names are out there -- there is a

2    difference between putting something up in the hotel for a

3    weekend before the trial and putting them up for a month

4    and-a-half and hoping nobody takes action against them.

5          THE COURT:  Sure, but producing 50,000 pages of

6    discovery on the weekend before trial doesn't usually go well

7    either.

8          MR. KESSLER:  Right.  Understood, Your Honor.

9          THE COURT:  Yeah.  I don't mean to be inappropriate in

10   how I suggest that.  I know that.

11         MR. KESSLER:  Not at all, Your Honor.

12         THE COURT:  You know that already.  I think that was

13   all the questions I had for you.  Let me just review my notes

14   for a second as to everybody else.

15         There was a lot in the Government's brief about the

16   identities of the additional CIs.  Is that something that any

17   of the Defendants are actually asking for at this time?  That

18   wasn't my understanding.

19         MR. GRAHAM:  Your Honor, from my perspective there is

20   one -- there is one, and I think -- okay.  There is one -- of

21   the two most important CHSs, one is we've talked about at

22   length, Dan CHS-2.  There is another who is actually a

23   Defendant in a federal case in Wisconsin.  The Government

24   doesn't have to put him up for, you know, months because they

25   are already putting him up.  He is detained in Wisconsin, and I

1      can't see any reason why we are not getting the same

2      communications between handlers and him that we are getting for

3      Dan, because there is no issue whatsoever as to his identity.

4      He is a Defendant in a case that is a matter of public record.

5      As far as others go, yeah, we think we should get those sooner

6      but our arguments are our arguments.

7              THE COURT:  Thank you.

8              As to that Defendant, any reason -- or not Defendant,

9      excuse me, CSI.  Any reason that can't be produced sooner

10     rather than later?

11             MR. KESSLER:  I am not thinking anything off the top

12     of my head, Your Honor, but this is kind of a last minute

13     thrown out thing that we didn't brief or you know, there could

14     be reasons that I am not thinking of.

15             THE COURT:  All right.  I am not going to put you on

16     the spot with it right now.  I would admonish the Government to

17     make that information available as soon as it's feasible if

18     only to reduce the bottleneck that is going to come right

19     before trial.  Thank you.

20             MR. KESSLER:  Yes, Your Honor.

21             THE COURT:  I was actually asking if there was any

22     issue as to identity, but it sounds like you know exactly who

23     that person is so that's not the problem here.

24             All right.  So having heard the argument today and the

25     Government's statements regarding what it intends to produce,

1    let me just sum up where I think we are.  Judge Jonker put out
2    a number of orders last week that pretty clearly set out the
3    law in this area, noting that the Government has well
4    established but limited predisclosure obligations.  Those
5    include the obligations to provide specified discovery under
6    Rule 16, the ongoing obligation to produce potentially
7    exculpatory information under Brady versus Maryland, the
8    obligation to provide Jencks and Giglio information, and
9    obviously, the obligation to provide with the Court's orders
10   requiring disclosure and marking of trial exhibits by the time
11   of the final pretrial conference as well as its obligations
12   under the Jencks act.

13        I don't have anything in front of me that indicates
14   that the Government has failed to live up to any of those
15   obligations in this case so far.  There is a lot of discussion
16   about whether or not the Defense has everything, which may be
17   in part because they think there should be more, but I haven't
18   seen any evidence that something that is required to have been
19   disclosed to date should have and has not been.  I also haven't
20   seen any evidence that the Government will be unable or
21   unwilling to comply with its continuing obligations.  I don't
22   see any reason at this point to require anything more than what
23   are the normal requirements of the law.  I have asked
24   Mr. Kessler a number of questions relating to making sure that
25   the Court understands exactly what has been produced and what

1    he will produce specifically in order to determine if there is

2    any disconnect between how the Government is viewing what would

3    be Brady, Rule 16, Jencks, Giglio information and what the

4    Court views that in making sure that the Government's position

5    is appropriately broad. I am satisfied by those

6    representations today that he is making an appropriately broad

7    assessment -- that the Government is making an appropriately

8    broad assessment.

9         As is always the case in criminal discovery there is a

10   great deal of reliance on the Government's, and the AUSAs'

11   specifically, obligations to provide this material, and I don't

12   have any reason based on what I've seen to have any reason to

13   impugn the integrity of the two AUSAs on this case, and two, I

14   don't have any reason to think they won't uphold their

15   requirements that are given to them by the law as they are

16   required to carry them out.

17        All that said, I will say what I said a couple of

18   times, that while the Government made the position that

19   Defendants were not predisposed to commit the crime as

20   unsupportable, that's obviously ultimately for the court or the

21   jury to decide, and any review for Brady, Giglio, Jencks, Rule

22   16 should be done through that lens and broadly considered, and

23   to the extent that if there is a close issue the Government

24   should submit that document or that issue for in camera review.

25   I actually don't really think that that admonishment is

1    necessary with regard to these AUSAs but I will make it anyway.

2          So I think that's where we are today. I tend to

3    agree -- the one issue I think that was -- that came up during

4    the hearing today that I had not considered was this question

5    of whether or not any phones given to Dan all of a sudden

6    become Government property and therefore G phones. It is an

7    interesting argument. I don't have case law in front of me but

8    I take Mr. Kessler's argument as probably the correct response

9    to that, which is that we would not expect that we would be

10   able to turn over everything on the FBI agent's phones, and the

11   same thing would be true of the CI. More to the point though,

12   it does not appear to me that there is a reason to go beyond

13   the usual process in this case, which is that the Government

14   reviews the material and produces what it is required to

15   produce.

16         Does anyone think that I have not addressed -- other

17   than that you disagree with my ruling, is there anyone who

18   thinks that I haven't addressed a specific argument either

19   while we are discussing them or now in closing?

20         MR. HILLS: No, Your Honor.

21         MR. GRAHAM: Your Honor, I think there was brief

22   reference at the beginning that we feel like we would have

23   bolstered our position by calling the witnesses who are here.

24   I think the Court's ruling clearly shows that, you know, those

25   witnesses aren't necessary, but I just wanted to make sure that

1       that issue was preserved.

2               THE COURT:  You, of course, can appeal me to Judge

3       Jonker on that issue if you think I am incorrect in declining

4       to take testimony today, but based on the record before me and

5       the statements that the Government has made I don't believe

6       that that is necessary at this time.

7               Anything else?  Mr. Gibbons, anything from you?

8               MR. GIBBONS:  No, Your Honor.  I am satisfied.  Thank

9       you.

10              THE COURT:  All right.  Thank you.  Based on that, I

11      will just indicate that respectfully that ECF Nos. 225 and 250

12      are denied.  Now, denying the motions doesn't mean that we

13      haven't come to some agreements today, but -- what is required

14      in terms of Government production, but for purposes of making a

15      record I will simply say that they are denied as opposed to an

16      outcome that says granted in part or not in part.

17              Anything else we need to take up today from your

18      perspective, Mr. Kessler?

19              MR. KESSLER:  No, Your Honor.  Thank you.

20              THE COURT:  Anything from any of the Defendants?

21              MR. HILLS:  No, Your Honor.

22              MR. GRAHAM:  No, Your Honor.

23              MR. GIBBONS:  No, Your Honor.

24              MR. BLANCHARD:  No, Your Honor.

25              THE COURT:  Ms. Kelly and Mr. Blanchard, anything else

1        from your perspectives?

2                    MR. BLANCHARD:  No, Your Honor.

3                    MS. KELLY:  No, Your Honor.

4                    (Proceeding concluded, 11:34 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.


/s/ _____

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, MI  49503