UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,                  No. 1:20-cr-183

         vs.                          Hon. Robert J. Jonker
                                      Chief United States District Judge

ADAM DEAN FOX,
BARRY GORDON CROFT JR.,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

                  Defendants.
_____/

## GOVERNMENT'S TRIAL BRIEF

The United States submits this trial brief for the Court's reference at the upcoming final pretrial conference.

1. <u>Factual Summary</u>

    a. <u>The Offense</u>

From on or before June 6, 2020, defendants Adam Fox ("Fox"), Barry Croft ("Croft"), Daniel Harris ("Harris") and Brandon Caserta ("Caserta") conspired to kidnap the Governor of Michigan ("the Governor."). (R. 172: Superseding Indictment, PageID.961.) Fox, Croft, and Harris conspired to use weapons of mass destruction (explosive devices) in furtherance of the plot. (PageID.967-68.) Croft and Harris possessed one of those explosive devices in this district on September 13, 2020 (PageID.969); and Harris transported an unregistered short-barreled assault rifle through this district on more than one occasion. (PageID.970.)

Additional details regarding the offenses are set forth in the plea agreements of two other conspirators, Ty Garbin ("Garbin") and Kaleb Franks ("Franks"). (PageID. 745-51, and 3118-3124, respectively.) Both Garbin and Franks will testify against the remaining defendants at trial. Among other things, they will testify that Fox and Croft initiated the kidnapping plot; that Harris and Caserta voluntarily joined it; and that none of the defendants were entrapped by law enforcement. (*Id*.)

    a.  <u>Witnesses</u>

       (1) <u>Government Witnesses</u>

The government presently intends to call 48 witnesses in its case-in-chief. Of those witnesses, 20 are chain-of-custody witnesses for the physical searches of the defendants' property, vehicles and persons. Should the defendants stipulate to the chain of custody for the seized items, the government's witness list will be reduced to 28 witnesses.

The remaining witnesses include FBI Special Agents involved in the investigation, two FBI Special Agents who joined the defendants' group in an undercover capacity, one or more confidential human sources, two cooperating defendants, and approximately a dozen civilian witnesses with knowledge of the plot. The government will also call the four expert witnesses disclosed in September 2021. (R. 341: Notice Regarding Expert Testimony, PageID.2110.) These include two FBI explosives experts, an ATF firearms examiner, and an FBI forensic examiner from the Computer Analysis Response Team (CART).

(2) <u>Defense Experts</u>

The defendants have collectively disclosed several expert witnesses, including forensic data examiners, a former FBI agent (PageID.3051-52), and an "expert in military style training and tactics." (PageID.3449-50.) The forensic data examiners are unobjectionable, assuming the proper foundation is established for consideration of their testimony. The government objects to the remaining two witnesses.

(A) <u>Patrick Buckley</u>

Fox offers Patrick "Ed" Buckley, a former FBI Special Agent, whom he says will testify about FBI best practices. By letter dated February 7, 2022, Fox advised Buckley will opine that when an investigation involves multiple confidential human sources, it is preferable that they not be aware of each other's identities. That practice was indeed followed by the agents in this case[1], making such testimony superfluous and irrelevant. Fox further states that Buckley will "advance the opinion that certain protocols should be employed when a target of a surveillance event is significantly impaired by drugs or alcohol." Fox does not specify who was supposedly impaired or when, what those protocols are, or why they are relevant in this case.

---

[1] For example, the FBI became aware that CHS "Steve" was playing both sides because he asked CHS "Dan" (whom he did not know was an FBI source) to destroy footage of the conspirators casing the Governor's house.

(B) <u>Eric Dorenbush</u>

Caserta intends to call Eric Dorenbush to opine that "the training and techniques used in [the defendants'] training videos are not necessarily offensive in nature," and that individuals like himself charge money to train civilians in military tactics. (PageID.3452.) Caserta provided this notice late, and the proposed testimony does not meet the standard of Rule 702. The witness' expertise in such pursuits as "assault procedures" and "explosive entry" (PageID.3455) may be useful to law enforcement or military clients, but is not scientific, technical, or other specialized knowledge that will help the jury understand the evidence or determine a fact in issue. Fed. R. Evid. 702(a). Testimony that non-criminals practice military tactics is no more germane here than testimony that non-criminals practice sport climbing would be in a second-story burglary case.

