IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No 1:20-CR-183-RJJ |
| Plaintiff, | Hon. Robert J. Jonker<br>Chief District Court Judge |
| V | |
| ADAM FOX et al. | |
| Defendant. | |

DEFENDANT ADAM DEAN FOX'S
TRIAL BRIEF

NOW COMES Defendant Adam Dean Fox, by and through Counsel, Christopher M. Gibbons of the Law Offices of Gibbons & Boer, and for his Trial Brief submitted to Court for its consideration in this matter prior to the trial presently scheduled to commence before the Court on March 8, 2022, states as follows:

Adam Fox is charged with conspiracy to kidnap the sitting Governor of Michigan, Gretchen Whitmer, in violation of 18 United States Code 1201(a). In addition, Adam Fox, is charged with conspiracy to obtain a weapon of mass destruction in violation of 18 United States Code 2332(a)(2)(A) and (C) in furtherance of that kidnapping plot. The evidence against Adam Fox consists of recordings of meetings, recordings of conversations during car travel, recordings of telephone conversations, social media posts, direct messages (both encrypted and un-encrypted), surveillance videos, and photographs.

## FACTS

For many years 38-year-old Adam Fox had freely expressed his political views on various social media platforms, particularly Facebook. Fox identified with the "Boogaloo" movement, which is more of a collection of economic and social ideas than it is an actual organized group. The ideas include the importance of the constitutional right to bear arms The core values expressed by many "Boogaloo" or "III%" groups are not xenophobic or exclusionary based on gender. They do not exclude anyone based on sexual identity, sexual preference or religious affiliation. They are not racist. They do not advocate for the pro-active use of force or violence. On April 30th, Fox was one of many protesters who were lawfully admitted to Michigan capitol building in Lansing and who were photographed in the building. Fox was wearing a Hawaiian floral shirt, which is a "Boogaloo" trademark. He was also open carrying a military style rifle.

In May of 2020, Fox was invited to a meeting in Dublin, Ohio that was scheduled for the weekend of June 6, 2020. The meeting was organized and paid for by CHS Robeson. Robeson had never met Fox, but he paid for his hotel room to attend the meeting. Robeson secretly recorded the meeting for the FBI. During the recorded meeting Fox stated that the militia was misunderstood, and steps should be taken to address the negative perception that they are violent, destructive, "domestic terrorists."

On June 14, 2020, Fox received a telephone call from CHS Dan. Dan was an Iraqi combat veteran and the XO of the Wolverine Watchmen, a newly formed group started in November of 2019 by Joe Morrison. On the telephone call Fox stated his belief that the negative image of the Militia needed to be a priority, it was associated with white male racists, so the Militia needed to diversify and be inclusive. During the conversation, which lasted nearly an hour, Fox spoke of seeking legal charges or a citizen's arrest of the Governor, for exceeding the lawful authority of

her office. He discussed that storming the capital to achieve a political statement was unrealistic and not possible. CHS Dan added "Meanwhile she's heading up North to her second house and shit. Getting her boat out and shit, meanwhile we are just down here scraping." CHS Dan was working for the FBI, made this phone call in the presence of Special Agents of the FBI, and the call was recorded.

On June 21, 2020, CHS Robeson sent Adam Fox a message on Facebook telling him that he was making him the Commanding Officer of the Michigan Chapter of the Patriot III% United States. He advised Adam Fox that he could select his own X.O. and recruit members. CHS Robeson and another informant, CHS Jenny, generated the Facebook page and wrote the "mission statement" for the Michigan 3% Patriot Milita page.

On June 22, 2020, Fox was contacted on Facebook Messenger by "Mark" from the upper peninsula, he was looking to "get more involved". He said his girlfriend Elise knew Fox's girlfriend. Mark, a rugged individualist, is an Agent of the FBI. On July 3, 2020, Mark came to the Vac Shack in Grand Rapids to meet Adam Fox. Fox told Mark many of his ideas that day, including that he was working on a legal idea, a citizen's arrest of the Governor. Mark was wired and the entire meeting was recorded. Mark from that point forward, was a fixture at nearly every event or training the FIB created for in Adam Fox's and his Michigan III% Patriot Militia.

