UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              No. 1:20-cr-183

      vs.                     Hon. Robert J. Jonker
                                     Chief United States District Judge

ADAM DEAN FOX and
BARRY GORDON CROFT JR.,

                Defendants.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS FOR ACQUITTAL

The evidence adduced at trial was sufficient to support the defendants' convictions as to all the charged offenses. That evidence included (among other things) the defendants' own recorded statements that they planned to kidnap Governor Whitmer. It was corroborated by accomplice testimony and video evidence that they cased her home twice in preparation for the abduction, agreed to use explosives and bombs in furtherance of the abduction, and that Croft unlawfully made, possessed, and detonated an improvised explosive device.

FACTS

1. Procedural History

In October 2020, defendants Adam Dean Fox ("Fox"), Barry Gordon Croft, Jr. ("Croft"), Ty Gerard Garbin ("Garbin"), Daniel Joseph Harris ("Harris"), Kaleb James Franks ("Franks") and Brandon Michael-Ray Caserta ("Caserta") were

charged by complaint with conspiring to kidnap the Governor of Michigan. (R. 1: Criminal Complaint, PageID.1.) A grand jury in this district returned an indictment charging them with the same offense in December 2020. (R. 86: Indictment, PageID.573.) In January 2021, Garbin pled guilty and admitted he had conspired with the other defendants to kidnap Governor Whitmer. (R. 143: Minutes of Change of Plea, PageID.759.)

In April 2021, the grand jury returned a superseding indictment adding additional charges. (R. 172: Superseding Indictment, PageID.961.) Count 1 charged Fox, Croft, Harris, Franks, and Caserta with conspiracy to kidnap, in violation of 18 U.S.C. § 1201(c). Count 2 charged Fox, Croft, and Harris with conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2). Count 3 charged Croft and Harris with possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d). Count 4 charged Harris with possession of an unregistered short-barreled rifle; also in violation of 18 U.S.C. § 5861(d). (*Id*.) In February 2022, Franks pled guilty to Count 1 and admitted that he conspired with the other defendants to kidnap Governor Whitmer. (R. 447: Minutes of Change of Plea, PageID.3135.)

Between March 8 and April 8, 2022, this Court presided over a 20-day jury trial. At the conclusion of the government's case-in-chief, the defendants moved for a directed verdict of acquittal under Fed. R. Crim. P. 29. (R. 609: Minutes of Jury Trial, March 30, 2022, PageID.5866.) The Court denied the motion. (*Id*.) The defendants unsuccessfully renewed the motion at the conclusion of their proofs. (R.

606: Minutes of Jury Trial, March 31, 2022, PageID.5863.) After a week of deliberation, the jury acquitted Harris and Caserta, and deadlocked on the charges against Fox and Croft. (R. 612, 613: Judgments of Acquittal, PageID.5870-71; R. 622: Declaration of Mistrial, PageID.6029.)

At trial, the Court admitted approximately 382 government exhibits, including social media posts, encrypted chat messages, photographs, and audio and video recordings. The exhibits also included physical objects such as zip ties, a taser, semiautomatic rifles, pistols, ammunition, and body armor. (Gov't Exhibits 1-478.) The government presented the live testimony of dozens of witnesses, including federal agents, a confidential human source, and co-defendants Garbin and Franks. (*See* R. 591, 592, 593: Testimony of Dan Chappel; R. 594: Testimony of Ty Garbin; R. 595: Testimony of Kaleb Franks.) For the purposes of this response, only a limited selection of the admitted evidence and testimony will be discussed.

    2.  <u>Government evidence produced at trial</u>

        a.  <u>Predisposition</u>

The superseding indictment charged Fox and Croft with conspiring as early as June 6, 2020, when they met in Dublin, Ohio to discuss anti-government actions, including the kidnapping of state governors, and recruiting like-minded individuals to their cause. (R. 172: Superseding Indictment, PageID.963.) Both defendants eventually argued they had been entrapped by the FBI, but evidence established they were predisposed to commit such acts long before that meeting:

3

In January 2019, Croft posted a photograph on Facebook of himself wearing a tricorn hat, displaying a tattoo on his forearm reading, "EXPECT US … 2nd Cont. Del. Reg." (Gov't Ex. 48). His girlfriend Chasity Knight testified at trial that Croft got the  "Second Continental Delaware Regiment" tattoo—and the logo of the anti-government extremist III% militia on his other hand—no later than 2017.

In April 2020, Croft posted, "I believe all it's going to take is 1 state, to burn out and hang a Govenor (sic), and those dominoes will start falling!!!%" (Gov't Ex. 4). In early May 2020, Croft asked an uncharged associate, "The lock up your Governor challenge. Which of the beautiful colonies is going to be the first to snatch a criminal bastard?!?!" (Gov't Ex. 11.) He added, "In Michigan, police stood in front of the People. These Governors need arrested, I'll go send me." (*Id*.) He told another associate, "I'll be in Columbia, SC on Friday. They say they want their Governor in custody … I want to grab them all, and hold trial." (Gov't Ex. 12.) In another audio message posted May 7, 2020, he said, "One criminal governor in our possession, we've captured the flag in that state." (Gov't Ex. 14.)

