# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

**UNITED STATES OF AMERICA**

                    Plaintiff,

v.

**ADAM DEAN FOX**, and
**BARRY GORDON CROFT, JR.,**

                    Defendants.

Case No. 1:20-cr-00183-RJJ

Hon. Robert J. Jonker
United States District Judge

**FILED UNDER RESTRICTED
ACCESS**[1]

---

/

## MOTION FOR NEW TRIAL AND FOR *REMMER* HEARING

Mr. Croft and Mr. Fox, by their counsel, move the Court to hold a *Remmer*

hearing and grant a new trial pursuant to <mark>Fed. R. Crim. P. 33</mark> based on the

[a juror]
misconduct of ▇▇▇▇▇▇ and the appearance of judicial bias which impacted

the proceedings.

## FACTS[2]

As the Court is aware, counsel for Mr. Croft previously raised an issue

[a juror]
regarding juror misconduct on the part of ▇▇▇▇. *See* <mark>ECF No. 707</mark>,

<mark>PageID.8959-8963</mark>. The initial complaint to the defense came from a co-worker

---

[1] This motion is filed under restricted access as ordered orally following receipt of
the verdicts and as ordered in ECF Nos. 726, 727, 729, and 735.

[2] The factual assertions are drawn from counsel's best recollection and, in some
instances, public news reports. The Court denied Croft's request for additional time
to brief this issue. The request was made, in part, to facilitate obtaining necessary
transcripts. To the extent that Counsel's recollection differs from the official
transcripts, the defendants defer to the official record.



("Person #1")[3] of [a juror] [REDACTED]. This complaint was received by Croft's counsel following the first day of trial proofs on August 10, 2022. *See* ECF No. 707, PageID.8959[4], Gaudard Aff. at ¶4, attached as Exhibit A. The thrust of the complaint was that [the juror] [REDACTED] had been telling co-workers that [juror] [REDACTED] had been summoned for jury duty, was hoping to get on the Whitmer Kidnapping trial, and intended to "hang" the defendants if [the juror] [REDACTED] was selected. *Id.* at ¶8. Put another way, [the juror] [REDACTED] had expressed to a co-worker that [juror] [REDACTED] had prejudged the case and intended to secure a conviction without regard to the evidence.

Person #1 reported the full name[5] of the juror to Croft's Counsel. Person #1 also provided a physical description of the co-worker [REDACTED] [REDACTED] which matched the physical description of [the juror] [REDACTED]. Further, Person #1 later reported to a defense investigator [other identifying information] [REDACTED] *Id.* at ¶11. This is consistent with the voir dire testimony of [the juror] [REDACTED] [REDACTED] [REDACTED] *Id.* at ¶12.

---

[3] Because the Court has directed that steps be taken to protect the identities of the jurors and public disclosure of the witness names might lead to disclosure of juror names, because the witnesses have expressed concern regarding adverse employment action if they speak out, and in order to protect their privacy, counsel is referring to the witnesses with pseudonyms in a manner similar to that used by the government in the criminal complaint. Prior to a *Remmer* hearing, counsel will disclose witness identities to the government.

[4] Counsel erroneously stated in his initial brief that the Court was informed on June 11th.

[5] Because this document may be publicly filed at some point, counsel has not included the juror's name here. *See* Order, ECF No. 727, PageID.9028 (directing public identification of juror by number only). However, Person #1 provided [REDACTED] [the juror's] [REDACTED] true name to counsel.

While the voir dire testimony was transmitted publicly via audio bridge, that Person #1 had the full name of the juror and an accurate physical description [the juror] ████ is evidence that the co-worker was a reliable reporter. Further, Person #1 identified himself with his true name and phone number.

Counsel informed the Court's case manager of the development on the evening of August 10th. On the morning of August 11th, the Court communicated through its law clerk that it did not intend to address the issue until after the trial day had concluded. Counsel objected and the Court's law clerk relayed that the Court was willing to conduct a hearing, but only if it could be completed before the scheduled 8:30am start of trial. The Court convened for a very abbreviated hearing in chambers where the Court curtailed Counsel's attempt to make a complete record regarding the alleged juror misconduct. The Court refused Croft's request to immediately question [the juror] ████ and, if appropriate, the balance of the jurors to determine whether the alleged misconduct had impacted them. The Court expressed a plan to deal with the issue later and ordered the parties into the Courtroom to continue trial.

Counsel recalls that the Court also expressed concerns with potential criminal liability for the juror if the allegations were true. However, rather than appoint counsel for the juror, strike the juror, or grant a mistrial, the Court announced its intention to engage in an *ex parte* examination of the juror.

