UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                No. 1:20-cr-183

        vs.                          Hon. Robert J. Jonker
                                         United States District Judge

ADAM DEAN FOX,

                Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

May it please the Court, the United States submits the following

memorandum for the Court's reference in determining an appropriate sentence:

    1.    <u>Facts and Procedural History</u>:

From before June 2020 through their arrest in October 2020, defendant

Adam Dean Fox conspired with co-defendants Barry Gordon Croft Jr., Ty Gerard

Garbin, and Kaleb James Franks to kidnap the Governor of Michigan. (R. 172:

Superseding Indictment.) Fox also conspired with Croft to use a weapon of mass

destruction in furtherance of the plot. (*Id.*, PageID.967.)

Garbin and Franks both pled guilty to the kidnapping conspiracy. At Fox's

first trial, the jury acquitted co-defendants Daniel Joseph Harris and Brandon

Michael-Ray Caserta, and deadlocked as to Fox and Croft. (R. 622: Declaration of

Mistrial, PageID.6029.) At the retrial, the jury convicted Fox and Croft of all counts

against them. (R. 728: Minutes of Jury Trial, Day 11, PageID.9039.) In a related

state trial in Jackson County, Michigan, three additional members of the Wolverine

Watchmen militia (Joseph Morrison, Paul Bellar, and Pete Musico) were convicted of providing material support for the terrorist plot; a felony carrying a 20-year maximum penalty. Additional defendants are pending trial on similar charges in Antrim County.

Since the facts are well known to the Court that presided over both federal trials, this memorandum will highlight only a selection of testimony and exhibits pertinent to the guideline calculations and statutory sentencing factors.

2.   <u>Guideline Issues</u>:

   a.   <u>Terrorism Adjustment</u>

      (1)   *Generally*

If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the base offense level is increased by 12 levels, and the criminal history category becomes VI. USSG § 3A1.4(a), (b). "A 'federal crime of terrorism' has two statutory elements. One concerns motivation: The offense must be 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.' 18 U.S.C. § 2332b(g)(5)(A). The other concerns the nature of the offense: It must violate one of a list of criminal provisions ranging from the production of biological weapons to the kidnapping of members of Congress. *Id*. § 2332b(g)(5)(B)." *United States v. Doggart*, No. 20-6128, 2021 U.S. App. LEXIS 33024, at *4 (6th Cir. Nov. 3, 2021).

(2)     *Predicate offense*

Fox's conviction for conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(A), is a listed predicate offense for application of the terrorism enhancement. 18 U.S.C. § 2332b(g)(5)(B)(i). In *United States v. Suarez*, 893 F.3d 1330, 1337 (11th Cir. 2018), the court affirmed a life sentence for a defendant with no criminal history who was convicted of Section 2332a for planning to detonate a bomb on Key West. "Indeed, Congress and the Sentencing Commission intended the terrorism enhancement to apply to [this] crime. The definition of a federal crime of terrorism in § 3A1.4, by incorporating § 2332b(g)(5), specifically includes a conviction under 18 U.S.C. § 2332a, the weapons of mass destruction crime for which [the defendant] was convicted." *Id*. The terrorism enhancement applies to inchoate offenses, such as attempt and conspiracy, just like completed attacks. *United States v. Hayne*, 835 F. App'x 855, 856 (6th Cir. 2020) (enhancement applied where defendant attempted to blow up a bridge with an improvised explosive device).

(3)     *Motivation*

The only remaining question is whether Fox intended to influence the conduct of the government through intimidation or coercion, or retaliate against government conduct. Either motive is enough to support the enhancement. *United States v. Varnell*, No. 20-6040, 2021 U.S. App. LEXIS 36684 (10th Cir. Dec. 13, 2021). The court in *Varnell* found both motivations present where the defendant said, "This country needs a revolution and the government needs to be weakened to

give people the courage to do it," and said he was, "going after government officials once militias start getting formed." *Id.*, at *21-22.

Long term planning is not required and influencing the government need not be the defendant's ultimate or sole aim. *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014). Specific intent may be inferred from circumstantial evidence, such as the "natural inference" arising from an attack on a government office. *Id.* The defendant's motives for retaliation need not be particularly coherent or consistent over time. *United States v. Van Haften*, 881 F.3d 543, 544-45 (7th Cir. 2018) (immaterial that defendant's motive for attacking United States was based on false or absurd beliefs).

The evidence adduced at trial established that Fox was motivated by a desire to retaliate against the government for various actions (real or imagined) that he considered "tyranny," including Covid restrictions and the false belief that the government intended to seize or ban assault weapons. In a December 2019 Facebook video, he posed with an assault rifle and said, "Keep reading all these fucking bills going through these state senates and shit about fucking taking our fucking firearms and our AR-15's and whatnot. Fuck your bills, man, just come and try to get 'em. Who else is ready for the boogaloo? I'm ready to boog-the-fuckin-loo on, man, I'm sick of this shit. We just gonna let 'em keep passing laws? Keep fucking violating our God-given rights? We just gonna keep bitching on Facebook? What are we gonna do? I'm ready to give maximum effort, man. I'm just waiting. Who's going to fire the first shot?" (Gov't Ex. 435.) Fox brandished his AR-15, and

added, "This is the only way that we take back our country, is right here. By brute fucking force. Physical violence." *Id.*

In an April 2020 Facebook video, Fox said, "We have the numbers, we have the arms, we have the ammunition, we have all the fucking tools and strategy that we need to just go take our country back from 435 members of fucking Congress that don't give a fuck about us." (Gov't Ex. 3.) On May 12, 2020 he said, "People need to stop with the misplaced anger and place the anger where it should go, and that's against our tyrannical fucking government." (Gov't Ex. 22.)

