IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

                Plaintiff,                      Case No 1:20-CR-183-RJJ

V                                              HON. ROBERT J. JONKER

ADAM FOX et al.

                Defendant.

---

### DEFENDANT ADAM DEAN FOX'S SENTENCING MEMORANDUM

Now Comes Defendant Adam Fox, by and through Counsel, Christopher M. Gibbons of the Law Offices of Gibbons & Boer, and submits the following Sentencing Memorandum in this matter, sentencing is presently scheduled for December 28, 2022.

        A.        Application of Sentencing Guidelines

<u>§2M6.1 does not apply</u>

On December 7, 2022, the Court issued an order adjourning Adam Fox's sentencing and requesting that the parties address two issues with respect to the scoring of the sentencing guidelines. The first issue was whether the application of U.S.S.G §2M6.1 is appropriate in this case for the conviction of conspiracy to use a weapon of mass destruction. The court properly identified that the guideline does not apply to a conviction under 2332a(c)(2)(A). The notes specifically state "Weapon of mass destruction" has the meaning given that term in 18 U.S.C. § 2332a(c)(2)(B), (C), and (D). 18 USCS Appx § 2M6.1. The appropriate guideline is U.S.S.G

§2K1.4 which encompasses property damage by use of explosives. The application of this guideline brings the base offense level to 24 as the bridge in Elk Rapids falls under the definition of a street that is available for public use.

### §3D1.2(b) should be applied, and offenses grouped

The second issue raised by the Court is whether the two conspiracy convictions should be grouped together under USSG §3D1.2(b) because they involve the same victim and are connected by a common criminal objective. In the present case the offenses should be grouped together. The charged conspiracy to damage the bridge in Elk Rapids was directly related to the charged conspiracy to kidnap the Governor. The police were not the intended victims of the charged conspiracy to disable the bridge, they were an indirect or secondary victim. The application notes to the guideline state that indirect or secondary victims are not included in the term "victim" for the purposes of applying the guideline.

> The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. 18 USCS Appx § 3D1.2

The superseding indictment in this case made clear that the conspiracy to "blow up" the bridge in Elk Rapids was "in furtherance" of the plot to kidnap the Governor, who was the intended victim, and the common criminal objective was the kidnapping itself. (ECF 172 Page ID).

### § 3B1.1 Leadership should not be applied

Both the Government and the PSR support the imposition of a four-point enhancement for leadership. Adam Fox objects to the imposition of the leadership enhancement.

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. 18 USCS Appx § 3B1.1

2

In addition to the consideration of the factors listed above, the Sixth Circuit requires factual support that the Defendant had control over at least one other individual within the criminal enterprise to qualify for the leadership enhancement. "We also ***require control over at least one other individual*** within a criminal organization to merit an enhancement under U.S.S.G. § 3B1.1" (a). *United States v. Woodside*, 642 Fed. Appx. 490, 498 2016 (6th Cir.)  There is no evidence to support the argument that Adam Fox exercised control over anyone. In contrast, Garbin, Franks, and Harris all testified that Adam Fox Was *not* their leader.

The Government argues that Adam Fox suggested or selected the Governor's vacation home as the location for the "mission" and this should support the imposition of a leadership enhancement.  At trial, CHS Dan admitted that he was the first to raise the idea of finding the Governor's boat and then her vacation home.  On August 16, 2020, CHS Dan sent Adam Fox six texts in a row about the vacation home and telling Fox they needed "to get eyes on it" The idea, the initial notion to drive by the Governor's vacation home, came directly from CHS Dan, and he raised it two more times on August 17, 2020, and again the day after. On August 23, CHS Dan brings up "the trip North" saying "just getting physical eyes on it". CHS Dan told Adam Fox that the date of the drive would be Saturday August 29, 2020, not the other way around.  CHS Dan also invited others to go on the ride, including Daniel Harris and Adam's friend "Mikey". On that date, CHS Dan retrieved Adam Fox at the Vac Shack, and drove him to Elk Rapids, where FBI cameras were already installed on the Governor's property. Adam Fox did not plan or lead this activity.