Moreover, "in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). The proposed testimony might mislead the jurors into believing an expert found the defendants lacked intent. It should therefore be excluded under both Rules 704 and 403.

b.  <u>Other evidence</u>

In addition to witness testimony, the government's proof will include the defendants' chat messages and social media communications (audio, video, and text), photographs and video recordings of key events, and undercover audio recordings of the defendants discussing the plot. The government will also offer

4

several demonstrative exhibits and a summary chart, all of which are discussed below in Paragraph 2(d).

    c.  <u>Stipulations</u>

To save time, the government has offered to stipulate to the evidentiary foundation for cell phone extractions, Facebook materials, chat messages, undercover audio recordings, jail calls, and physical exhibits seized from the defendants' persons and property.

    2.  <u>Evidentiary Issues</u>

The majority of the contested evidentiary issues contemplated by the parties have been resolved in pretrial motion practice, and will not be reiterated here. The matters below are addressed to minimize arguments about admissibility during trial.

    a.  <u>Authentication of Evidence</u>

In addition to the testimony of live witnesses, the government will offer several types of evidence at trial, including audio and video recordings, electronic communications ("chats"), and material posted on social media.

To establish that evidence is authentic, the Government need only present "evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). "This burden is slight." *United States v. Demjanjuk*, Case No. 1:99-CV-1193, 2002 U.S. Dist. LEXIS 6999, at *54 (N.D. Ohio Feb. 21, 2002). "[T]here need only be a prima facie showing, to the court, of authenticity, not a full argument on admissibility." *Id.* "Once a prima facie case is

made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *United States v. Thomas,* 921 F.2d 277; No. 90-3289, 1990 U.S. App. LEXIS 22476, at *11 (6th Cir. 1990). "The only requirement is that there has been substantial evidence from which they could infer that the document is authentic." *Id.*; see also *United States v. Carriger,* 592 F.2d 312, 316 (6th Cir. 1979).

(1) Audio Recordings

Much of the evidence in this case consists of undercover audio recordings of the defendants discussing the plot. These recordings can be authenticated by the testimony of a witness with knowledge about the conversation. Fed. R. Evid. 901(b)(1). They can also be authenticated through "an opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5).

Rule 901(a) does not require that an audio recording be authenticated by a witness who was actually present for the conversation. *United States v. Puttick*, 288 F. App'x 242, 2008, 2008 U.S. App. LEXIS 16387 (6th Cir. 2008). Any witness familiar with the recorded person's voice can authenticate the recording. *See United States v. Brown*, 510 F.3d 57, 67-68 (1st Cir. 2007) (law enforcement officer familiar with the defendant's voice based on hundreds of hours of listening to his telephone conversations); *United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004) (DEA agent qualified to identify defendants' voices on wiretap recordings based on

6

personal interviews with defendants); *United States v. Wells*, 347 F.3d 280, 288 (8th Cir. 2003) (agent who worked with confidential informant authenticated conversation between informant and defendant).

A witness need not have extensive exposure to the voice or voices to authenticate a recording. *United States v. Thomas*, 690 F.3d 358, 372 (5th Cir. 2012) ("Rule 901(b)(5) merely requires that the witness have some familiarity with the voice he identifies."). *See also, United States v. Norman*, 415 F.3d 466, 472-73 (5th Cir. 2005) (DEA agent's hour-long discussion with defendant after arrest sufficient); *United States v. Trent*, 863 F.3d 699, 707 (7th Cir. 2017) ("We have consistently interpreted this rule to require that the witness have only 'minimal familiarity' with the voice."); *United Sates v. Cruz-Rea*, 626 F.3d 929, 935 (7th Cir. 2010) (listening to 15-second voice exemplar fifty to sixty times met "low bar of minimal familiarity.").