On July 11-12 the group met again in Cambria, Wisconsin, CHS Robeson hosted the event, which was attended by CHS Dan, UCE Mark, and CHS Jenny and three other informants. Federal Special Agent Heinrich Impola from Detroit, Special Agent Corey Baumgartner from Wisconsin, Special Agent Kristopher Long from Baltimore were all also present in Cambria Wisconsin. Fox paid $49 for his hotel room. He received a discount rate due to his relationship with the President of the National 3% Patriot Milia, CHS Robeson, who arranged for the room.

Also in July, Robeson announced a "founding fathers call to action meeting" in Peebles, Ohio. On July 18, 2020, the "call to action meeting" was held, of the twenty-one individuals in attendance, at least five were actively cooperating with the FBI. This event was also recorded, by more than one informant. The discussions were dramatic, with CHS Robeson lamenting that the group was "out of time." CHS Dan and CHS Robeson implore the group to "set a direction." CHS Dan stated emphatically "*we have to leave here with a direction*." At the meeting Adam Fox stated that there are five sheriffs in Michigan that have spoken out against Governor Whitmer's restrictions and that he had left messages with all of them.

On July 27, 2020, CHS Dan came to the Vac Shack and sat with Fox for hours. They had dinner at the restaurant next door to the Vac Shack then returned to the store basement where Adam was living. Fox was smoking marijuana throughout the entirety of the meeting[1]. CHS Dan would directly pressure Fox regardless of his condition. CHS Dan raised the idea of taking action against the Governor, including a "snatch and grab". Fox stated that he had been "thinking about it" (as though it had been raised or discussed prior to that day) and that even if they did not hurt anybody, taking that kind of action would "devastate that community". Fox reiterates that again later in the same meeting. The morning following the meeting Adam sent CHS Dan the Wire message "you feel like we have a little direction now?"

Adam Fox, the evidence will show, make many inflammatory remarks about Governor Whitmer, the need to address what he believed was unconstitutional governmental action, the pandemic, and related social issues. But evidence will demonstrate that also Adam Fox repeatedly expressed that he did not want to pursue what he perceived to be CHS Dan's desire to kidnap or

---

[1] Throughout this four-month time-period informants and agents observed Fox regularly smoking marijuana. They were aware of Fox's chronic marijuana use throughout the months of activity.

harm the Governor of Michigan and he did not want to purchase or take possession of any explosives for any reason, stating at times that they needed to "Back off that Plan" and "Ixnay the Planeek" Further facts will be advanced at Trial.

## LAW

**A. A criminal conspiracy requires a tangible agreement to accomplish a plan or scheme between fellow conspirators.**

In *Yates v. United States*, the Supreme Court explained that a "project still resting solely in the minds of conspirators" was insufficient to support a conviction for conspiracy. 354 U.S. 298, 334, 77 S. Ct. 1064, 1085 (1957). A criminal conspiracy requires an agreement to a specific plan or scheme which represents how the underlying criminal venture will be accomplished. The government alleges not only an agreement to kidnap the sitting Governor of Michigan, but also an agreement to use a weapon of mass destruction to accomplish that scheme. Defendant Adam Fox states that while there was much talk, there was never an agreed plan or scheme to accomplish either charged offense.

> …conspiracy requires a specific plan. *See Pinkerton v. United States*, 145 F.2d 252, 254 (5th Cir. 1944) (holding that a criminal conspiracy requires (1) an object to be accomplished; (2) a plan or scheme embodying means to accomplish that object; (3) an agreement by two or more defendants to accomplish the object; and (4) an overt act, where applicable).

*United States v. Stone*, 2012 U.S. Dist. LEXIS 41434, *5 (6th Cir.)

> The unlawful combination being the gist of the conspiracy, it follows that there must be an agreement of some kind willingly entered into by the parties to it. There must be *unity of design or purpose, a concert of will and endeavor, comprising what has been agreed to*.

*United States v. Bostic*, 480 F.2d 965, 968, 1973 (6th Cir.) (emphasis added) It is entirely unclear what "the plan" was here, and to the extent that anything that can be identified as a plan, there is no evidence that Adam Fox, or any of the defendants, agreed to go along with it.

**B. A criminal conspiracy cannot exist between federal informants and agents and the alleged conspirator.**

Defendant Adam Fox denies having ever entered into a conspiratorial agreement. However, it is important to note that it is well established under Federal law and in the Sixth Circuit that one cannot have a conspiracy with a government informer or undercover agent. The overwhelming majority of the evidence produced against Adam Fox consists of him speaking to or communicating by text with undercover informants and undercover FBI agents. These communications cannot form the basis of a criminal conspiracy. In a traditional "wheel" conspiracy, individuals otherwise unknown to one another may be connected in a conspiracy based on their dealing and association with one or two central individuals, but under the law, those individuals cannot be government informants or agents.