Fox also posted anti-government material on Facebook months before meeting Croft or any government informants. In a December 2019 video, he stated, "It's boogaloo time in 2020." (Gov't Ex. 435.) He counseled, "Let's go man, what are we waiting on? This [brandishing AR-15] is the only way that we take back our country is right here, by brute fucking force, physical violence." He added, "Who's going to fire the first shot? Y'all ready? I am." (*Id*.)

In January 2020, Fox posted a photograph of flex cuffs, similar to the ones he later said could be used on Governor Whitmer. (Gov't Exs. 2, 380.) In March 2020, he posted a video of himself stating, "We have the numbers, we have the arms, we have the ammunition, we have all the fucking tools and strategy that we need to just go take our country back from 435 members of Congress that don't give a fuck about us." (Gov't Ex. 3.)

By May 2020, Fox and Croft were discussing anti-government action directly with each other. On May 30, Croft left a Facebook voice message for Fox stating, "We're getting ready to go the fuck to war." (Gov't Ex. 23.) He followed up the same day about obtaining weapons and concealing their activities from law enforcement: "We're going to use this mayhem to spread their logistics. … We need this shit to topple these tyrants. I need to get these faggots in custody, and I will not be able to do it with the full weight of the FBI and all these other motherfuckers on us. We need this shit." (Gov't Ex. 24.)

b. <u>Fox and Croft meet and plan</u>

On June 5, 2020—the day before they met each other in person in Dublin, Ohio—Fox posted a recruiting notice on Facebook stating, "2nd Continental Michigan Regiment, weak ones need not apply." (Gov't Ex. 32.) Croft tagged the page "Last Croft is with Adam Dean Fox," and encouraged readers, "Hit my bro up, Constitution or bleed out!!!%." (*Id*.)

On June 6, 2020, Croft and Fox met with extremists from several states at a hotel in Dublin, Ohio, where they discussed launching coordinated attacks and

recruiting like-minded individuals in their home states. (Gov't Exs. 34-40.) Croft claimed divine sanction for terrorism and murder: "Because one of the commandments I was commanded, and I have to break that. Father knows why. I've already asked permission, and it's been granted. I'm not worried about it anymore. I'm not even going to give it a second thought. If I have to fly through a motherfucker, burn his whole motherfucking family to the ground knowing that I have one myself, I'm sorry. I'm going to do it." (Gov't Ex. 34.) Croft said, "You grab, you grab the Capitol with the governor, they're going to love you." (Gov't Ex. 39.)

c. Fox and Croft recruit accomplices

On June 8, 2020, Croft assisted Fox with his home-state recruiting by introducing him to Joe Morrison, leader of the Michigan-based "Wolverine Watchmen" militia. Croft told Morrison on Facebook Messenger, "Call me … [G]et with Adam Dean Fox. We are going to as we had historically. 2nd Continental Michigan regiment is forming as a Constitutional defense apparatus." (Gov't Ex. 43.) Morrison responded, "I'll reach out." (*Id.*)

The next day, Croft let Fox know he was sending potential recruits his way: "[Y]ou are also going to have people from Michigan tell you, 'Yo, Croft sent me to you.' You know what I mean? So, you know, I'm, I'm putting, I'm putting them cats on ya, brother. It's going to be that. And they gonna form up on us, and we're going to do our thing, man. It's, motherfuckers don't even know, man, we're just at the beginning stages and shit, you know what I mean? Like we haven't even, we just got in the fight." (Gov't Ex. 52.)

6

On June 20, 2020, Fox met several potential recruits (including confidential human source "CHS" Dan) in the basement of the Vac Shack, his home and place of employment in Grand Rapids. Both CHS Dan and cooperating defendant Ty Garbin testified that they attended the meeting as representatives of the Wolverine Watchmen, and that Fox made them leave their phones upstairs for operational security. (R. 591: Chappel Tr., PageID.4659-63; R. 594: Garbin Tr., PageID.5247-49.) Fox discussed plans to assault the Capitol in Lansing, and said, "I don't feel like we should be waiting until November. I feel like we should be actively staging and planning … if the opportunity presents itself." (Gov't Ex. 64.)

The next day, Fox reported back to Croft that he would be bringing new Michigan recruits to a field training exercise ("FTX") in Cambria, Wisconsin: "Yeah I'm fully intending on bringing a ton of people with me too. I'm getting a lot of these Michigan, or excuse me Wolverine Watchmen to come with, and then, might get some from Michigan Home Guard, might have a couple from Michigan Liberty Militia, might be a couple of stragglers from other militias, but yeah, were going to bring as many people out to Steve's for that weekend as we can, and were definitely going to be there." (Gov't Ex. 68.)

### d.  The defendants lay out their plans and begin training

A few days later (June 29, 2020) Croft told an uncharged associate on Facebook Messenger, "Michigan's government is a target of opportunity, if opportunity presents, will engage … God knows the Gov. needs hung." (Gov't Ex. 71.) Fox related their plan to an undercover agent (UC "Mark") in the Vac Shack

basement on July 3, 2020: "The reason we talk here is because every fucking electronic device is compromised. Okay? ... If I say I want to kill the fucking Governor, and they heard that, they could come and get me." (Gov't Ex. 74.)