That *ex parte* hearing occurred after proofs concluded on August 12, 2022. The seven minutes of unsworn questioning was not probing, didn't follow up on



potential discrepancies from [the juror's] █████████ voir dire testimony, and invited the juror to

deny allegations without any risk of consequence for false statement. Juror Tr., 2:1-

7:7, ECF No. 735, PageID.9050-9055. For example, as part of the Court confronting [the juror]

████████ with the allegation and before permitting an answer, the Court showed

its hand to the juror:

> It's not like I have that on tape. It's not like I have anybody saying that under oath, but we have information that came to the Court that suggests you made statements like that as recently as Monday, which was before you became a juror, in connection with your place of work.
> So I can see the puzzled look on your face, and so the first question is, do you remember making statements like that at any time?

Juror Tr., 3:20-4:2, ECF No. 734, PageID.9051-9052.

In another example, [the juror] ████████ referred to the March trial of the defendants.

██████████ ████████ ████████ ██████████████████

██████████ [the juror's] Counsel's recollection of ████████ voir dire testimony is that [juror] ████

was aware of the case from media coverage of the arrests in 2020 but had not heard

about the matter since. The Court did not follow up on the basis for knowledge

about the March 2022 trial[6] and the Court did not permit defense counsel to

participate in the questioning or suggest questions to be asked of the juror.

---

[6] It is possible that the juror learned about this during trial as it was surely referenced with some witnesses. However, the record is silent as to the basis of the juror's knowledge. Counsel's recollection is that as of the morning of August 11, 2022, when the issue was presented to the Court and counsel requested immediate questioning of the juror, the fact of the March trial had not been presented to the jury.

Person #1 has refused to provide further information to defense investigators stating that he has a fear of negative employment consequences if he does. Gaudard Aff. at ¶16. The Court also noted that Person #1 was unwilling to provide additional information regarding the identity of the person who heard first-hand from [the juror] ██████. *See* Order, ECF No. 711, PageID.8981.

Over defendants' verbal objection on the morning of August 11, 2022 and Croft's written objection (ECF No. 707, PageID.8963), the Court refused to convene a *Remmer* hearing where such information could have been compelled from Person #1 and instead conducted an *ex parte* and unsworn discussion with the juror without counsel or defendants being present and thereafter issued an order declining to dismiss the juror or grant a mistrial. Order, ECF No. 711, PageID.8979-8989; Transcript, ECF No. 734, PageID.9049-9056.

On the morning of August 23, 2022, defense investigators identified another co-worker of [the juror] ██████, Person #2, who provided defense investigators a similar report that Person #2 had also heard second-hand that [the juror] ██████ was stating an intention to get seated on the "Whitmer Kidnapping" jury and to convict the defendants. Gaudard Aff. at ¶17-20. Person #2 provided the first name of the co-worker ("Person #3") who heard the plans of [the juror] ██████ firsthand. *Id.* at ¶20. Defense investigators were able to identify Person #3 based on this information. *Id.* at ¶22-23.

Defense investigators also learned from Person #2 that [the juror's family member ██████ works at the same employer as the juror] ██████████████████, Person #1, Person #2,

and Person #3. *Id.* at ¶21. In fact, Person #2 approached a defense investigator

outside of the place of employment regarding [the juror's] ████ misconduct because

Person #2 was fearful that [the juror's family member] ████ would hear Person #2 speaking about

the situation. *Id.* at ¶27.

After defense investigators identified Person #3, they requested permission to

speak with Person #3 from the common employer of [the juror] ████ and Persons #1-3. *Id.*

at ¶23-25. The human resources manager for the employer refused to provide access

without permission from the company's general counsel. *Id.* Croft's Counsel

unsuccessfully attempted to obtain permission from the employer's general counsel.

The jury, [including the subject juror] ████ delivered a verdict late in the morning

on August 23, 2022. *See* Minutes, ==ECF No.728==, ==PageID.9039==.

Meanwhile, defense investigators identified the vehicle driven by Person #3

and waited for him to get out of work on the afternoon of August 23, 2022, so that

they could question him. While waiting for Person #3 to get out of work, Person #2

informed investigators that [the juror's family member] ████ had announced that [the juror] ████

contacted [family member] ████ from jury deliberations, discussing the status of deliberation and that

the jury had reached a verdict but that it had not been delivered in court yet.

Gaudard Aff. at ¶27.

The known communication between [juror and family member] ████ was in clear

violation of the Court's instruction forbidding jurors speaking to anyone else about

the case or disclosing the status of the voting.

6

On the afternoon of August 23, 2022, defense investigator approached Person #3 as he was walking to his vehicle. Gaudard Aff. at ¶28. Similar to Person #1, it appeared that Person #3 did not want to be involved and refused to speak to defense investigators. Gaudard Aff. at ¶28.

[identifying information] [juror identifying information]

███████████████  █████████████████████ .

Throughout the trial, the Court expressed its opinion on the persuasiveness of the evidence being elicited by defense counsel on cross examination. Many times, the Court interjected with commentary about defense counsel wasting time, asking questions that it viewed as unpersuasive, commenting that it believed that counsel was being unnecessarily repetitive, threatening to impose time limits on defense counsel only, or otherwise demeaning the performance of defense counsel.