In a June 2020 Facebook video, Fox complained about public health precautions implemented by Governor Whitmer: "I mean, this whole gym situation has turned into a fiasco. She's playing with people's livelihoods. There's no reasons why the gyms can't open now … this tyrant bitch constantly does this. I just, I don't get it, you know. It's very frustrating. These gym owners have to be hurting financially. I, I don't know boys, we gotta do something. … I myself wanna offer these gyms, Constitutional comfort, if you will." (Gov't Ex. 69.)

In another June 2020 video, Fox explicitly stated his motive was the overthrow of the government. "Saying the Boogaloo Bois wish to incite the next Civil War? How fucking *wrong* could they ever be? We want a *revolutionary* war. We want to get rid of this corrupt, tyrannical, fucking government. That's what we want to get rid of." (Gov't Ex. 70.) In describing his early plans to UCE Mark in July, Fox advised, "The consensus is, as of right now is taking the fucking Capitol

by force, like with extreme heavy fucking prejudice toward our fucking government officials." (Gov't Ex. 72.)

The trial evidence also established Fox wanted to influence government conduct through intimidation or coercion. He advocated abducting Governor Whitmer to "trade" for unspecified concessions, and said her abduction would cause the government to heed his demands. When Fox met Croft and other extremists in Dublin, Ohio, he counseled abducting multiple state governors at once: "You need to hit them all at the same time, and you need to take hostages. You need tyrants as hostages. There you have value. Then human life is the value to it, right?" (Gov't Ex. 40.) As he explained to UCE Mark a month later, "Then we have got a tool negotiate with … we want the tyrant bitch." (Gov't Ex. 77.)

On September 12, 2020, just before the night reconnaissance of the Governor's home, Fox similarly told Caserta and state defendant William Null, "The whole point of this is to send a message, because it doesn't matter. If we, if we cut her out that don't matter. There's still the puppet-masters above. The whole point is this, we're, we're sending the fucking message to them. Hey. If we can get her, we can get you." (Gov't Ex. 233.)

Fox conspired to use a weapon of mass destruction to facilitate the kidnapping of the Governor. He intended both to retaliate against and influence the government. The enhancement in USSG § 3A1.4 therefore applies.

    b. <u>Official Victim Adjustment</u>

  The sentencing guidelines provide that if the victim was a government officer or employee, and the offense of conviction was motivated by such status, the offense level is increased by three. USSG § 3A1.2(a). If the offense of conviction is found in Chapter Two, Part A of the guidelines (Offenses Against the Person), the offense level is increased by six. USSG § 3A1.2(b).

  The Sixth Circuit has repeatedly rejected claims that the "official victim" enhancement only applies to federal officers or employees. "We hold that federal criminal sentences may be enhanced pursuant to § 3A1.2(a) if the underlying conduct was motivated by the victim's status as a state or local government employee." *United States v. Hudspeth*, 208 F.3d 537, 540 (6th Cir. 2000) (county prosecutor). *See also United States v. Manns*, 690 F. App'x 347, 354 (6th Cir. 2017) (county prosecutor and clerk of court).

  "'Motivated by such status', for purposes of § 3A1.2, means that the offense of conviction was motivated by the fact that the victim was a government officer or employee . . . ." USSG § 3A1.2, App. Note 3. "This adjustment would not apply, for example, where the both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id*.

  Fox himself implicitly recognized Governor Whitmer's official status countless times by referring to her as a "tyrant," defined as "a sovereign or ruler, legitimate or otherwise, who uses [her] power unjustly and arbitrarily, to the

oppression of [her] subjects." (Black's Law Dictionary, 5th Ed.)[1] In fact the defendants appear to have been motivated more by her status as the head of state than any identifiable grievance with Governor Whitmer personally. In April 2020, Croft posted the following message on Facebook: "I believe, all it's going to take is 1 state, to burn out and hang a Govenor [sic], and those dominoes will start falling!!!%" (Gov't Ex. 4.) In May 2020 Croft asked, "Which Governor is going to end up dragged off, and hung for treason first?" (Gov't Ex. 360.) And, as Croft told associates that month, "I want to grab them *all*, and hold trial. A people's trial." (Gov't Ex. 12, emphasis added.) He explained to Fox, "Once we get a foothold, one criminal governor in our possession and we've captured the flag in that state. We can then start to issue terms." (Gov't Ex. 14.) When CHS Dan asked Fox if the mission would be "catch and release," Fox echoed Croft: "Fuck no, bitch! Once we got her she's ours, man. She getting charged man. Fuck that. Either she's going to prison or she's getting hung. She's suffering her fucking fate, dude. And then after that we're going after the others. This is the example, bitch. The head's cut off. We're coming to burn the rest of the body now." (Gov't Ex. 127.)

The defendants selected Governor Whitmer as their first victim because Croft found a willing and able operations leader in Fox. As Croft put it to one associate, "Michigan's government is a target of opportunity. If opportunity presents, will engage. God knows the Govenor (sic) needs hung." (Gov't Ex. 71.) Fox began recruiting for the mission soon thereafter, telling an associate on May 19, 2020, "We

---

[1] It is undisputed that Governor Whitmer was the legitimate Governor of Michigan at the time of the offense.

need to go get these governors and arrest them, and put them on trial for their crimes and their violation of the Constitution." (Gov't Ex. 20.) Fox pressed followers to attack "our tyrannical fucking government," and said, "Let's just go to the fucking top, let's start at the fucking top, and then we'll weed our way down, how 'bout that?" (Gov't Ex. 22.)