While the underlying facts do not support the enhancement, the law regarding the enhancement does not support its application here either.  The application notes to the guideline make clear that having an idea or making a suggestion to commit a crime does not amount to leadership. "This adjustment does not apply to a defendant who merely suggests committing the

offense." 18 USCS Appx § 3B1.1 The critical factor with respect to this enhancement is the exercise of control over at least one other individual with criminal liability, i.e., not a CHS or UCE.

There is no evidence whatsoever that Adam Fox had any control over any other person. The Government noted that even simple acts of supervision, such as telling participants what to pack or how to train are sufficient to support a leadership enhancement, but they have no evidence that Adam Fox ever gave any instructions like this to any other participant.

Garbin, Franks, Harris, and Caserta, all members of "the Brick Squad", expressly rejected CHS Dans efforts to bring Adam Fox into the group. The testimony at both trials was clear, the other Defendants did not look to Adam Fox as a leader, they did not regard him as knowledgeable with respect to firearms, and they did not think his tactical skills were sufficient. Ty Garbin described Adam Fox's weapons as inferior and that he had made the effort to train Fox. The Government's narrative that Adam Fox was a leader was exactly that, a story. The evidence presented at both trials directly contradicts any claim that Adam Fox exercised control over even one member or participant.

<u>§2X1.1 Reduction for Conspiracy should be applied</u>

Both the Government and the PSR do not support awarding Adam Fox a 3-level reduction for conspiracy as provided by the Guidelines in §2X1.1. This reduction is mandatory unless the conspirators had completed all of the acts necessary for the successful completion of the substantive offense. The Governments assertion that the defendants had completed all the acts necessary to carry out either the kidnapping or the bombing of the Elk Rapids bridge is directly contradicted by the evidence presented by the Government at both Trials. The Government alleged that the Defendants were planning to approach the Governor's vacation home from the water in a boat, kidnap the Governor from her cottage and take her by motor vehicle to a path through a

4

private property down to Lake Michigan, where another boat would be waiting to take them out into the lake. The Government also alleged that the Defendants had conspired to acquire a "bomb", not that they had acquired it and were prepared to use it in the kidnapping plot.  The Defendant's had no boat to cross Birch Lake,  they had no boat to meet them in Lake Michigan, they had no established date upon which they intended to act. There is no reasonable argument that the group had completed the necessary steps to proceed on either offense of conviction.  As a result, the 3-level reduction for conspiracy should be awarded.

### §3A1.4 Terrorism Adjustment and Departure

Under the terrorism guideline, USSG §3A1.4 the Court can make a mandatory adjustment based on the motivations of the defendant and a conviction on an established list of crimes that are regarded as "federal crimes of terrorism". It must be contained on of a lengthy list of criminal violations contained in § 2332b(g)(5)(B). The mandatory adjustment requires the Court to consider the defendant as a criminal history category VI, the highest level reserved for those Defendants with the worst criminal records.  Application note 4 under the guideline, provides for a departure if the Court finds that the Defendant may have harbored the motive to commit a crime calculated to influence the or affect the conduct of government but had not committed one of the offenses listed in § 2332b(g)(5)(B). The offense of conspiracy to kidnap a State Governor is not contained in the list of offenses that are considered federal acts of terrorism. The offense of conspiring to use a weapon of mass destruction is contained in. § 2332b(g)(5)(B).

In addition, the sentencing guidelines permit the Court to depart downward if the Court finds that the mandatory imposition of the highest criminal history category over represents the seriousness of the defendant's criminal past.

> A judge determining that § 3A1.4(b) over-represents "the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes" always has the discretion under § 4A1.3 to depart downward in sentencing. *United States v. Meskini,* 319 F.3d 88, 92, 2003 (2nd Cir).

Defendant Adam Fox has never been convicted of a crime prior to his convictions in the present case. Adam Fox has no documented history of violence. A category VI criminal history substantially over represents his criminal history. Defendant Adam Fox requests that the Court make a substantial downward departure from the advisory sentences resulting from the recommended application of the Terrorism enhancement in the PSR.