Once the profferor establishes the minimal level of familiarity necessary under the Rule, objections based on the extent of the witness's familiarity with the voice and any time gap between the identification and the basis of the witness's familiarity go to the weight of the evidence, not to its admissibility.

*5 Weinstein's Federal Evidence § 901.06* (2021).

The government will authenticate most of the recorded conversations in this trial through witnesses who were actually present, including CHS "Dan," Garbin, and Franks. A smaller number were recorded by CHS "Steve" or other individuals who will not testify. The government will offer those exhibits through an agent who

provided and recovered the recording device, and authenticate them through the testimony of witnesses familiar with the voices. For example, an agent will testify that he gave a recorder to "Steve," later retrieved it from him, and listened to the resulting recordings of him speaking with Fox and/or Croft. Any agent or cooperating defendant familiar with the voices of "Steve," Fox, or Croft can authenticate the tape.[2]

(2) Electronic Communications

The government will also offer screenshots of "chat" messages the defendants exchanged with each other over encrypted messaging applications. Circumstantial evidence is sufficient to authenticate letters, e-mails, and the like. *See United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011). There is no requirement that these chats be self-authenticating to be entered into evidence. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs*, Civil Action No. 5: 18-435-DCR, 2021 U.S. Dist. LEXIS 225811, at *6-7 (E.D. Ky. Nov. 23, 2021) (citing *United States v. Bertram*, 259 F. Supp. 3d 638, 640 (E.D. Ky. 2017)). For example, an e-mail can be authenticated if the sender or recipient testifies about it. *Id.* Even a non-party to the message, who has a personal history of communicating with the sender or recipient, can authenticate it if he can testify about its distinctive characteristics. *Id.* Arguments about provenance (for example, that someone else might have sent a

---

[2] "Steve's" voice appearing on the tape does not open the door to impeaching him under Fed. R. Evid. 806. *See United States v. Adeyinka*, 410 Fed. Appx. 986, 2011 U.S. App. LEXIS 3350 (7th Cir. 2011) (absence of informant was inconsequential, since his side of conversations was properly admitted as nonhearsay background to give context to recorded statements of defendant and codefendant.).

message using the account) or meaning (e.g., whether the defendant was serious or joking) go to weight, not admissibility.

As with the audio recordings described above, the government will authenticate the vast majority of the chat messages through the testimony of actual participants, including "Dan," Garbin, and Franks. In rare instances, a witness may authenticate a message through other circumstantial evidence. For example, witnesses can testify that "Wayward" or "Debased Tyrant" were Caserta's chat group code names, and that certain topics (e.g., anarchy, "Zionist banker" conspiracy theories) were characteristic of his communications.

(3) <u>Social Media</u>

The government will also offer written messages, photographs, audio recordings, and video recordings the defendants posted on social media, including Facebook. Federal Rule of Evidence 902 addresses evidence that is self-authenticating. "No extrinsic evidence of authenticity" is required for this evidence to be admitted. *Id.* Courts in the Sixth Circuit regularly admit self-authenticating evidence pursuant to Rule 902 without any witness testimony. *See, e.g., Gjokaj v. United States Steel Corp.,* 700 F. App'x 494, 502 (6th Cir. 2017); *JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 750 F.3d 573, 582 (6th Cir. 2014).

Federal Rule of Evidence 902(11) specifically authorizes the self-authentication of "certified domestic records of a regularly conducted activity." *See Gjokaj v. United States Steel Corp.,* 700 F. App'x 494, 502 (6th Cir. 2017). The records must satisfy the business records requirements of Rule 803(6)(A)-(C), "as

shown by a certification of the custodian... that complies with a federal statute or a rule prescribed by the Supreme Court." Fed. R. Evid. 902(11).