> Moreover, proof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction. *United States v. Pennell*, 737 F.2d 521, 536, 1984 (6th Cir.) (Citations Omitted)

Acting under the direct supervision of FBI Special Agents CHS Robeson, CHS Dan, CHS Jenny and Government undercover agents were the binding force and catalyst for every event, impassioned speech, and nearly every suggestion of criminality. They spent eight months actively "surveilling", communicating with, directing, and "commanding" the defendants. CHS Dan as the XO of the Wolverine Watchmen and CHS Robeson and CHS Jenny as "National Board Members" of the Patriot III% Militia of the United States. They collectively steered the Wolverine Watchmen, then Adam Fox, and then Barry Croft all the way from Delaware. Like music producers seeking out young, talented, musicians that can be combined into a money-making act, each of these defendants was selected and groomed by the government's agents and informants for their role as member of this "conspiracy".

**C. An overt act can only take place *after* there is a conspiratorial agreement, not before.**

The Government alleges in the Superseding Indictment that the conspiratorial conduct in question took place on dates ranging from May 1, 2020, until October 7, 2020. Defendant Adam Fox states that on May 1, 2020, he had never met any of his alleged co-conspirators much less made any conspiratorial agreements with them. This is a significant point, as it is a legal impossibility to have an overt act in furtherance of a conspiracy prior to the formation of a conspiratorial agreement.

> The relationship between the overt act requirement and the elements of a general conspiracy was further addressed in *Yates v. United States*, where the Supreme Court explained, "the function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work,' . . . and is neither a project still resting solely in the minds of conspirators nor a fully completed operation no longer in existence." 354 U.S. 298, 334, 77 S. Ct. 1064, 1085, 1 L. Ed. 2d 1356 (1957)

When the government alleges "overt acts" that occur months before Adam Fox had even met any of the agents, informants, or individuals involved in the alleged conspiracy, the Governments offering proof of such an act cannot, as a matter of law, be a legitimate basis for finding an overt act in furtherance of a conspiracy, because the conspiracy could never have existed on that date. Defendant Adam Fox raises as a legal defense that an Overt Act cannot take place before an established criminal agreement, and that the Government must prove beyond a reasonable doubt that a criminal agreement to a specific plan or scheme was reached prior to claiming an overt act in furtherance of that agreement.

**D. Adam Fox lacked the predisposition to commit a kidnapping or use a weapon of mass destruction and his participation was induced by persistent and repeated pressure and manipulation by government informants.**

It is very well settled that a criminal defendant may advance the defense of entrapment along with other affirmative defenses. *Mathews v. United States*, 485 U.S. 58, 70, (1988). In the

Sixth Circuit, a defendant seeking to advance entrapment as a defense must proffer some evidence that he lacked the predisposition to commit the offense. A defendant must also proffer some evidence that the Government induced him to commit the offense. See *United States v. Ambrose*, 483 F.2d 742, 753 1973 (6th Cir.) The present case is not typical, and defendant Adam Fox can meet the demand of showing sufficient evidence that he lacked the predisposition to commit any crime like kidnapping or use of a weapon of mass destructions and the Government surpassed all tolerated norms and limitations in its attempt to press Fox and his co-defendants into this alleged conspiracy.

> An entrapment defense consists of two elements: government inducement of the crime, and a lack of predisposition on the part of a defendant to engage in the criminal conduct. The defendant cannot simply assert an entrapment defense, however, without also presenting some evidence. On the issue of predisposition, the defendant must assert evidence sufficient at least to put the issue in dispute. At that point, the burden shifts to the government to prove the defendant's predisposition beyond a reasonable doubt.