Fox told UC Mark, "[W]e're not just taking fucking the building; we're taking fucking politicians and we need a list. We're going in there with specific agenda to take these motherfuckers hostage. Because at the end of the day that building is brick and mortar. That's fucking, that's not valuable, that's not worth anything. It's totally replaceable. ... You take the motherfucking politicians, now you got human life. That's the most valuable thing you got. Then you got something to negotiate with. ... Then maybe we use them motherfuckers as a bargaining tool for the fucking head of the State. Cause at this point, that's what we want. We want her held accountable for her crimes." (Gov't Ex. 76.) Fox continued, "And then we have got a tool to negotiate with. Like, bring us the Governor. You can have them all. ... We just want the bitch. We want the tyrant bitch. We want her flex-cuffed, on a table, while we all pose and get our pictures taken like we just made the biggest drug bust of the fucking history. That's what we want." (Gov't Ex. 77.)

On July 10, 2020, Croft told another source (CHS Steve) that he needed explosives but didn't want to be caught with them: "We need them. I need them all. I need to get these guys demolition trained, bro. That's the element that the militia's missing." (Gov't Ex. 85.) "If the feds ping my phone and roll me, you know what I mean, I don't want to be with the explosive device." (Gov't Ex. 86.)

Over the weekend of July 11-12, 2020, Fox and Croft attended the FTX in Cambria, Wisconsin. Garbin and Franks testified that they constructed a plywood "kill house" to practice breaching a building (Gov't Ex. 103), and that by that time Croft, Fox, and the other defendants had all agreed to kidnap and/or kill Governor Whitmer. (R. 594: Garbin Tr., PageID.5263-65, 5273; R. 595: Franks Tr., PageID.5446-48.) Croft confirmed this on July 12, when he told CHS Steve, "A quick, precise grab on that fucking governor. And all you're going to fucking end up having to possibly take out is her armed guard. Whitmer. Whitmer. Michigan. Whitmer. Her armed guard. All I'm going to have to possibly neutralize." (Gov't Ex. 108.)

Six days later Fox confirmed their intentions as well, telling CHS Dan, "She doesn't have an office in the Capitol. She has her own fucking building with her own office." (Gov't Ex. 113.) He stated, "We can do recon for two weeks. Planning for one week. And one night execution in the middle of the fucking night. Remote detonation. Send a fucking message." (*Id.*) Steve asked, "And who is this bitch?" Fox's girlfriend responded, "Gretchen," and Fox added, "Who the fuck you think, man?" (*Id.*)

On July 27, 2020, Fox told CHS Dan his preference for kidnapping: "But, I really feel like snatch and grab is the way to go, bro, I mean … Yeah, I mean, it's, it's the, it's the most peaceful route we can go, in a way." When Dan asked, "But is it going to be catch and release?" Fox replied, "Fuck no, bitch! Once we got her she's ours, man. She getting charged, man. Fuck that. Either she's going to prison or

9

she's getting hung. She's suffering her fucking fate, dude. … And then after that
we're going after the others. This is the example, bitch. The head's cut off. We're
coming to burn the rest of the body now." (Gov't Ex. 127) He added, "Cause I think
at that point, snatch and grab, man. Just grab the fucking governor, dude. Fucking
just grab the bitch. Because at that point, if we do that, dude, it's over." (Gov't Ex.
128.)

> e. <u>The defendants case the Governor's home and agree to use
> explosives</u>

On August 29, 2020, Fox, Eric Molitor, and CHS Dan conducted a daytime
reconnaissance of the Governor's vacation home. As the jury heard in recorded
audio from the trip, Fox directed Molitor to take photographs and slow-motion
videos of the home, which he later posted to the conspirators' encrypted message
group. (Gov't Exs. 173-75, 178, 181.) After the reconnaissance, Fox drew a map of
the home and its vicinity, including the distance and response times from the local
police department and nearest State Police post. (Gov't Exs. 187-88.)

A week later (September 7, 2020), Fox told Dan, "My main concern now is,
man, we make the fucking plan, we get it all fucking foolproof, and before we can
even go out fucking execute it, we're getting fucking stormed individually by the
goddamn feds because they know every goddamn thing we've been doing because we
have been compromised since fucking Ohio." (Gov't Ex. 215.) "I'm not going to let us
go down like that, dude. I'm sorry, I'm not. I mean, we're patriots. We're, our goal is
to restore the constitutional republic. You know? Granted, some things that we're
going to have to do to do that might get us labeled as domestic terrorists by this

media and stuff, but in our hearts and minds we got to know we are not domestic terrorists. You know what I mean?" (*Id.*)

In mid-September 2020, Croft drove 12 hours from Delaware to Ty Garbin's property in Luther, Michigan for the FTX with Fox, Garbin, Harris, Franks and Caserta. Croft constructed an improvised explosive device ("IED") by taping pennies to the outside of a commercial mortar shell, and told CHS Steve the shrapnel would be thrown "Probably a good twenty five feet in circumference. Three hundred and sixty degrees. Um, and those, those pennies, because that propulsion isn't being dulled, they're going to be very hot when they go out. Um, getting hit in any place with any one of 'ems not going to be a good thing. They'll go right through your skin." (Gov't Ex. 219.)

Croft told Garbin and Caserta, "If we're going to attack them, we have to start to attack them. … I want, I want you guys to understand we are seeing things we've never seen before. The reason for that is the same reason you're seeing the shit out of the public that you're seeing. Fear. If they're afraid and they bleed we can fucking kill them. So for the first time in life we're seeing fucking fear out of them and we're doing something right. Look at how small this group is. When we show them out there you can win, get out of the way." (Gov't Ex. 220.)