On Friday, August 12, 2022, the Court distributed copies of a district court opinion which argued for the trial court's right to impose time limits on all parties. *See United States v. Reaves,* 636 F. Supp. 1575 (E.D. Ky. 1986). The Court opined that "It's getting ridiculous," referring to the time spent on cross-examinations and warning it was going to think "hard" over the weekend about enforcing time limits "unless the defendants can start focusing on something that really matters."[7]

---

[7] Tresa Baldas, *Judge scolds defense in Whitmer kidnap trial: Stop wasting time talking 'crap',* THE FREE PRESS (August 13, 2022), https://www.freep.com/story/news/local/michigan/2022/08/13/whitmer-kidnap-judge-scolds-defense/10310376002/

The Court thereafter issued an opinion declining to impose time limits based, in part, on an August 3, 2022 "Re-Tweet" by Croft's Counsel of a comment made by another attorney which referenced cross examination of Infowars host Alex Jones:



*See* Order, <mark>ECF No. 711</mark>, <mark>PageID.8988</mark>, n. 6 (including a screenshot from a mobile device of Croft's Counsel's Tweet noting that apparently Croft's Counsel and the Court agree on the unremarkable proposition that good cross examination is good.). The record is silent as to who was observing Croft's Counsel's Twitter account nor when,[8] why, or how it came to the attention of the Court that Croft's counsel agrees that good cross exam is good.

---

[8] The Twitter user @popehat, a criminal defense attorney from California, has a habit of changing his Twitter name in response to current events. The name is "18Hat793" was a reference to an allegation in the search warrant executed on August 8, 2022 for Former President Trump's Mar-a-Lago residence. As such, it appears that Croft's Counsel's Tweet from before this trial began was captured sometime after trial began.

On August 17, 2022, the Court announced to counsel immediately before the government began questioning Kaleb Franks, a key cooperating witness, that it was going to impose the so-called "Bertelsman Rule"[9]. On a 20-minute break following direct examination, the Court observed that the Government had spent 50 minutes on direct, so the Defendants had to determine how to split 50 minutes between them. When counsel couldn't agree, the Court ordered that each defendant had 25 minutes to complete cross examination.

Unlike Judge Bertelsman in *Reaves,* the Court did not provide notice in advance of trial that it intended to impose time limits, did not impose the time limits on both sides, did not consider the complexity of the witness's testimony nor the witness' alignment with the government, and imposed an arbitrary limit on cross examination of the defense only. Counsel has found no criminal appellate case approving of the so-called "Bertelsman Rule" and can't even determine that the procedure proposed in *Reaves* was actually implemented at a trial in that matter.

The fact of the defense-only time limit was not concealed from the jury. During cross-examination of Mr. Franks, the Court impatiently interjected with the amount of time remaining for each lawyer. During Croft's examination, the Court commented, in front of the jury, to the effect that counsel could use his time in an ineffective manner if he wished.

---

[9] This was an apparent reference to the opinion in *United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky. 1986) authored by Judge Bertelsman.

There was significant media coverage of the so-called "Bertelsman Rule" over the weekend[10] and on Monday, the Court announced without explanation that the rule was no longer in effect after having denied defense counsel an opportunity to effectively cross examine a key cooperating witness who had testified that he had agreed with the Defendants to commit the crimes charged.

Throughout the trial, the Court repeatedly interjected with commentary regarding the quality of the defense evidence and questioning, the time it was taking defense counsel to complete questioning of witnesses[11], made sarcastic remarks about the trial continuing until Thanksgiving, referred to defense counsel's

---

[10] Tresa Baldas, *Defense blasts judge in Whitmer kidnap retrial: You're favoring the feds in front of jury,* THE FREE PRESS (August 17, 2022), https://www.freep.com/story/news/local/michigan/2022/08/17/whitmer-kidnap-trial-defense-criticizes-judge-favors-feds/10346464002/.

John Agar, *Lawyers object to limit on cross examination in Gov. Whitmer kidnap case*, MLIVE (August 17, 2022), https://www.mlive.com/news/grand-rapids/2022/08/lawyers-object-to-limit-on-cross-examination-in-gov-whitmer-kidnap-case.html.

Ed White, *Key insider: 2 men were 'very eager' to kidnap Gov. Whitmer,* THE ASSOCIATED PRESS / DETROIT NEWS (August 17, 2022), https://www.detroitnews.com/story/news/local/michigan/2022/08/17/key-insider-2-men-were-very-eager-kidnap-gov-whitmer/10347075002/

[11] While the Court frequently interjected regarding the examination of the defense counsel, counsel does not recall the Court ever interjecting or complaining of the duplicative nature of admitting both physical exhibits and photographs of them, repeated questioning of multiple witnesses about the same subject matter, or other comparable actions taken by the government in presenting its case.

questioning as "crap", and made other remarks that the Court itself has described as "dyspeptic"[12].