In a June 9, 2020 video, Fox exhorted followers to attack the Governor because of her position as head of the state: "What's the point in owning all this gear, investing all this money in all this shit if you ain't ever gonna go fucking use it? We have a tyrannical governor who for months has fucking violated our Constitutional rights and basically tyrannical ruled our state." (Gov't Ex. 51.) On August 29, 2020 he explicitly referenced her authority as a motive: "Having the Governor hog-tied on the table while we all pose like we just made the world's biggest drug bust? Photo op! … Fix this, bitch ass. Ain't so funny when you ain't got all the power, is it?" (Gov't Ex. 200.)

As noted earlier, Fox said he wanted to "take tyrants as hostages" (Gov't Ex. 40), use "the tyrant bitch" as "a tool to negotiate with," (Gov't Ex. 77), and send a message to her supposed "puppet masters." (Gov't Ex. 223.) Those statements only make sense in the context of the victim's official status.

However paranoid the conspirators' motives, the evidence establishes they chose to kidnap the victim because she was a sitting state governor. Since kidnapping is found in Chapter Two, Part A of the guidelines (USSG § 2A4.1

(Kidnapping, Abduction, Unlawful Restraint)) the offense level in this case should be increased by six.

    c.    <u>Leadership Enhancement</u>

        (1)    *Law*

If the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive, the offense level is increased by four. USSG § 3B1.1(a).

There can be more than one person who qualifies as leader or organizer of a criminal association or conspiracy. *United States v. Grigsby*, 692 F.3d 778, 791 (7th Cir. 2012). Factors the Court should consider in deciding who is an "organizer or leader" include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense. USSG § 3B1.1, App. Note 4. The defendant need only have "some control" over his subordinate's actions, which includes organizational responsibility. *United States v. Kabir*, 51 F.4th 820, 826 (9th Cir. 2022). In *Kabir*, "the district court reasonably concluded that Kabir had 'the necessary influence and ability to coordinate the behavior of others so as to achieve a desired criminal result," because he suggested to co-conspirators what to pack, how to train, and what sorts of physical training to undertake. *Id*. In addition, his recruitment of two other conspirators was "indicative of his playing a leadership or central organizational role in the conspiracy." *Id*.

The Guidelines define a participant as a "person who is criminally responsible for the commission of the offense, but [who] need not have been convicted." *United States v. Rathod*, 826 F. App'x 527, 537 (6th Cir. 2020), citing USSG § 3B1.1 cmt. n.1. "[C]ases applying the guideline uniformly count as participants persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *Id.*, *citing United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

Leaders and organizers, including the defendant himself, are counted when tallying the number of participants. *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000) (collecting cases). Other participants need not be involved in every aspect of the crime. *United States v. Fosher*, 124 F.3d 52, 56-57 (1st Cir. 1997) (participant did not participate in the robbery, but assisted the defendant in targeting the victim's home, and provided a home in which the planning meeting took place.)

Participants can also include acquitted defendants. *United States v. Hardwell*, 80 F.3d 1471 (10th Cir. 1996). Where the jury does not find co-defendants guilty beyond a reasonable doubt, the district court is not foreclosed from finding by a preponderance of the evidence that they were "criminally responsible" and thus participants the defendant's conspiracy. *United States v. Lacey*, 86 F.3d 956, 968 (10th Cir. 1996).

"If the offense involved fewer than five participants, the 'otherwise extensive' language of § 3B1.1(a) is an alternative ground on which the sentencing court may base its decision to depart upward." *United States v. Anthony*, 280 F.3d 694, 699

11

(6th Cir. 2002), *citing United States v. Carrozzella*, 105 F.3d 796, 803 (2d Cir. 1997). The leadership enhancement is appropriate where the "otherwise extensive" activity is the functional equivalent of a crime involving five or more participants. *Id.* Application Note 3 is the starting point of the analysis. *Id.*, at 700. It provides that "in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the services of many outsiders could be considered extensive." USSG § 3B1.1, App. Note 3.

In considering whether a criminal activity is otherwise extensive, the sentencing court should examine: (i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme. *Anthony*, 280 F.3d at 700-01, *citing Carrozzella*, 105 F.3d at 804.

      (2)    *Facts*

Fox was a leader in the criminal activity because he recruited participants and took the initiative in selecting and scouting the target location, collecting funds, and advancing the plot. As he advised an associate on May 19, 2020, he was by then already "trying to put together a team [to] get some shit going … to get these fucking governors and arrest them and put them on trial for their crimes and their violation of the Constitution." (Gov't Ex. 20.)

On June 4, 2020, he told his Facebook followers, "If you're interested in joining my movement and seeing what this is going to be all about, and being a part of something bigger than just online bitching, hit me up." (Gov't Ex. 31.) The same day, he reported on his progress to co-leader Croft: "I'm gonna actively begin recruiting to build my regiment here. I can't fucking wait man … Second Continental Michigan Regiment, Second CMR, baby! … We're going to be putting together elite motherfuckers that are ready to go snatch a motherfucker." (Gov't Ex. 491.) He then posted to his Facebook page, "2nd Continental Michigan Regiment, weak ones need not apply." (Gov't Ex. 32), showing his intent to build a sister unit to the "2nd Continental Delaware Regiment" tattoo on Croft's forearm. (Gov't Ex. 48.) He told Croft, "I got a couple guys that I'm recruiting right now to help with leadership, and that have some particular skills in mind, or, a particular skill set that could be very beneficial." (Gov't Ex. 492.)