### B. The Governments Sentencing Memorandum

The Government has provided to the Court a thirty-three-page memorandum replete with assertions that were otherwise challenged by Defendant Adam Fox at Trial. Were they all to be individually addressed it could consume hundreds of pages and all the effort would not change the outcome or where the Defendant finds himself, awaiting sentencing on his convictions in this case. Undersigned would, however, like to advance three key points in response to the Government's sentencing memo.

First, the Government in its sentencing memorandum, freely and frequently uses Adam Fox's language to paint Adam Fox a leader of a multi-state para-military organization that was sincerely plotting an attempt to kidnap the sitting Governor of the State of Michigan. At trial, Adam Fox, whether he testified in his own defense or not, was not permitted to use any of his prior statements on the recorded surveillance or in text messages. The Government freely used the audio surveillance and text messages, carefully selecting only the most damaging statements, and actively suppressed any exculpatory statements.

The Government actively and frequently objected to any of the trial Defendants attempts to use either the audio surveillance or the text messages, no matter how minimal. If a Defendant testified, he was not permitted to testify about any prior out of court statements, including their

6

own. Daniel Harris, who testified and was acquitted, was not permitted say that he expressly stated that he would *not* participate any attempt to kidnap the Governor.

Adam Fox's exculpatory statements were not available to him in his own defense, whether he testified in his defense or not. When CHS Dan raised the notion of kidnapping on July 27, 2020, Fox stated that "even if they did not hurt anybody", taking that kind of action would "devastate that community". CHS Dan ignored Fox's remarks.

Adam Fox could not use his statements to show the overall lack of seriousness in the kidnapping "plot". At an August 1st, 2020, barbeque the "plan", discussed while smoking huge amounts of marijuana, was to kidnap every Governor from every state, using a Blackhawk helicopter and a Huey. They also discussed an "ocean exit" by boat up the St. Lawrence River. The government played 19 seconds of audio from that meeting lasting nearly 5 hours.

Another example is a lengthy phone call between Adam Fox and CHS Dan on September 8, 2020. Adam Fox told CHS Dan that he did not want to take any immediate action, that the kidnapping "plot" should be put on "the back burner" and that they needed to go with the "bug out plan". In other out of court statements Adam Fox urged CHS Dan to seek medical treatment and have his visible hernia surgically repaired even if it meant months of recovery. This sharply contrasts the Government's assertions that Adam Fox intended to attempt the kidnapping before November 2020. In short, there is a very wide divide between the statements as presented in the Government's case and the entire content of the recordings and text messages.

Second, the Government makes several very specific claims about Adam Fox's conduct that are misleading and inaccurate. The Government advances that Fox "wrangled" the Wolverine Watchmen to Cambria, Wisconsin. The only members of the Wolverine Watchmen that went to Cambria, Wisconsin were invited by CHS Dan. They were transported to Cambria in an SUV rented by CHS Dan and paid for by the FBI. Adam Fox had literally nothing to do with their appearance in Cambria, Wisconsin.

7

The Government claims that Adam Fox organized the "recon" of the Governors vacation home on August 29th, when the CHS Dan admitted at trial that he suggested the trip and that he located the Governor's address, not Fox. The Government's memorandum is filled with claims that Adam Fox was organizing, leading, and giving tasks to others, particularly on September 12, 2020, when Fox and others drove to Elk Lake.  On the evening in question there were four individuals wearing functional audio surveillance equipment, UCE Mark, UCE Red, CHS Dan and CHS Robeson.  Adam Fox was in the presence of an operational recording device for the entire duration of the night's events from leaving Luther for dinner with Mark to returning to Luther in CHS Dan's vehicle and going to bed. The Government never produced a single audio clip of Adam Fox giving these orders or assignments during either trial proceeding. They were not produced because they do not exist.

In its sentencing memorandum the Government describes an individual, Joshua Miller, as leaving "the group when it's violent aims became apparent." (ECF 781 Page ID 10324) Adam Fox has never met or spoken to Joshua Miller. The Government claims that Adam Fox was attempting raise funds for the kidnapping plot when it was undisputed that Fox turned down the repeated offer of a $5,000.00 credit card on at least six occasions. CHS Dan testified under oath that he was told directly by the FBI to offer the credit card to Fox, which he never accepted. UCE Mark testified that Fox never asked him to contribute money.