Rule 803(6), in turn, provides that business records are admissible if they are accompanied by a certification of their custodian or other qualified person that satisfies three requirements: (A) that the records were "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) that they were "kept in the course of a regularly conducted activity of a business"; and (C) that "making the record was a regular practice of that activity." *Id.*

Numerous courts have found records like the defendants' Facebook postings authentic pursuant to Rule 902(11). *See, e.g., United States v. Gal*, 606 F. App'x 868, 875 (9th Cir. 2015) (e-mails authenticated based on Yahoo! affidavit); *United States v. Hassan*, 742 F.3d 104, 133 n.25 (4th Cir. 2014) (Facebook and Google certificates satisfied requirement for authentication); *United States v. Hitt*, No. 2:15-cr-117-GEB, 2018 U.S. Dist. LEXIS 1856, at *3-4 (E.D. Cal. Jan. 4, 2018) (Yahoo! and AT&T certificates authenticated subscriber and login information, IP records).

Those courts that have declined to admit provider records pursuant to Rule 902(11) generally have done so where, in the courts' view, the proponent has sought to use the 902(11) certification to prove too much. A certificate from an internet service provider cannot, for example, establish the admissibility of the *content* of e-mails, since the business does not have knowledge of the creation of that content, or a business duty to record it. *See, e.g., United States v. Edwards,* 2019 U.S. Dist.

LEXIS 179077, *31, 2019 WL 5196614 (D. Kan. October 15, 2019); *United States v. Shah,* 125 F. Supp. 3d 570, 575-76 (E.D.N.C. 2015).

In some cases, the defendants' social media postings are self-evidently authentic. For example, Fox, Croft, and Caserta all posted videos of themselves advocating attacks on the government and/or law enforcement. In other cases, the government will authenticate the audio recordings or postings through witnesses who either received them personally, or are familiar with the defendants' voices or writings. In a smaller number of instances, the defendants sent audio or text messages to non-testifying third parties (e.g., other domestic terrorism subjects). These are self-authenticating under Rule 902(11), and in the case of audio messages, will also be authenticated by witnesses familiar with the defendants' voice.

   b.  Summary Chart

The government will offer a chart demonstrating the relative frequency of each defendant's active participation in their encrypted chat group, for each month of the conspiracy. This evidence is relevant to show that none of the remaining defendants were mere "passive listeners" in the conversations, and is similar to the "toll analysis" summaries frequently offered in drug cases. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 587–88 (6th Cir. 1998).

Rule 1006 of the Federal Rules of Evidence provides:

The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by

11

other parties at a reasonable time and place. And the court may order
the proponent to produce them in court. The Sixth Circuit has labeled
summaries that meet the elements of Rule 1006 "primary evidence
summaries."

*United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).

To be admitted under Rule 1006, the underlying information in a primary-
evidence summary (1) must be so voluminous that it cannot be conveniently
examined in court; (2) it must have been previously provided for examination by the
opponent; (3) the summarized information must itself be admissible evidence; (4)
the summary must be accurate and presented in a nonprejudicial manner; and (5)
the summary must be properly introduced, by the person who oversaw its
preparation. *United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008); *United States
v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005); *United States v. Modena*, 302 F.3d
626, 633 (6th Cir. 2002).

It is not necessary that it be literally impossible to examine all the
underlying records, but only that an in-court examination would be inconvenient.
*Bray*, 139 F.3d at 1109. If the requirements of Rule 1006 are met for primary-
evidence summaries, "the summary, and not the underlying documents, is the
evidence to be considered by the factfinder." *Bray*, 139 F.3d at 1109. The admission
of Rule 1006 exhibits as evidence "is a matter within the discretion of the district
court." *Jamieson*, 427 F.3d at 409 (quoting *Bray*, 139 F.3d at 1109).

The underlying chat messages are too voluminous to examine in court, as
they include multiple entries every day over the course of several months. The
messages have all been provided to the defense in discovery. While the contents of

12

every message are not necessarily admissible, the frequency of the defendants'

active participation is. The chart is non-prejudicial: it includes only statistical facts,

and draws no conclusions. The chart will be presented by the analyst who prepared

it.

The summary chart should be admitted as a "primary evidence summary."

Admitting it as a pedagogical device summary would be improper in this case.