*United States v. Jones*, 575 F.2d 81, 83, 1978 (6th Cir). The precise weight of the burden on the defendant to produce evidence that he lacked the predisposition to commit the crimes he is charged with, and that the Government induced him to act is with is not entirely well defined. The Sixth Circuit has repeatedly held that a defendant is entitled to an entrapment instruction whenever there is "sufficient evidence" from which a reasonable jury could find entrapment. *United States v. Khalil,* 279 F.3d 358, 361, 2002 (6th Cir) The defendant is required to show some evidence as to each of the two factors, predisposition and inducement. The defendant must provide enough evidence to support both elements of entrapment to receive an entrapment instruction. *United States v. Demmler*, 655 F.3d 451, 457, 2011 (6th Cir.) The basic legal standards regarding the evaluation of predisposition are as follows. The Sixth Circuit provides a list of five factors as a guideline for determining the defendant's predisposition. Specifically:

> The Sixth Circuit has established clear standards to help guide a Court through its analysis of the evidence relating to predisposition. First, in the court emphasized that the Government must prove predisposition at the time of the initial contact between the Government and the Defendant, rather than at the time the offense is actually committed. Second in the court listed a number of factors relevant to determining predisposition which include: the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement, or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Knight,* 604 F. Supp. 984, 987(6th Circuit) . As the court noted in its Opinion and Order dated 1/25/22 the 6th Circuit Pattern Jury Instruction now includes a sixth factor, whether the defendant has ever taken part in any similar criminal activity, with anyone else, before or after.

The Court should note that the fifth factor to be considered with respect to predisposition is, specifically, the *nature* of the Government's inducement. The respective levels of predisposition and inducement are often directly related to one another.

> As the Eighth Circuit has explained, "[t]he two inquiries are often closely linked, because the need for greater inducement may suggest that the defendant was not predisposed to commit the crime; and conversely, a ready response to minimal inducement indicates criminal predisposition.". Here, for example, if the government had to go to such extreme lengths to persuade White, the jury may have been more likely to conclude that White was not predisposed to committing the crime *Id* at 32-33

The Sixth Circuit in *United States v. White*, 815 Fed. Appx. 27, 29-30, 2020 (6th Cir) explained that improper inducement occurs when the Government repeatedly and persistently solicits a person to commit a crime. Inducement consists of an opportunity but also an additional "plus" factor such as excessive pressure by the government or the government's taking advantage of an alternative, non-criminal type of motive. Courts look to whether the government overcame the will of a reluctant, otherwise law-abiding person. *United States v. Martin*, 780 Fed. Appx. 248, 249, 2019 (6th Cir.)

9

After the Defendant has shown some evidence of lack of predisposition and some evidence of inducement, the burden shifts to the Government to show that the Defendant held the predisposition to commit the crimes charged before Government agents approached the defendant. However, the law in the Sixth Circuit is clear, predisposition is not a generalized inclination.

> As the Court explained, "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition."

*United States v. Hood*, 811 Fed. Appx. 291, 297, 2020 (6th Cir.)  Evidence of predisposition must be conduct near enough to the conduct alleged that it reasonably supports the inference that the defendant was predisposed to engage in *that* particular conduct. *United States v. Wilson*, 653 Fed. Appx. 433, 438-439, 2016 (6th Cir).

> Predisposition to commit a crime occurs when a defendant was ready and willing to commit the charged crime and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means

*United States v. Hamzeh,* 986 F.3d 1048, 1050, 2021 (7th Cir.)  Posting memes of the Governor on Facebook, calling her a "Tyrant Bitch", or proposing a citizen's arrest of the Governor, are not evidence of the predisposition to commit a kidnapping or to use a weapon of mass destruction.

 In the case of Adam Fox, it is both repeated and persistent pressure and the manipulation of friendship and "patriotism" that are the driving force behind his participation. In addition, the CHS's manipulated and capitalized on the unusual circumstance of the pandemic, the shutdown of businesses, social unrest and rioting.

## CONCLUSION

Adam Fox did not reach any tangible, credible, agreement to accomplish either the kidnapping of the Governor of Michigan, nor the use of a weapon of mass destruction in the process of that kidnapping. In addition, to the extent that Adam Fox did ever entertain such

dialogue, he was constantly in the presence of, encouraged, pressured, or otherwise controlled by an informant or undercover employee of the FBI. In addition, the government has alleged "overt acts" that exist before, or independent of, any possible agreement to act. An overt act must take place after an agreement to commit a criminal act and must manifest the that the conspiracy is "at work". Last, defendant Adam Fox did not have the predisposition to commit a kidnapping or use a weapon of mass destruction and to the extent he participated in the activities alleged, he was directly and repeatedly pressured to do so by the informants involved.

In closing, the Court is advised that the Adam Fox will be seeking the application of the Entrapment jury instruction at trial.

Respectfully submitted,

Date: February 17, 2022         By: /s/ Christopher Gibbons
                                     Christopher Gibbons
                                     Attorney for Defendant Fox