Fox invited Caserta and an undercover agent (UC "Red") to accompany him for a nighttime surveillance of the Governor's home: "We already put fucking eyes on her cottage up there. … And were going to take another look tonight. Get eyes on it at nighttime. We're going to do two vehicles if you guys are down, you want to

11

roll?" (Gov't Ex. 223.) Fox told Caserta the Governor's home was a good target: "It's fucking perfect, dude. There's a goddamned public boat launch on the other side of the lake from her, and its literally concealed by fucking trees, and then it's like, it's just it's too fucking perfect man it really is. [UI] take her on Birch Lake. … Fucking shoot it out, there is one bridge going out of the fucking city. … Blow that fucking bridge, that little PD can't get there, the closest police station is like 20 miles away on all fucking sides. That gives a 20-minute fucking timeframe. … Take her ass out to fucking Lake Michigan. Drop her fucking motor and leave the bitch stranded. Send the fucking message. … The whole point of this is to send a message, because it doesn't matter. If we, if we cut her out that don't matter. There's still the puppet-masters above. The whole point is this, we're, we're sending the fucking message to them, 'Hey. If we can get her, we can get you.'" (*Id.*)

Fox then told Caserta and Mark, "Let's go watch this menu video, yeah? Let's watch some shit blow up. Let's go." (*Id.*) UC Red testified that he was introduced to the defendants as a bomb supplier, because the defendants were trying to obtain explosives from other uncontrolled sources. Fox gathered the other conspirators to introduce Red, and to watch a video demonstrating the kinds of explosives they could acquire. Fox told the other defendants, "We have a menu of sorts to watch real quick. If you're down with the cause, this is something that we are going to be collectively raising money to go live, so. We're going to need some boom-boom. So, the [UI] guy is a baker. He didn't bring anything because its deer season and shit, [UI] couldn't come through with all the shit. He brought a video and shit. Big dump,

so. Basically, a video of a bunch of shit being blown up, and it's basically a menu of what we can buy." (*Id*.) After watching the video, Fox stated, "I got to see that again." (Gov't Ex. 226.) He asked, "What kind of a price tag we looking at?" and said, "Say we pull together like five G's, what would that get us?" (*Id*.)

On the night of September 12, 2020, Fox, Croft, Garbin, Franks and several others conducted a nighttime surveillance of the area around the Governor's home. Croft later suggested that he had been bundled into the car by government agents, without knowing where they were headed or why. But Franks testified that before the group departed for the reconnaissance, Croft said he was "going to get eyes on the bridge." (R. 595: Franks Tr., PageID.5643.)

During the drive, Fox discussed his plan to kill the Governor's security team and abduct her: "So, that's a pretty light detail, right? … We could be sitting on a fucking boat with silencers. Ping! Ping! Ping! Ping! Ping! Her detail is gone before we even reach the shore. Maybe she's got one or two inside. Okay, well, then we deal with those. But we could even two, if we're running an eight-man, ten-man team. We could flank, if you want to. We have another fucking team come from fucking foot, don't leave no, no uh, forensic trail. Come by foot. Flank this side as we're approaching from water side. Then, collapse. Hit the target. Extract the target to the water. Book it across the fucking lake." (Gov't Ex. 229.)

On the way to the house, Fox stopped at the bridge Croft mentioned to Franks, and took pictures underneath of places to seat an explosive device. (Gov't Ex. 223.) When Croft arrived at the boat launch across Birch Lake from the

Governor's house, he told UC Red, "[B]ased on what the map looks like, she should

be right at about around those three lights dead ahead, based on what the map

looks like. … Yeah, it, it, it actually ends over here. But her house by the, by the,

you know, the address, should be either in between those three dots, or that orange

light to your left. (Gov't Ex. 248.)

When the defendants returned to Garbin's camp near Luther, they discussed

how to deal with the Governor's security detail. Croft stated, "We can hit them with

quantity but we definitely have to pick up our quality as well. That's why

incendiaries are absolutely necessary. If you have something shoulder-fired you can

go on a lead vehicle. … That's, that's why I wanted it [his 37 mm projectile

launcher] played with, man." (Gov't Ex. 249.) Croft added, "We need the target's

habits" (Gov't Ex. 250) and shared his observations of government protective

convoys: "Listen. I run out of Delaware, and go to North Carolina, about twice a

week. I've been seeing the way that they move, with their SUVs. They come up with

their D.C. tags, there's three of 'em in tandem. … But you could tell, the way that

they roll, diplomatic, they've got at least six people in those vehicles. So you're

looking at a, every car, with four to six people, have to guesstimate, on, on that

plane." (Gov't Ex. 254.) Harris told Croft, "If we're to do anything that hinders their

movement, they're going to stop and fight their way out. … They're going to hit us

head on." Croft replied, "Right." (Gov't Ex. 255.)

When Franks asked him if they were going to be able to return to their

normal lives after the abduction, Croft replied, "That's something you're going to

need to think about then. If we're going to carry out an operation of this magnitude you are going to have to walk away from life. You will be living as a self-proficient unit [UI] foraging for everything you get. We will be fighting our way in and out of every situation we encounter. That simple." (Gov't Ex. 257.)