## LAW AND ARGUMENT

### I. THE DEFENDANTS WERE ENTITLED TO AN EVIDENTIARY HEARING REGARDING THE JUROR MISCONDUCT.

The Sixth Amendment guarantees a criminal defendant a trial by an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 726–27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). That means a jury must base its verdict "upon the evidence developed at trial" and not other considerations. *Morgan*, 504 U.S. at 727. The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *See Morgan,* 504 U.S. at 729.

The standard for relief when a juror makes false statements is set out in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548 (1984). There, the Court explained that to obtain a new trial, a party "must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. Obviously, if [juror] stated [juror] harbored no prejudgment, but

---

[12] The official record will disclose which of these comments were made in the presence of the jury. Counsel's recollection is that the "crap" comment was made out of the presence of the jury, but that comments about being in trial until Thanksgiving, wasting time, and regarding the persuasiveness of the evidence were made in the presence of the jury.

11

actually harbored a plan to convict regardless of the evidence, the *McDonough* standard would be easily met.

When faced with an allegation of bias, then, the question becomes "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount,* 467 U.S. 1025 (1984).

The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). Due process requires that the trial court take steps to determine whether jury misconduct has occurred. *Nevers v. Killinger,* 169 F.3d 352, 373 (6th Cir.1999), *overruled on other grounds by Harris v. Stovall,* 212 F.3d 940 (6th Cir.2000).

"[A]n extraneous influence on a juror is one derived from specific knowledge about or a relationship with either the parties or their witnesses." *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998). The allegation here is that the ███ [the juror] ████████ had undisclosed preexisting knowledge about the parties and an intent to convict them before hearing the evidence, therefore it was an extraneous influence on the jury.

The Sixth Circuit has held that a *Remmer* hearing applies in cases of juror misconduct as well as extraneous influence. *Cf. United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994). While the defendant must show actual prejudice to be entitled to a new trial, the defendant only has to establish some likelihood of

prejudice to be entitled to a *Remmer* hearing. *Smith v. Nagy*, 962 F.3d 192, 202 (6th Cir.), *reh'g denied* (July 1, 2020), *cert. denied,* 141 S. Ct. 634, 208 L. Ed. 2d 236 (2020)

A prospective juror's failure to disclose material information is grounds for a new trial if it demonstrates bias. *McCoy v. Goldston,* 652 F.2d 654, 658–59 (6th Cir.1981). "And if a trial court is presented with evidence of things like juror bias, it must hold a 'hearing with all interested parties permitted to participate.'" *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *8 (6th Cir. July 5, 2022) quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954).

It should be no surprise that the parties must be permitted to participate in the hearing, because, as this Court noted, "[u]nder *McDonough,* for a prospective juror's nondisclosure to warrant a new trial, a **defendant** must show that (1) the juror 'failed to answer honestly a material question on voir dire,' and (2) 'a correct response would have provided a valid basis for a challenge for cause.'" Restricted Access Order, ECF No. 711, PageID.8984, citing *English*, 900 F.3d at 813 (quoting *McDonough*, 464 U.S. at 556) (emphasis added); *see also United States v. Pennell,* 737 F.2d 521, 532 (6th Cir.1984) (noting that the burden of proof rests upon a defendant to demonstrate juror partiality).

The Court correctly noted that it was the Defendant's burden to show juror bias, but then denied the Defendants an opportunity to participate in the very hearing it held to determine whether such bias existed.

   a. **The Court's *ex parte* and unsworn questioning was insufficient to protect Mr. Croft's right to a fair trial before an impartial jury.**

The Court has placed the defendants in a classic Catch-22. The Court denied the defendants an opportunity to participate in the questioning of [the juror] and has ordered that the Defendants may not contact the jurors following the verdict. As such, the Court has prevented the defendants from developing the record regarding the juror misconduct, despite it being their burden to carry. *English*, 900 F.3d at 813. A district court abuses its discretion when it denies a defendant a meaningful opportunity to prove actual bias. *United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998)

The Court's questioning of [the juror] on an *ex parte* basis and without placing the juror under oath was insufficient to uncover juror misconduct or protect the defendants' Fifth and Sixth Amendment rights. For example, as part of the Court confronting [the juror] with the allegation and before permitting an answer, the Court showed its hand to the juror:

> It's not like I have that on tape. It's not like I have anybody saying that under oath, but we have information that came to the Court that suggests you made statements like that as recently as Monday, which was before you became a juror, in connection with your place of work.
> So I can see the puzzled look on your face, and so the first question is, do you remember making statements like that at any time?

Juror Tr., 3:20-4:2, ECF No. 734, PageID.9051-9052.

There was simply no reason to tell the juror that the Court could not substantiate the allegation. The point of the questioning should have been to

14

determine whether the integrity of the trial had been compromised and whether [the juror] ▓▓▓▓▓ had lied during voir dire. To accomplish this, a searching inquiry with input from the defendants was required.