On June 8, 2020, Fox pursued a recruiting tip from Croft, and called Wolverine Watchmen leader Joe Morrison. He said, "[I]f Barry said we have the same common goal, then I'm sure we do, and me and you definitely need to sit down and talk." (Gov't Ex. 45.) After talking to Morrison, Fox reported back to Croft that his recruiting efforts were bearing fruit: "Hey brother, hope all is good. Your boy from fucking, Wolverine Watchmen here in Michigan hit me up. … It's good looking, if this guy checks out. Sounds like he's got a decent sized group man. I'm gonna be growing a fucking army here, bro. Ha! Fucking army man! Fuck a militia, we're gonna grow a fucking army!" (Gov't Ex. 493.)

On June 13, 2022, Fox told Morrison he was recruiting even more broadly. "I want to have a meeting next Saturday, possibly at my vacuum store in Grand Rapids on 36th and Division, right on the corner there. I have a secure basement where we could all kind of sit and talk. If you're down with that, let me know. I might have, maybe some other guys coming from a couple other militias. And then we'll kind of like talk, hypothetically, some shit that could go down." (Gov't Ex. 55.)

On June 20, 2022, in the basement of the Vac Shack, Fox recruited Wolverine Watchmen leadership representatives to his movement, including Ty Garbin and Paul Bellar. The next day, he told Croft about his success and future recruiting plans: "Yeah, I'm fully intending on bringing a ton of people with me, too. A lot of these Mich—excuse me, Wolverine Watchmen to come with, and then, if I get some from Michigan Home Guard, might have a couple from Michigan Liberty Militia." (Gov't Ex. 68.) He explained to CHS Dan at that training on July 11 that "our group is growing," and that he needed it to continue growing: "We got a few, four, five, six-man teams that are training, so. That's where it comes in man we get moving together four, five, six teams but then we get those four, five, six teams to be able to do it fucking together. And then we are a fucking kill squad dude. We will fucking be straight by then." (Gov't Ex. 101.)

On August 4, 2022, Fox explicitly acknowledged his leadership role in a conversation with CHS Dan: "[T]he way I feel like I can lead best, is by fucking example. I don't feel like I, I can be a good leader telling people what to do things. I think I can be a good leader by showing them what to do." (Gov't Ex. 133.)

14

Consistent with that sentiment, he organized the first (daytime) reconnaissance of the Governor's home on August 29, 2022, collecting participant Daniel Molitor along the way. During the drive, he told Molitor they were leading an even broader movement: "Basically, what we're hoping is that when we engage, it's inspirational." (Gov't Ex. 194.) Using internet data, he directed Molitor and CHS Dan to her home, stating, "Gretchen E. Whitmer. She about forty-nine years old? Pop this address in. Actually, her current address is [Redacted], Elk Rapids, Michigan." (Gov't Ex. 195.)

When they arrived, he directed Molitor to videorecord their reconnaissance for future tactical reference: "Alright, we're going one more time. Barricade, do me a favor, will you bro? Do slow-mo video real quick. Put this up against that window over there, and then press that button. Do a slow-mo video as we go by there." (Gov't Ex. 198.) He added, "It's in sight. Standby for go. Three, two, one, begin now. Take the whole neighborhood right here. And stop. Make sure you got it. Hopefully you motherfucking got it all, man." (Gov't Ex. 199.)

After the reconnaissance, he directed Molitor and CHS Dan to drive to a nearby boat ramp, from where they could launch a nighttime assault. "Right here. Hold on. Stop … Okay, Alright. The Lord sends the boat launch. That's a perfect fricking spot … go over and get the bitch, come back, hook the fucking trailer, pull the boat, drop the boat, take the bitch and go." (Gov't Ex. 197.) He directed them to find the local police department (Gov't Ex. 193), figure out how far to the nearest State Police post, and made a map of the neighborhood with estimated police response times. (Gov't Ex. 187.)

On September 12, 2020, Fox led other participants through a "kill house" exercise meant to simulate breaching the Governor's home. (Gov't Ex. 240.) He later recruited other participants to conduct a nighttime surveillance of the home. He briefed Caserta and state defendant Bill Null on his tactical plans, and rounded up multiple participants to view a video of explosives they could use in the plot:

> And, we're going to take another look tonight. Get eyes on it at nighttime. We are going to do two vehicles. If you guys are down, you want to roll? [UI] two. We have a menu of sorts to watch real quick. If you're down with the cause, this is something that we are going to be collectively raising money to go live, so. We're going to need some boom-boom. So, the [UI] guy is a baker. He didn't bring anything because its deer season and shit, [UI] couldn't come through with all the shit. He brought a video and shit. Big dump, so. Basically, a video of a bunch of shit being blown up, and it's basically a menu of what we can buy.
>
> So, gather the few of us [UI] that we are taking a ride tonight. We are going to leave here probably around eight o'clock, here in a couple of hours. Go get dinner and stuff. But we're going to go, we're going to take comms, two new vehicles, we're going to go put eyes on it again tonight, get another look at it from nighttime, and then we're going to mark a couple of things at night, because when we went up there at first, It's fucking perfect dude.
>
> There's a goddamn public boat launch on the other side of the lake from her, and its literally concealed by fucking trees, and then it's like, it's just, it's too fucking perfect man it really is. [UI] Take her on Birch Lake. Fucking shoot it out, there's one bridge going out of the fucking city. Blow that fucking bridge, that little PD can't get there, the closest police station is like twenty miles away on all fucking sides. That gives us a twenty-minute fucking time frame.

(Gov't Ex. 223.)

Participants Ty Garbin and Kaleb Franks, an FBI agent posing as the bombmaker ("UC Mark") and CHS Dan all testified that Fox and Croft gathered multiple participants to watch the explosives "menu" video. (Gov't Exs. 224, 226.)