The Government claims that Adam Fox "successfully solicited Harris to contribute money to UC Red, the supposed purveyor of explosives: "You know I talked to Beaker (Harris), even said we can use, we've got a little bit of a pool thing going." (ECF 781 Page ID 10313). Adam Fox did not say this and is not the speaker of these words, these words were spoken by *CHS Dan who was working for the FBI*. (See attached Govt's Ex. 276). These misleading assertions are unacceptable and have no place in any federal proceeding, much less in a proceeding where the Government is seeking a life sentence for a man with no criminal record whatsoever.

8

Third, the Government in its memorandum employs exaggerated language to create the false narrative of a terrifying para-military leader. Adam Fox is described as creating an army with a cadre of operators. For example, Adam Fox's conduct is compared to Timothy McVeigh who committed an actual bombing that killed 168 people, 19 of whom were children. These histrionic descriptions of Adam Fox do not rationally address his actual conduct and they do not accurately reflect either his actual intentions or his actual capabilities. Adam Fox was an unemployed vacuum repairman who was venting his frustrations on social media but abiding by the laws of the State of Michigan. Adam Fox is not the leader of an multi state "army" of domestic terrorists. The Government's descriptions of Adam Fox are calculated to frighten the public.

C. <u>Factors under 18 U.S.C. S3553(a)</u>

In approaching the determination of an appropriate sentence in a typical case the Court should first apply the sentencing guidelines and correctly calculate the guideline range. *Gall v United States*, 525 U.S. 38 (2007.) However, in this case, the guidelines as applied in the pre-sentence investigation report drive the guideline range to its extremes, burying the needle at the farthest end of the spectrum, just short of actual capital punishment. Neither the Defendant's acts nor his personal history supports the application of such an extreme sentence.

The Court should weigh the propriety of the provisional guideline range against the factors enumerated in 18 U.S.C. S3553(a). After considering the advisory range, the positions of the parties, and the factors, a sentencing court should impose a sentence that is sufficient, *but not greater than necessary*, to achieve the purposes of sentencing.

    1.    The nature and circumstances of the offense and the history and characteristics of the defendant.

        a.    The nature and circumstances of the offenses.

From early June 2020 until the day of his arrest in October Adam Fox was the subject of contact and pressure not only from CHS Dan but also by CHS Robeson. By early July CHS Dan

9

was having daily contact with Adam Fox and suggested illegal activity that ranged from attempted murder to malicious property crimes. These are facts, not arguments, CHS Dan admitted under oath that he had made these suggestions to Adam Fox. By July CHS Robeson was Adam Fox's "commanding officer". Fox was invited to meetings filled with inflammatory rhetoric delivered by Dan and by CHS Robeson both of whom manipulated not only Fox's sense of "patriotism" but also his need for friendship, acceptance, and male approval.  In addition, Adam Fox was operating under the unprecedented psychological pressure that was unique. The facts and circumstances leading to his arrest occurred during the shutdown of the entire global economy and the unusual restrictions placed on American citizens during onset of the Covid 19 pandemic. To the degree Adam Fox acquiesced to the influences and pressures on him it placed him at the center of events that have now led to his conviction for conspiracy to kidnap and conspiracy to use a weapon of mass destruction.

The crimes of conviction are inchoate, it is undisputed that there was no actual attempt to kidnap the Governor, and there was no attempt to purchase a "weapon of mass destruction". The sentencing guidelines do not provide any substantial downward departure, potentially four points, because this was an unrealized conspiracy. In contrast, they apply as if the actual kidnapping and bombing had successfully occurred.

      b.   The history and characteristics of the defendant.

Adam Fox is 39 years old.  Adam Fox had difficult childhood by any standard, including frequent physical abuse by his stepfather. There were intermittent and inadequate interventions by child protective services which resulted in his removal from his home environment, only to then return Fox to his abusive environment. On one occasion Fox was returned home wearing a "wire", which resulted in his stepfather's arrest. These constant disruptions and his otherwise unstable

home environment resulted in frequent disruptions in his education. Adam Fox changed grade schools on twelve occasions. In spite of these considerable setbacks, Fox graduated from High School in Potterville, MI. Fox's biological father, Dean Waggoner, played no role in his life. As an adult Fox legally changed his name from Waggoner, to Fox, his mother's maiden name.