While the frequency of the defendants' active participation is admissible in court,

the *content* of many of the underlying communications is inadmissible. (See R. 439:

Order on Motions in Limine, PageID.2996-3014.)

c.  Demonstrative Exhibits

The government intends to offer four demonstrative exhibits: (1) a map of

Michigan, with closeups; (2) three-dimensional video recreations of Fox's workplace

(the "Vac Shack"), the defendants' training camp near Luther, Michigan, and the

highway bridge under which Fox and Croft intended to place a bomb; (3) a

demonstration that lights used to signal from across the lake are in fact visible from

the road near the Governor's house; and (4) a video demonstration of the route the

defendants' planned to take to extract the Governor from her home to Lake

Michigan.

The court has authority under Fed. R. Evid 611(a) to admit such illustrative

aids. *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). The map of

Michigan is a standard Google map, without any annotations or other information

specific to this case. An FBI witness will testify about the process for constructing

the three-dimensional videos, which were made from photographs of the scenes. That exhibit also contains no sound or text annotations. Cooperating defendants Garbin and Franks can testify that the light-signaling demonstration accurately reflects their experience during the nighttime reconnaissance of the Governor's home. Finally, CHS "Dan" can testify that the video of the drive from the Governor's home to Lake Michigan accurately reflects the route he traveled with the conspirators the same night.

      d.  <u>Destructive Device Re-Creation</u>

Count 3 of the superseding indictment charges Croft and Harris with possessing an unregistered destructive device. (PageID.969.) Last September, the government provided notice that it would call Forensic Examiner Kelly A. VanArsdale, an FBI explosives expert; and Robert Gillette, an FBI forensic chemist. They will testify that the commercial fireworks, gunpowder and other materials seized from Croft's residence could be used to build a destructive device. As part of their examination, they detonated a commercial firework identical to the one detonated by Croft and Harris on September 13, 2020. The government will play a videorecording of that controlled explosion to demonstrate the effect of the device.

Experimental evidence may be admitted if the test was conducted under conditions substantially similar to those of the event. *United States v. Metzger*, 778 F.2d 1195, 1204 (6th Cir. 1985). "[T]he substantially similar standard is a flexible one which, even when construed strictly, does not require that all variables be

controlled." *Id*. Most dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility. *Id*.

In *Metzger*, ATF agents exploded ten sticks of dynamite in a station wagon to demonstrate the effect of the explosion. A videotape of the experiment was properly admitted notwithstanding the defendant's claim that the test vehicle and quantity of dynamite varied from the original items. *Id*. at 1204-05.

In another case, the district court properly admitted a videotaped detonation "to educate the jury about what Molotov cocktails do, which in turn helped the jury decide whether the Molotov cocktails qualified as destructive devices." *United States v. Mooney*, No. 03-6050, 2005 U.S. App. LEXIS 639, at *17-19 (6th Cir. Jan. 12, 2005).

In a third case, the government called an explosives expert who examined a bomb the defendant left in a marijuana field. The expert "explained to the jury in detail how he constructed the replica bomb so that it would be identical to the bomb found in the marijuana field. He then detonated the replica and recorded the explosion on videotape." *United States v. Jones*, 124 F.3d 781, 787 (6th Cir. 1997). "Defendant's argument that [the tape] was unnecessary for the jury to determine that the device was a bomb ha[d] no merit," because "the videotaped explosion of the replica bomb served as evidence to establish that the bomb was a destructive device." *Id*.

Ms. VanArsdale and Mr. Gillette will testify that they constructed the replica bomb using the exact commercial firework Croft purchased, possessed in his home,

15

and detonated with Harris on September 13, 2020. Although testimony at trial will establish Croft taped pennies to the original device as shrapnel, this element was omitted from the demonstration to avoid any risk of unfair prejudice. *See Jones*, 124 F.3d at 787. The agents will testify, however, that the addition of shrapnel indicates the device was intended as a weapon. *See United States v. Spoerke*, 568 F.3d 1236, 1247-48 (11th Cir. 2009); *United States v. Beacher*, 156 F. App'x 268, 269 (11th Cir. 2005).

e. <u>Fox DVD of Training Materials</u>

On August 29, 2020, Fox conducted a daytime reconnaissance of the Governor's home. (R. 173: Superseding Indictment ¶ 9, PageID.964.) During the trip, Fox gave CHS "Dan" a digital video disc (DVD) containing various tactical training manuals and instructions for launching terrorist attacks.