Fox asked UC Red if they could order the explosives on credit: "If we have to have a little IOU for a month, you good with that?" Fox told the group, "Either way, guys, we're going to have this shit. And either way we need this shit. And also too, we're going to tack on another six hundred dollars on there because I'm, we're going to get like twenty fash, flash bangs." (Gov't Ex. 258.) Fox told CHS Dan, "Ok, so, we're obviously, we're moving forward. So, from here on out, us in Michigan, we need to start, trying to break out recon teams. This is something we're going to have to be all over, I mean, I think we should go look at it a couple of times. This has got to be precision man. There's no room for fucking mistakes man, at all. And shit's going to get hairy. Like, we're going to have to steal some shit. Like, we're not going to be using any of our shit. We're not going to leave a fucking trail back to us." (Gov't Ex. 260.)

The next morning (September 13, 2020) Fox told the other defendants, "So, a lot of you went with us last night. You kind of know, what, like, you know, what our intentions are. It comes with a price tag. Now there's shit we got to do. To be able to do to them, so, things to do, shit we want to do, we can do easily, for like four grand. It's our job now. We got to pool this money together, I want to try to raise it in the next month, because it's something we'll be sitting on. You never know, if we want

to do this, it's going to be, being ready, but it's going to be opportunistic. Like it's going to be, when the, the asset arises there, boom, we got to go. Like that's another key reason why we need fucking, like, local intel." (Gov't Ex. 264.)

  f. <u>The defendants detonate a practice bomb and discuss acquiring more explosives</u>

  Before leaving Luther, Croft and Harris detonated the IED Croft had constructed, surrounded by human silhouette targets. Multiple witnesses, including Harris and Knight, testified that Harris and Croft set off the bomb together. The jury heard the scene unfold in recorded audio, including the following exchange from nearby attendees:

| | |
|---|---|
| Robeson: | Where's Barry at? |
| Knight: | Up there. They're getting ready to detonate. |
| Plunk: | They're up there getting ready to go boom. |
| Robeson: | Who, who's with him? |
| Plunk: | Dan Harris. |
| | … |
| Robeson: | You'll see Barry run this time. He doesn't usually run but when he lights shit up he runs fast… |

(Gov't Ex. 222.)

  FBI bomb expert Kelly Van Arsdale testified that by affixing pennies as shrapnel, Croft converted the firework into a bomb, which could maim or kill bystanders. FBI bomb technician Kristopher Long testified that the components of the device were similar to those used by the Tsarnaev brothers in the Boston

Marathon bombing. ATF Special Agent Timothy Hunt testified that no one had registered the destructive device in the National Firearms Registration and Transfer Record, as required by law.

On September 30, 2020, Fox told CHS Dan he was counting on the other co-defendants to contribute to the explosives purchase as promised: "Dude, we specifically fucking asked. I specifically asked everyone as a group, 'Do we agree to this? This is a group fucking bill.' So everyone that stood there and said 'yes' better have some fucking money in the pot, bro. They know that the fucking shit was going to be about four G's, so they better come appropriately. Like, I'm already putting in, I'll put in way more than my share, cause I don't know who the fuck is going to be there. But, I mean, I'll try, I'll try to put that four or five hundred in on the seventh, and then I'll try coming back another couple three hundred. … I mean, that's like a pretty good fucking portion from my end. Considering that I figured about four hundred each person if there was ten of us." (Gov't Ex. 277.) CHS Dan asked specifically whom he was counting on, and Fox replied, "So, Barry [Croft] … Steve … Ty [Garbin] … Beaker [Harris] … Null brothers, they said 'yes' … and then who else was standing right there? Fucking what's-his-face should be on board, Brandon [Caserta]." (*Id.*)

On September 30, 2020, Fox told CHS Dan his ideas for additional training and preparation: "I'll get the basement [of the Vac Shack] all ready. … [W]e can go pitch motherfucking black. … We can go, you know one room lit up, one room not. Transition from night vision to off or whatever, you know. … Whatever, whatever

we want to do we can run them all through the fucking scenarios. I got some regular fucking handcuffs now so we don't want to waste flex cuffs so we can practice detaining somebody." (Gov't Ex. 278.) He added, "Maybe we should be acquiring some other shit, like tasers, stun guns, something like that. … Maybe just like if we could be real covert, and that way we could be less lethal. Like maybe we cuff asset with, you know, we get the jump on a light, light, light security detail. … I mean, if there is a six to eight fucking security detail, we're just going to, to have to go out and get bloody." (*Id.*)

g.  The arrests and search warrants

On October 7, 2020, Fox, Harris, Garbin, and Franks were arrested in Ypsilanti, Michigan, where they planned to meet UC Red. Fox had $366 in cash on his person. (Gov't Ex. 403.) Garbin testified that after the arrest, Fox told him he "brought a couple hundred cash with him as a good faith payment to Red, and that he had another couple hundred dollars stashed away in a plastic gun case in the basement in the Vac Shack [for a] good faith payment towards the explosive device we needed." (R. 594: Garbin Tr., PageID.5340.) FBI agents found $600 there (Gov't Ex. 375), along with a backpack containing a combat knife, zip tie "flex cuffs," rope and duct tape. (Gov't Exs. 379, 380.)

Croft was arrested in New Jersey on October 8, 2020. Agents searched his home in Delaware and found a shotgun with spiked "breaching" barrel made to forcibly enter closed doorways (Gov't Ex. 344); the same commercial fireworks used to construct the IED at Luther (*Id.*); a large jar of metal BBs, smokeless powder,

18

and chemicals used to make "exploding targets." (Gov't Exs. 342, 345-48.) FBI bomb expert Kelly Van Arsdale testified that those components could be combined to make a bomb.