Further, as the Court noted, the initial complainant, Person #1, did not claim [the juror] to the Court that he lacked information about who ▓▓▓▓▓ spoke to. Instead, the Court just accepted Person #1's statement that he was unwilling to identify the person now known to Defense Counsel and identified herein as Person #3. *See* ==ECF No. 711==, ==PageID.8989== (noting that "[n]or would [Person #1] identify this person.).

The Court undoubtedly possesses the power to compel testimony from witnesses, even when they would rather not be involved or are "unwilling" participants. "Because the '[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.' questions directed at potential bias may be constitutionally compelled." *Williams v. Bagley*, ==380 F.3d 932, 944== (6th Cir. 2004) quoting *Dennis v. United States,* 339 U.S. 162, 171-172 (1950).

When the Court determined that Person #1 knew the name of the person to [the juror] whom ▓▓▓▓▓ had disclosed his intended misconduct, the Court should have compelled testimony from Person #1 (and then Person #3) at a *Remmer* hearing [the juror] where it should have excused ▓▓▓▓▓ from further service.

**b. The Court's insistence on conducting the juror hearing on an *ex parte* basis over the objection of defendants violated Rule 43 and the defendants' constitutional right to be present at every stage of their trial.**

"One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."

15

*Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 1058, 25 L. Ed. 2d 353 (1970) citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892).

The Sixth Circuit has observed that the Supreme Court has "dealt with the matter of communications between a jury and the trial judge and concluded that messages from a jury should be answered in open court with an opportunity for counsel to be heard before the court responds." *United States v. Gay*, 522 F.2d 429, 434–35 (6th Cir. 1975) citing *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975).

The *Gay* court went on the explain that in "*Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919), a civil action, the Court held that the parties have the right to be present in person or by counsel 'at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict.' In *Shields v. United States*, 273 U.S. 583, 588-89, 47 S.Ct. 478, 71 L.Ed. 787 (1927), the Court noted that A fortiori, the same rule would apply in a criminal case." *Id.*

Further, Fed. R. Crim. P. 43 addresses a citizen's right to be present at his own criminal trial: "Unless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at . . . every trial stage, including jury impanelment . . . ." Fed. R. Crim. P. 43. "[T]he scope of Rule 43 was intended to be broader than the constitutional right. Accordingly, insofar as due process is concerned, the statutory right is at least as far-reaching as the constitutional right." *United States v. Alessandrello*, 637 F.2d 131, 138 (3d Cir. 1980).

16

"An in-chambers conference concerning the dismissal of a juror is not expressly exempted in Rule 43(b) or (c), and . . . an in-chambers conference concerning the dismissal of a juror would be a stage in the trial within the meaning of Rule 43(a)." *United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978). The *Brown* court noted that such a conference, while prohibited by Rule 43, doesn't reach a constitutional dimension where the absence of the defendant "would frustrate the fairness of the trial so long as counsel for the defendant is present." *Id.* at 987

It appears that the Sixth Circuit is on solid footing in concluding that Rule 43 requires at least the presence of counsel. The Supreme Court in *United States v. Gagnon*, 470 U.S. 522, 523, 105 S. Ct. 1482, 1483, 84 L. Ed. 2d 486 (1985), addressed a juror issue where the district court questioned the juror without the defendant present.

In addressing the Rule 43 claim, the Supreme Court assumed for purposes of the appeal that the *in camera* hearing was a "stage of the trial" under Rule 43. *Id.* at 527. However, it went on to explain that there was sufficient evidence that the defendants waived their presence at the hearing because the District Court announced its intention to hold the hearing and nobody objected before or after the hearing. The Court went on the explain that "[a] defendant knowing of such a discussion must assert whatever right he may have under Rule 43 to be present." *Id.* at 528.

Here, the Court expressly overruled defendants' verbal and written objections to the court engaging in an *ex parte* in-chambers conference without Counsel and

defendants present. And, in fact, the Court did engage in an *ex parte* in-chambers conference concerning the dismissal of a juror without either counsel or defendants present.

## II.   THE COURT SHOULD GRANT A NEW TRIAL PURSUANT TO RULE 33.

Federal Rule of Criminal Procedure 33 states "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires**."** Fed. R. Crim. P. 33(a).

[the juror]

### a.  A new trial is warranted because of the misconduct of ███ ███████████ .

In recognizing the trial judge's broad discretion in ruling on a defendant's Rule 33 motion, the Supreme Court has held "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

Due process requires a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *United States v. Wheaton*, 426 F. Supp. 2d 666, 670 (N.D. Ohio 2006), *aff'd,* 517 F.3d 350 (6th Cir. 2008).