16

They also testified that Fox took the lead in organizing the surveillance trip, assigning individuals to specific cars and missions. Fox and Croft took the first car, and inspected the highway M-31 bridge for a place to plant a bomb. (Gov't Ex. 230.) He assigned Ty Garbin, Kaleb Franks, and uncharged participant Brian Higgins to the second car, directing them to signal when they had found the Governor's house. (Gov't Exs. 242, 243.) He assigned twin brothers (and state defendants) Bill and Mike Null to the third car as a roving lookout.

The next day (September 13, 2020), Fox gathered Croft, Garbin, Franks, Harris, Caserta, Molitor, Bill Null, Mike Null, Brian Higgins, CHS Dan and undercover agents. Fox led the fund-raising pitch to acquire explosives, and instructed the other participants about the need for further reconnaissance:

> So, a lot of you went with us last night. You kind of know, what, like, you know, what our intentions are. It comes with a price tag. Now there's shit we got to do. To be able to do to them, so, things to do, shit we want to do, we can do easily, for like four grand. It's our job now. We got to pool this money together, I want to try to raise it in the next month because it's something we'll be sitting on. You never know, if we want to do this, it's going to be, being ready, but it's going to be opportunistic. Like it's going to be, when the, the asset arises there, boom, we got to go. Like that's another key reason why we need fucking, like, local intel. We need to get in with the locals a little bit. We're going to have to keep doing recon, kind of get in.

(Gov't Ex. 264.)

On September 19, 2022, Fox took the lead in attempting to organize another tactical training. He invited Garbin, Caserta, Harris, Franks and others to his workplace, where he stated, "I'm gonna get the basement of this store cleared and if anyone wants we can do a CQC [close quarters combat] training here" to "work on

acquiring an asset and detaining for extraction?" (Gov't Ex. 443.) He reminded his followers, "Well we need all the reps we can get, have 6 weeks til election and one week is ftx so let's utilize these 5 weekend best we can." (*Id*.) Fox later acknowledged that he had successfully solicited Harris to contribute money to UC Red, the supposed purveyor of explosives: "You know, I talked with Beaker [Harris], even said we can use, we've got a little bit of a pool thing going." (Gov't Ex. 276.)

On October 26, 2022, the State of Michigan convicted Wolverine Watchmen Joe Morrison, Pete Musico and Paul Bellar of providing material support for a terrorist act (that is, Fox and Croft's plot) after a jury trial.[2]

(3)   <em>Analysis</em>

(A)   <em>"Organizer or Leader"</em>

Fox will argue that his conspiracy had no defined rank structure, and other participants in his plot were not obligated to follow his orders. But the enhancement does not require the defendant to exercise direct decision making authority over five or more followers. Rather, it applies when the defendant is a leader *or organizer*, in a criminal activity that include five or more participants. As noted in *Kabir*, the exercise of decision-making authority is only one factor in leadership, and defendant need only have "some control" to satisfy it. Ironically, Fox himself recognized the distinction between leadership and decision-making authority when he told CHS Dan, "Everyone wants to just bark orders and tell people what to do but nobody wants to actually fucking go out there and put the work in themselves and show

---

[2] https://www.freep.com/story/news/local/michigan/2022/10/26/whitmer-kidnapping-plot-verdict-morrison-musico-bellar-guilty/69592973007/

them. That's the best kind of leaders. The guy that's down there with you doing the fucking work." (Gov't Ex. 133.)

The other factors (the nature of the defendant's participation in the commission of the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense) also show Fox was a leader or organizer in the activity. Until the Wolverine Watchmen met Fox, they were anti-government extremists without a coherent plan. It was Fox who first suggested they storm the Capitol. Fox proposed three possible locations for kidnapping the Governor, and tasked others with conducting surveillance. It was Fox who eventually decided her vacation home presented the greatest likelihood of success. Then Fox handed out the assignments for the nighttime reconnaissance of her home.

Fox also took the lead in recruiting in Michigan. He co-opted a large part of the Wolverine Watchmen as his army and helpers, and selected a cadre of operators from within that "militia" to carry out the kidnapping mission. He used a combination of social media advertising, video pitches and in-person recruiting (e.g., at Second Amendment protest rallies) to grow his ranks, until he had assembled the final "kill squad" he promised.

Finally, the degree of Fox's participation was unrivaled even by Croft. Fox wrangled the Wolverine Watchmen to Cambria, Wisconsin and Luther, Michigan for small-arms training. He planned and executed the daytime surveillance of the Governor's home, selected the approach and escape routes, and planned how to

thwart and avoid law enforcement. He led the nighttime surveillance and took the lead in raising money for explosives.

### (B) *Five or more participants*

The criminal activity in this case involved more than five participants. As noted in *Paccione*, the count must include the leaders themselves – Fox and Croft. The count must also include all persons who are criminally responsible, whether or not they were convicted. Both Garbin and Franks admitted their criminal responsibility, bringing the count to four. As held by the court in *Lacey*, the acquittal of Harris and Caserta does not foreclose the Court from finding them responsible by a preponderance of the evidence. Substantial evidence supports their responsibility, including Harris' suggestion that they "just cap" the Governor, and Caserta's enthusiastic support for "extract[ing] the asset." (Gov't Ex. 443.) Both trained alongside Fox, Croft, Garbin and Franks in the kill houses; and Garbin and Franks testified they were active members of the conspiracy. That brings the count to at least six. Finally, it must include Joe Morrison, Pete Musico, and Paul Bellar, who provided training locations and other assistance. Their recent convictions for material support to this conspiracy are firm proof of their involvement, and bring the total to at least nine participants.

### (C) *"Otherwise extensive"*

Even where the requisite five participants are lacking, the leadership enhancement applies where the "functional equivalent" of five – including both participants and non-participants whose knowing or unknowing services were used.