The abuses and indignities that Adam Fox endured as a child were not expressed in the form of violence or criminality as an adult. Adam Fox has no criminal history and no documented history of violence. Adam Fox has never engaged in any criminal activity for profit or otherwise before or during the time he was being surveilled by the FBI. Not surprisingly, Adam Fox suffers from anxiety and depression. Prior to his arrest Adam Fox was smoking marijuana every day multiple times a day and openly smoked marijuana throughout the recorded surveillance in this case. In the ten years prior to his arrest, Fox worked at the Vac Shack, a vacuum repair business in Grand Rapids. In 2020 Fox was introduced into militia culture by his girlfriend, Amanda Keller. Keller played a central role in drawing Adam Fox into the orbit of CHS Dan and CHS Robison. By the summer of 2020, Adam Fox was, for the first time in his life being *included*. CHS Robeson had welcomed Adam into his "National Patriot III% Militia. CHS Dan invited Adam Fox to the trainings in Munith, Cambria, and Luther. Adam Fox had no friends, no home, and no money, but by June of 2020 he was riding around in CHS Dan's expensive truck, going to trainings, being treated to lunch, and being included.

Adam Fox, throughout the recorded surveillance made repeated statements to CHS Dan and others expressing the need to shut down, delay, or re-direct their efforts toward a different goal, but the suggestions were ignored or expressly overruled. In contrast to the repeated assertions of special agents under oath, Adam Fox never discussed murdering or harming the

Governor, in contrast on September 12, 2020, he stated "we're not out to kill anybody." (See Gov Ex 223)

> 2 and 3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense and to afford adequate deterrence for criminal conduct

The sentencing guidelines as applied in the pre-sentence investigation report fall so far over the contemplated maximum that they default back to a score of 43, which provides for up to life in prison.  This is largely due to the inclusion of significant enhancements, i.e., twelve points for Terrorism, six points for the targeting of an government official, and four points for leadership. These enhancements are designed to address the seriousness of the offense, but in the present case they result in a guideline sentence range that dramatically eclipses a fair and just assessment of the conduct of Adam Fox.  In addition, nothing in the guidelines addresses the unusual socio-political climate within which all his conduct occurred and nothing in the guidelines addresses the direct effect and influence that CHS Dan and CHS Robison had on the rhetoric and conduct of Adam Fox.

The guidelines drive a recommended sentencing range that would impose a sentence far greater than necessary to achieve the overall goals of promoting respect for the law and providing a just punishment.  The Sixth Circuit has held that a below guidelines sentence does not amount to ignoring or failing to consider the conduct supporting the enhancements and the presence of an enhancement does not mean that the crime is so serious that a variance is inherently unreasonable. See *United States v. Cherry*, 487 F.3d 366, 367, 2007 (6th Cir.)  The evidence presented was that Adam Fox discussed kidnapping Governor Whitmer with a Blackhawk helicopter and then stranding her on her own boat in the middle of Lake Michigan. There was no evidence that killing or harming the Governor was considered or discussed. The "plan" itself was unclear at best but it

involved multiple participants, multiple vehicles, and at least two boats. The Supreme Court has recognized that defendants who do not kill or intend to kill are categorically less deserving of the most serious forms of punishment *See Graham v. Florida*, 560 U.S. 48, 69, 130 S. Ct. 2011. The evidence presented at Trial was that the group, at its worst, was discussing abandoning the Governor in her own boat in Lake Michigan, yet guidelines here are driving the most serious form of punishment.

Undersigned objects to the imposition of a leadership enhancement. The Sixth Circuit considers the following list of factors: the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. Adam Fox did not recruit any of the charged Defendants, he did not know any of them. Except for Croft, Adam Fox was introduced to all the other defendants by CHS Dan. Fox had never actually met Croft, they were only connected on Facebook.