While some of the materials describe plans similar to the defendant's own plot, the DVD's real relevance is to show that Fox (who claims to have been entrapped) was actually the one proposing violent action. Other materials on the DVD (for example, instructions for using poison or detonating a nuclear device) are not strictly germane to the charges. Because admission of the full DVD might be unfairly prejudicial, the government proposes to have a witness show the physical disc, and describe only the relevant contents.

f.  <u>Background Evidence</u>

The government intends to offer various conversations and electronic communications between the defendants that preceded June 6, 2020, the latest opening date for the conspiracy charged in Count 1 of the superseding indictment. This includes such items as photographs of the defendants attending anti-government rallies with tactical gear, body armor and assault weapons; conversations about "arresting" government officials, and displays of Hawaiian shirts, flags, and other paraphernalia associated with the "Boogaloo" movement.

"[B]ackground evidence is not barred by Rule 404(b)." *United States v. Reyes*, 51 F. App'x 488, 494 (6th Cir. 2002). "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). The Sixth Circuit has "most often applied this exception in conspiracy cases." *United States v. Rice*, 90 F. App'x 921, 924 (6th Cir. 2004). "The evidence here at issue showed the circumstances from which the conspiracy arose—the witnesses described the personal relationships and events in which the conspiracy took root. This is a proper use of background evidence, and we therefore affirm the district court's decision to admit the evidence." *Reyes*, 51 F. App'x at 494.

3. <u>Other Anticipated Issues</u>

    a. <u>Undercover Agents Testifying Under Pseudonym</u>

Two of the government's witnesses are FBI agents who interacted with the defendants in an undercover capacity. (Undercover Employees, or "UCE"s). UCE "Mark" joined the defendants' group posing as a like-minded militia enthusiast from the Upper Peninsula of Michigan. UCE "Red" was introduced to the group as an explosives expert, to divert Fox, Croft and Harris from their efforts to recruit independent bombmakers.

Both UCE "Mark" and UCE "Red" are currently involved in undercover anti-terrorism investigations unrelated to this case. The government requests that they be permitted to testify using their pseudonyms ("Mark" and "Red") to avoid compromising those investigations or endangering their safety. The government will provide the defendants all information regarding the witnesses required by Rule 16, *Brady*, *Giglio*, and the Jencks Act. Courts have granted such accommodations in other cases. *See United States v. Zelaya*, 336 F. App'x 355, 357 (4th Cir. 2009); *United States v. Abu Ali*, 395 F. Supp. 2d 338, 344 (E.D. Va. 2005).

In *Zelaya*, the court noted the right to cross-examination is not absolute, and the district judge may limit it when the information sought may endanger a witness' safety. *Zelaya*, 336 F. App'x at 358, citing *United States v. Palermo,* 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address, and place of employment is not absolute.").

On February 11, 2022, an associate of Croft hosted a video podcast show, on which Croft has appeared by telephone from jail. The host boasted of exposing "Agent Chambers, and Agent Impola, who we basically, effectively ruined." At minute 59:00 he stated his intent to influence the jury at this trial: "My thinking was to have the militia at the courthouse, and do a big recruitment, and do it right there at the courthouse. For the juries. Jury nullification! Jury nullification! Jury nullification!"

At the end of the podcast, the host stated: "We were born for this. We were born with the purpose to stand against you … You've stirred one hell of a hornet's nest, and we've been waiting." He concluded, "We have gone through every bit of peaceful means. Tell me when this starts to sound familiar, if you've ever read our Constitution, FBI … We will not stop. We will steamroll every single problem if we have to. Everything that stands between us and our children being free will be demolished. You had to know that would be the case. And we'll do it through the means of going to court just as much as we'll revolt in a bloody war the way our Constitution says we may have to do in throwing off the binds of tyranny."

It is reasonable to assume that associates of Croft (like the podcaster and other sympathizers of the anti-government militia movement) will attend the trial, and will take down and disseminate the true identities of the UCE witnesses. Such dissemination would undermine active domestic terrorism investigations, and jeopardize the physical safety of the agents. Weighed against this risk, the

publication of the UCEs actual first and last names would contribute little to the defendants' ability to effectively cross-examine them.