The defendants attempted to establish they had been entrapped by the FBI, but adduced scant evidence of inducement to commit a crime. They suggested Special Agent Jayson Chambers had orchestrated a plot with CHS Dan to ensnare them; but Croft asked Chambers only a cursory few questions on the stand, and Fox asked him none. On the contrary, defendants Garbin and Franks both testified that they had conspired with Fox and Croft of their own volition. (R. 594: Garbin Tr., PageID.5355-56; R. 595: Franks Tr., PageID.5669-70.) Both denied that they had been coerced or offered any inducement to join the plot, or that they had seen or heard anything to suggest any other defendant had been coerced or induced. (*Id.*) Garbin specifically testified that he considered Fox and Croft to be the leaders of the plot. (PageID.5356.)

### 3. Deliberations and Verdict

After closing arguments, the jury retired to consider the evidence. In the middle of their deliberations the jurors sent a note asking, "Can we get a legal description of a 'weapon'?" (R. 631: Trial Transcript Excerpt, PageID.6934.) After discussing with the parties, the Court announced its intent to give the jury a modified version of the definition found in Black's Law Dictionary, to wit, "[A]n instrument used or designed to be used either to destroy, injure or kill someone or something." (*Id.*, PageID.6939.) The Court brought the jury back in, and instructed

the members, "There is no overarching definition that I know of in State or Federal law for a weapon. It's more contextual. But I do think the most general thing I can say is that the weapon, when it's just used as a word by itself, is meant to be a category of devices that could readily be used or designed to either destroy or injure or kill someone or something." (PageID.6941.) The Court added, "That's the general idea of weapon as opposed to something you'd simply use for fun." (*Id.*)

<u>LAW AND ARGUMENT</u>

### *1. Sufficiency of the Evidence Generally*

If a jury has failed to return a verdict, the defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after the court discharges the jury. Fed. R. Crim. P. 29(c)(1), (2).

"A motion for acquittal is granted for only one reason; insufficiency of the evidence to sustain [a] conviction." *United States v. Turner*, 490 F. Supp. 583, 488 (E.D. Mich 1979). The evidence must be viewed in the light most favorable to the government, without considering the credibility of the witnesses or the weight of the evidence. *Id*., citing *Glasser v. United States*, 315 U.S. 60 (1942), *United States v. Luxenberg*, 374 F.2d 241, 248 (6th Cir. 1967). The government must be given the benefit of all inferences which can reasonably be drawn from the evidence. *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir. 1984), *citing Glasser*, 315 U.S. at 80. It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. *Id*., citing *Luxenberg*, 374 F.2d at 248.

 Defendants Fox and Croft challenge the sufficiency of the evidence for Counts 1 and 2 of the Superseding Indictment, which charge them with kidnapping conspiracy (18 U.S.C. § 1201(c)) and conspiracy to use a weapon of mass destruction (18 U.S.C. § 2332(a)(2)(A)) respectively. To find the defendants guilty of either of those conspiracy charges, the jury would have to find:

> (A) First, that two or more persons conspired, or agreed, to commit a federal crime;

(B) Second, that the defendant knowingly and voluntarily joined the conspiracy;

(C) And third, that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

Sixth Circuit Pattern Jury Instruction 3.01A.

Circumstantial evidence that a reasonable person could interpret as showing participation in a common plan may be used to establish the existence of a conspiracy agreement. *United States v. Donohue*, 726 F. App'x 333, 349-50 (6th Cir. 2018), *citing United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010). Once a conspiracy has been established, only slight evidence is necessary to implicate a defendant. *United States v. Poulos*, 895 F.2d 1113, 1117 (6th Cir. 1990). Even the uncorroborated testimony of an accomplice may support a conviction. *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (quoting *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990)).

"To show an agreement, the government need only prove that the co-conspirators 'in some way or manner . . . came to a mutual understanding to try to accomplish a common and unlawful plan.'" *United States v. Whitfield*, 663 F. App'x 400, 408 (6th Cir. 2016) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). Proof of a formal agreement is unnecessary; a tacit or material understanding among the parties is sufficient. *Id*; *see also United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1989). The existence of that tacit agreement can be inferred from acts done with a common purpose. *United States v. Hughes*, 895 F.2d

1135, 1141 (6th Cir. 1990); *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991).

The evidence presented at trial was sufficient to support a conviction for Count 1 (kidnapping conspiracy). Indeed, even the uncorroborated testimony of Garbin and Franks alone would suffice to meet the low bar set in Rule 29 when viewed in the light most favorable to the government, as the law requires. The defendants' own words more than corroborated that testimony, however: Fox explicitly said he wanted to "snatch and grab" the Governor, and Croft proposed "a quick, precise grab on that fucking governor…Whitmer. Whitmer. Michigan. Whitmer."

It is not necessary to exclude every reasonable—or unreasonable— hypothesis except that of guilt (e.g., "live action role playing" or "stoned crazy talk"). Moreover, there need be no explicit oral or written contract to establish a meeting of the minds. The existence of their tacit agreement can be inferred from the many acts each did toward their common purpose, including reconnoitering the Governor's home at night.