When a jury is not impartial, the defendant's Sixth Amendment rights are violated. *Morgan v. Illinois,* 504 U.S. 719, 726–27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). That means a jury must base its verdict "upon

18

the evidence developed at trial" and not other considerations. *Morgan*, 504 U.S. at

727. The presence of even a single biased juror deprives a defendant of his right to

an impartial jury. *See Morgan,* 504 U.S. at 729.

Here, there is ample evidence that ████████ [the juror] expressed an intention

to convict the defendants based on extraneous influences occurring prior to voir

dire. There is also evidence that ██ [the juror] violated the Court's instruction not to discuss or

disclose the status of the jury's deliberation in violation of the Court's order. *See*

Pattern Jury Instruction 8.01. There is similarly ample evidence to believe that the

juror lied during voir dire, but the *ex parte* method chosen by the Court was

insufficient to uncover such misconduct.

Accordingly, the Court should conduct a *Remmer* hearing as discussed above

and grant a new trial pursuant to <mark>Fed. R. Crim. P. 33</mark>.

### b. A new trial is warranted based on the appearance of judicial bias impacting the jury.

The issue of judicial bias affecting the jury was previously raised by counsel

when the Court permitted counsel to make a record regarding the limitation it

imposed on the cross examination of Kaleb Franks.

It is well recognized that judges should strive toward an atmosphere of

impartiality in court proceedings especially in those cases heard by jury. *Rocha v.

Great American Ins. Co.,* 850 F.2d 1095, 1101 (6th Cir.1988). "The basic

requirement [of the role of a federal trial judge] is one of impartiality in demeanor

as well as in actions." *U.S. v. Hickman,* 592 F.2d 931, 933 (6th Cir.1979)

"The problem is that potential prejudice lurks behind every intrusion into a trial made by a presiding judge." *Id.* "The reason for this is that a trial judge's position before a jury is 'overpowering.'" *Id.* citing *United States v. Hoker*, 483 F.2d 359, 368 (5th Cir. 1973). "His position makes 'his slightest action of great weight with the jury.'" *Id.* citing United States v. Lanham, 416 F.2d 1140, 1144 (5th Cir. 1969).

"Assuming that a trial judge has good reason to interject himself into the trial, the manner in which he does so is crucial. Thus, an objective demeanor is important. Outright bias or belittling of counsel is ordinarily reversible error." *Id.* at 933-934.

"Although a trial is a quest for the truth, and a federal trial judge is more than a neutral arbiter; interference with the presentations of counsel has the potential of making a mockery of a defendant's right to a fair trial, even in the absence of open hostility." *Id.* at 934.

Here, throughout the trial, the Court showed hostility toward defense counsel. The Court often commented on the quality of the questioning of defense counsel and the persuasiveness of the arguments it believed would flow from the questioning. Frequently, the Court commented that the defense "had enough" to make arguments, in a manner that cast doubt on the believability of the arguments.

During the questioning of a star witness, Mr. Franks, on issues of credibility, the Court openly suggested that defense counsel was not using his limited time effectively or wisely. Ironically, in the *Reaves* case cited by the Court in support of

time limits, Judge Bertelsman argued in favor of time limits because it would avoid the very "*sua sponte* interruptions by the court to debate what evidence is repetitious or cumulative" that occurred during counsel's time-limited exam. *Reaves*, 636 F. Supp. at 1580.

Because the Court's position before the jury is "overpowering" and the Court belittled counsel and counsel's performance in front of the jury, a new trial is warranted pursuant to Rule 33. *Hickman*, 592 F.2d at 933-934.

### c. A new trial is warranted based on the unconstitutional imposition of time limits.

"Where the trial court has curtailed a defendant's cross-examination of a 'star' government witness—as it has done in this case—its ruling must be more carefully scrutinized." *Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989).

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Miller v. Genovese*, 994 F.3d 734, 742 (6th Cir. 2021) quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Kaleb Franks was charged in the superseding indictment. Weeks before the March trial, he entered into an agreement with the government to plead guilty and testify that Croft and Fox conspired with him to kidnap the Governor. The value of his testimony was touted by the government in its opening and closing statements.

Yet the Court ordered that cross-examination by each defendant of this witness, whose credibility was an issue on which the government apparently

believed the case hinged, would be limited to 50% of the time spent on direct examination. This time limit was imposed with virtually no notice. It was announced without elaboration that the "Bertelsman Rule" would be in effect immediately prior to the government beginning direct examination and the defendants were not given an opportunity to propose alternatives or even prioritize their questioning for the curtailed examination.

While the Court permitted the parties to make a record following the curtailed examination, that was not a sufficient remedy. As noted by the Supreme Court, "[c]ounsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what fact a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." *Alford v. United States*, 282 U.S. 687, 692, 51 S. Ct. 218, 219, 75 L. Ed. 624 (1931) (cleaned up).

Notably, the Court didn't limit the amount of time the government spent examining the witness on direct examination or propose a limit for redirect examination.