That additional number includes helpers like Daniel Molitor, who surveilled and video-recorded the Governor's home at Fox's direction on August 29; Brian Higgins, who drove the car Fox tasked with finding the Governor's home on September 12; and Bill and Mike Null, who drove the car Fox tasked as a "lookout" the same night.

Applying the *Carrozzella* factors adopted by the Sixth Circuit in *Anthony,* there were six charged participants, and at least seven more uncharged ones whose activities were organized by Fox and/or whose services were necessary to the criminal scheme. That brings the total to at least thirteen—an extensive criminal activity. The Court should recall that Croft called for attacks against the government in multiple states, but the plot only progressed beyond planning in Michigan. The reason was Fox, who fanatically embraced the cause, and persistently pushed his recruits to action.

### d.   Incomplete Conspiracy Reduction Not Warranted

Fox argues his guideline range should be reduced by three, because the offense was a conspiracy rather than a completed kidnapping. The sentencing guidelines provide the base offense level for attempt, solicitation, or conspiracy is the same as for the substantive offense, subject to any adjustments. USSG § 2X1.1(a). "If the offense is a conspiracy," however, the level is decreased by three "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or

interruption by some similar event beyond the defendant's control." USSG

§ 2X1.1(b)(2) (emphasis added).

The reduction is only to be applied when the arrest occurs well before the

defendant or any co-conspirator has completed the acts necessary for the

substantive offense. *United States v. Lyles*, 506 F. App'x 440, 452 (6th Cir. 2012).

*But see United States v. Quinn*, No. 17-4082, 2018 U.S. App. LEXIS 3289, at *2-6

(6th Cir. Feb. 12, 2018) (denial of § 2X1.1 reduction was harmless error where police

arrested conspirators before they completed burglaries needed to raise funds to

purchase explosives.)

In *United States v. McGarr*, 330 F.3d 1048 (8th Cir. 2003), the Hobbs Act

robbery conspirator argued the reduction should apply, because the government

failed to prove that, but for official interference, the conspirators would have carried

out the robbery. The district court "found that the conspirators had conducted

sufficient planning and had sufficiently set in motion those events necessary for

execution to make completion of the offense reasonably certain. In addition, the

district court found no meaningful indication that, absent official interference, any

of the conspirators were likely to abandon the enterprise," and properly denied the

reduction. *Id.*, at 1050.

The Fifth Circuit has laid out four non-exhaustive considerations to guide its

courts' application of the guideline:

> First, the § 2X1.1(b)(2) inquiry focuses on the substantive offense and
> the defendant's conduct in relation to that specific offense. Second, §
> 2X1.1(b)(2) does not require the reduction for a conspirator who has
> made substantial progress in his criminal endeavor simply because a

significant step remains before commission of the substantive offense
becomes inevitable. Third, in order to support a denial of the reduction
under § 2X1.1(b)(2), the circumstances must demonstrate that the
balance of the significant acts completed and those remaining tips
toward completion of the substantive offense. This requires that the
district court consider the quality of the completed and remaining acts,
not simply the relative quantities of each. Fourth, a sentencing court
should consider the temporal frame of the scheme and the amount of
time the defendant would have needed to finish his plan, had he not
been interrupted. As the completion of the offense becomes more
imminent, the reduction will become less appropriate.

*United States v. Soto*, 819 F.3d 213, 217-18 (5th Cir. 2016) (reduction properly
denied where court found defendants would have sent ammunition to Mexico but for
law enforcement intervention) *citing United States v. Waskom*, 179 F.3d 303, 308
(5th Cir. 1999) (determining whether a three-level reduction under § 2X1.1(b) is
warranted requires a fact-specific inquiry that "resists a precise standard.")

In Fox's case, a significant step remained before the commission of the
substantive offense became inevitable. That is, the defendants had not yet launched
their attack. But Fox and his co-conspirators had made substantial steps in the
criminal endeavor. Those included two reconnaissance trips, multiple training
exercises, and the acquisition of specialized weapons and equipment, including
assault weapons, body armor, and night vision equipment. The balance of the
significant acts completed and those remaining tipped toward completion of the
substantive offense. Fox had in fact already packed his "kidnapping kit," a backpack
containing zip ties, duct tape, and a combat knife. (Gov't Ex. 339.)

Fox and his co-conspirators also had enough time to complete their plan, had
they not been interrupted. In fact, Fox told the other conspirators they had only "six

weeks until the [November 2020] election," and they needed to "utilize these 5 weekend (sic) best we can." (Gov't Ex. 443.) Although the conspirators may have wanted explosives to blow up the M-31 bridge, they had already made all the preparations necessary to kidnap the Governor by the time they were arrested in October 2020. As Fox put it, "It's going to be opportunistic. Like it's going to be, when the, the asset arises there, boom, we got to go." (Gov't Ex. 264.) Because the completion of the offense was imminent, and there was no meaningful evidence that, absent official interference, any of the conspirators were likely to abandon the enterprise, the reduction is inappropriate. It should be noted that the Court did not apply an "incomplete conspiracy" reduction in either Garbin's or Franks' cases, and both were involved in the same conspiracy as Fox.

In *Unites States v. Rorrer*, 161 F. App'x. 518, 520 (6th Cir. 2005), the Sixth Circuit affirmed the district court's denial of the "incomplete offense" reduction because "co-conspirators had completed all the acts necessary on their part for money laundering, and the only remaining step, repayment of the loan, was up to a third party who was beyond the conspirators' control."  The same is true here: the only remaining step was for the Governor to appear at her cottage so they could launch their plan, but fortunately she was still beyond their control.