In addition, the testimony of Ty Garbin, Kaleb Franks, and Daniel Harris all weigh directly against the assessment of a leadership enhancement. All the defendants above testified that Adam Fox was not their leader. In addition to testifying that Adam Fox was not their leader all of the above Defendants testified that Adam Fox was inexperienced with weapons, and that he had inferior skills and tactical gear. Ty Garbin testified that he had provided tactical training to Adam Fox, not the other way around. The pre-sentence report states that Fox "led training exercises, provided weapons, and made decisions about the targets and timing of the planned attacks". Adam Fox did not lead or host any trainings, he did not provide any weapons, and he did not raise any funds as argued by the Government.

4. The need for the sentence imposed to protect the public from further crimes of the defendant

Adam Fox was 38 years old at the time of his arrest. He had never been convicted of a crime. There is no reason to believe that Adam Fox would engage in conduct that would result in further crimes or create any danger to the public.

5. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Adam Fox fully intends to avail himself of all educational and vocational training that is available to him. Adam Fox also intends to participate in any substance abuse treatment that would be available to him.

6. The kinds of sentences available.

With respect to this factor, the PSR guidelines range up to lifetime incarceration, and further provide for the imposition of a lengthy term of supervised release. The Sentencing Reform Act aims to create a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences. 18 U.S.C.S. § 3582(c)(2). *Hughes v. United States,* 138 S. Ct. 1765, 1768, (2018)

Both Ty Garbin and Kaleb Franks testified that they both had, along with Daniel Harris on a nature hike, agreed to go along with a "plan" to kidnap the Governor. Both Garbin and Franks testified that the role they were going to serve was as "operators', i.e., the tactical vanguard of the kidnapping. Garbin spent weeks converting his property in Luther, MI into a training facility, moving hundreds of used tires and re-grading the property with an excavator to create a firing range. This Court sentenced Ty Garbin to 75 months of incarceration and 3 years of supervised release. Kaleb Franks was sentenced to 48 months of incarceration and 3 years of supervised release. Both Garbin and Franks were given consideration for their cooperation with the Government. In a similar case, *United States v. Wright*, 747 F.3d 399, 407, 2014 (6th Cir), four

men were arrested for a failed attempt to bomb an interstate bridge in Ohio. In that case, the four men were provided with an inert fake "bomb" which they attempted to detonate under the bridge. The Sixth Circuit affirmed the District Court's substantial downward departure from the guidelines even with the application of the terrorism enhancement.

> In a memorandum issued after the sentencing hearings concluded, the court explained that it had opted to vary downward on the basis of the inert nature of the explosives, the CHS's role in facilitating the offense, and various individual characteristics of the defendants. Wright was sentenced to 138 months in prison for each offense, significantly below the guidelines range, which the court calculated as 324 to 405 months. Baxter received a sentence of 117 months and Stevens 97 months, also well under the court's guidelines calculations of 262 to 327 months and 188 to 235 months, respectively. *United States v. Wright*, 747 F.3d 399, 407, 2014 (6th Cir.)

In this case, there was no fake or inert explosives that changed hands. The defendants above had actually placed the fake bomb under the bridge and attempted to detonate it. In this case there was no bomb whatsoever. No funds were advanced to "Red" to pay for the "bomb". UCE Red testified that Adam Fox had made no attempt to contact him after Luther and had declined to take his phone number when he offered it to Fox. The lack of an actual explosive device, the extensive involvement of multiple CHS's at every stage, and the inchoate nature of the two offenses are each alone a suitable basis to sentence Adam Fox well below the guideline range. Taken together, these factors, as well as Adam Fox's history of law abiding behavior, certainly support a substantial variance from the sentencing guidelines in this case.

    Wherefore, Defendant requests that this Honorable Court to reject the Government's suggestion to impose the most extreme application of the sentencing guidelines and sentence Adam Fox with proportionality to the sentencing of Garbin and Franks, and more appropriately to his actual conduct.

December 9, 2022,                                        Respectfully Submitted,

                                                                   Christopher M. Gibbons
                                                                   GIBBONS & BOER

                                    Christopher M. Gibbons
                                    2404 Eastern Ave SE
                                    Grand Rapids, MI 49507