### b. Invited Argument

The offense conduct was witnessed by both individuals on the government's witness list, and by other individuals the government does not intend to call. The defendants are aware of these witnesses, and may already have subpoenaed some to testify on their behalf.[3] In any event, the defendants are free to subpoena those witnesses themselves if they choose.

When a defendant implies that the government failed to call a witness because the evidence would be favorable to the defendant, the prosecutor may properly comment that "the defense too could have called the witness if desired." *United States v. Johnson*, 583 F. App'x 503, 508 (6th Cir. 2014) (quoting *United States v. Newton*, 389 F.3d 631, 638 (6th Cir. 2004). Such response is "invited," and does "no more than respond substantially to right the scale." *United States v. Henry*, 545 F.3d 367, 381 (6th Cir. 2008); *see also United States v. Clark*, 982 F.2d 965, 969 (6th Cir. 1993) (prosecutor's rebutting suggestion "was . . . fair comment designed to meet the defense counsel's argument.").

With regard to CHS "Steve," both sides recognize he may invoke his Fifth Amendment privilege against self-incrimination. (*See* R. 428: Order Denying Motion to Compel Immunity, PageID.2928.) Absent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who,

---

[3] Defense subpoena requests are filed Ex Parte, and are not visible to the government on ECF.

when called, will only invoke a privilege. *United States v. Reyes*, 362 F.3d 536, 542 (8th Cir. 2004).

"A defendant does not have the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of the jury." *Id.*, citing *United States v. Lyons*, 703 F.2d 815, 818 (5th Cir. 1983). "[E]ven if the party seeking to argue the inference concocts a reason that the silence may be relevant, the danger of unfair prejudice usually outweighs the probative value because there is no way the opponent can test the meaning attributed to the invocation." *Reyes*, 362 F.3d at 542, citing *United States v. Deutsch*, 987 F.2d 878, 884 (2d Cir. 1993). "Most of the circuits which have addressed this issue have held it not to be error for a district court to bar such a witness from testifying." *Deutsch* 987 F.2d at 883-84, citing *United States v. Vandetti,* 623 F.2d 1144, 1147-49 (6th Cir. 1980).

c.  Forfeiture Election

The superseding indictment includes forfeiture allegations, notifying the defendants that the government will seek the forfeiture of firearms and other property used to facilitate the offenses. (PageID.971-76.)

The "forfeiture phase" of a criminal case does not occur until after the defendant has been convicted of an offense or offenses supporting forfeiture because criminal forfeiture is part of the defendant's sentence, and not part of the government's case-in-chief. The court conducts the postconviction "forfeiture phase" of a bifurcated trial upon the government's motion for a preliminary order of

forfeiture. Fed. R. Crim. P. 32.2(b)(1) (forfeiture findings must be made as soon as practicable after the court enters a verdict or finding of guilty). In this phase, the court or, in some instances, the jury, "must determine what property is subject to forfeiture under the applicable statute." *Id.*

The jury must determine whether the government has established the required "nexus" between the property and the offense, by a preponderance of the evidence. *See, e.g., United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense, but only an additional penalty for an offense that was established beyond a reasonable doubt). Federal Rule of Criminal Procedure 32.2(b)(4) provides that either side may request that the jury that convicted the defendant act as the trier-of-fact as to whether the requisite "nexus" exists for the forfeiture of such property. The trier-of-fact's determination may be based on evidence already in the record, including written plea agreements, or made after an evidentiary hearing. Fed. R. Crim. P. 32.2(b)(1).

<div style="margin-left: 40%;">

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

</div>

Dated: February 17, 2022          /s/ Nils R. Kessler
                                  NILS R. KESSLER
                                  JONATHAN ROTH
                                  Assistant United States Attorney
                                  P.O. Box 208
                                  Grand Rapids, MI 49501-0208
                                  (616) 456-2404
                                  *nils.kessler@usdoj.gov*