Moreover, the law does not support the defendants' contention that the details of the "plan" to effectuate the kidnapping conspiracy must be firmly decided by the members of the conspiracy and that the kidnapping is plainly feasible. Members of a conspiracy need not agree on all the details. *See, e.g.*, *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988).  Indeed, as this Court instructed the jury, "impossibility of success" is no defense to a conspiracy charge.  A defendant

23

may be found guilty of conspiracy "even if it was impossible for them to successfully complete the crime they agreed to commit."  Sixth Circuit Pattern Criminal Jury Instruction 3.13.

The evidence was equally sufficient to support conviction on Count 2 (conspiracy to use a weapon of mass destruction). After casing the Governor's house during the daytime, Fox determined that blowing up the nearby bridge would hinder police and facilitate the plot. Croft said he wanted to "get eyes on the bridge" before leaving to case the house again at night. Fox crept under the bridge at night looking for a place to plant explosives, and ordered $4,000 worth from UC Red. Croft constructed an anti-personnel IED and said he needed "to get these guys demolition trained, bro. That's the element that the militia's missing." As with Count 1, Fox and Croft's tacit agreement to use explosives can be inferred from their individual acts and statements in furtherance of their common purpose.

As to Count 3, the evidence was sufficient to establish Croft possessed an unregistered destructive device in Luther, Michigan. Multiple witnesses related seeing him with the device. Croft described its construction, with pennies affixed as shrapnel, in his own recorded words. Even his co-defendant Harris testified that Croft made, carried, and assisted him in detonating the device. The jury saw a video of Croft constructing an unsuccessful prototype in Wisconsin, and saw the bomb making materials (including similar explosive materials) seized from his residence. Experts testified that the device met the definition of a bomb, and that it was not registered to him in the National Firearms Registration and Transfer Record.

### 2. *Entrapment*

"An entrapment defense has two elements: (1) 'government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct.'" *United States v. Demmler*, 655 F.3d 451, 456 (6th Cir. 2011) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1998)). "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 372 (1958).

Courts weighing inducement generally distinguish between the government "merely afford[ing] an opportunity or facilities for the commission of the crime," *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011) (quoting *Mathews*, 485 U.S. at 66), and the government providing "an 'opportunity' plus something else-typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive.'" *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010) (quoting *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994)). Generally, "[a]n improper inducement occurs when the government 'repeated[ly] and persistent[ly] solicit[s]' a person to commit a crime." *White*, 815 F. App'x at 29 (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (alterations in *White*)); *see also United States v. Geralt*, 682 F. App'x 394, 406 (6th Cir. 2017) ("Inducement requires evidence of repeated and persistent solicitation or excessive pressure by the government.") (internal citations and quotation marks omitted). As this Court has held, "Applying this framework,

simply setting up a ruse—even an extended one—or running a confidential source, or even proposing a criminal act is not enough." (R. 421: Opinion and Order, PageID.2904.)

"The predisposition inquiry involves assessing whether a defendant was 'inclin[ed] to commit the crime with which he was charged.'" *United States v. White*, 815 F. App'x 27, 29 (6th Cir. 2020) (quoting *United States v. Kussmaul*, 987 F.2d 345, 349 (6th Cir. 1993) (alterations in *White*). Courts in the Sixth Circuit consider the following factors in evaluating a defendant's predisposition to commit an offense:

> 1. the character or reputation of the defendant;
>
> 2. whether the suggestion of the criminal activity was initially made by the government;
>
> 3. whether the defendant was engaged in criminal activity for a profit;
>
> 4. whether the defendant evidenced reluctance to commit the offense but was overcome by government persuasion; and
>
> 5. the nature of the inducement or persuasion offered by the government.

*United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990).

The defendants claimed in opening that they had been induced to join the conspiracy. They argued the same in closing (over objection), without supporting facts in evidence. At most, the defendants established that government informants provided land on which to stage one of their trainings, and let Fox use a website to promote his "Three Percenter" chapter. As both the Sixth Circuit and this Court held, providing opportunities or facilities is not inducement.

26

Fox and Croft were not "unwary innocents," either. Applying the *Nelson* factors, the evidence established they were both predisposed to commit the charged offenses:

Both Fox and Croft espoused anti-government action long before they met any government agents or informants. Croft had been advocating a "second American revolution" (including tattooing his body with insurrectionist slogans) for years, and proposed hanging a governor to destabilize the states like "dominoes." The jury saw Fox likewise broadcast his desire to "kick off the boogaloo" (initiate a second civil war) before he met any government agents or sources.

The defendants produced no evidence that the idea to kidnap the Governor originated with the government. On the contrary, Croft told the plotters in Dublin, Ohio that he had received permission directly from God. Fox proposed storming the Capitol and trading hostages for the Governor the first time he met CHS Dan and the other potential recruits Croft sent his way.

The defendants showed no reluctance to join the plot. The jury heard both Fox and Croft, in their own voices, promoting it with enthusiasm and fervor.

Finally, the nature of the supposed "inducement or persuasion" was evidenced only by insinuation in questions and argument. For instance, Croft repeatedly claimed that CHS Steve had paid for the conspirators' hotel rooms and travel, but no witness confirmed that, and defense records only established that he may have reserved a room for himself. Questions likewise suggested that Fox and others admired CHS Dan's combat experience and wanted to impress him. But no

evidence showed Dan, Steve, or any undercover agent applied any pressure—much less "excessive pressure" or "repeated solicitation"—to kidnap the Governor.