Because the Court's imposition of time limits on the cross examination of Kaleb Franks violated the defendants' Sixth Amendment rights, the Court should grant a new trial.

## CONCLUSION

Both because of the juror misconduct and the Court's demeanor in front of the jury, the Court should hold a *Remmer* hearing and then grant a new trial.

Respectfully Submitted,


Dated: September 6, 2022          /s/ Joshua A. Blanchard
                                  Joshua Blanchard
                                  BLANCHARD LAW
                                  Attorneys for Defendant Croft
                                  309 S. Lafayette St., Ste. 208
                                  Greenville, MI 48838
                                  616-773-2945
                                  josh@blanchard.law


Dated: September 6, 2022          /s/ Christopher Gibbons
                                  Christopher Gibbons
                                  Gibbons & Boer
                                  Attorneys for Defendant Fox
                                  2404 Eastern Ave SE
                                  Grand Rapids, MI 49507
                                  616-460-1587
                                  cgibbons0003@gmail.com

## CERTIFICATE OF COMPLIANCE WITH LCrR 47.1(b)(ii)

I certify that this brief contains 5,867 countable words as defined by LCrR

47.1(b)(i) and calculated by Microsoft Word for Mac version 16.64.


Dated: September 6, 2022          /s/ Joshua A. Blanchard
                                 Joshua Blanchard

# Exhibit A

Declaration of Gary Gaudard

# DECLARATION OF GARY GAUDARD

I, Gary Gaudard, state as follows:

1. I was employed as an investigator for the defense team of Adam Fox.

2. Pursuant to a Joint Defense Agreement in *United States v. Fox*, et al, I was authorized to speak with counsel for Barry Croft.

3. This declaration contains a summary of relevant information for purposes of supporting the defendants' motions for new trial but does not include every fact known to me.

4. On the evening of August 10, 2022, I was advised by Attorney Joshua Blanchard that he had received a call from a subject regarding a juror in the *Fox* matter. The caller is hereafter referenced as Person #1[1].

5. Based on the name and description provided by Person #1, the juror was identified as ███████ [the juror].

6. After speaking with attorneys for Croft and Fox it was decided that I would call Person #1 and take his statement.

7. On August 10, 2022, around 1840 hours, I called Person #1 who told me that he works with ███████ [the juror] at an employer[2] ███████████ [identifying information].

---

[1] The true name and phone number of the caller were provided to me. I understand that the true name and phone number have been provided to both the Court and the lawyers for the government.

[2] The specific name of the employer was provided to me and has since been verified. However, consistent with the Court's directive that the parties not identify jurors, I am not specifically naming the employer in this declaration.



[the juror]

Person #1 told me that he and ▆▆▆▆ have worked together for about

10 years.

8. Person #1 reported that [the juror] ▆▆▆▆ was stating that [the juror] ▆had jury duty and
that if [the juror] ▆ could get on the Whitmer jury that "they were going to hang."
He said that [the juror] ▆▆▆▆ also said that the subjects on trial were "guilty,

no matter what."

9. Person #1 said that he knows from working with [the juror] ▆▆▆▆ that [the juror] ▆ is
"far-left leaning" and felt that [the juror] ▆▆▆▆ obviously had ▆ mind already
made up. He said that [the juror] ▆▆▆▆ was talking like this in the week leading
up to [the juror's] ▆ jury service and as late as Monday, August 8, 2022.

10. I know from my involvement in this case that August 8, 2022 was the

day before jury selection began.

11. I asked Person #1 to describe [the juror] ▆▆▆▆ for me. Person #1 described ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
[identifying information]
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

12. I recall from being present at jury selection that [the juror] ▆▆▆▆ testified ▆▆▆
[consistent with identifying information]
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

13. Person #1 later added that he did not hear [the juror] ▆▆▆▆ say these things
firsthand. He said that several co-workers heard [the juror] ▆ say the above
things about [the juror's] ▆ potential jury service in the Whitmer trial. Person #1

2

[the juror]
said that one of the subjects who heard ████ was a friend of Person

#1 that had worked with them for many years and had no reason to
[the juror]
doubt what that person was saying about ████

14. Person #1 declined to give me the names of anyone who heard this

firsthand but said that they would ask at work in the morning if anyone

was willing to speak with me. It should be noted that neither Person #1

nor anyone else called me the following morning with any further

information.

15. On August 22, 2022, I recontacted Person #1 to see if he could provide
[the juror's]
any further information on ████ statements prior to the trial.

16. I spoke with Person #1 on the phone. Person #1 said that no one was
[the juror's]                                              [the juror's
willing to speak with me about ████ statement. He said that ████
family member]
████ also works at the mutual employer, and people are afraid

of losing their jobs. He said that people are also being protected against

actions by BLM or similar organizations if their names get out. Person
[the juror's]
#1 further added that if he is compelled to talk about ████

statements, he will now say that he does not know anything.