3.    <u>Statutory Sentencing Factors</u>:

The Court is required to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.  In determining the particular sentence to be imposed, the court must consider, among other things:

*a.*     *The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)):*

While the plot to kidnap a sitting state governor is shocking for its temerity, it is not without recent antecedents. For Fox's paranoid fantasies of government "tyranny," one need look no further than the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City. For the Three Percenters' myth that a small band of armed fanatics can overthrow an entire state, one finds a parallel in the ideology of the ISIS caliphate. The defendant's plan to use homemade explosive devices to kill and maim recalls the 2013 Boston Marathon bombing. And not all of the parallels preceded Fox's plot, either, as the insurrection of January 6, 2020 illustrated.

As to the characteristics of the offender, the Court should not be deceived by Fox's trial suggestion that his crimes were an understandable, if overblown, reaction to public health measures. He was already advocating the "Boogaloo" (overthrowing the government by physical violence) in 2019, before the SARS-CoV-2 virus appeared in China in December 2019, and long before U.S. states began implementing shutdowns in March 2020.[3]

Fox was not motivated by frustration with his economic circumstances, either. While he temporarily lived in a shop basement, he also spent thousands of dollars on assault weapons, ammunition, body armor and "good-faith" money for a bomb maker. As he highlighted in his own case, he spent substantial sums on

---

[3]https://www.cdc.gov/museum/timeline/covid19.html#:~:text=January%2010%2C%202020,%2DnCoV)%20on%20its%20website.

recreational drugs. He also spent numerous days traveling and training for terrorist acts, time that could have been profitably spent working to improve his material circumstances. As he told Croft on June 4, 2020 (two days before their meeting in Dublin, Ohio),  "I'm supposed to start that security detail tomorrow, and I might lose it 'cause I'm not missing our meeting this weekend. So, that meeting's really fucking important to me, dude. And I might be turning down a fucking contract for it. So, just want you to know that, that's where my hearts at. That's how important this shit is to me, is that I'm gonna probably miss out on a job because of it." (Gov't Ex. 488.)

The Court should also consider some of attributes of Fox's character that exacerbated the offense. For instance, he repeatedly referred to the Governor as "that tyrant bitch," discussed "hog tying" her, and boasted a desire to sexually abuse her. He asked in an encrypted chat, "you wanna stick it in her pooper?" before instructing CHS Dan to add "flash bangs" and a "hood for our asset" to the flex cuffs he already possessed. (Gov't Ex. 208.) In other words, it was not enough for Fox to overthrow the state — humiliating the Governor was an essential part of his plan to retaliate against and influence the government.

When co-conspirator Caserta proposed attacking the Governor's supposed "puppet masters," Fox replied, "Making people disappear is instilling fear." (Gov't Ex. 213.) When Caserta responded, "I want Zionist banker blood," Fox said, "Copy that." (*Id*.) And Fox repeatedly expressed a more general desire to plunge the country into chaos; as when he said, "In all honesty, I just, right now, I want to

make the world glow, dude. I'm not even fucking kidding, I just want to make it all glow dude. I don't fucking care anymore. I'm just so sick of it. That's what it's going to take for us to take it back. We're just going to, everything is going to have to be annihilated, man." (Gov't Ex. 123.) As he put it on the day before Independence Day, 2020, "In the eyes of my God, I will die a fucking saint. Covered in blood." (Gov't Ex. 75.) Fox's extremism, misogyny, hate, and misanthropy argue against a lenient sentence.

> b. *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A)):*

Had Fox and his co-conspirators succeeded in abducting the Governor, they might indeed have precipitated a spasm of violent social unrest. But as the Supreme Court has noted, "A conspiracy poses a threat to the public over and above the threat of the commission of the relevant substantive crime, because the combination in crime (a) makes more likely the commission of other crimes, and (b) decreases the probability that the individuals involved will depart from the path of criminality." *United States v. Jimenez Recio*, 537 U.S. 270, 272 (2003).

Fox and his co-conspirators traveled and trained across multiple states with weapons of war, always paranoid that they were being watched by unseen enemies. They experimented with and detonated an improvised explosive devices. They had no real plan for what to do with the Governor if they actually seized her. Paradoxically, this made them more dangerous, not less. The conspirators might easily have killed the Governor in a botched kidnapping, killed unsuspecting law

enforcement during a traffic stop or other unexpected encounter, or blown-up innocent bystanders with a negligently constructed bomb.

The sentence in this case must promote respect for the law, especially since the defendants planned to overthrow democracy, and attack law enforcement to do it. When Fox attempted to recruit witness Matt Keepers as a bomb maker in June, 2020, he explained, "I promise you, this will not be a social club. We don't back the blue…" (Gov't Ex. 444.) He told participant Daniel Molitor on August 29, 2020, "for all those fucking fence-sitters, and the other ones that are doing this with one foot in and one foot out. Or one foot with the police and one foot with trying to be constitutionalist. Let's just be honest, man; if you're a fucking patriot, if you're a militia person, if you're a Three Percenter in this country, and you can't say that I backed the fucking blue. I understand that those are everyday men and women, but they like us have a choice to make okay?" (Gov't Ex. 194.)

And Fox repeatedly advocated taking the law into his own hands, telling associates "the legal route will never succeed." (Gov't Ex. 164; R. 595: Trial I Tr., PageID.5562.) When he could not get a so-called "constitutional sheriff" to arrest the Governor, he suggested making a "citizens' arrest." (Gov't Ex. 20; R. 592: Trial I Transcript, PageID.4820.) Fox was correct that "the legal route" would never accomplish his aims, because those aims were criminal. The sentence should send a message that we resolve our differences at the ballot box and in the courts, not with guns, bombs, and zip ties.