### 3. *Issue Preclusion*

The defendant bears the burden of proving that the jury, in reaching its decisions in the first trial, necessarily decided an issue that precludes the government from a retrial on the hung counts. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 359 (2016) (quoting *Schiro v. Farley*, 510 U.S. 222, 233 (1994)); *Currier v. Virginia*, 138 S. Ct. 2144, 2150 (2018) (test for issue preclusion to bar retrial is "a demanding one").

In *Yeager v. United States*, 557 U.S. 110 (2009), the Supreme Court held that the Double Jeopardy Clause incorporated the doctrine of issue preclusion, and "precludes the government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." 557 U.S. at 119. In determining what issues were necessarily decided by the jury, the inquiry is on the verdict of acquittal, as opposed to the hung counts, because the jury speaks through its verdict and hung counts have "no place in the issue-preclusion analysis." *Id*. at 122. Thus, "'when an issue of ultimate fact has once been determined by a valid and final judgment' of acquittal, it 'cannot again be litigated' in a second trial for a separate offense." *Id*. at 119-20 (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)).

*Yeager* accepted the very narrow test for issue preclusion set forth in *Ashe*: "[T]o decipher what a jury has necessarily decided, we held that courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury

could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Id*. at 119-20 (quoting *Ashe*, at 444); *see also United States v. Jenkins*, 902 F.2d 459 (6th Cir. 1990) (court must search the record looking for a reason why jury could have reached its conclusion without deciding issue that defendant contends forecloses retrial).

Issue preclusion is narrower in criminal cases principally because of "the limited availability of appellate review … the government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.'" *Langley v. Prince*, 926 F.3d 145, 164 (5th Cir. 2019) (quoting *United States v. Powell*, 469 U.S. 57, 65 (1984)). As a result, "[t]ime and again … The Supreme Court has repeatedly admonished lower courts to carefully apply issue preclusion in criminal cases." *Id*. at 165. The Supreme Court recently reaffirmed the high burden on the defendant to establish issue preclusion: "to say that the second trial is tantamount to a trial of the same offense is the first and thus forbidden by the Double Jeopardy Clause, we must be able to say that 'it would have been irrational for the jury' in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second." *Currier v. Virginia*, 138 S. Ct. 2144, 2150 (2018) (quoting *Yeager* at 127, 129).

Croft's "issue preclusion" arguments do not hold water. He claims that, "[i]n acquitting Mr. Harris on Count 2 [conspiracy to use a weapon of mass destruction], the jury necessarily either determined that he did not knowingly agree and join the conspiracy, or that if he did, none of the overt acts were proven." (R. 629: Croft Mot.,

PageID.6912.) In other words, as Croft admits, the jury might have simply found there was insufficient evidence that Harris agreed with Fox and Croft. That in no way "necessarily" precludes a finding that Fox and Croft agreed with *each other*. Thus, issue preclusion cannot apply to count 2 because the jury could have decided only that Harris was not a conspirator.

Croft also incorrectly argues that by acquitting Harris of Count 3 (possessing an unregistered destructive device), the jury must have decided that Croft did not knowingly possess the device or that it was not actually such a device. (*Id.*, PageID.6918-19.) At first glance, it may appear inexplicable that Harris could be acquitted of Count 3 after admitting all the contested elements on the witness stand. But the Court's supplemental instruction to the jury defined a "weapon" to exclude "something you'd simply use for fun." The jury could plausibly have interpreted that as an element of intent and found the Government did not prove it beyond a reasonable doubt as to Harris.  In other words, the jury could have rationally concluded based on that instruction that Harris – who the jury determined was not a conspirator – only possessed and ignited the destructive device "for fun" without also deciding the same for Croft.  (R. 631: Tr. Excerpt, PageID.6941.) After all, Croft, not Harris, built the device by attaching the pennies to the mortar shell and talked about the pennies as shrapnel.  (Gov't Ex. 219.)

In any event, Croft's claim that "uncontroverted trial testimony that … Harris was the person who detonated the device in question" is unsupported by the record. (*Id.*, PageID.6913.) The evidence proved Croft and Harris set off the device

30

*together*, and Harris' acquittal undermines neither Croft's commission of the overt act in Count 2, nor Croft's unlawful possession of the device as charged in Count 3.

## CONCLUSION

Viewing the evidence adduced at trial in the light most favorable to the government, neither Fox nor Croft can meet their burden of demonstrating that the evidence was insufficient to support a conviction on the counts with which they are charged, or that the "not guilty" verdicts as to Harris or Caserta preclude a retrial on issue preclusion grounds. For the foregoing reasons, the government requests that the Court deny the defendants' motions for acquittal.

Respectfully submitted,

ANDREW BYERLY BIRGE
Attorney for the United States,
Acting under Authority Conferred by
28 U.S.C. § 515

Dated: May 19, 2022

  */s/ Nils R. Kessler*
NILS R. KESSLER
CHRISTOPHER M. O'CONNOR
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404
nils.kessler@usdoj.gov

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LCrR 47.1(b)(ii), the undersigned certifies that this brief complies with the type-volume limitation and contains no more than 10,800 words as provided by LCrR 47.1(b). A word count was made using Office 365 and the brief contains 8,126 words.

Dated: May 19, 2022

*/s/ Nils R. Kessler*
NILS R. KESSLER
CHRISTOPHER M. O'CONNOR
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404
nils.kessler@usdoj.gov