17. On the morning of August 23, 2022, along with another investigator, I
[identifying information]
went to the common employer ████ to see if anyone would be
[the juror's]
willing to provide further information regarding ████ statement.

Upon arrival at around 0930 hours I made contact with Person #2[3].

---

[3] Person #2 is an individual whose identity is known to me who was working at the
common employer of Person #1, Person #2, and ████. [the juror]

18. I advised Person #2 that we were following up on some statements that may or may not have been said by a potential juror in a case we were working. I advised them that we were investigators working for a group of defense attorneys. I also told them that we believed the juror worked at their place of employment.

19. Person #2 then asked me if they could name the juror. Person #2 then said the name of ▉▉▉▉ [the juror] I asked how they knew this, and they said that ▉▉▉▉ [the juror] had been saying things about being on the Whitmer jury prior to ▉▉ [the juror's] service. Person #2 said that ▉▉▉▉ [the juror] was talking about finding them guilty no matter what.

20. Person #2 said that they did not hear ▉▉▉▉ [the juror] say this firsthand but that a friend had heard it directly from ▉▉▉▉ [the juror] Person #2 provided the first name of the friend but declined to give us the friend's full name and said that they would check to see if the friend could speak with us.

21. While we were speaking with Person #2, they said that we should keep our voices down because ▉▉▉▉▉▉▉▉▉▉▉▉ [the juror's family member was ▉▉▉▉▉▉▉▉ near the place where we were speaking. ▉▉▉▉▉▉ [identifying information] ▉▉▉▉▉▉▉▉▉▉▉▉

22. The friend identified by Person #2 had a relatively uncommon first name.

23. Through independent investigative means we were able to identify the friend Person #2 had referenced. Person # 3 was identified and their

4

information matched Person #1's initial interview talking about the [the juror] person that heard ▆▆▆▆ make the statements directly.

24. A short time later management came out to the lobby and advised us that they were not allowed to say anything regarding the matter and referred us to their corporate attorney.

25. We told them that we would be in the area in case anyone wished to speak with us, and I provided them with a business card. We thanked them for their time and left the lobby.

26. I remained in the parking lot for the common employer while defense attorneys reached out to the corporate attorney for the common employer.

27. I was parked in the lot around 1350 hours when Person #2 approached [the juror's family member] me. Person #2 advised that later that morning, ▆▆▆▆ [the juror] [family member] ▆▆▆▆ announced that ▆▆▆▆ had just texted ▆▆ [family member] and that advised ▆▆ that they had a verdict and that they were waiting to announce it. This was prior to the reading of the verdict in the [The family member] [the person] courtroom. ▆▆▆▆ did not say if ▆▆ knew or what the verdict was. Person #2 later learned that the jury had returned a verdict of guilty on all charges.

28. On August 23, 2022 at around 1600 hours, I attempted to speak with Person #3 as they were walking to their vehicle in the parking lot. I called the person's name, and they acknowledged me. I identified myself

and told Person #3 that I wanted to speak with them regarding possible statements that ▮▮▮▮▮ [the juror] had made regarding the Whitmer trial. Person #3 stated that they did not know anything and refused to speak with me and got into their vehicle.

29. Person #3's statement was inconsistent with the reports obtained from Person #1 and Person #2 and the investigator understood the statements as an expression that Person #3 did not wish to be involved.

30. I offered to speak with them outside of work but they did not want to speak with me. I offered my card in case they changed their mind. They said that they did not want to talk with me later and declined to take my card and drove out of the lot.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on _____ Sep 5, 2022 _____.

*Gary A Gaudard*
Gary A Gaudard (Sep 5, 2022 15:05 EDT)
Gary Gaudard

6

# 2022-09-05 - Gaudard Declaration

Final Audit Report                                                   2022-09-05

| | |
|---|---|
| Created: | 2022-09-05 |
| By: | Joshua Blanchard (josh@blanchard.law) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAGl9rDob__Ca6lzWDjoQsEhrhjS5cs_2M |

## "2022-09-05 - Gaudard Declaration" History

📄 Document created by Joshua Blanchard (josh@blanchard.law)
2022-09-05 - 6:20:11 PM GMT- IP address: 68.188.210.48

📧 Document emailed to leadpolygraph@gmail.com for signature
2022-09-05 - 6:20:50 PM GMT

📄 Email viewed by leadpolygraph@gmail.com
2022-09-05 - 6:51:14 PM GMT- IP address: 74.125.212.203

🖊 Signer leadpolygraph@gmail.com entered name at signing as Gary A Gaudard
2022-09-05 - 7:05:11 PM GMT- IP address: 174.211.39.179

🖊 Document e-signed by Gary A Gaudard (leadpolygraph@gmail.com)
Signature Date: 2022-09-05 - 7:05:12 PM GMT - Time Source: server- IP address: 174.211.39.179

✅ Agreement completed.
2022-09-05 - 7:05:12 PM GMT