28

Finally, the sentence must provide just punishment for the offense. The guidelines provide for a life sentence because Congress recognized kidnapping is an extremely serious offense. When the aim of that kidnapping is to terrorize the people and affect the conduct of government, it is so pernicious that only the most serious sanction is sufficient.

   c. *The need for the sentence imposed to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)):*

Deterrence is perhaps the single most important consideration in crafting a sentence in this case. As Fox told a potential recruit in June 2020, "I'm plugged in nationwide now bro. If you're serious about doing something, we should talk more … So where Oath Keepers at? Down to arrest the Governor?" (Gov't Ex. 494.) Anti-government extremist organizations like Fox and Croft's "Three Percenters" and the "Oath Keepers" of January 6, 2021, share a desire to tear down the government and replace it with some undefined construct. A guideline sentence will deter potential recruits from joining, or remaining in, their nationwide movement.

As trial testimony established, some "militia" adherents are interested in training and other ancillary activities, but balk at breaking the law. As Franks and Caserta discussed, some participants would "skedaddle" when the group started talking about kidnapping or "offing" people. (R. 595: Trial I Tr., PageID.5626-28.) Witness Joshua Miller, for example, did indeed quit the group when its violent aims became apparent. (R. 651: Trial I Tr., PageID.7560-61.) While hard-core extremists like Fox and Croft might not be deterred, a stiff sentence will increase the number of possible recruits who turn away at the invitation to commit political violence.

Congress recognized the paramount need to deter terrorism by imposing a sanction of up to life in prison. As the public became aware after January 2020, Fox's plot was a harbinger of more widespread anti-government militia extremism. The life sentence recommended by the United States Sentencing Commission would convince others to reject the lure of such extremism.

        d.     *The need for the sentence imposed to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C)):*

While Croft supplied ideas, ideology, bomb-making skills, and encouragement, Fox was the driving force urging their recruits to take up arms, kidnap the Governor, and kill those who stood in their way. Throughout June and July 2020, he attempted to enlist "bakers," (Gov't Ex. 66, 113) and even suggested using package bombs: "Maybe we just need to, like, party it out, make a cake, and send it. Full fucking send." (Gov't Ex. 122.) As the jury observed, he also repeatedly placed himself in volatile situations with loaded assault weapons and body armor, making another mass casualty shooting more likely with every appearance. (Gov't Ex. 5, 6, 58.) Unlike Ty Garbin and Kaleb Franks, Fox has expressed no remorse for his actions, making it more likely he will return to the same dangerous conduct if released.

        e.     *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6)):*

The Sixth Circuit has repeatedly held the sentencing disparities courts should avoid pursuant to U.S.C. § 3553(a)(6) are national disparities, not disparities among specific cases. *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007);

*see also United States v. Bass*, 17 F.4th 629, 636 (6th Cir. 2021) (improper to compare federal and state sentences). For 3553(a)(6) purposes, "the Guidelines … are 'our barometer for promoting nationwide sentencing uniformity.'" *United States v. Hymes,* 19 F.4th 926, 936 (6th Cir. 2021) (citation omitted).

Should Fox highlight the sentences of co-conspirators Garbin and Franks as points of comparison, it should be remembered that those defendants admitted their guilt, cooperated, and expressed remorse for their crimes. Moreover, neither of those defendants was convicted of conspiracy to use a weapon of mass destruction. Each received a reduced sentence for reasons specific to his own circumstances.

The Guidelines call for a life sentence for Fox.  The government, as it did even for Garbin, supports a guideline term for the conspirators, including Fox. While this Court has found particularized reasons to vary from an advisory Guideline sentence for others, there do not appear to be substantial grounds to do so for Fox.

Although Fox faces significant guideline enhancements, each is warranted. This was no "run of the mill" kidnapping plot. He targeted not just any victim, but an official victim; and not just any official, but the head of a state.  He was no follower; he was an active recruiter and prime mover. The terrorism enhancement here literally takes Fox's Guideline score off the chart. But it applies. His goal was not personal gain; it was a bona fide "revolution."

The kidnapping of the Governor and whatever the conspirators chose to do with her next were intended to intimidate (or inspire) in the pursuit of his political

aims. His goal predated the opportunistic circumstances he sought to exploit. Throughout the plot, he expressed no concern for risks to bystanders and specifically contemplated harming law enforcement as well as the Governor. Even without the terrorism enhancement, Fox would face a sentence of 30 years to life in prison.

This Court has wide discretion in sentencing. But Congress, by authorizing a term of up to life in prison, and the neutral Sentencing Commission, by advising a term of life in prison applies here, sends a clear message of just how serious a sentence is warranted for Fox. Public officials should never have to worry for their safety, or the security of their families, because of the hard decisions their jobs require. If our elected leaders must live in fear, our representative government suffers. A plan to kidnap and harm the Governor of Michigan is not only a threat to the officeholder but to democracy itself. The sentence imposed by this Court should reflect the incredibly dangerous threat posed by Adam Fox and Barry Croft's attempt to light the fire of a second revolution.

CONCLUSION

The words President Gerald R. Ford spoke at his inauguration are etched on the entrance to the federal courthouse: "Our Constitution works; our great Republic is a government of laws and not of men." This Court's sentence should affirm that message by demonstrating the rule of law will defend itself against political violence and anti-government extremism.

Respectfully submitted,

ANDREW BYERLY BIRGE
Attorney for the United States,
Acting under Authority Conferred by
28 U.S.C. § 515

Dated:  December 5, 2022          */s/ Nils R. Kessler*_____
NILS R. KESSLER
CHRISTOPHER M. O'CONNOR
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-2404
(616) 456-2404
*nils.kessler@usdoj.gov*